**EXHIBIT**

**7**

Alexander E. Jones; 22-33553

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN and SCARLETT LEWIS,** | § | **IN THE DISTRICT COURT** |
| *Plaintiffs,* | § | |
| | § | |
| **and** | § | |
| | § | |
| **DAVID WHEELER, FRANCINE** | § | |
| **WHEELER, JACQUELINE BARDEN,** | § | |
| **MARK BARDEN, NICOLE HOCKLEY,** | § | |
| **IAN HOCKLEY, JENNIFER HENSEL,** | § | |
| **DONNA SOTO, CARLEE SOTO** | § | |
| **PARISI, CARLOS M. SOTO, JILLIAN** | § | |
| **SOTO-MARINO, WILLIAM** | § | |
| **ALDENBERG, WILLIAM SHERLACH,** | § | |
| **ROBERT PARKER, AND ERICA ASH** | § | |
| *Intervening Plaintiffs,* | § | |
| | § | |
| **v.** | § | **459th JUDICIAL DISTRICT** |
| | § | |
| **ALEX JONES and FREE SPEECH** | § | |
| **SYSTEMS, LLC,** | § | |
| *Defendants.* | § | **TRAVIS COUNTY, TEXAS** |

## RESPONSE TO PLAINTIFFS' CHALLENGE TO NET WORTH DECLARATION AND MOTION FOR SANCTIONS FOR FALSE AND FRIVOLOUS PLEADING

This is the Response of Free Speech Systems, LLC ("FSS") to Plaintiffs' Challenge to Net Worth Declaration and Motion for Sanctions for False and Frivolous Pleading (the "Motion") filed by Plaintiffs Neil Heslin and Scarlett Lewis (the "Texas Plaintiffs"). This Response is supported by the Declaration of Ben Broocks, which is attached hereto as **Exhibit A**. FSS would respectfully show the Court as follows:

## I.
## INTRODUCTION

Plaintiffs ask the Court to rule that the Jones Declaration is insufficient under TRAP 24.1 for two reasons.

**As to FSS assets**, they claim that Mr. Jones's statement that FSS has no assets because the Bankruptcy Court 's Supplemental Order vested those assets in the Bankruptcy Estate of Jones, is false.  This claim also serves as the basis on which Plaintiffs ask this Court for sanctions.

**As to FSS liabilities**, they claim FSS improperly included BOTH the judgments in Connecticut in favor of fifteen Plaintiffs there for approximately $1.3B (the "Connecticut Judgment") and this Court's separate judgment in favor of two separate plaintiffs (Heslin and Lewis) in the amount of $50M (the "Texas Judgment") as liabilities in its calculation of net worth and that neither the Connecticut Judgment nor the Texas Judgment can be considered as a true liability.

Neither of these contentions has any basis in law or the facts.  Both requests should be denied.

**II.**
**FSS' ASSETS HAVE BEEN TRANSFERRED TO THE BANKRUPTCY ESTATE OF ALEX JONES**

The Motion asks the Court to find the Jones Declaration insufficient because FSS failed to establish that FSS has no assets, however this is entirely premised on their claim that the Supplemental Order was "nullified" by the Bankruptcy Court. The Texas Plaintiffs' claim is demonstrably false for numerous reasons.

**A. THIS COURT'S OWN TURNOVER ORDER RECITES THAT THE BANKRUPTCY COURT'S SUPPLEMENTAL ORDER IS VALID AND IN EFFECT**

The Texas Plaintiffs' claim that the Supplemental Order was declared void or nullified is conclusively established as false because the very order this Court entered on August 13, 2025 (the "Turnover Order") specifically recites the Supplemental Order as having continued viability. **Exhibit A-9**.  Below is an excerpt of the Turnover Order this Court was wrongly induced to enter

that references both the Initial Cash Order (sometimes called the "June Order") and Supplemental

Order that by its terms supplements the June Order (sometimes called the "September Order"):

> The Court also FINDS that Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i) as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

**Exhibit A-9**, p. 3. Notably, referring to the Initial Cash Order (or June Order) and Supplemental

Order (or September Order), the Turnover Order this Court signed, states that they "...vested

authority in the [bankruptcy] Trustee to take control of....[FSS], including its assets and bank

accounts." And further, orders turnover "subject only to the approval of the [Bankruptcy]

Trustee…". The Plaintiffs would never have included such a recitation of the September Order as

vesting FSS assets in the Jones Bankruptcy Estate if they actually believed it was void or had been

nullified. The fact that they did not proves that it is the Plaintiffs themselves who have committed

dishonesty in this Court.

Furthermore, the very paragraph referenced above was also included in the form of order

submitted in the original Application for Turnover, submitted jointly by the two Texas Plaintiffs

and the 15 Connecticut Plaintiffs. It was no mistake.

While no more is needed to refute Plaintiffs' bogus claim that the Supplemental Order was declared void or nullified, this Court's Turnover Order further specified that all relief related to FSS's assets was "subject only to approval of the Trustee":

> 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
> (i)      as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

**Exhibit A-9**, p. 3. There is no logical explanation for the inclusion of this caveat other than to demonstrate Plaintiffs' knowledge of the continuing viability of the Supplemental Order.[1]

Yet it is virtually the **exact** statement in the Jones Declaration that the Texas Plaintiffs now allege is false and worthy of sanctions, even referred to as "litigation misconduct" and "disturbing" by Plaintiffs' counsel, Mark Bankston, during the hearing on August 13, 2025. The motive behind this gamesmanship is to seek sanctions against Defendants at every turn to distract from the substantive issues. The Texas Plaintiffs' hypocrisy should not be tolerated and certainly could not be a basis for sanctions. Any question of the continued viability of the Supplemental Order should end there. But there is more.

**B. THE BANKRUPTCY COURT HAD NO JURISDICTION TO NULLIFY THE SUPPLEMENTAL ORDER**

According to the Texas Plaintiffs, (a) the Supplemental Order referenced above was "nullified" by Judge Lopez during a bankruptcy hearing that occurred on February 5, 2025, and thus (b) the statements in the Jones Declaration misrepresent the status of the "nullified order."

---

[1] Limiting the turnover "subject only to the approval of the [bankruptcy] Trustee" is meaningless; it is the Bankruptcy Court that must approve.

[Motion, p. 4].  Additionally, the Texas Plaintiffs' basis for requesting sanctions is that FSS's counsel "decided to file a pleading in this Court pretending the nullification never happened." [Motion, p. 11].  In addition to the fact that this Court's own order cites the September Order, nullification of the September Order did not occur because it could not legally occur because the Supplemental Order was at that time on appeal and the Bankruptcy Court was without jurisdiction to nullify or void that order.

As the United States Supreme Court has explained, the "filing of a notice appeal is an event of jurisdictional significance." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982). Such an appeal confers exclusive jurisdiction on the appellate court while divesting the lower court "of its control over those aspects of the case involved in the appeal." *Id*. The doctrine of exclusive appellate jurisdiction evolved as a judicially created doctrine designed to maintain the integrity of the appellate process. *See e.g.*, *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007). "This rule applies with equal force to bankruptcy cases" as it does to civil litigation. *In re Transtexas Gas Corp*., 303 F.3d 571, 579 (5th Cir. 2002).  Thus, the Texas Plaintiffs' claims that the February 2025 bankruptcy hearing resulted in the nullification of the Supplemental Order, is an impossibility under the law. *See e.g.*, *Sherman v. SEC (In re Sherman),* 491 F.3d 948, 967 (9th Cir. 2007)[2] and state law is the same.   *In re Martinez*, 478 S.W.3d 123, 126 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("After a trial court's plenary power over a final judgment has expired, the trial court generally cannot sign an order in the same case in which the court sets aside, vacates, modifies, corrects, or reforms its judgment, and an order in which the trial court does so

---

[2] *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

generally is void.") (citing *In re Sw. Bell Tel. Co.,* 35 S.W.3d 602, 605 (Tex. 2000)). The Bankruptcy Court lacked jurisdiction and was without power to void the Supplemental Order, even if that is what it desired.  Although the Texas Plaintiffs understand this fully, their Motion does not substantively address this other than to sheepishly acknowledge that there may have been a question on this issue.  But the claim "there may have been a question" is without citation to authority and inexplicable in that if they truly believed that, why didn't Plaintiffs themselves note the "question"?

### C. BANKRUPTCY JUDGE LOPEZ HIMSELF STATED HE DID NOT AND COULD NOT DECLARE THE SEPTEMBER ORDER VOID

As to what happened in February 2025, after the Bankruptcy Trustee's repeated disobedience of the Bankruptcy Court's order to sell FSS assets, an exasperated Bankruptcy Court did state in February 2025 that he was rescinding the Supplemental Order. While the Bankruptcy Court's exasperation was well justified, after it was pointed out to the Bankruptcy Court that the Texas Plaintiffs' perfected appeal of the Supplemental Order removed his jurisdiction to alter, expand or vacate an order while on appeal,  the Bankruptcy Court quickly corrected course and acknowledged that based on the pending appeal by the Texas Plaintiffs, it lacked jurisdiction to void the Supplemental Order, the Bankruptcy Court stating:

> THE COURT…I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.
>
> MR. JORDAN: It is, Judge.
>
> THE COURT: I lose jurisdiction over that immediately.

**Exhibit A-8, p. 8, l: 15 – 19.**   This is a statement the Texas Plaintiffs curiously -- or not -- do not address.  And Judge Lopez again reiterated this in the June 5, 2025 hearing where he said so on several occasions:

> THE COURT:  I don't think I modify the order --
>
> MR. JORDAN:  You didn't.
>
> THE COURT:  -- back in February.
>
> MR. JORDAN:  No.
>
> THE COURT:  The question is, do I do it now?  It's
> the question you're telling me.

**Exhibit A-1**, p. 47, lines 8-13. Judge Lopez repeated the fact that he did not have authority to nullify the Supplemental Order several times, including:

> The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I

…

> that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another

**Exhibit A-1**, p. 40, l: 5-8, 23-24. There is no ambiguity in Judge Lopez's ruling.

Judge Lopez elaborated and confirmed, yet again, that the Supplemental Order remains valid, acknowledging that all he denied was the Connecticut and Texas Plaintiffs attempt to control the auction of the FSS assets:

> THE COURT:  No, I agree.  I don't know how people are construing it.  Maybe I can provide some clarity there. There is an order out there.  That order, there was a sale, a proposed sale under that order.  He didn't -- I denied it.

**Exhibit A-1**, p. 48:10-13. If there was any doubt about the continuing viability of the Supplemental Order, Judge Lopez's statements confirming it is still out there should remove any such doubts notwithstanding that Judge Lopez denied the first and second effort to conduct an auction and compromise claims in that auction process by the Connecticut and Texas Plaintiffs.

### D.  NEITHER DID BANKRUPTCY JUDGE LOPEZ "NULLIFY" THE SEPTEMBER ORDER

The Texas Plaintiffs seem to make some kind of argument that while Judge Lopez may not have voided his September Order, he "construed and enforced his original sale order to find that the supplemental order was necessarily nullified following the unsuccessful auction."  Motion, p. 7.  But this, too, is spurious.

First, nowhere do the Texas Plaintiffs cite to Judge Lopez saying he was "construing" the Supplemental Order as being nullified.  To the contrary, Judge Lopez himself stated in the June 5 hearing he had not even modified it:

```
        THE COURT:  I don't think I modify the order --

        MR. JORDAN:  You didn't.

        THE COURT:  -- back in February.

        MR. JORDAN:  No.

        THE COURT:  The question is, do I do it now?  It's
   the question you're telling me.
```

**Exhibit A-1**, p. 47:8-13. If nothing else, from the above excerpt asking rhetorically in June "do I do it now?" demonstrates the Supplemental Order's continuing viability.

The Texas Plaintiffs desperate and unsubstantiated attempt to argue Judge Lopez was simply "interpreting" the Supplemental Order as being "nullified" is nonsense, as if "interpreting" the Supplement Order as being nullified is different from actually nullifying it. This is nothing more than a feeble attempt at misdirection.

And while nothing else is needed to show the absurdity of this argument, they do not answer the question of why they themselves (a) included the Supplemental Order in the form of Order they asked this Court to sign, (b) did not note their "interpreted as nullified" in any form of disclosure, and (c) why they included "subject to the approval of the bankruptcy trustee," whose "approval" would only be an issue if the Supplemental Order had viability.  The law is clear that one cannot do by "interpretation," what the law prohibits.

It is undisputed that the Supplemental Order transferred all the assets of FSS into the Bankruptcy Estate. It is this fact that undisputedly results in FSS having no positive net worth. Thus, the real issue here is not simply whether the Supplemental Order was "nullified" (it was not) or the legally nonsensical position the Supplemental Order was not nullified but interpreted as being "nullified," but whether Judge Lopez revoked or modified the Supplemental Order in a manner that one could reasonably interpret as effectively transferring the assets out of the Bankruptcy Estate and back to FSS.

The issue in the appeal brought by the Texas Plaintiffs was "[d]id the Bankruptcy Court err when ... it entered [the Supplemental Order]...that … vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones" and the filing of the appeal divested the Bankruptcy Court of its control over any aspects of the case involved in the appeal or covered by the notice. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 74 L. Ed. 2d 225 (1982) ("The filing of a notice of appeal … divests the district court of its control over those aspects of the case involved in the appeal."); *Evans v. Synopsys, Inc.*, 34 F.4th 762, 776 (9th Cir. 2022) (same).  Although the rule does not completely divest the lower court of subject-matter jurisdiction, it does bar a lower court from issuing or modifying orders involved in the appeal. *Pro Sales, Inc. v. Texaco, U.S.A., Div. of Texaco, Inc.*, 792 F.2d 1394 (9th Cir. 1986). This

bar extends to "proceedings that relate to any aspect of the case involved in the appeal." *Coinbase, Inc. v. Bielski,* 599 U.S. 736, 143 S. Ct. 1915 (2023).

Interpreting the Supplemental Order in a manner that actually transfers the assets from the Bankruptcy Estate to FSS is therefore impermissible under the law. The Texas Plaintiffs cannot overcome the fact that the Supplemental Order results in FSS having no assets, irrespective of how the liabilities are calculated

### E. THE SEPTEMBER ORDER CANNOT NOW BE VOIDED OR MODIFIED EVEN SHOULD BANKRUPTCY JUDGE LOPEZ WANT TO

Not only was the September Order not voided -- or nullified -- such could not occur now even if Judge Lopez were inclined to do so, because the September Order is now a final, non-appealable order -- it cannot be appealed or changed.

The Supplemental Order was issued in September 2024. On October 11, 2024, the Texas Plaintiffs appealed the Supplemental Order to the United States District Court but did not seek a stay of the Supplemental Order. **Exhibit A-4**. And on December 18, 2024, the Texas Plaintiffs filed a notice with the District Court stating that the issue in that appeal was "Did the Bankruptcy Court err when ... it entered [the Supplemental Order]...that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones." **Exhibit A-5**. Importantly and unaddressed by the Texas Plaintiffs is the argument that upon appealing the Supplemental Order, the Bankruptcy Court immediately lost jurisdiction to alter the Supplemental Order, which is unquestionably the law.

On November 11, 2024, the Connecticut Plaintiffs, who have convinced this Court to enter the current Turnover order stayed by the Austin Court of Appeals, intervened in the appeal acknowledging that at the hearing on September 24, 2024 that produced the Supplemental Order "the Bankruptcy Court stated that it would [enter] a supplemental order holding that control of all

FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy..." and went on to say that the Supplemental Order "clarified that... all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee."  **Exhibit A-6**, pp. 7-8.

On May 6, 2025, the Texas Plaintiffs here who had appealed the Supplemental Order and the fifteen Connecticut Plaintiffs and the Bankruptcy Trustee who had adamantly supported the Supplemental Order, voluntarily dismissed the appeal.  **Exhibit A-7**.  Thus, at the very latest by June 5, 2025 – i.e., 30 days after dismissal of the appeal – the Supplemental Order became a final unappealable judgment.  ***It cannot now be changed, modified or challenged***.

F. **DEFENDANTS' MOTION FOR RECONSIDERATION SOUGHT A RECONSIDERATION OF THE AUCTION, NOT THE SUPPLEMENTAL ORDER**

The Texas Plaintiffs claim that the Bankruptcy Court's not ruling on the Motions to Reconsider filed by First United America Company and FSS establishes that Judge Lopez was declining to reconsider his ruling in February "that the supplemental order was nullified." [Motion, p. 13]. However, in both reconsideration requests, the parties sought reconsideration of the Court's decision to not conduct a sale of FSS's assets.  During the June 5th hearing, in again confirming his lack of authority to void the Supplemental Order, Judge Lopez confirmed what he intended to communicate back in February:

> The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

**Exhibit A-1**, p. 40:5-15.

And Judge Lopez made very clear he was even in June deliberating whether to order another sale of FSS assets -- something impossible if the Supplemental Order had been declared void or nullified:

> The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And

**Exhibit A-1**, p. 49:6-11. This would be impermissible under Plaintiffs' interpretation of what occurred.

It is without question, that FSS has no assets.  Apart from consideration of liabilities

addressed infra, this in itself is sufficient to support the bond amount.

### III.
### FSS' LIABILITIES INCLUDE THE CONNECTICUT JUDGMENT -- AND WHILE UNNECCESARY SHOULD ALSO INCLUDE THE TEXAS JUDGMENT

In setting forth detailed information concerning FSS's assets and liabilities from which net worth can be ascertained, the Jones Declaration describes that the effect of the Supplemental Order vesting ownership of all FSS's assets in the property of the Bankruptcy Estate was that FSS has no assets and therefore "does not have a positive net worth for that reason alone." *See* Jones Declaration, ¶10.   Even excluding both of these two Judgments, it is undisputed that there is no "net worth" because there are no assets titled in FSS – the net worth is at best zero assets, if not negative.   And fifty percent of zero in calculating the bond amount equals zero. Thus, for that reason alone the Texas Plaintiffs' request that the Court declare it insufficient under TRAP 24.1 should be denied.

However, turning to liabilities, the Texas Plaintiffs ask the Court to rule that the Jones Declaration is insufficient under TRAP 24.1 claiming that FSS improperly included judgments as liabilities in its calculation of net worth.   But again, the Texas Plaintiffs play fast and loose with the law and the facts, intentionally conflating the $1.3B Connecticut Judgment as a liability -- which unquestionably must occur -- with the $50M Texas Judgment.   A reading of their Motion leaves it unclear whether Plaintiffs are saying neither judgment can be included.  If so, they cite no authority and are badly mistaken.

As to the calculation of liabilities, the Texas Plaintiffs have argued that FSS has pursued a frivolous argument by classifying a money judgment as a liability in a net worth calculation, which, according to the Texas Plaintiffs, is yet another mechanism whereby the Court should impose

sanctions.  Motion, p. 15.  But they do not say which judgment should not be considered:  the Texas Judgment?  the Connecticut Judgment?  Both?

Jones's Declaration lists the liabilities arising from both the $50M Texas Judgment and $1.3B Connecticut Judgment, setting forth detailed information as to both. While the Texas Plaintiffs complain that the judgments should not be included in the net worth calculation, which one?  If they are referring to the Connecticut Judgment, It is important to note first that the Texas Plaintiffs cite no legal authority for the contention that the Connecticut Judgment should not be included as a liability.

Second, it is also important to remember that this Court's August 13, 2025 Turnover Order in favor of the Connecticut Plaintiffs has found that the Connecticut Judgment is: "valid, final, and payable," and "final and [remains] unpaid." **Exhibit A-9**, pp. 1, 3. While Defendants do not concede this position, it is the law of the case and  it is not possible to argue anything short of the fact that this Court has found the Connecticut Judgment is "final".

 Third, the Texas Plaintiffs appear to conflate whether it is proper to include the Texas Judgment with the analysis on inclusion of the separate Connecticut Judgment.   All authority the Texas Plaintiffs, cite deals with inclusion of the Texas Judgment and does not address the Connecticut Judgment.

For example, Texas Plaintiffs rely on *Senior Care Living VI, LLC v. Preston Hollow Capital, LLC*, 695 S.W.3d 446, 456 (Tex. App.—Houston [1st Dist.] 2023, no pet.) for the proposition that "for the purposes of setting a supersedeas bond, Texas courts have held that the amount of a money judgment is a contingent liability and should not be included in the net worth calculation." Motion, p. 16. The Texas Plaintiffs' analysis of the holding of *Preston Hollow* is intentionally misleading, as it only even arguably addresses whether the Texas Judgment should

be included in the bond analysis, not the Connecticut Judgment. Moreover, *Preston Hollow* involved a bond financing structure to construct a senior living facility in Fort Bend, Texas and the $45 million construction loan Senior Care received. When Senior Care defaulted on its loan obligations, it sought a declaration from the trial court, confirming that it was not in default. The trial court entered a final judgment against Senior Care and Mark Bouldin (as guarantor on the note) and determined that Senior Care and Bouldin were jointly and severally liable in the amount of $52.5 million.

Senior Living filed a $10 bond, asserting that it had a negative net worth.  Important to the issue here, Senior Hollow's listed liabilities included the original $42.6 million in bonds payable, which remained unpaid and outstanding as a liability. In challenging the negative net worth declaration, Preston Hollow made the same argument Plaintiffs attempt here, which is to argue: the money judgment is a contingent liability and should not be included in the net worth calculation.  The Houston court made it clear that Senior Care's total liabilities are largely made up of the $42.6 million ***in bonds payable***, which is distinct from the underlying money judgment:

> While it is certainly true that those bond obligations form the basis of the underlying litigation—specifically, the dispute over whether Senior Care defaulted on the terms of the bond obligations, or whether Appellees breached the terms of the agreements—and the trial court's final judgment, the "money judgment of $52,847,040.86" was not identified as a liability in Bouldin's supplemental declaration, nor by Jordan at the June 9, 2022 hearing.
>
> …
>
> The liability created by the bonds and notes existed prior to the underlying litigation, and Appellees have not presented this Court with any precedent suggesting that this pre-existing liability transformed into a contingent liability because of the trial court's final judgment.

*Senior Care Living VI, LLC*, 695 S.W.3d at 457 – 58.  Here, it is undisputed that Jones and FSS are, jointly and severally, subject to a $1.3 billion judgment issued in Connecticut, which this Court

has already found to be "final."   This liability has nothing to do with this Court's $50 million final judgment, which has been bonded as to FSS.

And it is not even clear that the Texas Judgment itself should be excluded in liabilities, as including the Texas Judgment so is within the court's discretion. *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 914 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Thus, while the Connecticut Judgment provides more than adequate "liability" to offset whatever FSS assets may or may not be valued at, the Texas Judgment itself is includable at this Court's discretion.[3]   The declaration of Jones makes clear that:  "Based on the facts hereinafter set forth, FSS has no assets and liabilities that exceed $1,344,864,850.33. FSS has a negative net worth." Jones Dec., ¶1.  The Connecticut Judgment, on its own, demonstrates that FSS has a negative net worth. As such, the Court should deny the Texas Plaintiffs' request that the Court declare the Jones Declaration insufficient under TRAP 24.1.

### IV.
### SANCTIONS ARE NOT WARRANTED

The Motion requests sanctions under Rule 13 and Chapter 10 of Tex. Civ. Prac. & Rem. Code § 10.001. In essence, the Texas Plaintiffs make two separate arguments as to why sanctions should be assessed: (1) the Texas Plaintiffs' claim that Defendants' counsel "violated their duty of candor regarding events in the bankruptcy court" by misrepresenting the status of the Supplemental

---

[3] In true irony, the Texas Plaintiffs' prior briefing, which is incorporated into their present challenge, relied on *James Holmes, Superseding Money Judgments in Texas: Four Proposed Reforms to Help the Business Litigant and to Further Improve the Texas Civil Justice System,* 51 ST. MARY'S L.J. 69 (2020) and selectively quoted that: "there is no reported decision in which a trial court has concluded that a judgment liability should go onto a balance sheet so as to lessen overall net worth. All published decisions, rather, have allowed the trial court to keep the judgment liability off of the balance sheet." Motion, p. 15; *Id*. at 98-99.  Clearly the author is referring to the judgment in the case itself, i.e. the Texas Judgment, and not the Connecticut Judgment.  However this author goes forward and suggests that the judgment in the underlying case itself -- here the Texas Judgment -- should be included, arguing "First and foremost, Texas law should recognize a judgment liability as a balance-sheet liability for the judgment debtor Under GAAP accounting, a judgment liability is as inevitable and ascertainable as a liability can be…Texas law should adopt the GAAP accounting viewpoint on judgment liability." *Id*. at 101. Thus, their own authority, albeit a law review, argues this does not apply to the Connecticut Judgment but only the Texas Judgment.

Order; and (2) "[w]ith respect to the averment that the families' judgments create liabilities exceeding the company's assets, the argument is legally frivolous, as Defendant's counsel should (or did) know." [Motion, p. 16]. This Response establishes legal and factual support for all the allegations contained in the Jones Declaration making sanctions entirely improper.

Chapter 10 allows sanctions for pleadings filed with an improper purpose or that lack legal or factual support. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 362 (Tex. 2014). It provides that upon signing a pleading or motion, a signatory attests that:

> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]
>
> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Tex. Civ. Prac. & Rem. Code § 10.001. Pleadings that violate these Chapter 10 requirements are sanctionable. *Id*. § 10.004(a). ***But a court may not sanction a represented party under section 10.001 for unfounded legal contentions***. *Id*. § 10.004(d).

Rule 13 provides that pleadings that are groundless and in bad faith, intended to harass, or false when made are also sanctionable:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who . . . make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt . . . .

> Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law . . . .

Tex. R. Civ. P. 13. Importantly, Rule 13 does not permit sanctions on the issue of groundlessness alone. Rather, the filing in question must be groundless and also either brought in bad faith, brought for the purpose of harassment, or false when made. *Id*. "Groundless" for purpose of this rule means ***no basis in law or fact* and** not warranted by good faith argument for the extension, modification, or reversal of existing law. *Emmons v. Purser*, 973 S.W.2d 696 (Tex. App. 1998).

Courts should presume parties and their counsel filed all papers in good faith, and the party seeking sanctions must overcome that presumption. See Tex. R. Civ. P. 13; *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d. 725, 731 (Tex. 1993). The party seeking sanctions has the burden of showing its right to relief. *Id*. at 731.

First and foremost, sanctions are entirely improper and not warranted due to the simple fact that there was no misrepresentation of the status of the Supplemental Order as the Texas Plaintiffs argue in support for their request for sanctions (argued *supra*). Ample evidentiary support exists for Defendants' allegations about the status of the Supplemental Order, far exceeding the minimum standard of having "some basis in law or fact" (*i.e.,* not groundless) required by the Court.

As for the claim that "the averment that the families' judgments create liabilities exceeding the company's assets," if FSS has no assets, its net worth can be no more than zero.  But as demonstrated, there is no legal basis for not considering the Connecticut Judgment as a true liability.

Far from meeting their burden, the Texas Plaintiffs simply reference their prior briefing arguments as support for the contention that the claim is "legally frivolous" and worthy of

sanctions. The Texas Plaintiffs' arguments fail for multiple reasons. First, under Chapter 10, a court may not sanction a represented party under section 10.001 for unfounded legal contentions. Tex. Civ. Prac. & Rem. Code § 10.004(d). As to the substance of the Texas Plaintiffs' arguments referenced in their prior briefing that argues that "a money judgment is a contingent liability and should not be included in the net worth calculation". As argued in more detail above, the Texas Plaintiffs' argument was wrong at the time it was originally made, and it is equally wrong today. And not only that, the caselaw cited by the Texas Plaintiffs only states that the underlying judgment that is being appealed cannot be listed as a liability. No case holds that other judgments found to be final must be excluded from the calculation of net worth. Thus, it cannot be said that the averments completely lack any legal or factual basis. "A trial court has no 'discretion' in determining what the law is or applying the law to facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). What the Texas Plaintiffs are attempting to do is utilize the frustration this Court has previously expressed towards Jones and FSS and continue the pattern to argue that any argument advanced by Jones and FSS is a lie and made in bad faith.  This is entirely improper and is itself bad faith.

The Texas Plaintiffs have not, and cannot, overcome this burden to establish that Defendants' pleadings were groundless, much less have they proved the additional element that they were brought either in bad faith or for the purpose of harassment. *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d. 725, 731 (Tex. 1993); *see also New York Underwriters Ins. Co.*, 856 S.W.2d at 205 (trial court must find that pleadings are in fact groundless and brought in bad faith or to harass). While sanctions under Chapter 10 allows sanctions for pleadings filed without any evidentiary support, this Response establishes in substantial detail the legal and factual support for the pleading filed by Defendants. This is because the record clearly establishes the continuing

viability of the Supplemental Order. One cannot reasonably argue that there is no evidentiary support for the factual allegations contained in the Jones Declaration. Furthermore, this Response also establishes the legal support for Defendants' calculation of liabilities that result in either FSS's negative net worth or FSS's zero net worth, either of which fully justify the bond and the Jones Declaration of no positive net worth.  As such, this Court should deny the Texas Plaintiffs' request for sanctions.

**V.**
**CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, the Court should overrule the Texas Plaintiffs' challenge to the net worth of FSS and deny their request for sanctions.

Respectfully Submitted,

*/s/ Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**Broocks Law Firm, PLLC**
248 Addie Roy Rd, Suite B301
Austin, Texas 78746
(512) 201-2002 - Telephone
(512) 201-2034 - Fax
bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com

Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas 78401
Phone: (361) 884-5678
Fax: (361) 888-5555
Email:  sjordan@jhwclaw.com

aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

Alan B. Daughtry
State Bar No: 00793583
alan@alandaughtrylaw.com
3355 West Alabama, Suite 444
Houston, Texas 77098
Telephone:      (281) 300-5202
Facsimile:      (281) 404-4478

**ATTORNEYS FOR FSS**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2025, I served a copy of the above filing on all counsel of record via the Court's e-filing server in accordance with the Texas Rules of Civil Procedure.

*/s/ William Broocks*
William Broocks

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>   *Plaintiffs,*<br><br>and<br><br>DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO-MARINO, WILLIAM ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, AND ERICA ASH<br>   *Intervening Plaintiffs,*<br><br>v.<br><br>ALEX JONES and FREE SPEECH SYSTEMS, LLC,<br>   *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br><br><br><br><br><br><br><br><br>459th JUDICIAL DISTRICT<br><br><br><br><br>TRAVIS COUNTY, TEXAS |

## DECLARATION OF BEN BROOCKS

Pursuant to TEX. CIV. PRAC. & REM. CODE §132.001, I provide the following declaration in support of Defendant's Response to Plaintiffs' Challenge to Net Worth Declaration and Motion for Sanctions for False and Frivolous Pleading.

1. My name is Ben C Broocks. My date of birth is June 28, 1953, and my address is 248 Addie Roy Rd., Suite B-301 Austin, Texas 78746. I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2. I am an attorney of record for Free Speech Systems, LLC in this matter, accordingly, the facts as set forth herein are within my personal knowledge.

3. Attached hereto as **Exhibit 1** is a true and correct copy of the Hearing transcript in Southern District of Texas, Bankruptcy Case No. 22-33553 on June 5, 2025.

4. Attached hereto as **Exhibit 2** is a true and correct copy of an order enter on June 21, 2024 in Southern District of Texas, Bankruptcy Case No. 22-60043, Docket No. 956.

5. Attached hereto as **Exhibit 3** is a true and correct copy of an order enter on September 25, 2024 in Southern District of Texas, Bankruptcy Case No. 22-60043, Docket No. 1021.

6. Attached hereto as **Exhibit 4** is a true and correct copy of the Notice of Appeal of Supplemental Order filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 1.

7. Attached hereto as **Exhibit 5** is a true and correct copy of the Statement of Issues on Appeal filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-1.

8. Attached hereto as **Exhibit 6** is a true and correct copy of the Intervention in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 8.

9. Attached hereto as **Exhibit 7** is a true and correct copy of the Nonsuit filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 22.

10. Attached hereto as **Exhibit 8** is a true and correct copy of the Hearing transcript in Bankruptcy Case No. 22-33553 on February 5, 2025.

11. Attached hereto as **Exhibit 9** is a true and correct copy of an August 13, 2025 Turnover Order entered in Cause No. D-1-GN-18-001835.

FURTHER DECLARANT SAYETH NOT

EXECUTED on September 2, 2025 in Travis County, Texas.

_____

Ben C Broocks

Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,                    )   CASE NO: 22-33553
                                       )
                                       )   Corpus Christi, Texas
                                       )
          Debtor.                      )   Thursday, June 5, 2025
                                       )
                                       )   1:00 p.m. to 2:32 p.m.
-------------------------------)


HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                 BEN C. BROOCKS
                            Broocks Law Firm PLLC
                            6207 Bee Cave Road, Suite 120
                            Austin, TX 78746

                            SHELBY JORDAN
                            Jordan & Ortiz, PC
                            500 North Shoreline Blvd.,
                            Suite 804
                            Corpus Christi, TX 78401

For Chrsitopher R.          ERIN ELIZABETH JONES
Murray:                     Jones Murray LLP
                            602 Sawyer, Suite 400
                            Houston, TX 7007

                            JOSHUA WOLFSHOHL
                            Porter Hedges LLP
                            1000 Main, 36th Floor
                            Houston, TX 77002

For First United            WALTER J. CICACK
American Companies, LLC:     Hawash Cicack & Gaston LLP
                            711 W. Alabama Street, Suite 200
                            Houston, TX 77006

For Veronique                    AVI MOSHENBERG
De La Rosa:                      Lawson & Moshenberg PLLC
                                 801 Travis Street, Suite 2101, #838
                                 Houston, TX 77002


For William                      KYLE KIMPLER
Aldenberg:                       Paul, Weiss
                                 1285 Avenue of the Americas
                                 New York, NY 10019


For the U.S. Trustee:            HA MINH NGUYEN
                                 Office of the United States Trustee
                                 515 Rusk Street, Suite 3516
                                 Houston, TX 77002

Court Reporter:                  YESENIA LILA

Courtroom Deputy:                YESENIA LILA

Transcribed by:                  Veritext Legal Solutions
                                 330 Old Country Road, Suite 300
                                 Mineola, NY 11501
                                 Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Exhibit 1

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

Exhibit 1

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

Exhibit 1

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

Exhibit 1

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification.  Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES:  I think it's been assigned to Judge Rosenthal.

THE COURT:  That's what I understood. So, and they don't come any smarter --

MS. JONES:  That's correct.

THE COURT:  -- than Judge Rosenthal.

MS. JONES:  I agree 100 percent.

THE COURT:  So and I just, again, I'm relying on the text here.  Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007.  While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

THE COURT: Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS: Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then. It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT: I got it.

MR. BROOCKS: And --

THE COURT: Okay.

MR. BROOCKS: But I think by the end of the year, we should be closed with all of those.

THE COURT: Okay. Thank you.

MS. JONES: But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT: So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

Exhibit 1

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news.  I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments.  So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter.  So me having status conferences like this is really where I try to get the real information.

MS. JONES:  And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases.  But with respect to what the trustee needs to do, this is, this is where we are.  And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed.  So I think that case, for the most part, it's done.  I don't expect anything else in that case, at this point.

THE COURT:  Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler.  From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary?  Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG:  100 percent, Your Honor.  Let me start with the state court cases.  Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG:  Right.  Judge, I think that's a great idea.  We fully --

THE COURT:  I don't know if it's a great one, but it's an idea.  Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG:  Sure.  And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut.  We've reached a settlement on going forward.  And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor.  So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate.  But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT:  And so, but I don't want -- well, Let me hear from others.  What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

Case 22-33553   Document 1246-7   Filed in TXSB on 09/30/25   Page 51 of 158
Exhibit 1

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

Exhibit 1

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule.  Something happened at those arguments.  Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing.  I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT::  Mm hmm.

MR. JORDAN:  I mean.  And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have  time to get the cameras and stuff, I mean the audio.  But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here.  It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT:  Mr. Bankston represents the plaintiffs,

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this.  "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?"  Now, I'll stop there for just a second.  I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it.  I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself.  "What is, what is accomplished by this appeal?  The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties."  And then, Your Honor, this, this second page, I don't, I think that's all we've got.  I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did.  So that's okay.  I'm not willing to do that.  And, and so I want to point that out

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

Exhibit 1

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper.  We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there.  I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them.  We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to.  Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going.  But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal.  That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT:  The reply to which docket?

MR. JORDAN:  I'm sorry, to my motion.

THE COURT:  Oh, yes, yes.

MR. JORDAN:  When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court.  That's their response. And of course my reply then was wait a minute.  That is not how it works.  If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it.  Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal.  That was all correct.  Now it's not.  So now what's the effect of that?

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Exhibit 1

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something.  That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion.  It's not on sua sponte of the Court.

THE COURT:  Oh, I agree with that.

MR. JORDAN:  Okay.  So no one has asked you to do anything.  They've said, oh, it's all moot --

THE COURT:  No, I agree.  I don't know how people are construing it.  Maybe I can provide some clarity there.  There is an order out there.  That order, there was a sale, a proposed sale under that order.  He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard.  The trustee can move if he wants.  I know you can sell the equity.  And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before.  But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to.  Truste's got an offer.  Trustee will weigh.  Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

Exhibit 1

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

Exhibit 1

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT:  Where does the -- let me ask you a question.  It's a good question to ask.  FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical.  We'll just use X dollars in July of 2025 or through August, or the first six months of this year.  Right?  Where does that money go?

MR. JORDAN:  It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent.  So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations.  So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT:  Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones?  If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN:  See that's the dilemma.  If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT:  No, no.  I got it.  I got it.

MR. JORDAN:  Okay.

THE COURT:  It's an -- I understand the point.

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today. I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN:  And they purport to -- and we only found these this morning.  We weren't, we weren't ever served any notice, but we weren't parties to these adversaries.  These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these.  And my question, if I may ask the question, I'm not asking for an advisory opinion.  I just, this is the Court's order.  It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS.  And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court.  These were remand motions that I think they're, they're not the ones that we're involved in that's up for today.  But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem.  We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT:  No.

Exhibit 1

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

THE COURT: Mr. Broocks, good afternoon.

MR. BROOCKS: I'll be very brief, Your Honor. Thank you so much for entertaining this. I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review. They could. There's a specific doctrine there under a whole lot of cases called the Golden cases. It says even if you didn't raise a constitutional issue below, you can raise it here. So we asked them to do so. The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals. They didn't even use, I'll say the "C" word, Constitution. That was their argument. It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it. We are going to go to the U.S. Supreme Court. We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay. And the moment they start any aggressive action; we're going to do that. We have a petition we're working on right now. That's Connecticut.

Now in the Texas appeal, the argument was threefold. It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was.  I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that?  And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required.  The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are.  And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed.  The justice says, what could she have done?  I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself.  There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins.  That's

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial.  The only differentiating factor was the damages.  Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family.  Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis.  So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue.  You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs.  Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved.  We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do?  What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no.  They said we're not going to address it.

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that? I wasn't, I don't think I was led to believe anything. I think I was given documents that led to a conclusion under the law.

MR. BROOCKS: These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect. And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts. And they say if a default judgment, then you can't say it was fairly --

THE COURT: Aren't those matters for an appellate court at some point?

MR. BROOCKS: No, those are matters for you. These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT: You're saying collateral estoppel on something I've already ruled on?

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal. We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court.  I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand.  The Supreme Court will either take up review of this or it will not.  We are confident that the judgment will stand.  I don't believe the Supreme Court will even take review.  As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal.  So when you ask what's the federal issue for the Supreme Court to look at?  It's a pretty good question.  Mr. Broocks won't agree with any of that.  I don't need to convince you of any of that.  The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't.  They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients.  I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context.  It specifically said we're tired of being hurt on air.  If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created. We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side. I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me. I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's  really  technically  nothing  for  me  to  reconsider

because there's nothing, I haven't done anything. But I don't think my position has changed in terms of what I said in February. I want this case to continue to move . Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years. And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work. So I want to know, the trustee is going to tee up some non-exempt assets. We'll take those up in the ordinary course. We'll come back and figure it out. In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today. But if there's a lot of money sitting somewhere, then maybe we can think about that. But if courts rule, I'd like to know about them. We'll see where things go. Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing. Yes, sir.

MR. MOSHENBURG: Makes total sense, Your Honor. I completely echo what Mr. Kimpler just said. I just wanted to make sure the Court understood. I don't agree with their characterization. If any of that sticks, I'm happy to answer any questions about it.

THE COURT:  They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies.  That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up.  We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-60043 |
| FREE SPEECH SYSTEMS LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

## ORDER DISMISSING CASE

For the reasons stated on the record at the hearing held on June 14, 2024, this case is dismissed. It is further ORDERED:

1.      The employment of all professionals retained in these chapter 11 cases and the Subchapter V Trustee's service is terminated. Except as otherwise set forth below, the Debtor's CRO shall have no further responsibilities with respect to the Debtor's operations.

2.      The CRO is authorized to transfer control and signing authority with respect to the Debtor's bank accounts to Christopher R. Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander Jones, Case No. 22-33553.

3.      Final applications for compensation shall be filed no later than 14 days after entry of this Order.

4.      This Court shall retain exclusive jurisdiction over the following matters:

      a. Adversary Proceeding No. 24-3038, *Elevated Solutions Group, LLC v. Free Speech Systems LLC, et al.*;

      b. Adversary Proceeding No. 23-3127, *Free Speech Systems LLC v. PQPR, Limited Holdings LLC, et al.*;

      c. Adversary Proceeding No. 22-3331, *Neil Heslin, et al. v. Alex E. Jones, et al.*; and

      d. Applications for approval of professional fees and expenses.

5.      The Court retains jurisdiction to interpret and enforce this Order.

Signed:  June 21, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

Exhibit 3

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 25, 2024

Nathan Ochsner, Clerk

|  |  |
|---|---|
| **In re:** | § |
|  | § **Chapter 11** |
|  | § |
| **FREE SPEECH SYSTEMS, LLC,** | § **Case No. 22-60043 (CML)** |
|  | § |
| **Debtor.** | § |
|  | § |
|  | § |

### ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1. Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2. The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

Signed: September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | ) Chapter 11 (Subchapter V) |
|  | ) |
| **FREE SPEECH SYSTEMS LLC,** | ) Case No. 22-60043 |
|  | ) |
| **Debtor.** | ) |
|  | ) |

**NOTICE OF APPEAL**

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), pursuant to 28 U.S.C. § 158(a)(1) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure, appeal to the United States District Court for the Southern District of Texas this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024. A copy of the Supplemental Dismissal Order is attached hereto as **Exhibit A**.

The parties to the Supplemental Dismissal Order and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

| Party | Party's Attorneys |
|---|---|
| **Appellants**<br><br>Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine | **WILLKIE FARR & GALLAGHER LLP**<br>Jennifer J. Hardy<br>State Bar No. 24096068<br>600 Travis Street<br>Houston, TX 77002<br>Telephone: (713) 510-1766<br>Fax: (713) 510-1799<br>Email: jhardy2@willkie.com<br><br>**WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi (admitted *pro hac vice*)<br>Ciara A. Sisco (admitted *pro hac vice*) |

Exhibit 4

| | 787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Fax: (212) 728-8111<br>E-mail: slombardi@willkie.com<br>E-mail: csisco@willkie.com<br><br>**LAWSON & MOSHENBERG PLLC**<br>Avi Moshenberg<br>State Bar No. 24083532<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002<br>Telephone:  (713) 449-9644<br>E-mail:  avi.moshenberg@lmbusinesslaw.com<br><br>**CHAMBERLAIN, HRDLICKA,<br>WHITE, WILLIAMS & AUGHTRY, PC**<br>Jarrod B. Martin<br>State Bar No. 24070221<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>Telephone:  (713) 356-1280<br>Fax:  (713) 658-2553<br>E-mail:  jarrod.martin@chamberlainlaw.com |
|---|---|
| **Appellee**<br><br>Free Speech Systems, LLC | **O'CONNORWECHSLER PLLC**[1]<br>Annie E. Catmull (Texas Bar No. 00794932)<br>4400 Post Oak Parkway, Suite 2360<br>Houston, Texas 77027<br>Telephone: (281) 814-5977<br>E-mail: aecatmull@o-w-law.com |

---

[1] O'ConnorWechsler PLLC is Appellee's last known counsel.

2

Dated: October 8, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: slombardi@willkie.com
E-mail: csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail: avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: (713) 356-1280
Fax: (713) 658-2553
E-mail: jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

3

Exhibit 4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 8, 2024.

*/s/ Jennifer J. Hardy*

Case 4:24-cv-05036-YGR Document 46-1 Filed 01/10/25 Page 101 of 158
Case 4:23-cv-03830-YGR Document 124-7 Filed 11/04/24 Page 5 of 56
Exhibit 4

# Exhibit A

**Exhibit 4**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | § |
| | § Chapter 11 |
| | § |
| **FREE SPEECH SYSTEMS, LLC,** | § Case No. 22-60043 (CML) |
| | § |
| **Debtor.** | § |
| | § |
| | § |

### ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1. Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2. The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed:** September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

15564076

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 (Subchapter V) |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) |
| | ) |

**THE TEXAS PLAINTIFFS' STATEMENT OF ISSUES
AND DESIGNATION OF RECORD TO BE PRESENTED ON APPEAL**

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), under Rule 8009 of the Federal Rules of Bankruptcy Procedure, submit the following statement of issues and designation of items to be included in the record on appeal with respect to the Texas Plaintiffs' appeal of this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024.

**STATEMENT OF ISSUES**

1. Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

**DESIGNATION OF ITEMS FOR RECORD ON APPEAL**

The Texas Plaintiffs designate the following items to include in the record on appeal. Each designated item shall also include all filed exhibits attached to such item. Because the appeal of the Supplemental Dismissal Order relates in part to the companion bankruptcy action captioned *In*

*re Alexander E. Jones*, Case No. 22-33533, currently pending before the Bankruptcy Court of the

Southern District of Texas ("Jones Action"), the Texas Plaintiffs also designate items from that

docket in addition to the docket of the immediate Chapter 11 case ("FSS Action"). The Texas

Plaintiffs also designate this *Statement of Issues and Designation of Record on Appeal* for

inclusion in the record on appeal.

| ITEM NO. | DOCKET NO. | FILING DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 707 (FSS) | 8/29/2023 | Debtor's Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 2. | 740 (FSS) | 10/11/2023 | Joint Objection of the Sandy Hook Families to Debtors' Motion to Approve Employment Contract Pursuant to 11 U.S.C. Sections 105 and 363(b) |
| 3. | 741 (FSS) | 10/11/2023 | The Official Committee of Unsecured Creditors' (I) Reservation of Rights in Respect of Alexander Jones's Motion for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. § 503(b)(1) to the Extent Such Motion Is Not Withdrawn and (II) Limited Objection and Joinder in Respect of Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 4. | 823 (FSS) | 2/23/2024 | Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019 |
| 5. | 914 (FSS) | 5/28/2024 | Transcript of Hearing held on May 21, 2024 |
| 6. | 921 (FSS) | 6/2/2024 | Emergency Motion of the Connecticut Families for an Order Pursuant to Bankruptcy Code Sections 105(a) and 1112(b) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 7. | 684 (Jones) | 6/5/2024 | Emergency Motion for Entry of an Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 8. | 928 (FSS) | 6/7/2024 | Transcript of Hearing held on June 3, 2024 |
| 9. | 933 (FSS) | 6/11/2024 | Debtor's Emergency Motion for Court Instructions Regarding (1) Disposition of Debtors Property, and (2) Clarity as to the Chief Restructuring Officers Responsibilities and |

2

| | | | Authority, in the Event of Either a Dismissal of This Case or Conversion to Chapter 7 |
|---|---|---|---|
| 10. | 693 (Jones) | 6/12/2024 | Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on June 14, 2024 |
| 11. | 937 (FSS) / 695 (Jones) | 6/12/2024 | Jones's Witness and Exhibit List for Hearing on June 14, 2024 |
| 12. | 939 (FSS) / 696 (Jones) | 6/12/2024 | Additional Attachments to Alex Jones's Witness List and Exhibit List for Hearing on June 14, 2024 |
| 13. | 942 (FSS) / 697 (Jones) | 6/12/2024 | The Texas Plaintiffs' Witness and Exhibit List for Hearing on June 14, 2024 |
| 14. | 698 (Jones) | 6/12/2024 | The Official Committee of Unsecured Creditors' Notice of Filing of Supporting Parties' Conversion Order |
| 15. | 944 (FSS) / 699 (Jones) | 6/12/2024 | Connecticut Families' Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 16. | 702 (Jones) | 6/12/2024 | Statement of the Connecticut Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 17. | 703 (Jones) | 6/12/2024 | Statement of the Texas Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code (Amended) |
| 18. | 935 (FSS) | 6/12/2024 | FSS's Witness and Exhibit List for Hearing on June 14, 2024 |
| 19. | 936 (FSS) | 6/12/2024 | PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 20. | 941 (FSS) | 6/12/2024 | Additional Attachments to PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 21. | 938 (FSS) | 6/12/2024 | Melissa A. Haselden's Witness and Exhibit List for Hearing on June 14, 2024 |
| 22. | 943 (FSS) | 6/12/2024 | Jones's Response and Objection to Debtor's Emergency Motion for Court Instructions and Motion to Convert |
| 23. | 945 (FSS) | 6/12/2024 | The Texas Plaintiffs' Statement Supporting Dismissal of the Chapter 11 Case and Objecting to Conversion |
| 24. | 950 (FSS) / 706 (Jones) | 6/13/2024 | Connecticut Families' Updated Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 25. | 948 (FSS) | 6/13/2024 | Subchapter V Trustee's Report and Recommendation of Case Disposition |
| 26. | 951 (FSS) | 6/14/2024 | Debtor's Response to Motion to Convert |

3

Exhibit 5

| 27. | 953 (FSS) | 6/14/2024 | FSS's Revised Witness and Exhibit List |
|---|---|---|---|
| 28. | 955 (FSS) / 714 (Jones) | 6/14/2024 | Courtroom Minutes of June 14, 2024 Hearing |
| 29. | 708 (Jones) | 6/14/2024 | Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 30. | 709 (Jones) | 6/14/2024 | United States Trustee's Notice of Appointment of Chapter 7 Trustee |
| 31. | 956 (FSS) | 6/21/2024 | Order Dismissing Case |
| 32. | 957 (FSS) / 720 (Jones) | 6/23/2024 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 33. | 721(Jones) | 6/24/2024 | Transcript of Hearing held on June 14, 2024 |
| 34. | 959 (FSS) / 725 (Jones) | 6/24/2024 | Connecticut Families' Statement in Support of Trustee's Emergency Motion |
| 35. | 960 (FSS) / 726 (Jones) | 6/24/2024 | The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion |
| 36. | 961 (FSS) | 6/26/2024 | O'ConnorWechsler's Response to Chapter 7 Trustee's Emergency Motion |
| 37. | 732 (Jones) | 6/26/2024 | Chapter 7 Trustee's Witness and Exhibit List for Hearing on June 27, 2024 |
| 38. | 734 (Jones) | 6/26/2024 | Connecticut Families' Exhibit List for Hearing on June 27, 2024 |
| 39. | 758 (Jones) | 7/3/2024 | Transcript of Hearing held on June 27, 2024 |
| 40. | 829 (Jones) | 8/22/2024 | Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 41. | 845 (Jones) | 9/17/2024 | United States Trustee's Omnibus Objection to the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC, and Application to Employ Tranzon and Tranzon360 As Sale Broker |
| 42. | 847 (Jones) | 9/19/2024 | Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 43. | 848 (Jones) | 9/19/2024 | United States Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 44. | 849 (Jones) | 9/20/2024 | Jones's Limited Objection to Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 45. | 850  (Jones) | 9/20/2024 | Statement of the Texas Plaintiffs in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |

Exhibit 5

| 46. | 851 (Jones) | 9/20/2024 | Statement of the Connecticut Families in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
|---|---|---|---|
| 47. | 853 (Jones) | 9/23/2024 | Reply of the Trustee in Further Support of Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 48. | 854 (Jones) | 9/24/2024 | Proposed Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 49. | 859 (Jones) | 9/25/2024 | Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 50. | 861 (Jones) | 9/26/2024 | Transcript of Hearing held on September 24, 2024 |
| 51. | 1020 (FSS) | 9/24/2024 | Trustee's Proposed Order Supplementing Dismissal Order |
| 52. | 1021 (FSS) | 9/25/2024 | Order Supplementing Order Dismissing Case |
| 53. | 1028 (FSS) | 10/8/2024 | Notice of Appeal |
| 54. | 1029 (FSS) | 10/11/2024 | Election to Appeal District Court |
| 55. | 1030 (FSS) | 10/11/2024 | Clerk's Notice of Filing of an Appeal |
| 56. | 880 (Jones) | 10/15/2024 | Transcript of Status Conference held on September 11, 2024 |

## CERTIFICATION REGARDING TRANSCRIPTS

The Texas Plaintiffs hereby certify, pursuant to Federal Rule of Bankruptcy Procedure 8009(b)(1), that they are not ordering any transcripts. All transcripts have been prepared, are on the docket, and are designated in the foregoing designation of record.

## RESERVATION OF RIGHTS

The Texas Plaintiffs expressly reserve the right to (i) withdraw, supplement, amend or modify this Statement of Issues and (ii) move to strike any items included by Appellee in a designation of additional items. This filing is made expressly subject to, and without waiver of any and all rights, remedies, challenges, and objections.

Exhibit 5

Dated: October 22, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: slombardi@willkie.com
E-mail: csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail: avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: (713) 356-1280
Fax: (713) 658-2553
E-mail: jarrod.martin@chamberlainlaw.com

*Co-Counsel to the Texas Plaintiffs*

6

Exhibit 5

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 22, 2024.

*/s/ Jennifer J. Hardy*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re | |
| Free Speech Systems LLC, | Case No. 4:24-cv-03882 |
| Debtor, | (Appeal from Bankr. Case No. 22-60043) |
| Neil Heslin, et al, | |
| Appellants. | |

## MOTION OF THE CONNECTICUT FAMILIES TO INTERVENE PURSUANT TO RULE 8013 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

The Connecticut Families[1], as creditors and parties in interest in the above-captioned Chapter 11 case, by and through their undersigned counsel, file this motion (the "Motion") for entry of an order granting the Connecticut Families' motion to intervene as Appellees pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8013(g) in the appeal from the Bankruptcy Court's September 25, 2024 *Order Supplementing Order Dismissing Case* (the "Supplemental Dismissal Order," Bankr. Dkt. 1021[2]).  In support of the Motion, the Connecticut Families respectfully state as follows:

---

[1] The "Connecticut Families" are Erica Ash, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker.

[2] Citations to "Bankr. Dkt." refer to the Chapter 11 docket of FSS, Bankr. Case No. 22-60043 (Bankr. S.D. Tex.), while citations to "Jones Bankr. Dkt." refer to the Chapter 11 (now Chapter 7) docket of Alexander E. Jones, Bankr. Case No. 22-33553 (Bankr. S.D. Tex.).

Exhibit 6

## PRELIMINARY STATEMENT

1.      The Connecticut Families are, by far, the largest creditors of Free Speech Systems LLC ("FSS")—the subject of this appeal—and Alexander E. Jones ("Jones"), a now-Chapter 7 debtor who used to own and control FSS.

2.      The Connecticut Families have a strong interest in this appeal.  The appeal is an attempt by Appellants to secure the assets of FSS entirely for themselves, rather than through a fair and orderly liquidation process overseen by Jones's bankruptcy trustee.  Such a result would come at the direct expense of the Connecticut Families, who Appellants suggest should recover nothing.  The Connecticut Families actively participated in the briefing and hearing leading to the Supplemental Dismissal Order under appeal, in which the Bankruptcy Court rightly rejected Appellants' efforts.  The Connecticut Families seek intervention in this appeal of the order so they can continue to protect their interests.  Neither FSS nor Appellants would be prejudiced by the Connecticut Families' intervention.  Briefing on the appeal has not yet been scheduled.

3.      Accordingly, and as set forth in more detail below, the Connecticut Families respectfully request that the Court grant this motion to intervene.

## BACKGROUND

4.      FSS, was formed on November 16, 2007 as a limited liability company. Jones was its sole owner.  The Jones Chapter 7 estate, now administered by a bankruptcy trustee, holds FSS's equity interests.

5.      On July 29, 2022, FSS filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  (FSS Chapter 11 Subchapter V Voluntary Petition, Bankr. Dkt. 1.)  Jones subsequently filed a voluntary petition for relief under Chapter 11 in the Bankruptcy Court on December 2, 2022.  (Voluntary Petition of Alexander E. Jones, Jones Bankr. Dkt. 1.)

6.     The Connecticut Families are the surviving relatives of victims murdered in the Sandy Hook Elementary School shooting and one first responder.  For years following the shooting, Jones lied to his legions of followers by telling them that the Connecticut Families were "crisis actors" who faked their loved ones' deaths, and urged his followers to "investigate" the Connecticut Families and the Sandy Hook shooting. Jones's followers responded by stalking, harassing, and threatening the Connecticut Families, who suffered severe emotional and reputational harm, for which they ultimately sued and secured judgments against Jones and FSS.  As a result, the Connecticut Families are the largest creditors of FSS and of Jones.

7.     Specifically, the Connecticut Families hold claims totaling $1.4 billion against FSS and Jones arising from Connecticut state court judgments.[3]  (Claims No. 13– 16, 19–26, 32, 34–35, Bankr. Case No. 22-60043; Claims No. 7–21, Bankr. Case No. 22- 33553.)  While Appellants have also filed claims against FSS and Jones arising from claims they asserted in Texas state court,[4] those claims total $49.3 million in liquidated amounts to date.  (Claims No. 28–31, 33, Bankr. Case No. 22-60043; Claims No. 23–25,

_____

[3] *See Lafferty* v. *Jones*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court, Judgment on Verdict for Plaintiffs (Bankr. (Dkt. 509, Ex. A) (Oct. 12, 2022) and Memorandum Decision on Punitive Damages (Bankr. Dkt. 509, Ex. B) (Nov. 10, 2022).

[4] *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas, Notice of Final Judgment (Bankr. Dkt. 382, Ex. 1) (Jan. 13, 2023) and *Pozner* v. *Jones*, Cause No. D-1-GN- 18-001842, in the 261st District Court of Travis County, Texas, Amended Order on Plaintiffs' Motion to Compel and Motion for Sanctions (Oct. 15, 2021).  Two of Appellants' claims have yet to be liquidated.

3

27–28; Bankr. Case No. 22-33553.)  In other words, the Connecticut Families hold 96.7% of all liquidated claims against FSS and Jones, whereas Appellants hold 3.3% of liquidated claims.

8.  Of those amounts, at least $1.115 billion of the Connecticut Families' claims are non-dischargeable claims against FSS and Jones.  (Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03037, Dkt. 76.)  In contrast, $4.3 million of Appellants' claims are non-dischargeable claims against FSS and Jones.[5] (Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03035, Dkt. 46).

9.  On June 14, 2024, the Bankruptcy Court entered an order converting the Jones Chapter 11 case to a Chapter 7 case, (Jones Bankr. Dkt. 708), in which all of Jones' personal assets—including his 100% ownership of FSS—would be liquidated by a Chapter 7 trustee.  Because FSS would be an asset of the Jones Chapter 7 estate, the Bankruptcy Court entered an order dismissing FSS's Chapter 11 case on June 21, 2024. (Bankr. Dkt. 956).  However, because the Connecticut Families raised concerns that, unless FSS's case was also converted to one under Chapter 7, a dismissal could result in a "race to the courthouse" among FSS's creditors and inequitable distributions, the Bankruptcy Court specifically authorized the transfer of control and signing authority over the FSS bank accounts to the Jones Chapter 7 Trustee (the "Dismissal Order"), so

---

[5] Jones previously moved this Court for leave to appeal the Bankruptcy Court's interlocutory decisions on summary judgment regarding non-dischargeability.  Finding that Jones did not meet the requirements for interlocutory appeal, this Court denied those motions.  *See* Minute Entry and Order, *In re Alexander E. Jones*, Case Nos. 4:23-cv-04238, 4:23-cv-04240 (S.D. Tex. June 18, 2024).

4

that they could be administered as part of Jones's Chapter 7 bankruptcy estate and through a fair and orderly process. (Bankr. Dkt. 956).

10.    At the hearing leading to the Dismissal Order, Appellants had represented to the Bankruptcy Court that they were "surprised" by the Connecticut Families' concern about a race to the courthouse, and that they intended to work cooperatively with the Connecticut Families in collecting from FSS. (Jones Dkt. 721 at 178:15–16.) Yet within *two hours* of the Dismissal Order being entered, Appellants secretly filed (i.e., without notice to the Chapter 7 Trustee or the Connecticut Families) an Application for Turnover Order and an Application for Post-Judgment Writ of Garnishment in Texas state court. (Bankr. Dkt. 957, Exs. A [the "Turnover Application"] and C [the "Garnishment Application"].) Appellants immediately "ask[ed] that the [Texas state court] order Free Speech Systems to turn over all its nonexempt property," including money in its bank accounts, to them alone, so that Appellants—holders of 3.3% of liquidated claims against FSS—could recover 100% of FSS's assets, while the Connecticut Families—holders of 96.7% of liquidated claims against FSS—would recover *nothing*. (Turnover Application at 3, 5). Appellants sought this turnover notwithstanding the Bankruptcy Court's Dismissal Order—entered two hours earlier—vesting control of FSS bank accounts in the Jones Chapter 7 Trustee (Dismissal Order, attached to Appellants' Turnover Application at 13). The Texas state court granted the application and issued a turnover over approximately an hour later. (Bankr. Dkt. 957, Ex. B [the "Turnover Order"].) If the Turnover Order were enforced, it would have resulted in Appellants recovering all of FSS's assets for their own sake, to the exclusion of the Connecticut Families. Indeed,

5

that was the very purpose of Appellants seeking the Turnover Order and failing to give notice to the Connecticut Families.

11.     Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS.  (Bankr. Dkt. No. 957.)  The Connecticut Families filed a statement in support of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors.  (Bankr. Dkt. 959.)

12.     At a hearing on June 27, 2024, the Bankruptcy Court observed that Appellants' seeking of the turnover over clearly violated the intent of the Bankruptcy Court's Dismissal Order.  (*Id.* at 7:24–8:4 ["[I]t appears there's a conflict between what you asked for and got . . . and what I wrote in the order and what we talked about in the hearing.  And I read your motion, and I don't think you explained any of that to the state court judge."], 8:17–21 ["So I write an order turning something over to the trustee in his capacity to then determine, and for the reasons I state on the record, and then you file something on the record several hours later for the trustee to turn that over, right? Did I just get that right?"], 9:7–11 ["Because now you're requiring a Chapter 7 trustee [to turn over FSS bank accounts].  You didn't come to me.  You went to a state court who, quite frankly, had, you know – and you want a Chapter 7 trustee to comply with your – with

6

orders that potentially conflict with orders that I wrote."]) The Bankruptcy Court reiterated that the FSS bank accounts were under the control of the Jones Chapter 7 Trustee as of the original Dismissal Order. (Jones Bankr. Dkt. 758 at 5:1–10, 17:18–23, 19:16–24.)

13. On August 22, 2024, the Jones Chapter 7 Trustee moved the Bankruptcy Court for entry of an order authorizing the Chapter 7 Trustee to winddown FSS and sell its assets—including FSS's non-cash assets—pursuant to an auction process under Section 363 of the Bankruptcy Code. (Bankr. Dkt. 829.) Rather than challenge the Chapter 7 Trustee's authority to sell FSS's assets pursuant to Section 363 of the Bankruptcy Code, Appellants submitted a statement *in support* of the Jones Chapter 7 Trustee's winddown motion on September 20, 2024. (Jones Bankr. Dkt. 850). On September 23, 2024, the Connecticut Families submitted a statement of support as well (although noting that the pending turnover action in Texas state court was still an issue). (Jones Bankr. Dkt. 851.) The U.S. Trustee, however, objected to the motion to authorize the winddown of FSS, interpreting the Bankruptcy Code to mean that the Jones Chapter 7 Trustee held only the equity interests in FSS, not the intellectual property or other non-cash assets to be sold through the winddown process, and not the ability to sell that property through a Bankruptcy Court-approved sale. (Jones Bankr. Dkt. 845.) At a September 24, 2024 hearing in connection with the winddown motion, the Bankruptcy Court stated that it would clarify its Dismissal Order by entering a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy

7

Exhibit 6

case, rather than converting such case to one under Chapter 7. (Jones Bankr. Dkt. 861, Sept. 24, 2024 Hr'g Tr. 12:7–13:12, 26:12–28:1.)   Appellants, who appeared at that hearing, raised no objection to the Bankruptcy Court entering such an order.

14.     On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket.  (Bankr. Dkt. 1021).  This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee.  *Id.*

15.     Appellants filed a notice of appeal of the Bankruptcy Court's Supplemental Dismissal Order on October 8, 2024 (Bankr. Dkt. 1028).

## ARGUMENT

### I.     Intervention of the Connecticut Families Is Warranted

16.     Section 1109(b) of the Bankruptcy Code provides: "A party in interest, including the debtor . . . may raise and may appear and be heard on any issue in a case under [Chapter 11]."   11 U.S.C. § 1109(b).  Federal Rule of Bankruptcy Procedure 8013(g) provides that a motion to intervene in a bankruptcy appeal "must be filed within 30 days after the appeal is docketed" and must "concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate."   Fed. R. Bankr. P. 8013(g).  The Connecticut Families submit that intervention is warranted and appropriate under Bankruptcy Rule 8013(g) for the reasons set forth below.

17.    *Filing Within 30 Days.*    Appellants filed the Notice of Appeal in the Bankruptcy Court on October 8, 2024, which was docketed in this Court on October 11, 2024.  (Bankr. Dkt. 1028; ECF No. 1.)  This Motion is being filed timely within 30 days of docketing under Bankruptcy Rules 8013(g) and 9006 and Federal Rule of Civil Procedure 6.

18.    *Movant's Interest.*    There can be no credible dispute that the Connecticut Families have substantial legal and economic interests in the outcome of the Appeal.  As the largest unsecured creditors of FSS and of FSS's sole owner, Alex Jones, the Connecticut Families have a significant interest in the fair and orderly distribution of FSS's assets.  The Supplemental Dismissal Order was necessitated by Appellants' actions of seeking a turnover order and writ of garnishment mere hours after the entry of the original Dismissal Order in an attempt to secure all of FSS's assets for themselves, as opposed to a fair and equitable distribution to all creditors in their proportionate interests. The reversal of the Supplemental Dismissal Order would jeopardize this process by potentially allowing Appellants to seek to arrogate FSS's assets entirely for themselves, to the exclusion of the Connecticut Families.

19.    *Grounds for Intervention.*    The Connecticut Families seek to intervene to preserve the opportunity to participate in this appeal, including filing briefs and being heard at any argument.  As the largest creditors of FSS (and of Jones), the Connecticut Families are parties in interest in the underlying bankruptcy cases pursuant to Section 1109(b) of the Bankruptcy Code.  FSS is wholly owned by the Jones bankruptcy estate, whose Chapter 7 Trustee is defending the appeal on behalf of FSS.  (Bankr. Dkt. 1035.)

9

However, this appeal challenges the authority of the Jones Chapter 7 Trustee with respect to FSS's assets, and it is therefore essential for the Connecticut Families to be represented in addition to the Chapter 7 Trustee. Moreover, the Connecticut Families are one of two major creditor groups in the underlying bankruptcy proceedings. With FSS (via the Jones Chapter 7 Trustee, the sole equity owner of FSS) and the other major group (Appellants) separately represented in this appeal, the Connecticut Families should be afforded the opportunity to participate in the appeal too to preserve their interests.

20. *Whether Intervention Was Sought in the Bankruptcy Court.* The Connecticut Families appeared and actively participated in the FSS Chapter 11 proceedings and the related bankruptcy proceedings of Jones in the Bankruptcy Court below. The Connecticut Families did not need to seek to intervene in the Bankruptcy Court because, as creditors, they were parties in interest to the proceedings with standing to participate. The Connecticut Families participated fully in all briefing and hearings leading to June 27, 2024 Dismissal Order and the September 25, 2024 Supplemental Dismissal Order at issue in this appeal, including by presenting argument and evidence at the hearing leading to the Dismissal Order.

21. *Intervening at the Current Stage.* The Connecticut Families respectfully move to intervene at this time to preserve the opportunity to participate in all aspects of the appeal, with standing to be heard and defend their rights as significant creditors of FSS. Although the primary purpose of this appeal is to overturn the Supplemental Dismissal Order and thereby revive Appellant's effort to enforce the Turnover Order for their sole benefit (and at the exclusion of any recovery to the Connecticut Families), the

10

Appellants somehow failed to identify the Connecticut Families as relevant parties in this appeal, and no other parties to date have sought intervention.  Further, the intervention of the Connecticut Families would prejudice neither FSS nor the Appellants, as the record on appeal has not yet been transmitted to this Court, and no briefing schedule has been set.[6]

22.  *Participation as Amici Curie is Inadequate.*  Finally, it would not be adequate for the Connecticut Families to participate as *amici curiae*.  The Connecticut Families have significant interests in these appeals, which would not be fully protected by participation as non-parties.  Bankruptcy Rule 8017 requires leave of the court or consent of all parties for a non-party to file an *amicus curiae* brief, with such briefs facing a more restrictive page limitation (half of those allotted to parties), as well as leave of the court to be heard on oral argument.  Further, *amici* do not have standing should they wish to appeal any dispositions by the Court.  Given their ongoing and significant involvement in the underlying proceedings, the Connecticut Families should be permitted to participate in all aspects of this appeal as parties without the restrictions imposed on non-parties.

23.  Based on the foregoing, the Connecticut Families respectfully request that this Court grant leave for the Connecticut Families to intervene in the instant Appeal and be treated as "Appellees" for all purposes, as if originally named as such in the Notice of Appeal.

---

[6] On November 5, 2024, a notice of deficiency was issued on this docket indicating that Appellants had not yet designated the record, which had been due on October 22, 2024.  (Dkt. 2.)

WHEREFORE, the Connecticut Plaintiffs respectfully request that the Court enter the Proposed Order permitting the Connecticut Families to intervene as Appellees in this matter.

Dated:  November 11, 2024

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*_____
Ryan E. Chapple (Attorney-in-Charge)
State Bar No. 24036354
SDTX Bar No. 33327
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011

*Counsel to the Connecticut Families*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kyle J. Kimpler (*pro hac vice* pending*)*
Paul A. Paterson (*pro hac vice* pending*)*
Daniel A. Negless (*pro hac vice* pending*)*
Vida Robinson (*pro hac vice* pending*)*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Counsel to the Connecticut Families*

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (*pro hac vice* pending)
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Telephone: (203) 336-4421

*Counsel to the Connecticut Families*

12

Exhibit 6

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on November 11, 2024.

/s/ Ryan E. Chapple_____
Ryan E. Chapple

## CERTIFICATE OF WORD COUNT

This document complies with the word limitation set forth in the Court Procedures of the Hon. Charles R. Eskridge III because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 2,831 words

*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>Free Speech Systems, LLC,<br><br>Debtor,<br><br><br>Neil Heslin, et al,<br><br>Appellants. | Case No. 4:24-CV-03882<br><br>(Appeal in Bankr. Case No. 22-60043 (CML)) |

### STIPULATION OF VOLUNTARY DISMISSAL OF APPEAL
### PURSUANT TO FED. R. BANKR. P. 8023(a)

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (the "Appellants") and Appellees Christopher R. Murray solely in his capacity as chapter 7 trustee of the bankruptcy estate of Alexander E. Jones and sole owner of Free Speech Systems LLC, William Aldenberg, Erica Ash, Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Robert Parker, William Sherlach, Carlos M. Soto, Donna Soto, Carlee Soto Parisi, Jillian Soto-Marino, David Wheeler, and Francine Wheeler (collectively, the "Appellees," together with the Appellants referred to herein as the "Parties") hereby enter into this Stipulation and agree as follows:

1.  Appellants wish to voluntarily dismiss this Appeal pursuant to Federal Rule of Bankruptcy Procedure 8023(a).

Exhibit 7

2.    Appellees do not oppose dismissal of this Appeal.

3.    The Parties agree that each shall bear their own respective costs, fees, and expenses, including all attorneys' fees, incurred in connection with this Appeal.

4.    Federal Rule of Bankruptcy Procedure 8023(a) provides that "[t]he clerk of the district court . . . must dismiss an appeal if the parties file a signed dismissal agreement specifying how costs are to be paid and pay any fees that are due."

5.    Pursuant to Federal Rule of Bankruptcy Procedure 8023(a), the Parties submit this Stipulation requesting the voluntary dismissal of the above-captioned appeal.

Respectfully submitted this 6th day of May 2025.

| | |
|---|---|
| */s/ Erin E. Jones* | */s/ Jennifer J. Hardy* |
| **JONES MURRAY LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Erin E. Jones (TX 24032478) | Jennifer J. Hardy |
| 602 Sawyer St., Suite 400 | State Bar No. 24096068 |
| Houston, TX 77007 | 600 Travis Street |
| Telephone: (832) 529-1999 | Houston, TX 77002 |
| Fax: (832) 529-3393 | Telephone: (713) 510-1766 |
| E-mail: erin@jonesmurray.com | Fax: (713) 510-1799 |
| | E-mail: jhardy2@willkie.com |
| **PORTER HEDGES LLP** | |
| Joshua W. Wolfshohl (TX 24038592) | **WILLKIE FARR & GALLAGHER LLP** |
| 1000 Main Street, 36th Floor | Stuart R. Lombardi (*pro hac vice* forthcoming) |
| Houston, Texas 77002 | 787 Seventh Avenue |
| Telephone: (713) 226-6000 | New York, NY 10019 |
| Fax: (713) 228-1331 | Telephone: (212) 728-8000 |
| E-mail: jwolfshohl@porterhedges.com | Fax: (212) 728-8111 |
| | E-mail: slombardi@willkie.com |
| ***Co-Counsel for Christopher R. Murray, Chapter 7 Trustee*** | |
| | |
| */s/ Ryan E. Chapple* | |
| **CAIN & SKARNULIUS PLC** | **LAWSON & MOSHENBERG PLLC** |
| Ryan E. Chapple (TX 24036354) | Avi Moshenberg |

Exhibit 7

303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER PC**
Alison C. Stirling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL WEISS, RIFKIND WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul A. Paterson (admitted *pro hac vice*)
Daniel Negless (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: ppaterson@paulweiss.com
E-mail: dnegless@paulweiss.com
E-mail: vrobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail:
avi.moshenberg@lmbusinesslaw.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
Jarrod B. Martin
State Bar No. 24070221
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0388
Fax: (713) 576-0301
E-mail: jbmartin@bradley.com

***Co-Counsel to the Texas Plaintiffs***

Exhibit 7

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 6, 2025.

*/s/ Jennifer J. Hardy*
Jennifer J. Hardy

Exhibit 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND          )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF       )
UNSECURED CREDITORS,            )  Houston, Texas
                                )
        Debtors.                )  Wednesday, February 5, 2025
                                )
                                )  9:00 AM to 9:26 AM
------------------------------)


                          HEARING

       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:  SHELBY JORDAN
                         ANTONIO ORTIZ
                         Jordan & Ortiz, PC
                         500 N. Shoreline Blvd.
                         Corpus Christi, TX 78401

                         BEN BROOCKS
                         WILLIAM BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

For Chapter 7 Trustee:   JOSHUA WOLFSHOHL
                         KENESHA STARLING
                         JORDAN STEVENS
                         Porter Hedges LLP
                         1000 Main Street
                         Houston, TX 77002

                         CHRISTOPHER R. MURRAY
                         ERIN JONES
                         Jones Murray LLP
                         602 Sawyer Street
                         Houston, TX 77007

Exhibit 8

For Connecticut          KYLE KIMPLER
Families:                PAUL PATERSON
                         Paul Weiss Rifkind Wharton &
                         Garrison LLP
                         1285 Avenue of the Americas
                         New York, NY 10019

                         RYAN CHAPPLE
                         Cain & Skarnulis PLLC
                         303 Colorado Street
                         Austin, TX 78701

For Texas Plaintiffs:    AVI MOSHENBERG
                         Lawson & Moshenberg PLLC
                         801 Travis Street
                         Houston, TX 77002

                         JARROD MARTIN
                         Chamberlain Hrdlicka White Williams
                         & Aughtry, P.C.
                         1200 Smith Street, Suite 1400
                         Houston, TX 77002

                         JENNIFER HARDY
                         Willkie Farr Gallagher LLP
                         600 Travis Street, Suite 2310
                         Houston, TX 77002

Court Reporter:          UNKNOWN

Courtroom Deputy:        UNKNOWN

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Exhibit 8

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

Exhibit 8

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity.  They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity.  I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets.  That's what that order was intended to do.  The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process.  I won't recount what happened, but I didn't approve the proposed sale.  I had a – – I think the evidence is clear -- a backup bidder at the beginning.  We didn't even know what the winning bid was.  I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency.  There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency.  And the Trustee was

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

Exhibit 8

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers.  Connecticut family

Exhibit 8

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech. And now the Texas families are saying that the matter that they very much appealed, they're now embracing. The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order. But it was only for one purpose, to see if he could sell the assets. To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it. Ha Nguyen was here. The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed. I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again. Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate. Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed. I can't do that. I cannot do that. I don't have authority to do it. And I'm not going

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that. Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

Exhibit 8

most part. I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity. And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries. I'm going to settle these. I'm going to keep jurisdiction over these two things and this one. And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended. And I get to construe my own orders and I retain jurisdiction over them. This case will be highly simplified. And I know Mr. Wolfshohl said he's been listening to these transcripts carefully. I made it super simple for you this time.

There will be -- I don't know. Someone has a case, bring it. There have been multiple years of investigations. No lawsuits have been (indiscernible) in front of me. Maybe one is coming. I don't know. If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings. I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars. I'm sure

Exhibit 8

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

Exhibit 8

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

                         I N D E X


                         RULINGS

                                                Page      Line

Motion to Approve Sale, Denied                  16        8

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

Exhibit 9

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>    Plaintiffs | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and<br>FREE SPEECH SYSTEMS, LLC,<br>    Defendants | §<br>§<br>§ | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.).  Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

    (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid.  Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment.  The Turnover

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1. **Receiver's Information.**

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2. **Custodia Legis.** The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

---

ORDER REQUIRING TURNOVER AND APPOINTING RECEIVER  PAGE 4 OF 12

3.      **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

4.      **Continuing Effect of Order.** Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.      **Receiver's Powers.** Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

Exhibit 9

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6.    **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7.    **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8.    **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9.    **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

10.    **Receiver's Oath.** Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.    **Receiver's Fee.** Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.    **Receiver's Expenses.** Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13.     **Employ Professionals.** With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14.     **Limitation on Liability.** The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.    **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.     **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.     **Exempt Property**. Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18.     **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on ___August 13, 2025___.


_____
JUDGE PRESIDING