ACCEPTED
03-25-00617-cv
104941748
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 5:38 PM
JEFFREY D. KYLE
CLERK

No. 03-25-00617-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS

**EXHIBIT**

**12**

Alexander E. Jones; 22-33553

_____

FREE SPEECH SYSTEMS, LLC
*Appellant*,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
*Appellees*.

_____

On Appeal from the 459th District Court of Travis County, Texas
Trial Cause No. D-1-GN-18-001835

_____

**APPELLANT'S EMERGENCY MOTION FOR IMMEDIATE STAY OF VOID TURNOVER ORDER ISSUED IN VIOLATION OF THE BANKRUPTCY AUTOMATIC STAY**

_____

TO THE HONORABLE THIRD COURT OF APPEALS:

This is yet another case involving Alex Jones and his company, Free Speech Systems, LLC ("FSS") where attorney Mark Bankston has yet again led the

Honorable Judge Maya Gamble into significant error, this time the error requiring emergency relief which this Motion requests pending the appeal in this matter.[1]

Specifically Judge Gambe has now entered a void turnover order as to FSS assets and compounded this error by appointing a receiver over those assets. (Dec. Broocks**, Appendix A**).  That turnover/receivership order is void, not voidable, for a number of reasons and Defendant has filed a notice of appeal on this order, or in the alternative a motion for writ of mandamus, with respect thereto, although briefing has yet to occur.  Nevertheless, for a number of reasons Defendant asks this Court to stay the effectiveness of that Order until Defendant's appeal on the merits of this matter (or mandamus if appropriate) can be determined.

## I.     SUMMARY OF ARGUMENTS

### A. THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE IT VIOLATES THE AUTOMATIC STAY.

First, the turnover/receiver order is void as it violates the automatic stay of 11 U.S.C. §362(a).  The assets of FSS have been judicially transferred to and vested in the Chapter 7 bankruptcy estate of Alex Jones, where Christopher Murray has been appointed as Trustee, which Judge Gamble's turnover/receiver order acknowledges. As such FSS's assets are thus encompassed within the automatic stay provisions of

---

[1] This application is supported by the attached declaration of Shelby Jordan.  It is also supported by the attached declaration of Ben Broocks to which the referenced Appendix are attached by the indicated numbers.

§362(a) and cannot be made the subject of a turnover order.  As this Court itself has confirmed: If "... a party or state court takes action in violation of the bankruptcy stay, such action is void." *S. Cal. Sunbelt Developers, Inc. v. Grammer,* No. 03-19-00192-CV, 2019 Tex. App. LEXIS 11185, at *36 (Tex. App.—Austin 2019, pet. denied) (*citing York v. State*, 373 S.W.3d 32, 37-40 (Tex. 2012) and *Thuesen v. Amerisure Ins*., 487 S.W.3d 291, 297 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). Although apprised of this fact, Judge Gamble proceeded with entry of the turnover/receiver order notwithstanding, commenting: "So, I'm going to sign it. [Bankruptcy] Judge Lopez can scold everyone, including me, all the way from Houston, it's happened before, it can happen again." August 13, 2025, Transcript, p. 46, l: 6 – 9. (Dec. Broocks, **Appendix B**).   It is not about getting a "scolding" from a bankruptcy judge. It is about honoring the rule of law and not intentionally disregarding it.  Granting a turnover and allowing a receiver to take control of and make decisions under a void turnover order runs the risks of unnecessary but extreme prejudice and confusion.  This reason alone mandates the effectiveness of that Order be stayed until this Court can rule on the appeal.

**B. THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE IT WAS ENTERED IN FAVOR OF FIFTEEN STRANGERS TO THIS CASE -- NOT THE NAMED PLAINTIFFS -- AND THESE STRANGERS HAVE NO STANDING.**

Second, the turnover/receiver ordered was not entered in favor of the two Texas plaintiffs who received a judgment in Judge Gamble's court (i.e., Neil Heslin

and his former spouse Scarlett Lewis). Rather it was issued in favor of fifteen people who received a different judgment in Connecticut and now have brought their Connecticut judgment directly into a case that has nothing to do with them via intervention and they have done so after Judge Gamble lost plenary power.  They have done this because they want Judge Gamble's judicial assistance in collecting their Connecticut Judgment.  The fifteen Connecticut Plaintiffs, however, were not parties to the Texas case and thus are strangers to that action.  Moreover, these strangers were actually at one time opposed to the Texas plaintiffs (Heslin/Lewis) but now -- without evidence -- claim in their joint motion to enter the turnover order [Dec. Broocks**, Appendix C, p. 3**] that resulted in the Connecticut Plaintiffs' receipt of the Order, that the groups have worked out some kind of agreement among themselves:

> 4.      The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

This unsubstantiated agreement seems to include their selection of Judge Gamble as the one they want to assist them in their now-joint collection efforts.  But these fifteen strangers with their Connecticut Judgment have no justiciable interest in the Texas Judgment of Heslin/Lewis and therefore lack standing to request a turnover/receiver in a Texas case in which they were not involved to collect their

4

Connecticut judgment and which smacks of transparent forum shopping.   The turnover/receiver order was thus issued to strangers who lacking standing, which makes that order entered in their favor void.

**C. THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE THE TWO TEXAS JUDGMENT PLAINTIFFS AND FIFTEEN CONNECTICUT JUDGMENT PLAINTIFFS CANNOT USE A PROCEDURAL TURNOVER ORDER AS A DEVICE TO DEAL WITH SUBSTANTIVE ISSUES AMONG THEMSELVES VERSUS PURELY PROCEDURAL ONES**

A third and related reason is the Texas Supreme Court has made crystal clear that a turnover proceeding is purely procedural. *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577 (Tex. 2018) Yet here with the improper intervention of the fifteen strangers to the Texas Judgment of Heslin/Lewis, they have sought to interject Judge Gamble into the role of the arbiter of the collection agreement they claim to have independently reached, which role Judge Gamble has willingly accepted given her demonstrated antipathy towards Defendants.[2] On information and belief, the two Texas Plaintiffs and the

---

[2]  Judge Gamble's animosity towards Jones is apparent.  For example, all at the urging of attorney Mark Bankston, Judge Gamble  (i) entered a liability default judgment against media defendants Jones and FSS in violation of a host of United States Supreme Court cases that required the two Texas Plaintiffs to prove falsity of specific statements made by Jones and FSS, and also prove Jones/FSS's malice, with the Supreme Court mandating that plaintiffs prove malice by clear and convincing evidence; (ii) granted the two Texas Plaintiffs a post-trial pleading amendment to assert a punitive-damages cap busting claim asserting that the two Texas Plaintiffs were disabled; (iii) ruled that these two plaintiffs were disabled -- a determination to made by the Jury, and (iv) sanctioned Defendants and their attorneys at virtually every possible opportunity.

At the turnover hearing at which Defendants' counsel was not permitted to speak until Judge Gamble had already approved the turnover and sent it for typing, she said of Bankston. *See* App.  B, pp.5, 20.

Fifteen Connecticut Plaintiffs are not the only parties to this unsubstantiated "agreement." Rather, the turnover order itself recites that actions the receiver may take are "subject to the approval of the bankruptcy trustee" so that person is somehow a party although not named or joined. Additionally, on information and belief, at least three other people who are plaintiffs in cases in Texas that have yet to try, are believed parties to the agreement the Texas and Connecticut Plaintiffs reference but do not substantiate.[3] The turnover/receiver order is not a procedural turnover but a union of formerly adverse parties who now have selected Judge Gamble instead of the bankruptcy court, as the court they want to administer their collection agreement and adjudicate their internal disputes. But that kind of forum shopping is not permitted as it wrongly turns a "purely procedural" device into a substantive matter, forbidden by the Texas Supreme Court.

The balance of this Motion elaborates on these points and raises other issues, all of which justify this Court entering a Stay of the effectiveness of the turnover/receiver order until this Court hears the appeal of this matter.

## II.    THE TURNOVER/RECEIVER ORDER IS VOID AS IT VIOLATES THE AUTOMATIC STAY

The order at issue here (sometimes, "Order") is formally entitled "*Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as*

---

[3] Marcel Fontaine, Leonard Pozner, and Veronica De La Rosa.

6

*to Judgment Debtor Free Speech Systems, LLC."* A copy is attached as **Appendix A**. It was signed by Judge Gamble on August 13, 2025. The Order effects a turnover of all assets of FSS to a receiver, Greg Milligan, who was appointed by Judge Gamble.

The Order was originally sought by both the Texas Plaintiffs and the Connecticut Plaintiffs against both Alex Jones and his company FSS. [Dec. Broocks, Appendix C]. Jones is currently in bankruptcy court and matters related to turnover as to Jones were removed to the Bankruptcy Court where his bankruptcy case is currently pending. [Dec. Broocks, Appendix D]. Additionally, collection actions asserted against FSS have been stayed given the deposit of cash in lieu of a bond, which precludes collection of any portion of the Order on any assets of FSS. See TEX. R. APP. P. 24.1(f). [Dec. Broocks, Appendix E].

Given the removal to the bankruptcy court of claims pertaining to Jones and the deposit of cash in lieu of a bond, at the turnover hearing on August 13, 2025, after allowing Bankston to make a speech accusing FSS and its counsel of misleading the court with respect to the very matters herein addressed, Judge Gamble allowed the intervening Connecticut plaintiffs to press on for turnover and appointment of a receiver with respect to their Connecticut judgment. Allowing the intervening Connecticut Plaintiffs to proceed and then granting them turnover relief, was a willful violation of the automatic stay provisions of 11 U.S.C.A. §362(a).

7

The applicability of §362(a) to the Order, which addresses assets of FSS, turns on two orders issued by the United States Bankruptcy Court for the Southern District of Texas, both of which are referenced Judge Gamble's Order itself, namely an order entered by the bankruptcy court on June 21, 2024 (the "*June Order*") and another order entered on September 25, 2024 that supplements the June Order the "*September Order*").[4]  Here is the portion of Judge Gamble's Order referencing both the June and September Orders entered by the bankruptcy court that specifically state that FSS assets have been transferred to the Bankruptcy Estate of Jones and are thus protected by §362(a):

---

[4] At the start of the August 13, 2025 hearing Judge Gamble allowed Mark Bankson to make an impassioned and largely false claim that the September Order had been declared void by the bankruptcy judge who entered it in the first place and refused to let FSS counsel address this vastly false statement before she entered the Order.  [Appendix B, pp.5 - 17]. When FSS's counsel was finally allowed to speak after Judge Gamble had granted the Order it was first pointed out that this while Bankston claimed the September Order was void, the very form of the order tendered asking her to sign recited the September Order and its effectiveness and that recitation remained even in the revised order the Connecticut Plaintiffs asked be entered.  [Appendix B, pp. 37 - 39].  Judge Gamble did not care.

> **The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i) as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

Appendix A, p. 3. Notably, referring to the June and September Orders, Judge Gamble's Order states that they "...vested authority in the [bankruptcy] Trustee to take control of ...[FSS], including its assets and bank accounts." And further, orders turnover "subject only to the approval of the [Bankruptcy] Trustee," which clearly shows knowledge of the continuing viability of the September Order.[5]

That recitation is sufficient to demonstrate that FSS assets sought to be turned over were then and are now in the control of the Trustee of the Bankruptcy Estate of Alex Jones and protected by §362(a). But the September Order actually goes further and not just *gives* the FSS assets but vests the assets themselves in bankruptcy estate of Alex Jones – i.e. a transfer. Here is what the September Order actually says:

---

[5] Limiting the turnover "subject only to the approval of the [bankruptcy] Trustee" is meaningless; it is the Bankruptcy Court that must approve.

> 1.      Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

Dec. Broocks, Appendix F.

Indeed, Heslin/Lewis actually appealed the validity of the September Order to the United States District Court on October 11, 2024.  *See* Dec. Broocks, Appendix G, Dkt. 1.  And on December 18, 2024, filed a notice with the District Court stating that the issue in that appeal was " Did the Bankruptcy Court err when ... it entered an order [Docket No. 1021...that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones." *See* Dec. Broocks, Appendix H, Dkt. 14-1.  The Bankruptcy Trustee –who has not been made a party to this turnover/receiver order -- was designated as the appellee. *See* Dec. Broocks, Appendix I, Dkt. 14-2.

On November 11, 2024 the fifteen Connecticut parties who convinced Judge Gamble to enter the void turnover order actually intervened in the appeal acknowledging that at the hearing on September 24, 2024 that produced the September Order " the Bankruptcy Court stated that it would [enter] a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—

which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy..." and went on to say that the Supplemental Order "clarified that... all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee."  Dec. Broocks, Appendix J, pp. 7-8.

On May 6, 2025, the two Texas plaintiffs here who had appealed the September Order and the fifteen Connecticut Plaintiffs and the Bankruptcy Trustee who had adamantly supported the September Order, voluntarily dismissed the appeal.  Dec. Broocks, Appendix K, Dkt. 22.  Thus, at the very latest by June 5, 2025 –30 days after dismissal of the appeal – the September Order became a final unappealable judgment.  It cannot be challenged.

Based on the arguments Texas and Connecticut made at the August 13, 2025 hearing and assuming they will be re-raised here, particularly those of Mark Bankston, it is expected the false argument will be made to this Court that in a hearing on February 5, 2025, the Bankruptcy Judge declared the Order void. At the very best, this is a false "half-truth."

First, the fact that the September Order has not been voided is established because the very order the Texas and Connecticut Plaintiffs asked Judge Gamble to sign [Appendix C, proposed order p. 3] -- and the one she did sign [Appendix A] -- specifically recites the September Order as having continued viability.  The relevant

11

portion of her Order is quoted verbatim *supra*.  Any question of the continued viability of the September Order should end there.  But there is more.

By way of brief background, after the Bankruptcy Trustee's repeated disobedience of the Bankruptcy Court's order to sell FSS assets, an exasperated Bankruptcy Court did state in February 2025 that he was rescinding the September Order. While the Bankruptcy Court's exasperation with the Texas and Connecticut parties was well justified, after it was pointed out to the Bankruptcy Court that a perfected appeal removed his jurisdiction to alter, expand or vacate an order while on appeal,[6] the Bankruptcy Court quickly corrected course and acknowledged that based on the pending appeal by the Texas Plaintiffs, it lacked jurisdiction to void the Supplemental Order, the Bankruptcy Court stating:

> THE COURT…I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.
>
> MR. JORDAN: It is, Judge.
>
> THE COURT: I lose jurisdiction over that immediately.

Dec. Broocks, Appendix L, p: 8, l: 15 – 19.  And this lack of authority was again repeated several times by the Bankruptcy Court at a June 5, 2025 hearing where the Bankruptcy Court stated:

---

[6] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal."); *Sherman v. SEC (In re Sherman),* 491 F.3d 948, 967 (9th Cir. 2007); *Robertson v. Ranger Ins. Co.*, 689 S.W.2d (Tex. 1985).

12

THE COURT "... That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that."

\*\*\*\*\*

"... so I haven't revoked anything. I didn't have authority to do it anyway..."

Dec. Broocks, Appendix M, p: 40, l: 5 – 11 & 23-24.

As a last point on this, while it is a certainty that all FSS assets are part of the Jones Bankruptcy estate and thus protected by the automatic stay, the law is crystal clear that certainty of ownership is not required; the automatic stay applies if a bankruptcy estate has even an arguable interest.  In *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 300 (5th Cir. 2005) the Fifth Circuit clearly so held, stating:

> "Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right (hereafter, 'arguable property'). We answer in the affirmative, reverse the district court, affirm the judgment of the bankruptcy court, and remand to that court for further proceedings."

And this holding has been re-affirmed.  *See Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251 (5th Cir. 2006) *(citing Brown v. Chesnut* ("...this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity.")

## III.   THE TURNOVER IS VOID AS IT WAS ISSUED FOR 15 STRANGERS TO THIS LAWSUIT

13

A turnover order may only be issued against a judgment debtor **in that case** and in favor of a judgment creditor **in that case**.  Clearly, a turnover order cannot be used to levy on property in the possession of strangers to that judgment. *Parks v. Parker*, 957 S.W.2d 666, 668 (Tex. App.—Austin 1997, no pet.).  Similarly, a judgment creditor from a different matter is no less a stranger to the underlying judgment in a different case and thus has no standing to utilize the turnover machinery for his benefit in collecting a second, unrelated judgment.  And "agreement" of the actual creditor cannot overcome these barriers set by the constitution, statutes, and/or case law, even if satisfactory evidence of such "agreement" were adduced which it has not been here.

## A. THE CONNECTICUT PARTIES ARE STRANGERS TO THE TEXAS CASE WITH NO STANDING

This lawsuit – the Texas lawsuit – was initiated by two plaintiffs, Neil Heslin and his former spouse, Scarlett Lewis. After entry of a liability-default judgment,[7] in the later damages-only trial, Heslin was awarded $110,000.00 for his defamation compensatory damages based on claims he was defamed (a) by a reporter on one of Jones's shows (Owen Shroyer) who, in light of statements made by the official

---

[7] The liability default judgment was requested and entered in spite of the fact it violated a host of US Supreme Court mandates that plaintiffs - Heslin and Lewis -- must plead and prove specific statements made were false, in the context in which they were made and that they were published when the speaker knew they were false.  *See e.g., Phila. Newspapers v. Hepps,* 475 U.S. 767, 775-76 (1986).  And the plaintiffs were required to prove knowledge of falsity by clear and convincing evidence. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974).

coroner, on June 26, 2017 disputed the accuracy of Heslin's claims to have held his son's body and personally observed a bullet hole in his son's head and[8] (b) by Jones who allegedly echoed Shroyer's claims even though Jones actually said the opposite, Jones stating:

> "...NBC needs to clarify because the coroner said none of the parents were allowed to touch the kids or see the kids and maybe they mean[t] at the school, **I'm sure later maybe the parents saw their children**. The point is, is that because the media lies so much, you can't blame the public asking question and you can't ban free speech of people that are asking questions…" (emphasis added) [Dec. Broocks, Appendix O]

Heslin was also awarded $4,200,000 in defamation punitive damages. Scarlett Lewis did not sue for defamation.

Heslin and Lewis both asserted claims for intentional infliction of emotional distress ("IIED"), referencing in their petition nine broadcasts alleged to have indiscriminately inflicted such distress, two of which were the June and July broadcasts that were the basis of Heslin's defamation claim [Dec. Broocks, Appendix N]:[9]

---

[8] Heslin's own petition contained a URL, still live, to the coroners statements as reported in Connecticut media, where the coroner's statements, as reported were corroborated.  Dec. Broocks, Appendix N.

[9] In listing the broadcasts that were the basis of their IIED claims, Heslin and Lewis included two Heslin had claimed to be defamatory, thus violating this Court's precedent that an IIED claim based on the same conduct as a defamation claim is not permitted. *Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781, 814–15 (Tex. App.—Austin 2017), aff'd, 611 S.W.3d 1 (Tex. 2020).



For these IIED claims, Heslin and Lewis were each awarded $2,000,000 in compensatory damages and $20,500,000 in punitive damages for a total final judgment award of $49,310,000. Dec. Broocks, **Appendix P**. Judge Gamble entered her final judgment for the Texas Plaintiffs in the Texas Case on January 12, 2023[10] and lost plenary power on or around March 28, 2023.

In an unrelated suit in Connecticut, Jones and his FSS, were sued by the fifteen Connecticut Plaintiffs, one of whom was an FBI agent and others were sisters, parents or spouses of some of the Sandy Hook victims. As in Texas, the Connecticut trial court entered a default judgment as to liability, judicially decreeing Jones to have knowingly made false and defamatory statements with the Connecticut

---

[10] After post-trial motions Jones/FSS appealed to this Court where oral argument occurred on May 28, 2025.

Plaintiffs being judicially spared of having to prove anything but damages.  In the ensuing damages only trial, the fifteen Connecticut Plaintiffs were awarded roughly $1,400,000,000.00 in compensatory and punitive damages, which was later reduced by $150,000,000.00.[11]

## B. Judge Gamble Lost Plenary Power To Do Anything But Enforce Her Texas Judgment

A turnover order may only be issued in favor of a judgment creditor in that case against a judgment debtor in that case.  A turnover order cannot be used to levy on property in the possession of strangers to that judgment. *Parks v. Parker*, 957 S.W.2d 666, 668 (Tex. App.—Austin 1997, no pet.).  A judgment creditor from a different matter is no less a stranger to the underlying judgment and thus has no standing to utilize the turnover machinery associated with collecting one judgment for his benefit in collecting a second judgment.  Indeed, this Court has held that the Turnover Statute should

> "...not be applied by Texas courts to non-judgment debtors, and ... being merely a "procedural device," it may not be used to determine the "substantive rights" of judgment debtors—not to mention non-judgment debtors—when

---

[11] The Connecticut Court of Appeals refused to consider arguments involving the US Constitution, stating those issues had not been adequately briefed by Jones's separate counsel there, not the undersigned. *Lafferty v. Jones*, 327 A.3d 941, 961-62, n. 26 (Conn. App. 2024).  And the Connecticut Supreme Court refused to review the case even though they could have under-established Connecticut precedent allowing the Connecticut Supreme Court to review cases involving unbriefed Constitutional arguments. *Gleason v. Smolinski*, 319 Conn. 394, 396, 125 A.3d 920, 927 (2015); *State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989); *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).  U.S. Supreme Court Justice Sotomayor has granted the request of Jones and FSS to extend their time for filing a petition for cert review by the US Supreme Court.

there is a dispute over ownership of assets that are the subject of collection efforts."

*WC 4th v. Colo. Third St., LLC*, No. 03-22-00781-CV, 2024 Tex. App. LEXIS 5923, at *13-14 (Tex. App.—Austin Aug. 15, 2024, pet. denied).  Even more so it cannot be used by nonjudgment creditors who had nothing to do with the underlying judgment.

The fifteen Connecticut strangers to the Texas action intervened in Heslin/Lewis's Texas action[12] asserting they have reached an agreement to share proceeds of their respective judgments.  Dec. Broocks, Appendix C.  While it is believed they have done so to by-pass the normal Central Docket rules of Travis County and improperly insert themselves before Judge Gamble, the "agreement" of the actual creditor in the original case cannot overcome these barriers set by the constitution, statutes, and/or case law, even if satisfactory evidence of such "agreement" were adduced -- which it has not been here -- as jurisdiction cannot be conferred by agreement.[13]

After plenary power expired, the only power Judge Gamble retained was the power to enforce her orders and judgments for Heslin and Lewis.  And even then,

---

[12] A motion to strike that intervention has been filed but not yet heard.

[13] As further evidence of this, Heslin/Lewis along with the fifteen parties from Connecticut filed their motion for turnover and the parties were advised that they were assigned to Judge Lyttle and it so appeared on the Central Docket postings.  Moments before the hearing a paralegal somehow found out that the hearing had been switched to Judge Gamble.  Defendants have no idea how that transfer from one court to Judge Gamble occurred, but intend to find out. Appendix Q.

her ability to do so cannot be inconsistent with the original judgment for Heslin/Lewis and must not constitute a material change in substantially-adjudicated portions of the judgment. *Donalson v. City of Canton*, 2025 Tex. App. LEXIS 6101, at \*8 (Tex. App.—Tyler Aug. 13, 2025, no pet. h.).   As the Court in *Donalson* explained:

> "Upon the expiration of the trial court's plenary power, the trial court permanently loses jurisdiction substantially to modify the final judgment, and any judicial action taken after a trial court's plenary power has expired is void."

*Id*. at 9 (*citing Cook v. Stallcup*, 170 S.W.3d 916, 920 (Tex. App.—Dallas 2005, no pet.).   That has been improperly done here.

Although the recently-rendered *Donalson* case (decided in August 2025), is technically an improper intervention case (discussed in the next section, *infra*) its teachings are relevant here.   There, the City of Canton (City) sued Donalson over violations of the Health and Safety Code. Donalson claimed he had no ownership in the property and was dropped from the suit and new defendants were inserted who settled with the City, that judgment becoming final on July 5, 2020.   On December 31, 2024, Donalson intervened in the case claiming he had later purchased some interest from a foreclosing lender.   The City argued Donalson lacked standing -- and thus the trial court lacked jurisdiction -- because he had no legal interest in the property. Of initial relevance, the Tyler Court of Appeals held that an intervening party -- here the 15 Connecticut strangers -- have "... the burden to demonstrate a

justiciable interest in the suit." *Donalson* at *5.  The Tyler court noted that when the trial court lost plenary power it, it "permanently lost jurisdiction" and the trial court lacked jurisdiction to "take any action inconsistent with its final judgment..." *Donalson* at *9.  Hence any action other than strictly enforcing its judgment -- such as allowing an intervention as here --  is void:  "...any judicial action taken after a trial court's plenary power has expired is void."  *Donalson* at *8.

The Tyler Court went further, however, and stated that to the extent Donalson was trying to enforce the existing judgment, he still had to demonstrate by evidence that he had taken an actual assignment of an interest of an interest in the case.  *Id* at 9 ("To the extent Donalson's plea in intervention sought enforcement of the judgment, Donalson still was required to plead that he had a justiciable interest in the cause.").  Here the 15 Connecticut parties claim to have reached some agreement with the Texas plaintiffs [Dec. Broocks, Appendix C] but the record is devoid of any evidence other than a conclusory, self-serving statement.[14]

## IV.   THE CONNECTICUT PLAINTIFFS HAVE NO STANDING TO BRING THEIR CONNECTICUT JUDGMENT TO JUDGE GAMBLE

As courts have held on a number of occasions, a turnover order is a procedural device that empowers a trial court to assist a judgment creditor in reaching a

---

[14] Even were the claims of the fifteen Connecticut plaintiffs being asserted solely as assignees of interests from the Texas Plaintiffs, issuance of a turnover order on that basis would be void as the Texas judgment has been the deposit of cash in lieu of a bond, which precludes collection of any portion of the Order on any assets of FSS.  See TEX. R. APP. P. 24.1(f). [Dec. Broocks, Appendix E].

judgment debtor's property that under traditional remedies was beyond a creditor's reach. *Kennedy v. Hudnall*, 249 S.W.3d 520, 524 (Tex. App.—Texarkana 2008, no pet.). As the Supreme Court has instructed that turnover proceedings are "....limited to their purely procedural nature, and thus, bars use of the turnover statute to determined parties' and non-judgment debtors' substantive rights." *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 583 (Tex. 2018) *Alexander*, 540 S.W.3d 577 at 583 (Tex. 2018). The Supreme Court went on to find that "[i]f trial courts are in fact precluded from ruling upon the substantive rights of parties to the judgment sought to be enforced, it defies logic to hold the same court is empowered to determine the rights of complete strangers to the underlying judgment it is enforcing in that very proceeding. *Id*. In distinguishing substantive versus non-substantive claims, and also this Court's decision in *Breazeale v. Casteel*, 4 S.W.3d 434 (Tex. App.—Austin 1999, pet. denied), the Supreme Court stated:

> "Although some opinions view intervention as a proper method for a third party to protect its rights in a turnover proceeding, none go as far as holding that intervention enables a court to adjudicate third-party rights in what is otherwise a purely procedural device…And the turnover statute has no provision conferring authority on trial courts to decide the substantive rights of the parties properly before it in a turnover proceeding, let alone the rights of strangers to the underlying judgment."

*Id*. at 585. In the Texas Case here, the Connecticut Plaintiffs had no justiciable interest in the Texas Judgment. They are clearly strangers to the Texas Judgment by

21

any definition, yet they have been permitted free rein to plunder the assets of FSS despite clear prohibitions against doing so.

**V.     AS FSS ASSETS HAVE BEEN CONVEYED TO THE BANKRUPTCY TRUSTEE, FSS HAS NO ASSETS; THIS FAILURE TO LIST ASSETS IS FATAL TO THE ORDER AS OWNERSHIP OF SOME NAMED ASSETS IS REQUIRED.**

Under the turnover statute, a judgment creditor may seek turnover relief against a judgment debtor if the judgment debtor owns property that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities. TEX. CIV. PRAC. & REM. CODE § 31.002(a). While the trial court is not required to identify the specific property subject to turnover in the order, there must be some evidence that the judgment debtor has nonexempt property. *See Gillet v. ZUPT, LLC*, 523 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2017, no pet.).  The record that will be presented to this Court will demonstrate that no evidence was admitted by the trial court in entering the Turnover Application, and none showing FSS actually owned any assets.

Section 31.002(a) specifies that a judgment creditor may receive aid from a court under its provisions "if" the judgment debtor owns property that is nonexempt and that could not readily be attached or levied on by ordinary legal process. TEX. CIV. PRAC. & REM. CODE § 31.002(a). Conversely then, a judgment creditor may not receive aid from the court under the provisions of section 31.002 if the judgment debtor does not own property that is nonexempt and that could not readily be

22

attached or levied on by ordinary legal process. *Id*. The relief allowed by section 31.002(b), therefore, may be granted only when the conditions in section 31.002(a) exist.

The language of subsection (h), which permits a trial court to enter or to enforce an order requiring turnover without identifying the specific property subject to turnover in the order, does not eliminate the fundamental, preliminary requirement of subsection (a). *Tanner v. McCarthy*, 274 S.W.3d 311, 322 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Section 31.002 does not specify, or restrict, the manner in which evidence may be received in order for a trial court to determine whether the conditions of section 31.002(a) exist, nor does it require that such evidence be in any particular form, that it be at any particular level of specificity, or that it reach any particular quantum before the court may grant aid under section 31.002. However, a trial court must nonetheless determine that the request for aid pending before the court falls within the scope of section 31.002 before it enters an order granting relief under that section. *Tanner*, 274 S.W.3d at 322. *See also Gillet*, 523 S.W.3d at 754.

In this instance, not only was no evidence admitted whereby this Court could review the sufficiency of the record in the Turnover Application but the Turnover Application itself does not attach any evidence that the judgment debtor has non-exempt property, as all has been conveyed to the Estate of Alex Jones. This is

23

demonstrative of itself that the trial court abused its discretion in entering the turnover application.

## **REQUEST FOR RELIEF**

Free Speech Systems, LLC respectfully requests that this Court enter a Temporary Order, staying the enforcement of the Turnover Order and all collection and judgment enforcement activities undertaken in connection therewith, until this Court rules on FSS's motion on the merits of the Turnover Order.  FSS further requests all other relief to which it may be entitled.

Respectfully Submitted,

*/s/ Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**BROOCKS LAW FIRM, PLLC**
248 Addie Roy Rd, Suite B301
Austin, Texas 78746
(512) 201-2002 - Telephone
(512) 201-2034 - Fax
bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com

Alan B. Daughtry
State Bar No: 00793583
alan@alandaughtrylaw.com
3355 West Alabama, Suite 444
Houston, Texas 77098
Telephone:   (281) 300-5202
Facsimile:    (281) 404-4478

Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR APPELLANT**

25

## CERTIFICATION OF APPENDIX MATERIALS

I certify, as counsel for Appellant, that I have reviewed the factual statements contained in this Emergency Motion for Immediate Stay of Void Turnover Order Issued In Violation of the Bankruptcy Automatic Stay and have concluded that every factual statement in the Motion is true and correct and is supported by competent evidence included in the Appendix or Record. I further certify that the materials attached hereto as appendices are true and correct copies of what they purport to be, and that a Clerk's Record containing these materials has been requested in this matter.

*/s/ Ben C Broocks*
Ben C Broocks

## CERTIFICATE OF CONFERENCE AND COMPLIANCE WITH EXPEDITED NOTICE REQUIREMENTS

I certify that, prior to filing this motion, I contacted counsel for Appellees, to inquire whether Appellees are opposed to the relief sought in this motion. Appellees' counsel did not indicate whether they were opposed to the relief sought; accordingly, the Court should consider Appellees opposed. I further certify that, on the August 27, 2025, I notified Appellees' counsel that a motion for temporary relief was being filed.

*/s/ Ben C Broocks*
Ben C Broocks

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of August, 2025, a true and correct copy of the foregoing was served upon the following counsel of record in accordance with the Texas Rules of Appellate Procedure.

Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS, PLLC**

26

303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

Mark D. Bankston
State Bar No. 24071066
mark@fbtrial.com
**KASTER LYNCH FARRAR & BALL LLP**
1117 Herkimer
Houston, Texas 77008
713-221-8300
713-221-8301—Facsimile

**ATTORNEYS FOR APPELLEES**

William R. "Trip" Nix
State Bar No. 24092902
tnix@krcl.com
**KANE RUSSELL COLEMAN & LOGAN, PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
512-487-6650

**ATTORNEY FOR GREGORY S. MILLIGAN**


*/s/ Ben C Broocks*
Ben C Broocks

**APPENDIX INDEX**

| App. No. | Description |
|---|---|
| A | August 13, 2025 Turnover Order |
| B | Hearing transcript in Case No. D-1-GN-18-001835 on August 13, 2025 |
| C | *Application for Post-Judgment Turnover Order and Appointment of Receiver as to Judgment Debtor's Alexander E. Jones and Free Speech Systems, LLC* |
| D | *Notice of Removal* filed in Case No. D-1-GN-18-001835 |
| E | August 8, 2025 Confirmation of Travis County Clerk's Entry of Bond. |
| F | September 25, 2024 Order entered in Bankruptcy Case No. Case No. 22-33553, Docket No. 1021. |
| G | Notice of Appeal of Supplemental Order filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 1 |
| H | Statement of Issues on Appeal filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-1 |
| I | Designation of Appellee in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-2 |
| J | Intervention in Cause No. 4:24-CV-03882 in the Southern District of Texas |
| K | Nonsuit filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 22 |
| L | Hearing transcript in Bankruptcy Case No. 22-33553 on February 5, 2025. |
| M | Hearing transcript in Bankruptcy Case No. 22-33553 on June 5, 2025. |
| N | Plaintiffs' Fourth Amended Petition filed in Case No. D-1-GN-18-001835 |
| O | July 2017 Broadcast |
| P | Final Judgment entered in in Case No. D-1-GN-18-001835 |
| Q | *Intentionally omitted* |

## DECLARATION OF BEN C BROOCKS

Pursuant to Tex. Civ. Prac. & Rem. Code §132.001, I provide the following declaration in support of Emergency Motion for Immediate Stay of Void Turnover Order Issued In Violation of the Bankruptcy Automatic Stay.

1.      My name is Ben C Broocks. My date of birth is June 28, 1953, and my address is 248 Addie Roy Rd., Suite B-301 Austin, Texas 78746. I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2.      I am an attorney of record for Alexander E. Jones and Free Speech Systems, LLC in this matter, accordingly, the facts as set forth herein are within my personal knowledge.

3.      Attached hereto as **Appendix A** is a true and correct copy of an August 13, 2025 Turnover Order entered in Cause No. D-1-GN-18-001835.

4.      Attached hereto as **Appendix B** is a true and correct copy of the Hearing transcript in Case No. D-1-GN-18-001835 on August 13, 2025.

5.      Attached hereto as **Appendix C** is a true and correct copy of the *Application for Post-Judgment Turnover Order and Appointment of Receiver as to Judgment Debtor's Alexander E. Jones and Free Speech Systems, LLC* filed in Case No. D-1-GN-18-001835.

6.      Attached hereto as **Appendix D** is a true and correct copy of the *Notice of Removal* filed in Case No. D-1-GN-18-001835.

7.      Attached hereto as **Appendix E** is a true and correct copy of the August 8, 2025 Confirmation of Travis County Clerk's Entry of Bond.

8.      Attached hereto as **Appendix F** is a true and correct copy of the September 25, 2024 Order entered in Bankruptcy Case No. Case No. 22-33553, Docket No. 1021.

9.      Attached hereto as **Appendix G** is a true and correct copy of the Notice of Appeal

1

of Supplemental Order filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 1.

10.    Attached hereto as **Appendix H** is a true and correct copy of the Statement of Issues on Appeal filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-1.

11.    Attached hereto as **Appendix I** is a true and correct copy of the Designation of Appellee in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-2.

12.    Attached hereto as **Appendix J** is a true and correct copy of the Intervention in Cause No. 4:24-CV-03882 in the Southern District of Texas.

13.    Attached hereto as **Appendix K** is a true and correct copy of the Nonsuit filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 22.

14.    Attached hereto as **Appendix L** is a true and correct copy of the Hearing transcript in Bankruptcy Case No. 22-33553 on February 5, 2025.

15.    Attached hereto as **Appendix M** is a true and correct copy of the Plaintiffs' Fourth Amended Petition filed in Case No. D-1-GN-18-001835

16.    Attached hereto as **Appendix N** is a true and correct copy of Plaintiffs' Fourth Amended Petition filed in in Case No. D-1-GN-18-001835.

17.    Attached hereto as **Appendix O** is a true and correct copy of the July 2017 Broadcast.

18.    Attached hereto as **Appendix P** is a true and correct copy of the Final Judgment entered in in Case No. D-1-GN-18-001835.

FURTHER DECLARANT SAYETH NOT

EXECUTED on August 27, 2025 in Travis County, Texas.

Ben C Broocks

**APPENDIX A**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

    (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment. The Turnover

APPENDIX A

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1.      **Receiver's Information.**

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2.      **Custodia Legis.**  The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order.  The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

APPENDIX A

3.      **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order. The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

APPENDIX A

4.    **Continuing Effect of Order**. Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.    **Receiver's Powers**. Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

APPENDIX A

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

---

ORDER REQUIRING TURNOVER AND APPOINTING RECEIVER                    PAGE 7 OF 12

APPENDIX A

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7. **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8. **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9. **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

APPENDIX A

10.  **Receiver's Oath.** Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.  **Receiver's Fee.** Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.  **Receiver's Expenses.** Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13. **Employ Professionals**. With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14. **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

APPENDIX A

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.     **Indemnity.** The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

APPENDIX A

16. **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17. **Exempt Property**. Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18. **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on _August 13, 2025_.


_____
JUDGE PRESIDING

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | ) | IN THE DISTRICT COURT |
| Plaintiffs | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| ALEX JONES AND FREE SPEECH SYSTEMS, LLC, | ) | |
| Defendants | ) | 459TH JUDICIAL DISTRICT |

-----------------------------------------------------

**EX PARTE MOTION TO APPOINT RECEIVER,**

**MOTION FOR TURNOVER**

-----------------------------------------------------

On the 13th day of August, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Maya Guerra Gamble, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

APPENDIX B

A P P E A R A N C E S

**ON BEHALF OF PLAINTIFFS**

    Mark D. Bankston
    SBOT NO. 24071066
    Kaster Lynch Farrar & Ball, LLP
    1117 Herkimer Street
    Houston, Texas  77008
    (713) 221-8300

    AVI MOSHENBERG
    State Bar No. 24083532
    LAWSON & MOSHENBERG PLLC
    2301 Commerce Street, Suite 200
    Houston, Texas  77002
    (713) 449-9644

    RYAN E. CHAPPLE
    State Bar No. 24036354
    CAIN & SKARNULIS PLLC
    303 Colorado Street, Suite 2850
    Austin, Texas  78701
    (512) 477-5000

**ON BEHALF OF DEFENDANTS**

    BEN C. BROOCKS
    State Bar No. 03058800
    WILLIAM A. BROOCKS
    State Bar No. 25107577
    BROOCKS LAW FIRM PLLC
    248 Addie Roy Rd., Suite B-301
    Austin, Texas  78746
    (512) 201-2002

    SHELBY A. JORDAN
    State Bar No. 11016700
    JORDAN & ORTIZ, P.C.
    300 N. Shoreline Blvd., Suite 804
    Corpus Christi, Texas 78401
    (361) 884-5678

    ALAN DAUGHTRY
    State Bar No.00793583
    Attorney at Law
    3355 W. Alabama, Suite 444
    Houston, TX 77098
    (281) 300-5202

APPENDIX B

**PROCEEDINGS**

*(The following proceedings were held in open court)*

THE COURT:  D-1-GN-18-001835, Heslin and Lewis versus Free Speech Systems and Jones.

Announcements for the record, please.

MR. BANKSTON:  Good afternoon, Your Honor, good to be back.  Mark Bankston on behalf of the Plaintiffs, Neil Heslin and Scarlet Lewis.  I'm joined today by Avi Moshenberg, also my co-counsel for the Heslin Plaintiffs.  And we're also joined today by the Ryan Chapple.

THE COURT:  Oh, okay.  And that's everybody in Connecticut?

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.  And can you spell Chapple for me?

MR. CHAPPLE:  Yes, ma'am.  C-H-A-P-P-L-E.

THE COURT:  P-P-L-E.

MR. CHAPPLE:  Correct.

THE COURT:  It's a good thing I asked, because I wouldn't have done that.

MR. BROOCKS:  Your Honor, Ben Broocks, my colleague William Broocks, Shelby Jordan, and Alan Daughtry for Jones and FSS.

THE COURT:  Okay, I missed the third

one's name.

MR. BROOCKS:  Shelby Jordan.  Shelby Jordan.

THE COURT:  Okay, that's not on here.

MR. BROOCKS:  And then Alan Daughtry.

THE COURT:  Also -- oh, no.

Shelby Jordan?

MR. BROOCKS:  Jordan, yes, ma'am.

THE COURT:  Like S-H-E-L-B-Y?

MR. BROOCKS:  Exactly right.

THE COURT:  Okay.  All right.

And we're here on --

*(Interruption in proceedings.)*

All right.  And you've announced for an hour?

MR. BANKSTON:  Well, Your Honor, it's sort of complicated.  We announced for an hour when it was requested as an ex parte hearing.  I know why Defendants are here, but that clearly was not factored into the time announcement.  I know you've got a busy day today.

THE COURT:  All right.  Did you announce?

MR. BROOCKS:  Well, Your Honor, we thought the rules would apply they would announce for us.  All the secrecy in reality comes without cause.

THE COURT:  Okay.  So, you do understand this is an ex parte motion and the law allows it to proceed ex parte.  So, if you weren't here I wouldn't be worried about you.  Right?

MR. BROOCKS:  Right.

THE COURT:  All right.  Well, we'll see how it goes.

MR. BROOCKS:  Thank you, Your Honor.

*(Other docket matter called)*

THE COURT:  All right.  Well, Mr. Bankston, are you going to handle the argument today or --

MR. BANKSTON:  Sure.  What we're actually going to be doing is there is a threshold issue that I'm going to need to talk to you about that will probably affect what we can and cannot do today.  Then, when I'm done talking to you about that, then Mr. Chapple is going to be talking to you about the application itself and what we can do.

Okay, Your Honor.  It's been a long time since I've been here.

THE COURT:  I know.

MR. BANKSTON:  And let me start here. We're going to need to talk about an appeal bond.  I have stood here before a PowerPoint, I have this

6

feeling that often happens to me, it's happened a lot in this case, when I'm standing with a PowerPoint where I know I'm about to reveal to you litigation misconduct that you don't know anything about yet.

And when that first happened in this case, I will confess I had feelings of excitement about that, professional pride, all of those sorts of things I would feel when I'm about to do one of these PowerPoints.  And I don't feel that anymore.  I think you know, you knew two years ago, that I'm sick and tired of it.  And I'm going to reveal some things to you today that, again, I'm very disturbed about.

What has happened is that, after our ex parte application was filed and Defendants found out about it somehow, there has been a flurry of filings. I know you don't know anything about them because they haven't been sent to you, but there have been a lot of things filed.

The first thing that happened is that FSS filed a paupers check of $10 to act as a bond preventing the collection of this Court's final judgment.  Okay.  That happened just a few days ago. FSS purports to provide a deposit under TRAP 24, which allows a debtor to supercede a judgment with a deposit not exceeding 50 percent of the debtor's net worth.

APPENDIX B

Already this is probably going to throw up some flags to you, because you've revisited this position many times.  You'll remember that there was a request to modify the appeal bond and motion for new trial, you'll remember we've had a Braden hearing.  This is something we've done often.  But this is what they're doing, they put a $10 check.

Now, just real quickly, the legal standard on that is that a judgment debtor who does that has to provide an affidavit with certain information.

THE COURT:  Slow down just a little bit.

MR. BANKSTON:  Thank you.  Thanks for the reminder.

And then the judgment creditor, they can then file a challenge.  This just happened, so we're preparing a challenge to file right now.  When we do that, then this Court must hold a hearing and issue an order about whether that bond affidavit is sufficient.  Which we cannot do today.

THE COURT:  Right.

MR. BANKSTON:  We have to file a challenge to it.  So, this has slowed things down yet again.  All right, so we've got to do that challenge.

But we still need to talk about the

APPENDIX B

affidavit today, due to the ploy of new counsel.

So, as you see, we have new counsel again.  This would be 25?

THE COURT:  I don't know.  But I don't care anymore.  No -- nothing will be based on new counsel.

MR. BANKSTON:  Here there's nothing new about the strategies, okay.  Here is what has happened, this is counsel's ploy:  First, counsel filed an affidavit from Jones, claiming that FSS has no assets because they were vested in Alex Jones' bankruptcy trustee by judicial order.  That's what the affidavit says.  So, the filing of that affidavit stops the receivership in Heslin until the Court holds a hearing on Plaintiff's challenge.

But Defendant is also arguing regarding Lafferty.  Jones' new counsel claims that the factual averment in the affidavit prevents receivership in Lafferty.  Because, as you know, the appellate bond would not affect their interest in their judgment whatsoever.  But what they're saying is that, because an order vested all of FSS's assets into Alex Jones' bankruptcy trustee on judicial order, thus any act by this Court in receivership would violate a bankruptcy stay, thus the affidavit and its factual averments over

receivership in Lafferty.  But that would only occur if this Court found today that the statements in the affidavit were true.  They are not.

This is really disturbing, Your Honor, Okay?  This is what they did.  They got Alex Jones to sign this affidavit.  And the affidavit says, all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alex Jones.  And they say, because Judge Lopez of the Southern District Bankruptcy Court vested all ownership of all FSS cash and property of the estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets.

The affidavit cites to a bankruptcy order of September 25, 2024.  This is what that order says.  And it does say that:  All property of the estate is vested in the bankruptcy estate and shall be under control of the estate.  Looks good.

But what happened over the next year.  The next entire year.  You see, Judge Lopez had planned to liquidate FSS assets by placing them in the custody of Chris Murray, the Chapter 7 Trustee, who would then conduct an auction.  Judge Lopez entered the September 2024 Supplemental Order to accomplish that purpose.  That's what you're going to hear it referred

to as, "The Supplemental Order."  Okay.  But, as you probably saw, Judge Lopez was unsatisfied with the auction process, and thus he vacated the order and he prohibited its future use.

THE COURT:  Which order?

MR. BANKSTON:  The September.

THE COURT:  The Supplemental Order?

MR. BANKSTON:  The September -- in fact, I'll show it to you again.  This September order right here that you see, that -- where Jones is now using that in an affidavit to say FSS has no assets, this order judicially vested them in the estate of Alex Jones.  That order has been vacated.  The bankruptcy court has prohibited its future use.  And let me show you that.

This occurred, started up in a February 5th, 2025, hearing on something known as a 9019 motion.  This is after the auction, in the eyes of Judge Lopez, has failed.

Judge Lopez says, I entered a Supplemental Order so that to ensure you have the Trustee cover that he could sell the assets.  That's what the order was intended to do.  The Trustee asked me for a specific order but it was only for one purpose, to see if he could sell the assets.

APPENDIX B

As a result, Judge Lopez concluded it was improper to use the Supplemental Order, which was used for one purpose and one purpose alone, and that purpose is now gone.  Gone.

Judge Lopez ruled that he would vacate that order because it serves no purpose:  I'm not allowing a sale of the assets anymore.

He ruled that you may consider any use of the Supplemental Order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  Judge Lopez noted, it would be erroneous to use the Supplemental Order for a purpose in which it was never intended. Now, he vacated that order to promote, quote, the finality of the bankruptcy process so that the families can pursue whatever it is they want in judgments in state court.  He said, there's nothing stopping anyone from pursuing any claims in Texas State court.  The bankruptcy has no impact.

In other words, the bankruptcy itself, is stayed.  There's no automatic stay stopping.  No one has to come to ask me for permission.  You have whatever rights you have.

What's really important here, Your Honor, because we're going to be coming back to you not only

on a challenge, because today we're just talking about the truth of the statement in the affidavit, we're going to have to challenge it for Heslin, right, but today we're just talking about the truth of the statement in the affidavit. We're going to have to bring in in Heslin also a motion for sanctions because of counsel's knowledge.

At that point, in February 2025, Judge Lopez had made it clear to Defendants and their counsel, the ones sitting right here, these are the ones who were in bankruptcy court in that hearing, has made it clear that that order is no longer in force. But less there was any doubt, there were two subsequent attempts at reconsideration.

Attempt Number 1: An entity known as FUAC, which is a Jones-allied company seeking to purchase InfoWars, sought reconsideration by filing a motion approving the sale of FSS assets. That motion attempted to revive the Supplemental Order.

Here is what Judge Lopez said in an order of March 19th: The Court said at a hearing on February 6th that parties should consider the Court's Supplemental Order null and void for the reasons stated at the hearing. Nothing has changed.

There was a second attempt. This attempt

was by the layers who are now in front of you.  Jones and FSS moved to reconsider Judge Lopez's vacatur of the September -- I mean the September Supplemental Order.  In their motion, Jones and FSS recognized that the Supplemental Order was no longer in effect.  They noted in a Supplemental Order entered on February 5th, this Court declared that the Supplemental Order was null and void.  This motion requests the reconsideration of that declaration.

The Defendants asked Judge Lopez to reverse course, and they argued that holding the position that the Supplemental Order is void will create past, present, and future chaos.  So, they requested that this court reconsider its prior rulings.  They know that September order is not real.  They know it is null and void.

Now, to be sure, they have problems with Judge Lopez vacating the order.  They think he's without authority to do it.  They have moved for reconsideration.  But that order still exists.  That has been vacated.

So, now you have counsel who has turned around and taken that order, which they know is null and void, and they have used it, given it to Alex Jones to say in an affidavit, which we're now once again

frustrated in the efforts to pursue this Court's final judgment, and they obviously gave it to Jones for a very specific reason:  Because Jones can avoid perjury by just saying, well, I thought that's what was up, my lawyers tell told me that.

Now, what happened is that Jones' lawyers put a false statement in front of him and had him sign it.  And they knew it was a false statement.  And here is the thing, Your Honor, these attorneys are not -- this is not a mistake of ignorance.  A mistake of an attorney being a bad attorney.  These are smart attorneys.  These attorneys know full well that I would be able to show you all this.  They know that I will be able to show you where Judge Lopez vacated that order.  They know that that's not live and that argument will get defeated.  But they've accomplished the goal, which is we can't get a receivership for Heslin today.

And now they're going to be able to run around and do whatever they want until I can come back to this court and challenge this and get this process moving forward.  And in the meantime they've enriched themselves by doing it.  By doing the same thing every counsel before has done.  And how many times have I come here with a lawyer who has given you false information.  And how many times have you responded in

turn.  And that these new lawyers do not believe that there's going to be any meaningful consequence for that.  So, they give a false affidavit.

This is troubling for today, obviously. Because not having found success and convincing Judge Lopez to revise his Supplemental Order, Defendants counsel made a troubling decision:  They pretended -- they decided to file a pleading in this court, pretending the vacatur of the Supplemental Order never happened.

Now, it would be one thing if you were you to say, hey, look, there's an order that puts all the assets in Jones.  That order has been vacated, but we disagree with it and we're moving to reconsider it. If you were to tell the Court that, that's fine.

To tell the Court, here is an order it's in force, this prevents judgment, that's ridiculous. That's disgusting.  And it's being profited off of.  We can't do much about this today except that you can conclude today, you can conclude that that statement is false.

If that's the case, we have three requests for you, okay.  This is how we think we can go forward today:

One is let's go ahead right now if we can

because we need to do this quick to not allow any malfeasance to happen in the meantime, set a hearing date for Plaintiff's challenge to the TRAP 24 affidavit of FSS, as well as Plaintiff's motions for sanctions and I will have those on file before the end of the week.  By Friday those will be on file.

So, if we can get a hearing date, I know it is your usual practice to have the motion on file before we actually set the hearing date, I know dates are kind of hard to get right now, I would really like it if we could maybe set one today.

Second, something we haven't talked about yet, there's a notice of removal filed for Alex Jones. We'll deal with that in due course.  When that gets back to you we'll have some things to say about that. But for right now, take no action on anything relating to Alex Jones.  We don't want to mess around with the jurisdictional idea of it being removed, so nothing relating to Alex Jones.

Third, today, go forward today with hearing the Intervenor's application for turnover and receiver as to FSS.  Because, as I say, I've removed this threshold issue for you, I've shown you that Judge Lopez, in fact, vacated that order, that's not a real order, FSS's assets are not vested in the Trustee.

Judge Lopez has said come here and come pursue your remedies.  Mr. Chapple has some other things to say substantively about the application, but now that I've gotten that threshhold issue.

So unfortunately, in terms of Heslin and Lewis, we want no relief today except as set out.

THE COURT:  All right.  Do you know what --

You can sit down.

Do you know what page the motion ends on?  Because it's 196 pages and I have to scroll through one by one unless I know the page number.

MR. BANKSTON:  Are you referring to our application and motion?

MR. CHAPPLE:  I can find it quickly.

THE COURT:  Do you think it's 100 pages or --

MR. CHAPPLE:  Your Honor, I have a hard copy.

THE COURT:  Oh, okay, great.  Thank you.  That works even better.  All right.

MR. BANKSTON:  Oh, the last thing I should mention, Your Honor --

MR. BROOCKS:  Is that of the exhibits, as well, or just the motion itself, the application?

Because I'm going to talk about that.

THE COURT:  These are the exhibits and the response.

MR. BROOCKS:  But the exhibits to the Plaintiff's turnover request, I want to make sure you have their proposed order in front of you because I'm about to discuss --

THE COURT:  Okay, calm down.

MR. BROOCKS:  -- everything he said. Apologize.

THE COURT:  I'm looking at an Application For the Postjudgment Turnover.  That's what I wanted. I don't know what else is in here yet, that's what I'm looking at right now.  Okay.  Because I wanted to see -- I couldn't recall off the top of my head if it had been filed as a motion that you joined or it was a joint motion.  It's a joint motion.

MR. CHAPPLE:  Your Honor, it was a joint motion that we filed.

THE COURT:  All right.

MR. CHAPPLE:  And there's not an order in that notebook.

THE COURT:  That's all right.

MR. CHAPPLE:  Because, based on the change in our plan moving forward, based on what the

Defendants filed, I have another order today that only relates to the Connecticut Plaintiffs and only relates to Free Speech.

THE COURT: Did you happen to upload it to Box, as well, or not?

MR. CHAPPLE: No. I've got a hard copy right here.

THE COURT: Okay. That's fine.

MR. BANKSTON: One last thing, just because I haven't put it on the record yet, hasn't been announced in open court, is that the Heslin Plaintiffs as well as the Pozner Plaintiffs, Mr. Fontaine's estate representative, are all in a settlement agreement and joint --

THE COURT: I assumed that.

MR. BANKSTON: So that's -- just so that that's on the record, we're all united on that.

THE COURT: So, I used to do false claims act cases for relators and for the government, and those are -- I'm familiar with the concept and I assumed you wouldn't be here.

MR. BANKSTON: Otherwise.

THE COURT: Right.

MR. BANKSTON: That's right. Thank you, Your Honor.

THE COURT: So, that's fine.

All right. So, now I'll hear from -- I'm so sorry.

MR. BROOCKS: Broocks.

MR. CHAPPLE: Mr. Chapple.

THE COURT: Mr. Chapple, I'm sorry.

MR. CHAPPLE: Your Honor, may I approach?

THE COURT: Yes.

You want to use the podium.

MR. BROOCKS: I'm confused. Do I get a chance to respond to this fellow's accusations?

THE COURT: I haven't decided yet. It's an ex parte hearing.

MR. BROOCKS: Yeah, the argument he just made had nothing to do with -- he's talking about accusations of misconduct that are completely false. I can show you in ten seconds.

THE COURT: I haven't decided yet. It's an ex parte hearing.

MR. BROOCKS: Those accusations he just made are not. The accusations --

THE COURT: The entire hearing is an ex parte hearing. I haven't decided yet. I've asked to hear from Mr. Chapple. You understand that, right?

Are you going to look at your computer,

APPENDIX B

are you going to interrupt me and demand a response, and then ignore it when I give it to you?

MR. BROOCKS:  I apologize, I hear every word that you said.  I'm going to sit back down and be quiet until you call on me.

THE COURT:  Thank you.

Mr. Chapple.

MR. CHAPPLE:  Thank you, Your Honor.

As Mr. Bankston noted, none of the relief I'm seeking today relates to what I'll call the Texas Plaintiffs.  The only relief we're here seeking today relates to the Connecticut Plaintiffs and their application to appoint a receiver, Mr. Greg Milligan, as to Free Speech Systems.

Now, the Connecticut Plaintiffs have a final judgment against Judgment Debtor Free Speech Systems.  That final judgment is attached to the Declaration of Alinor Sterling, the trial attorney in Connecticut.

The final judgment is there, the final judgment has been exhausted in the appellate process in Connecticut.  It was affirmed in Connecticut.  A small dollar amount was reduced, but for all intents and purposes the lion's share of the judgment still stands. The Connecticut appellate court has denied a stay

pending the decision by the Supreme Court.  So, there's nothing staying collection efforts relating to the Connecticut judgment.

The Defendants have until September 5th to file a petition for certiorari with the United States Supreme Court, but that doesn't have any effect on whether or not collection efforts can move forward with regard to Connecticut.

Mr. Milligan, who is in the courtroom I believe at Your Honor's request, is here and ready to answer any questions that you may have.  Mr. Milligan is an Executive Vice President at Harney Partners.  He has over 25 years of experience.  He has experience as a Chief Restructuring Officer, as a Chapter 11 Trustee, as a Chapter 7 Trustee, as a court-appointed receiver in both state and federal court.  I believe he actually has been appointed a fiduciary in this court.

THE COURT:  He has.

MR. CHAPPLE:  In the R Partnership case.

THE COURT:  Yeah, we worked together for at least a year.

MR. CHAPPLE:  Your Honor, he's more than qualified to serve here.

So, from the court's perspective, two things have to be in evidence to allow for the

appointment of Mr. Milligan and the turnover order:
Number one, a final judgment.  We have that.  The
Connecticut judgment has been properly domesticated in
Travis County.

THE COURT:  That was going to be my
question.

MR. CHAPPLE:  And number two, the
existence of non-exempt assets by the Judgment Debtor.
We have that, as well.  There are no non-exempt assets
as to Free Speech Systems.  So, at this point, Judge,
the Court's task in this proceeding as to the entry of
the order appointing Mr. Milligan as the receiver and
the turnover order is only ministerial.

Now, there were a few issues raised in
the -- in the response filed by the Defendants on
Monday night.  Your Honor, we have a reply to that
response that I have here in hard copy that we haven't
filed yet, but I can provide a hard copy to you and
when I get to back to the office I can file it.  It
goes into detail refuting all of their arguments.  But
really, there are two principle arguments they make:

Number one is that the judgment hasn't
properly been domesticated.  That's not correct.  The
judgment was domesticated in Travis County upon filing
of a foreign judgment under the Uniform Enforcement

Foreign Judgments Act, both the Plaintiff's Original Petition and the final judgment.  It happens all the time.  It's a final judgment.

Now, there are certain things that a Judgment Debtor can do to contest that finality:  They have to file a motion for new trial, but they can't file any kind of motion for new trial.  There are a few limited circumstances under which they can seek relief.  They didn't do any of that here.  That final judgment is final, those issues are not appealable.  So, as we stand here today, the Connecticut Plaintiffs are entitled to pursue a receivership and a turnover order.

Now, one thing they did, Judge, the Defendants did remove the receivership action and they filed a bunch of counterclaims in federal court.  The receivership action, the removal, our motion to remand and our motion to dismiss the counterclaims, are pending in front of Judge Lopez and haven't been ruled upon.  They're going to be ruled upon by submission.  But none of that affects the finality of the Connecticut judgment and the domestication.  So, we have a final judgment sitting here.

One other principal issue that they argue in their reply is that the intervention was improper here.  As you recall, Judge, this is the case where you

rendered the judgment.  Judgment was rendered.  Back in the fall, the Texas Plaintiffs sought a turnover order, which you signed, and then the Connecticut Plaintiffs intervened on the basis of that turnover order.

Very soon after that, the case was removed and its since come back here.  It's been remanded.  I have the notice of remand here, as well.

THE COURT:  That's not exactly how I remember it, but the bottom line is the same.

MR. CHAPPLE:  We get to the same place.

THE COURT:  Right.

MR. CHAPPLE:  So, in their papers the Defendants contend that the intervention was improper, but again, they misapply the law and the facts.  To intervene in a postjudgment action like this merely requires that the Intervenors have an interest in the Judgment Debtor's property, and that's from a Court of Appeals case here in Austin, *Breazeale v. Casteel*.  And again, all of this is in the papers that I'll provide to you.  So, other courts that follow the Court of Austin appeals and allow third parties to intervene in receivership actions.

So, the intervention is proper, the Connecticut Plaintiffs have standing here, there is a final judgment that can result in the appointment of a

receiver and can result in the signing of a turnover order.

And Judge, like I alluded to earlier today, I have an order that is a little bit different than the one that we uploaded because it removes the Texas Plaintiffs and it also removes Alex Jones. Because, as Mr. Bankston discussed, you all are going to deal with that in due course. But today there's nothing preventing the Connecticut judgment and the Connecticut Plaintiffs from having a receiver appointed and having a turnover order.

I want to be clear, Mr. Milligan has been crystal clear, he is not going to do anything with relation to the Free Speech Systems' assets without the consent of the Chapter 7 Trustee. So, to the extent that Chris Murray, the Chapter 7 Trustee in the Alex Jones bankruptcy case, needs orders from the bankruptcy court to make sure that his transfer of assets to the receiver is okay, Mr. Milligan is going to, I don't mean to put words in his mouth, but he is going to work with the Chapter 7 Trustee to do that, and he is happy to discuss that here today.

THE COURT: So, I have intentionally not followed the bankruptcy case or really anything until it shows up here again. So, what is the status of the

APPENDIX B

bankruptcy case? Because I sort of felt like there was all -- there were some news articles, I mean I read the news as a citizen does, but. So, it sort of implied that the bankruptcy case was over.

MR. CHAPPLE: So, let me kind of give you the 30,000-foot view.

THE COURT: Okay.

MR. BANKSTON: Alex Jones Bankruptcy 101. So, there's Alex Jones' individual bankruptcy, right, and there's the Free Speech Systems bankruptcy. For a long while, both of those were Chapter 11 cases. And I may get my dates a little bit wrong. I believe at the end of 2023 there were motions to dismiss and/or convert both of those cases.

Judge Lopez ruled that the Alex Jones individual case should be converted to a Chapter 7. And that resulted in the appointment of Chris Murray, who we've been talking about, who is the Chapter 7 Trustee in the Jones case. He dismissed the Free Speech case. But when he dismissed the Free Speech case, he entered an order that said the Trustee in the Alex Jones case, Chris Murray, had some control over certain Free Speech assets. And really the intent of that was so the Chapter 7 Trustee could conduct the auction that you heard Mr. Bankston talk about.

APPENDIX B

THE COURT:  Okay.

MR. CHAPPLE:  So, that auction took place and --

THE COURT:  That was in the news.

MR. CHAPPLE:  Yes, the auction was in the news.  Certainly.  And so, the auction took place.  The Trustee went before Judge Lopez on a 9019 motion.  That's a motion in Bankruptcy Court to get a settlement authorized by the Court.  That's when Judge Lopez denied the 9019 motion, said he wasn't happy with the auction process.  He had a variety of questions.  He denied that relief.  And that's when you get into the issues that Mr. Bankston discussed regarding the vacating that order.

And so, as the bankruptcy case sits today, it's -- they're both relatively dormant.  They're -- and there are some adversary proceedings, as well, and so there are some hearings scheduled.  I believe we're set to be in front of Judge Lopez on a status conference maybe next month, I believe.  But, you know, relatively speaking, especially considering six months, a year, year and a half ago there's not a lot of activity in the bankruptcy case right now, and I think you saw the quotes from Judge Lopez that Mr. Bankston highlighted his clear desire to have the

Plaintiffs pursue their state court remedies, which is what we're trying to do today.

THE COURT:  All right.  Where is the domesticated order, where can I find it?

MR. CHAPPLE:  It is -- I think I have it right here.  I can get the cause number for you.

THE COURT:  Okay.

MR. CHAPPLE:  Okay.  And may I approach with the --

THE COURT:  So long as they have a copy.

MR. CHAPPLE:  Yeah, okay, let me get my papers together and I'll approach.

THE COURT:  Okay.

MR. CHAPPLE:  Your Honor, here is the proposed order granting the relief as to only Free Speech Systems and the Connecticut Plaintiffs.

THE COURT:  And then you're looking up the cause number you said.

MR. CHAPPLE:  That's correct, Judge.

Your Honor, I can read it off to you, if you're ready.

THE COURT:  Okay.

MR. CHAPPLE:  It's D-1-GN-24-004752.

And Your Honor, I also have a hard copy of the reply that we're filing here today.

THE COURT:  They have a copy of it?

MR. CHAPPLE:  I'm about to provide it.

THE COURT:  All right, thank you.

All right.  So, this looks like you filed it back in, well, a year ago, August of 2024.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  And until -- it looks like a part -- a partial removal, nothing -- there was no response by the Defendants.

MR. CHAPPLE:  Their response in state court was removal, Judge.

THE COURT:  No, no, I mean until -- oh, I see what you're saying.  So that happened some time ago, as well.

MR. CHAPPLE:  That's right.

THE COURT:  Okay.  But just for -- it's a little confusing.

MR. CHAPPLE:  And our position, and it's addressed in our reply, is that the law is clear that, upon that filing under the Uniform Enforcement of Federal Judgments Act, it acts as both an original petition and a final judgment.  So, that's final.

THE COURT:  Okay.  Did you happen to get the receiver order I typically use when you drafted this, or is this entirely your own?

MR. CHAPPLE:  That's my own, Your Honor. My apologies.

THE COURT:  Okay.  I'm going to have to read the whole thing, then.

MR. CHAPPLE:  I understand.

THE COURT:  Okay.  So, a couple of things.  So, I've had a lot of receivership experience in the past seven years.  And you're right, I trust Mr. Milligan absolutely, but I have developed a standard order, some standard language in my receiver order that I do use in all of them.  So, I typically do require a bond, it's going to sound sort of silly in this case because the amount is not very much.

I also don't allow payment of a receiver fee without court approval, so I changed that language. I do allow the receiver to withhold the money up to 25 percent, but that actual payment has to come back to the court first.  So, I'll have to change those.

Can you send it to my staff in Word?

MR. CHAPPLE:  Yes, ma'am, absolutely.

THE COURT:  Okay.  Can you do it right now?

MR. CHAPPLE:  Yes, ma'am.

THE COURT:  So, to Keri Ward, keri.ward@traviscountytx.Gov, because she knows exactly

the language I like for those provisions.

Okay.  I've never been asked for an advance receiver fee before.  So, I'll ask you to talk to me a little bit about that --

MR. CHAPPLE:  Okay.

THE COURT:  -- before I make that decision.

I am fine with the expenses cap, that's not a problem.  I will say, to the extent you have to come back to exceed that amount, you don't need to have a full hearing on that.  So, the receiver, as everyone knows, works with the court to affect the judgment.  He doesn't work or she doesn't work for either party.

So, I allow some ex parte, because I don't consider it ex parte between the receiver and the court, communications; and that would include a request from the receiver directly to do something with expenses or to have some decisions made, things like that.  So, that would be allowed and would be fine and I don't know, yeah.  So, I don't know if that will be necessary or not, but that's something I would not object to.

Typically I do approve hiring additional professionals, because those fees can get big quickly. But again, it doesn't have to be a full blown hearing

necessarily, I just need the information in advance and then I can approve it in an order.

Now, Mr. Milligan, I know that you have staff.  I'm assuming you are not considering the use of staff in your office as requiring an additional order, like is that --

MR. MILLIGAN:  Correct.

THE COURT:  That's subsumed under you.  Okay.

MR. CHAPPLE:  The order is on the way.

THE COURT:  Oh, that's Miss DuBois, my court reporter.  Miss Ward is in the back.  She tries to avoid the courtroom.

The paragraph 15 has sort of a strange sentence.  Are you essentially saying that if those individuals that you've labeled protected personnel, which I don't actually see -- I see receiver personnel -- oh, here we go.  Where are they.  They are the receiver, what's HMB, is that your company?

MR. MILLIGAN:  Yes, Your Honor.

THE COURT:  Receiver personnel, which is defined up here, Okay.

So, you're basically asking me to order that if you get sued by, I suppose, the Defendant or anyone else, that you could use the value in the

property for your defense costs?  Is that what you're asking?

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

I think you're just going to need to come back to court for that.  I mean, I'll add a sentence that that just needs to be approved by the Court before the money is used.

MR. CHAPPLE:  The --

THE COURT:  Indemnity.  So we need to wait for something to happen.

MR. CHAPPLE:  Understood.

THE COURT:  So we'll add that.

MR. CHAPPLE:  And you're going to add that language, Judge?

THE COURT:  We will.  Miss Ward, I'm sure, is already working on it.

So, what was the one I wanted you to talk to me about?  I've already lost my spot.

MR. CHAPPLE:  Your Honor, I believe it was 25,000 or 20,000.

THE COURT:  Oh, no, it was the advance fee, which you have as $10,000.

MR. CHAPPLE:  Got you.

THE COURT:  Judgment Creditor shall pay

the sum of $10,000 to the receiver as an advance on his fees.  And then would repay the advance to the judgment creditors from the first $10,000 of receivers fees earned.  So, that's a new one for me.

MR. CHAPPLE:  I think, Judge, just to the extent that the receiver incurs costs at the very initial outset of the receivership proceeding, whether it be --

THE COURT:  Well, so costs and fees are different.  If it said costs I'm not sure I would have raised the question.

MR. CHAPPLE:  I understand the distinction.

THE COURT:  So, do you mean costs or do you mean fees?

MR. CHAPPLE:  No, I mean costs.

THE COURT:  You mean costs.

MR. CHAPPLE:  Yes.

THE COURT:  Okay.  Then I think we can agree that its reasonable to get some money to pay for the costs of the efforts --

MR. CHAPPLE:  Yes.

THE COURT:  -- since it's likely to be pretty expensive.  So, let me -- so she's working on that part already.

Oh, I guess you did it this way because -- well, no, I usually get -- I have seen receivers submit separate costs and fees.  I'm just trying to think about how the language with read.

MR. CHAPPLE:  Which paragraph are you looking at, Your Honor?

THE COURT:  It's 11.

I'm going to say "Expenses."

I also don't think it makes a lot of sense to repay it right away.  So I'm saying that the Judgment Creditor, and its really just one in this order, correct?

MR. CHAPPLE:  It is, correct, Your Honor.

THE COURT:  May seek repayment at the conclusion of the receivership.

MR. CHAPPLE:  That's fine.

THE COURT:  Oh, the judgment, this actually should say -- I'm a little confused, I'm sorry, we're doing all this out loud.

MR. CHAPPLE:  No, that's fine.

THE COURT:  The judgment creditors are your clients.

MR. CHAPPLE:  Yes.

THE COURT:  So, this is wrong, it should say the judgment debtors.

MR. CHAPPLE:  What sentence are you looking at, Judge?  I'm sorry.

THE COURT:  The Judgment Creditors shall pay the sum of $10,000 for the receiver?  I mean you don't need an order for that, do you?

MR. CHAPPLE:  I think out of an abundance of caution here we put it in here.

THE COURT:  So, you are actually -- you're not planning to this 24 from the -- I misunderstood the whole paragraph.

MR. CHAPPLE:  I'm sorry, I should have been more clear.

THE COURT:  I just assumed you were trying to get them to.

MR. CHAPPLE:  No, it's an advance.

THE COURT:  FSS to pay.

Ignore everything I said.  Just delete all that.  We can't do that, I know.  Big old "Stet" here on that paragraph.

All right.  Well, I definitely have jurisdiction over this proceeding.  This is an ex parte proceeding, although we have the presence of all parties in the courtroom.  I do find that a judgment in the Connecticut cause, which I don't know the cause number so I'm just going to read from the proposed

order you gave me, CV-18-6046437 was rendered in Connecticut in all the appropriate courts and is valid, final, and payable.  I understand that there are some reductions through the Bankruptcy Court and through the appellate process in Connecticut, and so the number is slightly less than that.

I also find that the judgment is unsatisfied.

That Free Speech Systems, LLC, at least allegedly, owned property not exempt from attachment. My guess is that all of its properties is probably not exempt from attachment, execution, or seizure for the satisfaction of the judgment; and that the judgment creditors are entitled to and need the aid of a receiver to enforce their judgment.

And so, I just want to make sure.

Okay.  The judgment is final and unpaid.

And I am going to grant the application. I do think it should be granted, I am waiting for Miss Ward to change some of the language.

I appreciate your being here, Mr. Milligan.  As I mentioned before, I am familiar with your work, we did work together for approximately -- I think it was over a year at the end of it.  We tried to do it in a year, but lawyers,

right?

MR. CHAPPLE:  Tell me about it.

THE COURT:  It really wasn't the lawyers in that case.  On a really complicated case involving a lot of financial transactions and a lot of things, and I was very happy with the work that Mr. Milligan and his cohorts and colleagues performed for the court, so I am comfortable and happy to appoint Mr. Milligan in this role in this case.

And I think everything else in the order except those things I mentioned before, which are just the fee paragraph and the bond, which is I usually just do $500.  I know that seems kind of silly but I think it's a good idea just to -- for everyone, particularly people who may not be lawyers, who may pick this up and think, well, he gets to just take everything over and he didn't have to put anything up himself.  I think it's important for that, and that's why I do it.

So, we're going to all stay in the courtroom until Miss Ward gets this finished and brings it out here.  But that is the order of the court and I will sign that.

And so, that will conclude the ex parte part of this hearing.

Now, before you hop up, let's see,

Mr. Chapple, you can sit down.

So, Mr. Broocks, you wanted to respond to Mr. Bankston's allegations.  What I understood from him was that he's asking me to set a hearing to challenge a bond and for sanctions, two motions that have not yet been filed.  I am guessing everything he said today will be included in one or both of those motions and that you will have an opportunity to respond in writing and in argument when we have that hearing.

Obviously I never know what a lawyer is going to say before they stand up and start talking to me.  Mr. Bankston has been in front of me a lot, so he probably knows if he said, hey, I want to talk about some things that might not be perfectly on point for today, I might have said "no," so he didn't ask. That's okay, that's a lawyer.  That's what lawyers do. But that information, with the exception of letting me know that the Connecticut Plaintiffs or Lafferty Plaintiffs were here properly, really did not play into my decision today.  However, he did get to talk to me for about ten minutes on that; so if you want to do that now, I'll let you.

MR. BROOCKS:  Thank you, Your Honor.

THE COURT:  Would you like to do that?

MR. BROOCKS:  I would like to very much,

Your Honor.

THE COURT:  Okay.

MR. BROOCKS:  And I will be very brief about this.

What he's told you that is incorrect affects the validity of what you've just done, because it is true that in February, after a failed auction, Judge Lopez did say, this is over, it's void.  But then we presented to him the fact that the Texas Plaintiffs had appealed to the federal district court the order.  Because at one point in time Connecticut and Texas were very much at odds.  And he said in a June hearing, he specifically said, my action in doing so was void.  I didn't -- I did not void anything.  And I've got the transcript here of the June 5th hearing.

So, he -- not only did he say, I didn't do it, he said, I didn't have the authority to do it, it was -- my act of doing so was itself void.  And what this means for you, Your Honor, is that the -- and, in fact, even point out something else, the order that they asked you originally to sign and the one that you have just signed, let me get that, the page.

If you will look at the order you just signed, on page 3, they have you reflecting in your recitations you find that the Judgment Debtor FSS filed

for bankruptcy under Chapter 11, top of page 3, on July 29th, and I'm going to skip some of the parentheticals, in the Bankruptcy Court.

Then, Following a hearing on June 14th, the Bankruptcy Court issued two orders in the FSS Bankruptcy Case dismissing the FSS bankruptcy and vesting authority in the Trustee to take control of Judgment Debtor FSS, including its assets and bank accounts, and they cite the two orders. Then they say, Accordingly, the application only seeks relief relating to the following: As to the Judgment Debtor FSS, subject to the approval of the Trustee.

So, contrary to telling you that the orders are void, they have you signing this order saying the orders are still out there. Why did they include that, the recitation of two orders, if they thought they were void? Because they know they're not, Judge. He wasn't at the hearing. I was, Mr. Chapple was. Judge Lopez said, I didn't have the authority. And it even gets more complicated. Because under the federal Rules of Civil Procedure, once he had no authority to void an order, once its appealed, he can interpret it, but he can not change it, he can't void it. And he said so himself on June 5th, and I have the transcript.

Moreover, when they withdrew their appeal, they dismissed the appeal to the district court, what that did is it returned to -- the case to the Bankruptcy Court.  He cannot, as he said in his transcript, he cannot, given the lapse of time, sua sponte undo the Supplemental Order.  He said so.  What he has to do is someone must make a Rule 60 motion for -- and because he said, I can't do it myself, that's clear federal Rules of Civil Procedure, that I have to wait for someone to do it, and no one has done so.

So, whatever you've been told I'm stunned to hear it, because I was at the hearing, we filed a motion pointing out his lack of jurisdiction to vacate it, he acknowledged that, he says it in writing, he says it multiple times, and I can show you, I have them bookmarked here.  So, the point is not only is it incorrect to state that we have misrepresented things to you about the voiding of the order, it is just incorrect, he himself said that.  And the consequence of your signing today a turnover order about assets that have been judicially decreed to go to the Trustee, as they acknowledge, is itself void.  Is itself void.

The case of *Black vs. Shore*, which we argued and won in the Corpus Court of Appeals is about

that very subject:  Turnover orders issued when an automatic stay is in effect, and it is -- and -- is void.  Now, why would they ask you, to say, subject to the Bankruptcy Court Trustee?  The Bankruptcy Clerk Trustee has no authority to make decisions.

THE COURT:  I'm sorry.

*(Interruption in proceedings.)*

MR. BROOCKS:  May I continue, Your Honor?

THE COURT:  Yes.

MR. BROOCKS:  The Bankruptcy Trustee has no authority to make orders.  He always can make recommendations to the court.  It's the judge that does that.  Just like Your Honor.  You rule your court.  Judge Lopez will take a Trustee's recommendations.  He can't do anything without Lopez's approval.  So, these caveats about subject to the Bankruptcy Trustee's approval is a meaningless statement.  He has no authority to make orders.  The order they asked you to sign is void and if you sign it and it stays in effect, a mandamus will be filed because it's just not right.

The facts that they told you about the domestication itself, we did remove the entirety of the process.  It's in federal court.  We have challenged under federal rules and law the validity of the domestication.  We have challenged it.

Your honor, it gets to complicated First Amendment issues that Your Honor didn't get presented, apparently, but we argued in the Austin Court of Appeals back at the end of May, but we have argued, you know, Rule -- I mean 183 violations that we say validated the domestication, and that's in front of Lopez.  The very order you asked for the case number is a federal action.  So, the domestication is not valid.

THE COURT:  Well, it might not be valid to Mr. Jones, but your removal doesn't mention Free Speech Systems at all.

MR. BROOCKS:  No, the current removal. The current removal.  But the one we achieved back when they filed --

THE COURT:  No, I'm looking at it, from last October.  It doesn't say Free Speech Systems.

MR. BROOCKS:  It was my understanding, Your Honor, I don't have the documents in front of me, but I've got -- my recollection was that the domestication and turnover sought was in its entirety removed.  If I'm mistaken, I apologize.

THE COURT:  Yeah, I think what we're going to do -- well, I don't think it, I know what we're going to do.  I'm going to leave it, because I actually, that's why I wanted to see this file, was how

was the domestication done.  And I looked at the removal and I only see that it's on behalf of Mr. Jones.  So, I agree if there had been an order presented to me for Mr. Jones that I would have a problem, but it wasn't, it's just Free Speech Systems.

So, I'm going to sign it.  I know Judge Lopez can scold everyone, including me, all the way from Houston, it's happened before, it can happen again.  But I am worried about these assets.  I'm quite concerned that more and more time going by is justice denied, and that is not what we want in our courts and in our country, much less our state.

So, I am going to stick with my decision. I have heard you, we will come back on all the other things; but I feel like I have looked at the issues and the actual record in the court's file, and I don't think Free Speech Systems is part of that removal.  If I'm wrong, of course someone will tell me; and I'll change whatever I have to change, so.

MR. BROOCKS:  All right.  Thank you for hearing me out on that.

THE COURT:  Of course.  Always.  Just at the right time.

MR. DAUGHTRY:  Judge, can I make one correction?  Just what Mr. Broocks said, the transcript

of the hearing was not June, it was February 5, 2025, in which the Court said, I lose jurisdiction over that order immediately.

THE COURT:  Well, that's okay.  I'm not --

MR. DAUGHTRY:  I just didn't want a problem --

THE COURT:  I appreciate that, trying to be accurate.  I do.

All right, well, while we wait for the order, I guess we can look at the calendar.  You're right, I normally require a motion to be filed before a hearing is set, but since you know what you're going to file, the case is only coming to me, we really do that to control the dockets more than anything else, we can look ahead now.

History as a guide, everyone will want to file paperwork for me to read in advance, and probably a lot of it; so we need to build in some time.  So, let's start by thinking when you think you'll get your motions filed, Mr. Bankston.

MR. BANKSTON:  Okay.

THE COURT:  And then how much time you think you need, Mr. Broocks.

MR. BROOCKS:  May I make a comment?

THE COURT:  You may.

MR. BROOCKS:  As I understand the rules of the protest of the bond, we are entitled to get some discovery here.  So, if -- I haven't seen their papers, all I can go on is what has been said he's going to say.  To the extent that some of these issues he's addressed here today are going to be raised, I intend to take people's depositions.  It won't be long, but these are serious allegations and serious questions if we're entitled.  So, I wanted the Court to factor that into your scheduling is all same saying.

THE COURT:  Well, here is what I'll -- we'll pick a date based on briefing schedules alone.  And then if some issues arise and you think you need to conduct discovery, and they either agree and then you can say, Judge, we would like to push our hearing date by one week, or whatever it is, or they don't agree and they file a motion to quash, we'll have a hearing on that if you set it.  If you don't, we'll just proceed with the hearing.  So, we'll just handle it in the normal way instead of trying to anticipate how much fighting there will be.

MR. BROOCKS:  Thank you, Your Honor.

THE COURT:  Because then we would have to set it in like two years, and that doesn't do anybody

any good.

MR. BROOCKS:  Thank you, Your Honor.

MR. BANKSTON:  Just for safety sake why don't we say I can get it on file by Monday.

THE COURT:  Okay.  So, that's less than a week.

MR. BANKSTON:  Yes.  They're almost ready.  So, I anticipate Friday but let's just be safe and say Monday.

THE COURT:  So, if you receive his motions on Monday, August 18th, how much time do you think you need to respond?  We're just talking about briefing right now, not on everything that could possibly happen.

MR. BROOCKS:  Judge, I know you're not interested in my calendar, you know, and I understand that.

THE COURT:  And I know you have a lot of people that work with you.  I'm just asking you how much time do you want to get a response brief on file.

MR. BROOCKS:  And it's difficult to respond to that without having seen the motion, but I would say I've got a brief in California due on the 22nd and the Supreme Court September 5th.

THE COURT:  Are you saying they're more

important than me?

No, it's a joke.

MR. BROOCKS:  If they file it on Monday, the 18th -- may I confer, Your Honor?

THE COURT:  You may.

*(Pause in proceedings.)*

MR. BROOCKS:  Your Honor, can we have three weeks?

THE COURT:  Three weeks is a lot.

Also this is a mistake.

MR. BROOCKS:  That will be September 1st anyway, Labor Day.

I'm sorry, did you say "no" to three weeks?

THE COURT:  I did and then I got distracted by this order.  Because --

All right, Miss Ward, you've got to come back.  I'm sorry, it's not quite right.

*(Pause in proceedings.)*

THE COURT:  Okay, how about two weeks.

MR. BROOCKS:  That would put us at Labor Day?

THE COURT:  September 2nd.

MR. BROOCKS:  Monday?

THE COURT:  Oh, September 1st.  It's

Labor Day.

MR. BROOCKS:  Instead of ruining my son's Labor Day, what if we book the 29th, the Friday before.

THE COURT:  Sure, you got it.

MR. BROOCKS:  Okay, I'm being overruled. He is going to ruin my Labor Day.  So, I'll do the 2nd, if Your Honor will give it to me.

THE COURT:  Okay.  So, I need to keep track of this.  So, we are going to do August 18th, September 2nd.

I've never known Mr. Bankston to turn down an opportunity for more words.  Would you like the opportunity to file a reply?

MR. BANKSTON:  I think that's -- I would probably take advantage of that, I would imagine.

THE COURT:  Is a week enough time?

MR. BANKSTON:  Oh, yes, absolutely.  In fact, I was going to suggest having the hearing a week after the due date.

THE COURT:  But I have to read it all.

MR. BANKSTON:  So, you have to read the reply.

THE COURT:  So, 9/9, Mr. Bankston.

MR. BANKSTON:  Okay.  That can work.

THE COURT:  And then that means we're

going to -- oh, Miss Ward is on vacation the week later.

How much time do -- you think we can get this done in half a day, right?

MR. BANKSTON:  Oh, yeah, definitely not a full day, Your Honor.

THE COURT:  Okay.  Well, that doesn't leave me with any choices.  So, all right, morning or afternoon?

MR. BROOCKS:  Afternoon preference.

THE COURT:  Afternoon?  Afternoon okay?

MR. BANKSTON:  That's fine with me, Your Honor.

THE COURT:  Tuesday, September the 16th at 2:00 p.m.

MR. BANKSTON:  Thank you, Your Honor.

THE COURT:  Now, you'll still need to announce.  I'll get it set but you'll still need to announce.

Now, we just have to wait for Miss Ward. Because I lied to her and told her to only change two things and then I was like, oh, no, actually change these other things, too.  So, we're all just going to wait.

MR. BROOCKS:  While we're waiting can I

run down the hall?

THE COURT:  To do what?

MR. BROOCKS:  Go to the bathroom.

THE COURT:  Just don't make any phone calls to anyone.  Don't tell anyone to do anything, because I haven't signed the order.

MR. BROOCKS:  I'll sit back down.

THE COURT:  And I don't mean to be casting aspersions on your ethics, but just I have seen a lot of shenanigans in this case.

MR. BROOCKS:  And I want to say on this subject, we have nothing but the highest respect for this Court, and I want you to understand this, this is nothing but the highest respect for this Court at all times.

THE COURT:  Thank you.

And I take that as the court, an institution, not me.

MR. BROOCKS:  No, you, too.  Well, the court, obviously, but you, as well.

THE COURT:  Well, I'm not worried about me.  I'm worried about our institutions, I'm worried about the rule of law, I'm worried about professional ethics.  Those are the things I worry about.

MR. DAUGHTRY:  Your Honor, would it be

fair to request that we have a copy of the PowerPoint that was put on the screen today, since that really is planted in your mind and there's a lot that needs to be --

THE COURT:  Well, I'll tell you what, I don't have a copy of it.

MR. DAUGHTRY:  I meant could you ask --

THE COURT:  Let me finish.  I don't have a copy of it, and he's going to put it all in his brief, his motions, and you'll definitely get that. And so, I think we'll just both wait until we have what counts as a real legal filing in the case.  Okay?

MR. DAUGHTRY:  Okay, Judge.

THE COURT:  Thank you, Miss Ward.

All right, let me just look through it real quick.

*(Pause in proceedings.)*

I don't want to send her back to do another edit, I just for the first time noticed in the broad definition of "Rights" it says, "Hire any person necessary," but I have changed the language in the more particular clause to say "with court approval," and I intend that to govern over the clause in general rights.  You understand, Mr. Milligan?

MR. MILLIGAN:  I do, Your Honor.

THE COURT: Okay. Thank you.

All right, August 13th, the order is signed.

If you want a copy I'll have my Judicial Executive Assistant -- okay, so, we'll get file stamped copies made and brought back out for you.

Yes, Mr. -- oh, you're just ready to leave. No problem.

I am going to give you this back.

MR. CHAPPLE: Oh, thank you, Judge.

THE COURT: Thank you.

And we have our schedule. And I'll get the hearing set, but you've got to announce. Don't forget to do that. It will be in person, we'll be here.

Anything else before we go? No?

MR. BROOCKS: Nothing, Your Honor.

THE COURT: All right. Thank you all very much.

We will take, for my other case, about a 15-minute break. Thank you.

MR. BANKSTON: Thank you, Your Honor.

MR. BROOCKS: Thank you, Your Honor.

*(Evening recess.)*

REPORTER'S CERTIFICATE

THE STATE OF TEXAS          )

COUNTY OF TRAVIS            )

I, Alicia DuBois, Official Court Reporter in and for the 459th District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the Proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this, the 15th day of August, 2025.

                              /s/ Alicia DuBois
                              Alicia DuBois, CSR
                              Texas CSR 5332
                              Exp. Date:  1/31/26
                              Official Court Reporter
                              459th District Court
                              Travis County, Texas
                              1700 Guadalupe
                              Austin, Texas 78701
                              (512) 854-9301

7/7/2025 1:50 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Max Hernandez

NO. D-1-GN-18-001835

| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| Defendants | § | 261st JUDICIAL DISTRICT |

**APPLICATION FOR POST-JUDGMENT
TURNOVER ORDER AND APPOINTMENT OF RECEIVER AS TO
JUDGMENT DEBTORS' ALEXANDER E. JONES AND FREE SPEECH
SYSTEMS, LLC**

Plaintiffs Neil Heslin and Scarlett Lewis (the Texas Families) and Intervenors David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Families and, collectively with the Texas Families, the Judgment Creditors) respectfully request that the Court grant this Application for Turnover Relief and Appointment of a Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) against Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors). Judgment Creditors would respectfully show the Court the following:

1. **Connecticut Families' Judgment**. The Connecticut Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Connecticut Families in the amount of $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court. The Connecticut Supreme Court has

APPENDIX C

denied further review.  *See* **Exhibit B, Denial of Certification of Review**.  The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review.  *See* **Exhibit A, Declaration of Alinor C. Sterling**.  The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code.  Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024.  Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case).  On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1]  *See* **Exhibit C, Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones**.  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

APPENDIX C

with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed.  The Connecticut Appellate Court denied that motion on May 13, 2025.  *See* **Exhibit D, Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**.  The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

2.     In the Free Speech Systems, LLC Chapter 11 Case, the Bankruptcy Court for the Southern District of Texas issued an order dismissing the case and vesting authority in the Trustee in the Jones Chapter 7 Case (the Trustee) to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts.  *See* Dkt. 956 (June 21, 2024).  Accordingly, this Application only seeks relief relating to Judgment Debtor Free Speech Systems, LLC if approved by the Trustee in the Jones Chapter 7 Case.

3.     **Texas Families' Judgment**.  The Texas Families own a judgment against the Judgment Debtors.  Judgment Debtors are obligated to the Texas Families in the amount of $50,043,923.80 under the judgment rendered before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment).  *See* **Exhibit E, Declaration of Avi Moshenberg**.  The Connecticut Families' Judgment and the Texas Families' Judgment are collectively referred to as the Judgments.

4.     The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

5.     For the avoidance of doubt, the Judgment Creditors are **not** seeking any relief that would be inconsistent with the pending Jones Chapter 7 Case, including seeking any relief with respect to assets that Judgment Debtor Alex Jones owned on or before

June 14, 2024, as such assets constitute property of the Jones Chapter 7 Bankruptcy Estate.

6.      However, any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, do not constitute property of the Jones Chapter 7 Bankruptcy Estate and are thus available to satisfy the Judgments.  Further, any assets of Free Speech Systems, LLC, subject to the approval of the Trustee are available to satisfy the Judgments.

7.      Accordingly, Judgment Creditors seek to **only** execute upon the following categories of assets, and, in each case, solely to the extent necessary to satisfy the Judgments (collectively, the Receivership Assets):

(a)     any non-exempt assets Judgment Debtor Alex Jones has acquired post-conversion or may acquire in the future;

(b)     any pre-conversion assets of Judgment Debtor Alex Jones which are expressly abandoned by the Trustee such that they no longer are property of the Chapter 7 bankruptcy Estate;

(c)     any post-conversion payments Judgment Debtor Alex Jones is contractually entitled to; and,

(d)     subject to the approval of the Trustee, any assets of Judgment Debtor Free Speech Systems, LLC.

8.      Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.  A courtesy copy of this Application is being served on the Trustee.

9.      Judgment Creditors file this Application pursuant to pursuant to Texas Civil Practice and Remedies Code section 31.002(d) that provides: "The judgment creditor may move for the court's assistance under this section in the same proceeding in which the

APPENDIX C

judgment is rendered or in an independent proceeding." The proposed receiver, Gregory S. Milligan, resides in Travis County.

10.     **Turnover and Appointment of Receiver**. Chapter 31 of the Texas Civil Practice and Remedies Code provides that: "A judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities." TEX. CIV. PRAC. & REM. CODE § 31.002(a) (as amended Acts 2017, 85th Leg., R.S., Ch. 996 (H.B. 1066), Sec. 1, eff. June 15, 2017).

11.     The court may "appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." *Id.* § 31.002(b). Appointment of a receiver is prudent to provide for an orderly distribution of assets given Judgment Debtors have multiple creditors as detailed herein and given the attention that must be given to delineate the Jones Chapter 7 Bankruptcy Estate.

12.     **Property**. Pursuant to Judgment Debtor Jones's sworn discovery responses attached to this application, he has non-exempt property. *See* **Exhibit A**, **Declaration of Alinor C. Sterling**. Pursuant to Judgment Debtor Free Speech Systems, LLC's sworn discovery responses attached to this application, it has non-exempt property can be used to satisfy the Judgments. *Id.*

13.     **Turnover and Receiver**. Judgment Creditors request that Judgment Debtors be ordered to turn over all non-exempt, non-bankruptcy estate property and appoint Gregory S. Milligan, CTP, whose address is 8911 North Capital of Texas Highway

APPENDIX C

Suite 2120 Austin, Texas 78759, (512) 892-0803, milligan@harneypartners.com, as Receiver over such non-exempt, non-bankruptcy estate property. Mr. Milligan has served as post-judgment turnover receiver in numerous cases before courts of the State of Texas and federal courts; he is a certified turnaround professional; and he is qualified to serve. Judgment Creditors request no bond be required. *Childre v. Great Sw. Life Ins. Co.*, 700 S.W. 2d 284, 289 (Tex. App.—Dallas 1985, no writ).

14.     **Notice to Judgment Debtor**.  Notice and a hearing are not required before issuance of a turnover order.  *See Thomas v. Thomas*, 917 S.W.2d 425, 433-34 (Tex. App.—Waco 1996, no writ).

15.     **Attorney's Fees**.  Pursuant to Texas Civil Practice and Remedies Code section 31.002, Judgment Creditors are entitled to recover their reasonable costs and attorney's fees incurred in attempting to collect their judgment.

16.     **Prayer**.  Judgment Creditors pray that the Court grant this Application, order turnover of Judgment Debtors' non-exempt property that is not part of the Chapter 7 bankruptcy Estate, appoint Gregory S. Milligan as Receiver, award Judgment Creditors reasonable attorney's fees and expenses, and grant all further relief to which Judgment Creditors may be entitled.

APPENDIX C

Respectfully submitted this 7th day of July 2025.

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEYS FOR**
**THE CONNECTICUT FAMILIES**

/s/ Avi Moshenberg
Avi Moshenberg
State Bar No. 24083532
**LAWSON & MOSHENBERG PLLC**
2301 Commerce Street, Suite 200
Houston, TX 77002
Telephone: (713) 449-9644
Email: avi.moshenberg@lmbusinesslaw.com
**ATTORNEYS FOR**
**THE TEXAS FAMILIES**

APPENDIX C

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Application for Post-Judgment Turnover and Appointment of Receiver has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 7th day of July, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Chapter 7 Trustee | Christopher R. Murray<br>chris@jonesmurray.com<br>crm@trustesolutions.net<br><br>Erin Jones<br>erin.jones@jonesmurray.com<br><br>Joshua Wolfshohl<br>jwolfshohl@porterhedges.com |
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan<br>milligan@harneypartners.com |

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple

APPENDIX C

# EXHIBIT A

APPENDIX C

## DECLARATION OF ALINOR C. STERLING

THE STATE OF CONNECTICUT     §
                             §
COUNTY OF FAIRFIELD          §

1.      "My name is Alinor C. Sterling. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2.      "I am an attorney in the law firm of Koskoff Koskoff & Bieder PC and licensed to practice law in the State of Connecticut. I am one of the attorneys of record for David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively, the Connecticut Sandy Hook Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3.      "Judgment Creditors own a judgment against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Vickie L. Driver, 2525 McKinnon St., Suite 425, Dallas, Texas 75201; Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 900, Corpus Christi, Texas 78401. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the Judgment Creditors is the Connecticut Sandy Hook Families c/o Alinor C. Sterling, Koskoff Koskoff & Bieder PC, 350 Fairfield Avenue, Bridgeport, Connecticut 06604.

1

APPENDIX C

4.      "Judgment Debtors owe $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court.  The Connecticut Supreme Court has denied further review.  The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. True and correct copies of these documents are being filed contemporaneously with this Declaration.

5.      "Pursuant to the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code, domestication papers related to the Connecticut Families' Judgment were filed on August 1, 2024. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in

2

bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1]  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed.  The Connecticut Appellate Court denied that motion on May 13, 2025.  The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

6.      "The Judgment Creditors have counsel in the State of Texas.  Their counsel is Ryan E. Chapple of Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, Texas 78701."

## OATH

My date of birth is May 16, 1967.  My business address is 350 Fairfield Avenue, Bridgeport, Connecticut 06604.  I have read the foregoing Declaration, and I declare under penalty of perjury that the foregoing Declaration is true and correct.

Executed in Fairfield County, Connecticut on June 23rd, 2025.

Alinor C. Sterling

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

# EXHIBIT 1

<span style="color:red">APPENDIX C</span>

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.   COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

APPENDIX C

**TO PLAINTIFF ROBERT PARKER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $ 60,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES          $ 60,000,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF ROBERT
> PARKER AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>                                       $ 120,000,000.00

2

LM

APPENDIX C

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $ 25,000,000.00


B. EMOTIONAL DISTRESS DAMAGES                 $ 30,000,000.00
   (PAST AND FUTURE)


   TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)
                                              $ 55,000,000.00

3

LM

APPENDIX C

TO PLAINTIFF FRANCINE WHEELER:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $ 24,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $ 30,000,000.00
    · (PAST AND FUTURE)

            TOTAL FAIR, JUST AND REASONABLE
            DAMAGES TO PLAINTIFF FRANCINE
            WHEELER AND AGAINST ALEX JONES
            AND FREE SPEECH SYSTEMS
            (ADD LINE A AND LINE B)
                                               $ 54,000,000.00

4

LM

APPENDIX C

**TO PLAINTIFF JACQUELINE BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $10,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $18,800,000.00
    (PAST AND FUTURE)

                TOTAL FAIR, JUST AND REASONABLE
                DAMAGES TO PLAINTIFF JACQUELINE
                BARDEN AND AGAINST ALEX JONES
                AND FREE SPEECH SYSTEMS
                (ADD LINE A AND LINE B)
                                               $ 28,800,000.00

5

LM

**TO PLAINTIFF MARK BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                           $25,000,000.00


B.  EMOTIONAL DISTRESS DAMAGES                  $32,600,000.00
    (PAST AND FUTURE)


        **TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF MARK
        BARDEN AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)**
                                                $57,600,000.00


6

LM

APPENDIX C

**TO PLAINTIFF NICOLE HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $41,600,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF NICOLE
   HOCKLEY AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**
                                        $ 73,600,000.00

7

LM

APPENDIX C

**TO PLAINTIFF IAN HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $38,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $43,600,000.00
    (PAST AND FUTURE)

             **TOTAL FAIR, JUST AND REASONABLE
             DAMAGES TO PLAINTIFF IAN
             HOCKLEYAND AGAINST ALEX JONES
             AND FREE SPEECH SYSTEMS
             (ADD LINE A AND LINE B)**
                                               $81,600,000.00

8

LM

APPENDIX C

TO PLAINTIFF JENNIFER HENSEL:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $21,000,600.00

B.  EMOTIONAL DISTRESS DAMAGES          $31,000,000.00
    (PAST AND FUTURE)

> TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF JENNIFER
> HENSEL AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)
>
> $52,000,000.00

9

LM

APPENDIX C

TO PLAINTIFF DONNA SOTO:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $18,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $30,000,000.00
    (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

                                              $48,000,000.00

10

LM

APPENDIX C

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $36,000,000.00
    (PAST AND FUTURE)

    **TOTAL FAIR, JUST AND REASONABLE
    DAMAGES TO PLAINTIFF CARLEE
    SOTO PARISI AND AGAINST ALEX JONES
    AND FREE SPEECH SYSTEMS
    (ADD LINE A AND LINE B)**

                                               $ 66,000,000.00

11

APPENDIX C

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $18,600,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $39,000,000.00
    (PAST AND FUTURE)

          **TOTAL FAIR, JUST AND REASONABLE**
          **DAMAGES TO PLAINTIFF CARLOS**
          **MATHEW SOTO AND AGAINST ALEX JONES**
          **AND FREE SPEECH SYSTEMS**
          **(ADD LINE A AND LINE B)**

                                    $ 57,600,000.00

12

APPENDIX C

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                           $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $38,800,000.00
   (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

                                               $ 68,800,000.00

13

APPENDIX C

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                              $45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                     $45,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF WILLIAM
   ALDENBERG AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**                      $90,000,000.00

14

APPENDIX C

TO PLAINTIFF ERICA LAFFERTY:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                        $ 18,000,000.00


B. EMOTIONAL DISTRESS DAMAGES             $ 58,000,000.00
   (PAST AND FUTURE)


        TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF ERICA
        LAFFERTY AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)

        $ 76,000,000.00

15

APPENDIX C

TO PLAINTIFF WILLIAM SHERLACH:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                        $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES            $ 27,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
SHERLACH AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 36,000,000.00

16

LM

APPENDIX C

## II.   AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

If you check YES, the judge will determine the amount
due to the plaintiffs for reasonable attorney's fees
and costs and will then award the plaintiffs that
amount at a later date.

If you check NO, the judge will award $1 to the
plaintiffs for their attorney's fees and costs.

## WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.

    ☒ **YES**    (reasonable attorney's fees and costs to be awarded by the judge at a later date)

    ☐ **NO**    (judge will award $1)

17

APPENDIX C

FOREPERSON SIGNATURE

10/12/2022

DATE

18

APPENDIX C

# EXHIBIT 2

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . .   . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . .   . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg.  Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]   In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

APPENDIX C

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies.  All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him.  The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people.  Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident.  According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has."  The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

APPENDIX C

gain. In fact, by May, 2013, Jones was alleged to make approximately $10 million annually. Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ." In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card. Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

APPENDIX C

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before.  They don't know that they've sealed it all, demolished the building.  They don't know that they had the kids going in circles in and out of the building as a photo-op.  Blue screens, green screens, they got caught using."  On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . .  [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV."  Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

APPENDIX C

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

_____

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

7

APPENDIX C

throughout the course of the litigation.  The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants.  The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly.  And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022..  On October 12, 2022, the jury reached its verdict as to the various plaintiffs.  Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice.  For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei."  *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

APPENDIX C

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

APPENDIX C

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

### Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna v. Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

10

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

APPENDIX C

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award. Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, supra, 193

APPENDIX C

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472,493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

13

APPENDIX C

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier. . . .* Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

APPENDIX C

and cases cited therein. More recently, in *Bifolck v. Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

16

APPENDIX C

punitive damages against [the defendant].   The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees.   The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees.   [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.)   *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150 (1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

APPENDIX C

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

18

APPENDIX C

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

19

APPENDIX C

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

20

APPENDIX C

Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.) "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

21

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

APPENDIX C

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier.  Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

23

APPENDIX C

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

25

APPENDIX C

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim,* supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512.  'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions.  The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases.  In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

APPENDIX C

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co.* discussed. These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

30

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

APPENDIX C

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

APPENDIX C

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns.   In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

33

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

APPENDIX C

authorized or imposed in comparable cases.'  *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

35

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

APPENDIX C

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth.  On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs.  In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident."  (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

38

APPENDIX C

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion." (Citation omitted; footnote omitted.) Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

APPENDIX C

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

40

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

41

APPENDIX C

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

42

APPENDIX C

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

43

APPENDIX C

plaintiffs.   This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.


Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

APPENDIX C

costs in the total amount of $1,489,555.94, and awards CUTPA

punitive damages in the amount of $150,000,000.00.

421277

Barbara N. Bellis

APPENDIX C

APPENDIX C

# EXHIBIT 3

| AC 46131 | : | STATE OF CONNECTICUT |
| ERICA LAFFERTY, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46132 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46133 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

## PLAINTIFFS-APPELLEES' MOTION FOR RECTIFICATION

Pursuant to Rule of Appellate Procedure § 66-5, the plaintiffs-appellees hereby move the trial court to rectify the record in conformity with the verdict and judgment entered thereon.

Throughout the case, by agreement, the parties referred to Erica Lafferty, rather than the trustee of her bankruptcy estate, Richard Coan, as a plaintiff. Judgment entered in the total amount of $111,429,303.73 ($76,000,000.00 in compensatories plus $35,429,303.73 in punitives) in favor of Mr. Coan as Trustee of the Bankruptcy Estate of Ms. Lafferty. However, the verdict form and parts of the punitive damages Memorandum of Decision refer to Ms. Lafferty rather than Mr. Coan. To make the record crystal clear for the

1

reviewing court, plaintiffs seek rectification. The requested relief does not alter the amount or character of the judgment. It simply clarifies the record for a reviewing court.

## I.    BRIEF HISTORY OF THE CASE

The plaintiffs in this case are members of eight families who lost loved ones in the Sandy Hook Elementary School Shooting and one first responder. The plaintiffs brought suit against defendants Alex Jones and Free Speech Systems, LLC (collectively, "the Jones defendants") alleging invasion of privacy by false light; defamation per se; intentional infliction of emotional distress; and violation of the Connecticut Unfair Trade Practices Act. On June 18, 2019, the trial court (Bellis, J.) sanctioned the Jones defendants for discovery non-compliance and because Alex Jones threatened plaintiffs' counsel on his show. Reviewing pursuant to General Statutes § 52-265a, this Supreme Court affirmed. *Lafferty I*, 336 Conn. 332 (2020).

Following the affirmance of the sanction, the Jones defendants continued their obstruction of discovery. The trial court entered a default against the defendants and subsequently struck their notice of defenses. DN 574, 11/15/21 Default Ruling; Ex. B, DN 620.20, 12/24/21 Order Striking Notice of Defenses. The case proceeded as a hearing in damages before a jury, with evidence commencing September 13, 2022. The jury rendered a verdict in favor of the plaintiffs on October 12, 2022, awarding a total of $965,000,000.00 in compensatory damages and determining that common law punitive damages were warranted. The trial court assessed $323,139,555.94 in common law punitive damages and $150,000,000.00 in CUTPA punitive damages, for a total of $473,139,555.94. DN 1026, 11/10/22 Punitives MOD (Ex. A hereto). Final judgment entered on December 22, 2022,

2

when the defendants' motions for remittitur and to set aside were denied. DN 1043, 12/22/22 MOD Denying New Trial and Remittitur.

Jones appealed that judgment on December 29, 2022: AC 46131, *Erica Lafferty, et al. v. Alex Emric Jones, et al.*; AC 46132, *William Sherlach v. Alex Emric Jones, et al.*; and AC 46133, *William Sherlach, et al. v. Alex Emric Jones, et al.* On December 30, 2022, the three appeals were consolidated. On January 6, 2023, the Jones defendants filed a Corrected Appeal Form, adding FSS to the appeal.[1] On February 23, 2023, the plaintiffs-appellees filed a motion to transfer the consolidated appeals to the Supreme Court. That motion, Mot SC 220201, is pending.

## II.    SPECIFIC FACTS RELIED ON

On October 20, 2021, Erica Lafferty was removed as a party plaintiff and Richard Coan, Chapter 7 Trustee of the Bankruptcy Estate of Erica Garbatini a/k/a Erica Lafferty, was substituted in as a party plaintiff to prosecute the interests of Ms. Lafferty's bankruptcy

---

[1] FSS filed bankruptcy on July 29, 2022 in the United States Bankruptcy Court for the Southern District of Texas. On August 29, 2022, the Bankruptcy Court (Lopez, J.) lifted the automatic stay to allow trial and any subsequent appeal to proceed. See Order Modifying Automatic Stay, *In re Free Speech Systems, LLC*, Case No. 22-60043, (Bankr. S.D. Tex.), ECF No. 117. On December 2, 2022, Alex Jones filed bankruptcy in the same court. On December 19, 2022, the Bankruptcy Court lifted the automatic stay so that this appeal could proceed. See Order Modifying Automatic Stay, *In re Alexander E. Jones*, Case No. 22-33553, (Bankr. S.D. Tex.), ECF No. 58.

3

estate. DN 459.20, Substitution Order.[2] Throughout the proceedings at trial, however, the parties agreed to refer to Erica Lafferty as a plaintiff, rather than referring to Mr. Coan. *E.g.* Ex. B, 10/4/22 Tr. Vol. III at 36:21-37:7. This agreement also applied to the jury interrogatories and verdict, which referred to Ms. Lafferty as a plaintiff, rather than to Mr. Coan. *Id.* The resulting verdict thus reads as an award in favor of Ms. Lafferty of $76,000,000, but is in fact in favor of Mr. Coan, as representative of Ms. Lafferty's bankruptcy estate. *See* DN 1010, Jury Verdict (attached as Ex. C).

In order to make it clear to a reviewing court that the compensatory damages verdict and punitive damages assessment that comprise the total damages award are in favor of Mr. Coan in his capacity as trustee for Ms. Lafferty's bankruptcy estate, the plaintiffs seek rectification of two references to Ms. Lafferty in the Memorandum of Decision on punitive damages, DN 1026 (Ex. B). These requested rectifications are:

(1) Page 9: after "(14) as to Erica Lafferty, $76 million" add "(pursuant to the parties' agreement that references to Ms. Lafferty on the jury verdict and interrogatories are to be treated as references to Mr. Coan in his capacity as trustee of Ms. Lafferty's bankruptcy estate, this verdict amount enters in favor of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty)"

---

[2] Erica Lafferty has also been known as Erica Garbatini. *See* DN 459, E. Lafferty's Mot. to Substitute Party at ¶1; DN 460, E. Lafferty's Memo. ISO Mot. to Substitute Party at ¶1. On December 5, 2018, Erica Lafferty a/k/a Erica Garbatini filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Erica L. Garbatini*, Case No. 18-51587, Ch. 7 Petition (Bankr. D. Conn. Dec. 5, 2018) (ECF No. 1). On September 16, 2021, plaintiff Erica Lafferty filed a Motion to Substitute Richard Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, for Individual Plaintiff Erica Lafferty in *Lafferty v. Jones* (DN 459). The court granted Ms. Lafferty's Motion to Substitute on October 20, 2021 (DN 459.20).

4

(2) Page 20: change "as to Erica Lafferty, $25.33 million;" to "as to Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, $25.33 million."[3]

Rectification of these references will ensure that the terms of the judgment are crystal clear to a reviewing court.

## III.    LEGAL GROUNDS ON WHICH MOVING PARTY RELIES

The plaintiffs rely on Rule § 66-5, which authorizes clarification of the trial court record via a motion for rectification.

## IV.    CONCLUSION

For these reasons, the plaintiffs request that the relief sought be granted.

THE PLAINTIFFS-APPELLEES,

By:    /s/ Alinor C. Sterling
       ALINOR C. STERLING
       CHRISTOPHER M. MATTEI
       JOSHUA D. KOSKOFF
       KOSKOFF KOSKOFF & BIEDER
       350 FAIRFIELD AVENUE
       BRIDGEPORT, CT 06604
       asterling@koskoff.com
       cmattei@koskoff.com
       jkoskoff@koskoff.com
       Telephone: (203) 336-4421
       Fax: (203) 368-3244
       JURIS #32250

---

[3] Other references in the Memorandum of Decision require no alteration because they refer to "plaintiffs."

## CERTIFICATION

Pursuant to Rule of Appellate Procedure § 62-7, I hereby certify that on this date, a true and correct copy of the foregoing has been delivered electronically to the last known email addresses of each counsel of record for whom an e-mail has been provided, as indicated below; that the foregoing document has been redacted or does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order or case law; and that the foregoing document complies with all applicable rules of appellate procedure.

**For Alex Emric Jones & Free Speech Systems, LLC:**
Norman Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Telephone: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

_/s/ Alinor C. Sterling_
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

6

APPENDIX C

# EXHIBIT 4

APPENDIX C

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
  AT WATERBURY

3/31/2023


ORDER


The following order is entered in the above matter:

ORDER:

The motion for rectification, filed by the plaintiffs on March 29, 2023, is granted, without objection.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

APPENDIX C

# EXHIBIT 5

APPENDIX C

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPENDIX C

---

Lafferty *v.* Jones

---

# ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
## (AC 46131)

# WILLIAM SHERLACH *v.* ALEX JONES ET AL.
## (AC 46132)

# WILLIAM SHERLACH ET AL. *v.* ALEX EMRIC JONES ET AL.
## (AC 46133)

Moll, Clark and Eveleigh, Js.

### *Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of the trial court rendered following jury verdicts for the plaintiffs in three underlying consolidated actions that arose out of the 2012 mass shooting at the Sandy Hook Elementary School in Newtown. The court had defaulted the defendants as a sanction for their repeated, wilful failure to fully and fairly comply with the plaintiffs' discovery requests and for violating a protective order. The cases then proceeded to a hearing in damages, after which the plaintiffs were awarded compensatory damages, attorney's fees and costs and, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal, the defendants claimed, inter alia, that the court incorrectly concluded that the plaintiffs' allegations were sufficient to support a legally viable CUTPA claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and a protective order.

The trial court's default order was a sanction that was proportional to the defendants' wilful noncompliance and misconduct in repeatedly failing to produce critical documents that the plaintiffs needed to prosecute their case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the cause of the harm they suffered, as the effect of the trial court's default order was to conclusively establish the defendants' liability, thereby leaving the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly limited the scope of J's testimony was deemed abandoned.

APPENDIX C

---

Lafferty *v.* Jones

---

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter,

APPENDIX C

Lafferty *v.* Jones

the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part; judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert

APPENDIX C

---

Lafferty *v.* Jones

in the underlying consolidated tort actions[3] arising out of the 2012 mass shooting at Sandy Hook Elementary School in Newtown. On appeal, the defendants claim that the court improperly (1) defaulted them as a sanction for violating certain discovery orders and a protective order, (2) construed the effect of the default to relieve the plaintiffs of the burden to prove the extent of their damages, (3) restricted the scope of Jones' testimony at the hearing in damages, (4) denied their motion for a remittitur, and (5) concluded that the plaintiffs' claim asserting a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., was legally sufficient. For the reasons that follow, we disagree with the defendants' first, second, and fourth claims, and deem the defendants' third claim to be abandoned as inadequately briefed. We agree, however, with the defendants' fifth claim. Accordingly, we reverse in part the judgments of the trial court.

---

Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated actions were largely identical, and the jury verdict returned in each action was the same. In the interest of simplicity, unless otherwise deemed necessary, we refer to the motions, pleadings, and other documents filed in the controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

APPENDIX C

---

*Lafferty v.* Jones

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis, J.,* defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order.

APPENDIX C

Lafferty *v.* Jones

Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

APPENDIX C

---

Lafferty *v.* Jones

---

abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied,     U.S.    , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain throughout this opinion, we decline to review any claims that the defendants have abandoned as a result of inadequate briefing.

I

The defendants first claim that the trial court improperly defaulted them as a sanction for violating certain discovery orders, as well as a discovery related protective order. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Shortly after the underlying consolidated actions had been commenced, the Jones defendants filed special motions to dismiss the actions pursuant to Connecticut's anti-SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The plaintiffs moved for limited discovery vis-à-vis the special motions to dismiss; see General Statutes § 52-196a (d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections raised by the Jones defendants to the plaintiffs' requests for production seeking, inter alia, marketing data, sales analytics, and web analytics that the Jones defendants

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation' . . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts, which made changes to the statute that are not relevant to these appeals. Accordingly, we refer to the current revision of the statute.

APPENDIX C

---

*Lafferty v. Jones*

---

"own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.'"

APPENDIX C

Lafferty *v.* Jones

program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019 broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal

APPENDIX C

Lafferty *v.* Jones

pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

APPENDIX C

---

Lafferty *v.* Jones

---

over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free

APPENDIX C

---

Lafferty *v.* Jones

Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

---

Lafferty *v.* Jones

---

were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

---

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

APPENDIX C

---

Lafferty *v.* Jones

---

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of Practice Book § 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

APPENDIX C

Lafferty *v.* Jones

accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

APPENDIX C

---

Lafferty *v.* Jones

---

ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

APPENDIX C

---
*Lafferty v. Jones*
---

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the

APPENDIX C

---

Lafferty *v.* Jones

---

appropriate sanctions at the next status conference."
Subsequently, by way of a notice of compliance dated
October 8, 2021, the Jones defendants represented that
they had provided supplemental responses to the plain-
tiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanc-
tion the Jones defendants for producing "manufac-
tured" documents in discovery. The plaintiffs con-
tended that the trial balances that had been produced
were not the originals but, rather, constituted altered
trial balances that Roe had manipulated prior to produc-
tion. On October 7, 2021, the Jones defendants filed an
objection. On October 18, 2021, the plaintiffs filed a
reply brief, and on October 20, 2021, with leave of the
court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from
the parties over the course of three days between Octo-
ber 20 and November 15, 2021, the court issued an oral
decision defaulting the Jones defendants as a sanction
for violating (1) the protective order and (2) its discov-
ery orders.[20] With regard to the protective order, the
court found in relevant part that (1) the Jones defen-
dants acknowledged that the motion to depose Clinton
contained information obtained from a deposition that
was designated as "Highly Confidential-Attorneys Eyes
Only" pursuant to the protective order, (2) the Jones
defendants argued that the protective order did not
preclude them from publishing such confidential infor-
mation so long as they did not identify the witness from
whom the information was obtained, which position
"did nothing but reinforce the court's August 5, 2021
order and findings that the [Jones defendants'] cavalier
actions constituted wilful misconduct and violated the

---

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor
of the court defaulting the Jones defendants for their misconduct. On Octo-
ber 20, 2021, the Jones defendants filed a memorandum of law in opposition
to a default order.

Lafferty *v.* Jones

court's clear and unambiguous protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

APPENDIX C

---

*Lafferty v.* Jones

---

the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that [Flores] had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the court's order."

The court next addressed the Google Analytics data requested by the plaintiffs, stating: "With respect to analytics, including Google Analytics . . . the [Jones] defendants on May 7, 2019, represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports but did not regularly use them. . . . The [Jones] defendants also claim that, on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not [to] the codefendants, an email the plaintiffs state they did not receive and that the court found would not have been in compliance with our rules of practice. On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete, final supplemental compliance was made by . . . [Jones] and Free Speech Systems, LLC, and that Infowars, LLC, Infowars Health, LLC, and Prison Planet [TV], LLC, quote: 'Had previously produced all documents required to be produced,' . . . representing that with respect to the Google Analytics documents, Free Speech Systems, LLC, could not export the dataset and that the only way they could comply was through the sandbox approach. Then on

APPENDIX C

---

*Lafferty v. Jones*

[October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

---

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

APPENDIX C

---

Lafferty *v.* Jones

---

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants'

APPENDIX C

---

Lafferty *v.* Jones

---

failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

---

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-à-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of

APPENDIX C

---

Lafferty *v.* Jones

---

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021]

---

this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

APPENDIX C

Lafferty *v*. Jones

§ 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be

_____

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

---
Lafferty *v.* Jones
---

proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373–74.

A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available

conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC*, 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

---

Lafferty *v.* Jones

---

to the public, the defendants plainly violated the protective order.

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation,* and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged

APPENDIX C

---

Lafferty *v.* Jones

---

failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the

APPENDIX C

---
Lafferty *v.* Jones
---

defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery

APPENDIX C

Lafferty *v.* Jones

orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's orders regarding the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See Practice Book § 13-9 (a)[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

---

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

APPENDIX C

---

Lafferty *v.* Jones

C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably

---

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d 1165 (2006) (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

APPENDIX C

---

Lafferty *v.* Jones

---

concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows

APPENDIX C

---

Lafferty *v.* Jones

---

deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their

APPENDIX C

Lafferty *v.* Jones

failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336 Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

APPENDIX C

Lafferty *v.* Jones

public." The court iterated these concerns during argument preceding its sanction order, stating in relevant part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive materials. The court reasonably determined that a lesser sanction

Lafferty *v.* Jones

would not suffice under such circumstances. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

APPENDIX C

<hr/>

Lafferty *v.* Jones

<hr/>

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

<hr/>

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing

APPENDIX C

---

Lafferty *v.* Jones

---

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff

---

to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

APPENDIX C

---

Lafferty *v.* Jones

---

is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving

---

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

APPENDIX C

---

Lafferty *v.* Jones

that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the defendants' claim fails.

### III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside

---

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray* v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however, is the trial court decision that this court reversed on appeal. See id., 332–35, 340. The defendants' reliance on that language, therefore, is untenable.

APPENDIX C

---

*Lafferty v. Jones*

of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the

APPENDIX C

---

Lafferty *v.* Jones

defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the

APPENDIX C

---

Lafferty *v.* Jones

---

sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

APPENDIX C

---

Lafferty *v.* Jones

that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages

---

[37] The jury submitted several notes during its deliberations.

APPENDIX C

---

Lafferty *v.* Jones

---

or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be

Lafferty *v.* Jones

given in favor of its correctness. . . . The chief rationale that has been articulated in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy, partiality, or prejudice."[38] (Citations omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n ruling on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . A generous award of noneconomic damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have

---

[38] The defendants assert that we should exercise plenary review over their claim because the jury's verdict "shocks the sense of justice" in violation of their due process rights. The defendants provide no legal authority in support of this assertion. We, instead, apply the well settled standard of review and examine the court's decision for an abuse of discretion.

APPENDIX C

---

Lafferty *v.* Jones

---

reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Internal quotation marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442, 457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula, and there is no precise rule for the assessment of damages. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) Id., 457; see also *Commission on Human Rights & Opportunities* v. *Cantillon*, 347 Conn. 58, 68–69, 295 A.3d 919 (2023) ("Noneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's verdict was necessary because the plaintiffs failed to submit sufficient evidence to establish their damages, such as medical evidence or expert testimony concerning their emotional distress, leaving the jury without a means to determine damages other than relying on passion, prejudice, and speculation. The defendants maintain that, rather than prove their damages, the plaintiffs "focus[ed] . . . on arousing sympathy,

APPENDIX C

---

Lafferty *v.* Jones

---

directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

---

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may

APPENDIX C

---

Lafferty *v.* Jones

---

testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages

---

articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert* v. *Halle*, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

APPENDIX C

---
Lafferty *v.* Jones
---

was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported the jury's verdict and, although substantial, the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 782. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a)[42] of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

---

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

APPENDIX C

---

Lafferty *v.* Jones

---

of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Footnote added; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 788, 219 A.3d 767 (2019). Section 42-110b (a), in turn, provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a (4) defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,"[44] (2) the defendants engaged in a "campaign

---

[43] CUTPA "refers to 'trade or commerce' in the substantive provision, § 42-110b (a), but contains a definition of ' "trade" ' and ' "commerce" ' in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning." R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, "[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager

APPENDIX C

---
Lafferty *v.* Jones
---

of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that

---
to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

APPENDIX C

---

*Lafferty v. Jones*

---

"the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action.''

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part:

---

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

APPENDIX C

---
Lafferty *v.* Jones
---

"With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies

---

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

APPENDIX C

---

Lafferty *v.* Jones

---

about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." General Statutes § 42-110b (a). The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in non-commercial speech outside of the scope of CUTPA. The plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England*, *LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly

APPENDIX C

Lafferty *v.* Jones

admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*,

APPENDIX C

---
Lafferty *v.* Jones
---

177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey* v. *Stamford Hospital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019) (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA

APPENDIX C

---
Lafferty *v.* Jones
---

claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in § 42-110a (4) (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co.*, *LLC* v. *Soto*,      U.S.    , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

Lafferty *v.* Jones

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC,* supra, 331 Conn. 67.

APPENDIX C

---

Lafferty *v.* Jones

---

clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of

APPENDIX C

---

*Lafferty v. Jones*

---

invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

APPENDIX C

# EXHIBIT 6

APPENDIX C

STATE OF CONNECTICUT
**APPELLATE COURT**

Date: Hartford, December 10, 2024

*To the Chief Clerk of the Appellate Court.*
The Appellate Court has decided the following case:

ERICA LAFFERTY ET AL.
*v.*                                                                         *Opinion by Moll, J.*
ALEX EMRIC JONES ET AL.

WILLIAM SHERLACH
*v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL.
*v.*
ALEX EMRIC JONES ET AL.

Docket Nos. AC 46131 /AC 46132 /AC 46133
Trial Court Docket Nos. UWYCV186046436S /UWYCV186046437S /UWYCV186046438S

        The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

Chief Judge

Rescript

APPENDIX C

# EXHIBITS 7-8

<span style="color:red">APPENDIX C</span>

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S,
UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

APPENDIX C

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

    v.

ALEX EMRIC JONES ET AL.

### ORDER ON PETITION FOR CERTIFICATION TO APPEAL

    The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

           /s/
        Carl D. Cicchetti
        Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

APPENDIX C

# EXHIBIT B

APPENDIX C

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

### CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

<u>          /s/          </u>
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

APPENDIX C

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

    v.

ALEX EMRIC JONES ET AL.

### ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.


ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

    _____/s/_____
    Carl D. Cicchetti
    Chief Clerk


Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

APPENDIX C

# EXHIBIT C

APPENDIX C

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 22-33553** |
| ALEXANDER E. JONES, | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |
| DAVID WHEELER, *et al.*, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 23-03037** |
| | § | |
| ALEXANDER E. JONES, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM DECISION ON CONNECTICUT PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AGAINST JONES**

Plaintiffs are parents of children murdered in the Sandy Hook Elementary School tragedy and a first responder. Before this bankruptcy case started, the Plaintiffs sued Alexander E. Jones and other defendants in a Connecticut state court. Three years into the litigation, the state court entered a default judgment against Jones based on repeated violations of discovery orders. The default judgment made Jones liable for the defamation and emotional distress claims. And, under Connecticut law, deemed Jones to have admitted all allegations in the Plaintiffs' state court petition. A jury awarded about $1.4 billion in compensatory and punitive damages for defamation, intentional infliction of emotional distress, and the Connecticut Unfair Trade Practices Act claims.

Jones and an entity he owns named Free Speech Systems, LLC filed separate bankruptcy cases in 2022. Free Speech elected to proceed under Subchapter V of the Bankruptcy Code. Jones is in a traditional chapter 11 case, not Subchapter V. This decision involves Jones's case only.

The Bankruptcy Code provides that some debts are excepted from a bankruptcy "discharge" and remain enforceable against the debtor even after a bankruptcy case ends. Plaintiffs started this adversary proceeding seeking an order stating that the debts related to the state court action are excepted from discharge under § 523(a)(6) of the Bankruptcy Code. They also believe that the state court record, including court orders and jury awards, prove that there are no material

1 / 18

issues of disputed fact and that summary judgment is warranted as a matter of law. Jones disagrees.

After careful consideration, and for the reasons explained in detail below, the Court grants summary judgment on all claims, except common-law punitive damages.

## Background

In May 2018, thirteen of the Plaintiffs started the lawsuit captioned *Lafferty, et al. v. Jones, et al.*, UWY-CV-18-6046436-S, in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court.[1] Then in December 2018 and January 2019, two substantively similar complaints—captioned *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046437-S and *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the *Lafferty* complaint (the "**Connecticut Action**").[2] Plaintiffs alleged the defendants were liable for, among other things, (i) invasion of privacy, (ii) defamation and defamation per se, and (iii) intentional infliction of emotional distress.[3] They also alleged the defendants violated the Connecticut Unfair Trade Practices Act ("**CUTPA**").[4]

In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct."[8]

---

[1] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 1, ECF No. 57-4.

[2] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 2, 3, ECF Nos. 57-5, 57-6.

[3] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 336–84, 2 at ¶¶ 329–77, and 3 at ¶¶ 416–64, ECF Nos. 57-4, 57-5, 57-6.

[4] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 385–94, 2 at ¶¶ 378–87, and 3 at ¶¶ 465–74, ECF Nos. 57-4, 57-5, 57-6.

[5] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74, ECF No. 59-24.

[6] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.

[7] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:15–18, ECF No. 59-24.

[8] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 15:1–4, ECF No. 59-24.

The Connecticut Action proceeded to a jury trial on damages for intentional infliction of emotional distress, defamation/defamation per se, invasion of privacy, and CUTPA claims against Jones and Free Speech.[9]

The state court issued lengthy jury instructions. The court instructed jurors that under applicable law, each defendant was responsible for the other's conduct and the entirety of the harm to the Plaintiffs.[10] Here are some of the jury instructions for defamation and intentional infliction of emotional distress:[11]

| Defamation | Intentional Infliction of Emotional Distress |
|---|---|
| Certain defamatory statements, whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages . . . | The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct. |
| The defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. | The conduct was extreme and outrageous. The conduct was the cause of emotional distress experienced by the plaintiffs. The emotional distress sustained by the plaintiff was severe. |
| The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. | It is established that the defendants inflicted such emotional distress on the plaintiffs. |
| [D]efendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public | The court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her |

---

[9] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, 11–12, ECF No. 57-21.

[10] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, ECF No. 57-21. Thus, any argument that findings about the defendants' conduct do not apply to Jones individually is wrong.

[11] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 12, 14, 15, 23, ECF No. 57-21.

# APPENDIX C

| to investigate and look into the plaintiffs and to the stop the people supposedly being the Sandy Hook hoax. | character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended and aggrieved. |
|---|---|

The state court also instructed the jury it could award common law punitive damages if the defendants' actions were willful, wanton, or malicious.[12] A "willful and malicious" harm was one inflicted intentionally, and "wanton" was "reckless misconduct."[13]

The state court also determined that the defendants were liable for violating CUTPA because "their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous."[14] The jury charge states that the CUTPA claim would be assessed separately by the state court.[15]

In October 2022, the jury awarded the Plaintiffs a total of $965 million in compensatory damages for defamation and emotional distress.[16] The award consisted of $403.6 million in defamation damages and $561.4 million in emotional distress damages. They also awarded common-law punitive damages in an amount left for the state court to award separately.

The Plaintiffs also moved for an award of punitive damages under CUTPA, which Jones opposed.[17] Under Connecticut law, CUTPA claims are determined by a court, not a jury. In November 2022, the state court issued a memorandum opinion setting the jury's award of common-law punitive damages for attorney's fees at $321.65 million and costs of about $1.5 million and awarding CUTPA punitive damages of $150 million.[18] The court found that the defendants (including Jones) engaged in intentional and malicious conduct certain to harm the Plaintiffs:[19]

---

[12] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23–24, ECF No. 57-21.

[13] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[14] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[15] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[16] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 19, ECF No. 57-22. The emotional distress damages consisted of damages for invasion of privacy and damages "for other emotional distressed suffered." *See* Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 21, ECF No. 57-21.

[17] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 20, ECF No. 57-23.

[18] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 45–46, ECF No. 58-2.

[19] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43–44, ECF No. 58-2.

> The defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.
>
> The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience.
>
> The record also establishes that the defendants repeated the conduct and attacks on plaintiffs for nearly a decade, including the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs.
>
> This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.[20]

In December 2022, Jones filed his chapter 11 bankruptcy petition.[21] Soon after, this Court entered an agreed order involving Jones, Free Speech, and the Plaintiffs.[22] The agreed order modified the automatic stay to allow the state court to rule on post-trial motions and for any appeals by the defendants to proceed.[23] The Plaintiffs also agreed not to object to an application by Jones and Free Speech to employ their requested appellate counsel.[24] With the automatic stay modified, the state court denied a motion for new trial and Jones appealed the judgments to a Connecticut appellate court.[25]

The Plaintiffs started this adversary proceeding to determine the nondischargeability of the judgment debts against Jones.[26] They seek summary judgment mainly on the theory that the damages opinion, jury verdict, and admitted allegations from the Connecticut Action satisfy the requirements of

---

[20] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 41–44, ECF No. 58-2.

[21] *See* Voluntary Ch. 11 Pet. of Alexander E. Jones, Case No. 22-33553, ECF No. 1.

[22] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[23] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[24] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[25] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 23, 24, ECF No. 58-3, 58-4.

[26] Brief in Supp. of Mot. for Summ. J. at 1, ECF No. 60.

collateral estoppel on the issue of willful and malicious injury under § 523(a)(6).[27] In the alternative, they believe that the state court record establishes willful and malicious injury.[28]

Jones argues that summary judgment is not appropriate because (i) the issue of "willful and malicious injury" was not essential to the judgment in the Connecticut Action, (ii) federal law does not require federal courts to grant full faith and credit to allegedly unconstitutional state court judgments, (iii) public policy concerns about fairness, quality, and extent of the Connecticut Action outweigh any convenience afforded by the finality of judgment, (iv) collateral estoppel should not be applied when it appears the prior proceeding was skewed with the intent to obtain a non-dischargeable judgment in anticipation of bankruptcy, and (v) the record evidence produced by the Plaintiffs does not independently establish that they are entitled to judgment as a matter of law on a § 523(a)(6) claim.[29]

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Legal Standard

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment, "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings. FED. R. BANKR. P. 7056. A movant is entitled to summary judgment by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A material fact is one that might affect the outcome of the suit under governing law." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018).

Plaintiffs, as the movants here, bear the burden of proof at trial. So they must show the lack of a genuine issue of disputed fact that entitles them to judgment as a matter of law. If successful, the burden shifts to the nonmovant, Jones, to identify specific record evidence and articulate precisely how the evidence

---

[27] Brief in Supp. of Mot. for Summ. J. at 2–3, ECF No. 60.

[28] Brief in Supp. of Mot. for Summ. J. at 3, ECF No. 60.

[29] Def.'s Resp. to Mot. for Summ. J. at 10–12, ECF No. 61.

purports to defeat summary judgment. *See Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 869 (S.D. Tex. 2019) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). In determining whether summary judgment is appropriate, all inferences are drawn in Jones's favor. *See Harville v. City of Houston, Mississippi,* 945 F.3d 870, 874 (5th Cir. 2019).

<u>Analysis</u>

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

## I.     Section 523(a)(6) and Collateral Estoppel

A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed . . . ." § 101(5).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity. . . ." The Bankruptcy Code does not define "willful" or "malicious." In *Kawaauhau v. Geiger*, the U.S. Supreme Court held that a "willful and malicious injury" means a "deliberate or intentional injury." 523 U.S. 57, 61 (1998). This means that there must be intent to cause the injury, not just the act which leads to the injury. *Id.* at 61–62. In the Fifth Circuit, intent to cause injury exists "where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Shcolnik*, 670 F.3d 624, 629 (5th Cir. 2012) (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)). The objective standard requires a court to analyze from a reasonable person's perspective "whether the defendant's actions were substantially certain to cause harm, [and] are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Chowdary v. Ozcelebi (In re Ozcelebi)*, 640 B.R. 884, 905 (Bankr. S.D. Tex. 2022) (citing *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed. App'x. 360, 361–62 (5th Cir. 2007)). Substantial certainty does not mean absolute certainty, but it must be something more than a high probability. *See Mahadevan v. Bikkina (In re Mahadevan)*, 617 F.

7 / 18

Supp. 3d 654, 660 (S.D. Tex. 2022) (citing *In re D'Amico*, 509 B.R. 550, 561 (S.D. Tex. 2014)).[30]

Because of this intent requirement, debts arising from reckless or negligently inflicted injuries are not excepted under § 523(a)(6). *Geiger*, 523 U.S. at 64. For example, debts related to a debtor's act of intentionally driving a car into a crowded bar and killing a creditor's relatives were found to be based on willful and malicious injuries. *See Mahadevan*, 617 F. Supp. 3d at 660 (citing *Red v. Baum (In re Red)*, 96 F. App'x 229, 230 (5th Cir. 2004)). But debts related to a debtor's act of illegally selling a rifle to an individual, who years later shot people, were not based on a willful and malicious injury. *See Leyva et al. v. Braziel (In re Braziel)*, 653 B.R. 537, 558 (Bankr. N.D. Tex. 2023). The debtor intended to sell the rifle to the third party. *Id.* at 557. And while the sale itself was an intentional illegal act, it was not an act intended to harm the victims under either an objective or subjective standard. *Id.*

Plaintiffs can invoke collateral estoppel to establish that a debt is nondischargeable. *See Grogan v. Garner,* 498 U.S. 279, 284 n.11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Collateral estoppel prevents parties from relitigating issues of fact that were already "determined by a valid and final judgment" in a prior lawsuit in any future lawsuit involving the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Federal courts must give full faith and credit to state-court judgments. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."); *Shimon v. Sewerage & Water Bd. Of New Orleans,* 565 F.3d 195, 199 (5th Cir. 2009) (quoting *Parsons Steel*).

The laws of the state in which the judgments were entered determine whether collateral estoppel applies. *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996). A Connecticut state court entered the judgment, so the Connecticut rules of issue preclusion apply here. Under Connecticut law, collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011). Plaintiffs must establish that: "[1] [t]he issue must have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." *Wiacek Farms,*

---

[30] The plain meaning of willful and malicious tracks the objective and subjective tests under *Shcolnik* and *Miller*. Willful means "done deliberately: intentional." *Willful*, Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/willful) (last visited Oct. 17, 2023). And malicious means "having or shown a desire to cause harm to someone" Malicious, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/malicious) (last visited Oct. 17, 2023).

*LLC v. City of Shelton*, 30 A.3d 27, 32 (Conn. 2011) (quoting *Busconi v. Dighello*, 668 A.2d 716, 723 (Conn. App. Ct. 1995)).

An issue is actually litigated if it was "properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *See Solon v. Slater*, 287 A.3d 574, 586 (Conn. 2023). Fully and fairly litigated means that the party to be estopped "had an adequate opportunity to litigate the matter in the earlier proceeding." *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2 (Conn. Super. Ct. Jan. 19, 1996); *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993). To be necessary to the judgment, the determination of the issue must have been central to the judgment rendered (i.e., the judgment could not have been rendered without the determination). *See Wiacek Farms*, 30 A.3d at 32. In other words, "an issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1116 n.17 (Conn. 2002) (internal citations omitted). It is not enough that a fact could have been determined by the prior court but was not. *World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S, 2008 WL 4307568, at *6 (Conn. Super. Ct. Aug. 29, 2008) (citing *State v. Aparo*, 614 A.2d 401, 412 (Conn. 1992)).

Connecticut courts also note that there must be an identity of issues between the state court action and the issues to be decided here before collateral estoppel applies. *See, e.g.*, *Peterson v. iCare Mgmt., LLC*, 250 A.3d 720, 729 (Conn. 2021). This requires a court to assess the facts underlying a plaintiff's claim in the first proceeding. *See Solon*, 287 A.3d at 587. A court should determine "what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." *Id.* (quoting *Aetna Casualty & Sur. Co. v. Jones*, 596 A.2d 414, 421 (Conn. 1991)). Plaintiffs bear the burden of showing collateral estoppel applies here.

A bankruptcy court does not necessarily need a full state court record to apply collateral estoppel. *See Fielder v. King (In re King)*, 103 F.3d 17, 19 n.1 (5th Cir. 1997). But a state court record devoid of factual findings to support a dischargeability determination is not entitled to summary judgment. *See Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) (denying application of collateral estoppel where state court record lacked findings of fact).

## II.    Summary Judgment is Granted on Compensatory Damages

### A.    The issues were "fully and fairly litigated" and "actually decided"

Under Connecticut law, the allegations in a petition are deemed admitted, and the defendant's liability is established if a default judgment is entered against a defendant based on discovery abuse. *Smith v. Snyder*, 839 A.2d 589, 598 (Conn. 2004). "[A] default judgment is a decision on the merits and has the same preclusive

9 / 18

effect as any other judgment decided on its merits, so long as the party who is precluded had an 'adequate opportunity to litigate the matter in the earlier proceeding.'" *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. June 29, 2018) (quoting *State v. Ellis*, 497 A.2d 974, 989 n.22 (Conn. 1985)).

As noted above, the fully and fairly litigated prong is satisfied under Connecticut law where there is opportunity to litigate the matter, whether or not the defendant benefits from it. *Custom Pools*, 1996 WL 66264, at *2. Jones had the opportunity to participate in the state court litigation for three years before the default judgment was entered. He then participated in the damages trial and presented evidence on that issue. He also submitted argument before the state court ruled on common-law and CUTPA punitive damages. Thus, finding that the state court default judgment order and the resulting damages awards have the effect of fully and fairly adjudicating the issues decided in connection with the defamation, intentional infliction of emotional distress, and CUTPA claims is consistent the reasoning and holdings in Connecticut cases.

Jones argues that the precise issue of "willful and malicious injury" was not litigated in the Connecticut Action and that he did not have a chance to present certain defenses at trial. Neither argument changes the outcome here. Remember that Connecticut law focuses on the facts underlying the claims to determine identity of issues, and here those facts show identical issues. *See Solon*, 287 A.3d at 587. Federal courts focus on whether a state court made specific findings about an injury to a plaintiff that meets the test for willful and maliciousness under § 523(a)(6), and not the specific label of "willful and malicious." *See, e.g.*, *Mahadevan*, 617 F. Supp. 3d at 660 (analyzing collateral estoppel principles on defamation and intentional infliction of emotional distress claims); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014) (same); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 421 (Bankr. S.D. Tex. 2012) (same).

The Plaintiffs' complaints contain multiple well pleaded allegations about Jones's intent to cause the Plaintiffs harm or substantial certainty that Jones's actions would cause harm, all of which are deemed admitted as a result of the default judgment. They, along with the jury award, also constitute fully and fairly adjudicated issues (and actually decided ones) for purposes of collateral estoppel.

- "Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse."[31]

---

[31] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 7, 3 at ⁋ 7, ECF Nos. 57-4, 57-6.

10 / 18

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence."[32]

- "Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax — and he never has."[33]

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."[34]

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people."[35]

- "On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."[36]

- "Jones and Infowars purposefully sought to direct their message and spur 'investigation' of the Sandy Hook families."[37]

- "Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners . . ."[38]

---

[32] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 8, 3 at ¶ 8, ECF Nos. 57-4, 57-6.

[33] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 9, 3 at ¶ 9, ECF Nos. 57-4, 57-6.

[34] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 11, 3 at ¶ 11, ECF Nos. 57-4, 57-6.

[35] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 13, 3 at ¶ 13, ECF Nos. 57-4, 57-6.

[36] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 14, 3 at ¶ 14, ECF Nos. 57-4, 57-6.

[37] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 83, 3 at ¶ 89, ECF Nos. 57-4, 57-6.

[38] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 97, 3 at ¶ 103, ECF Nos. 57-4, 57-6.

11 / 18

- "The defendants' outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."[39]

- "The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs. . ."[40]

- "The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[41]

- "The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages."[42]

Jones tries to argue that these issues were not fully and fairly litigated because there was never a trial on liability. But the argument lacks merit because of the legal effect of the default judgment. Jones also claims he was deprived of certain constitutional rights by the state court. This Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise complaints about not being permitted the right to argue certain defenses at the damages trial or his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards. A right to appeal the state court's decision aside, the fully and fairly litigated and actually decided prongs are satisfied. *See, e.g.*, *Sims*, 479 B.R. at 421 (citing *Prager v. El Paso Nat. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969)); *In re Dahlin*, No. 16-36169, 2018 WL 2670501, at \*4 (Bankr. S.D. Tex. May 16, 2018) (finding that, under full faith and credit, defendant could not argue against nondischargeability because death penalty sanctions were improperly ordered). The Court rejects Jones's argument that it does not have to give full faith and credit to the state court default judgment order or the resulting damages awards.

---

[39] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 377, 3 at ⁋ 457, ECF Nos. 57-4, 57-6.

[40] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 337, 3 at ⁋ 417, ECF Nos. 57-4, 57-6.

[41] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 365, 3 at ⁋ 445, ECF Nos. 57-4, 57-6.

[42] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 14, 3 at ⁋ 433, ECF Nos. 57-4, 57-6.

This Court also agrees with the reasoning in cases like *Herbstein v. Bretman*, 266 B.R. 676, 685 (N.D. Ill. 2001), which held:

> [W]here [a litigant] participated extensively then failed to comply with an express court order issued multiple times at a risk of incurring default, [then] we agree with the Bankruptcy Court . . . that [the litigant] should not now be able to sidestep the collateral estoppel doctrine and litigate an issue in this forum that was forestalled in [another court] due solely to [the litigant's] decisions. [The litigant] is not entitled to a second bite at the apple. The issue underlying the … default judgment were "actually litigated" for purposes of the collateral estoppel doctrine.

## B. The issues were necessary to the judgment, including the jury award of damages

The findings about Jones's willful and malicious injury to the Plaintiffs' were also necessary to the judgment and the jury award of damages.

A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hopkins v. O'Connor,* 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004).

As noted earlier, the jury was instructed, among other things, that "the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large."[43] The jury was also instructed that the Jones defendants proximately harmed the Plaintiffs by spreading lies about them to their audience and the public by urging people to investigate the Plaintiffs about the alleged "Sandy Hook hoax."[44]

To establish intentional infliction of emotional distress under Connecticut law, a plaintiff must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the

---

[43] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 14, ECF No. 57-21.

[44] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 15, ECF No. 57-21.

emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 757 A.2d 1059, 1062 (Conn. 2000) (internal quotation marks omitted) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986)).

The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress:

> These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe.

Thus, there are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. These are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The jury considered damages in a multi-day trial and awarded damages based on these findings.

Nothing in the jury instruction for defamation or intentional infliction of emotional distress contemplates that a lesser standard of intent should apply to Jones's knowledge of the injury. Therefore, the damages for defamation and intentional infliction of emotional distress were necessarily awarded based on the finding that Jones intended to harm the Plaintiffs. On compensatory damages, the jury charge contains specific findings premised on the default judgment—not a broad general charge lacking in detail. This Court focuses on what the jury charge actually says, and not what it *could* say or *could* imply.

This case is like the bankruptcy court decision in *In re Scarbrough*. In *Scarbrough*, state court findings about a debtor's actions supported a finding that the debtor acted with a subjective motive to cause harm, so the debt was nondischargeable under § 523(a)(6). *Scarbrough*, 516 B.R. at 912. The state court findings included, for example, that the debtor damaged another's reputation and failed to turn over evidence for the express purpose of causing that party harm so the debtor could win his case. *Id.* at 905. The defamation jury instruction was that the debtor made statements he "knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." *Id.* at 912. That instruction mirrors the defamation instruction in this case.

The Fifth Circuit Court of Appeals later affirmed the bankruptcy court's holding. *Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 456 (5th Cir. 2016). The Fifth Circuit held that the jury's finding of damages for defamation independently supported the judgment, was binding, and precluded relitigating that issue in another case. *Id.* Therefore, in Jones's case, the language of the jury instruction confirms that the damages awarded flow from the allegation of intent to harm the Plaintiffs—not allegations of recklessness. *See Caton v. Trudeau (In re Caton)*, 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998) (finding that the factual allegations on which liability was based in a state court proceeding showed that the defendant acted with intent to cause injury). Summary judgment on the nondischargeability of the jury awards for compensatory damages is granted.[45]

### III.    Summary Judgment is Granted on CUTPA Punitive Damages

For the reasons explained above, the issue of willful and malicious injury was also fully and fairly (and finally) litigated in relation to the CUTPA punitive damages award. Jones had the opportunity to participate in the state court litigation, and he did so. He also submitted argument about CUTPA punitive damages.

The findings on willful and maliciousness were also necessary to the judgment. These findings were actually litigated and determined. There is no question that the issues to be estopped are identical. The state court issued a 45-page opinion on the CUTPA and common law punitive damages.[46] The court determined that the material allegations in the Plaintiffs' complaints, "which have been established by virtue of the defaults" entitled them to an award of CUTPA punitive damages. On CUTPA punitive damages, the court stated it assessed factors such as (i) the degree of the defendants' relative blameworthiness— whether it was reckless, intentional, or malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages were small, providing a low incentive to bring the action; and (v) whether the award will deter the defendant and others from similar conduct.[47]

The court considered the degree of blameworthiness the most important consideration and found that Jones's actions were intentional and malicious, and

---

[45] The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal.

[46] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 39, ECF No. 58-2.

[47] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 29–30, ECF No. 58-2 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 418 (2003)).

awarded punitive damages based on these findings.[48] The state court did not base any of the CUTPA punitive damages on recklessness:

> The record clearly supports the plaintiffs' argument that *the defendants' conduct was intentional and malicious, and certain to cause harm* by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." . . . This depravity, and cruel, persistent course of conduct by the defendants establishes *the highest degree of reprehensibility and blameworthiness. . .* Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.[49]

These are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. They are not, as Jones argues, superfluous findings about intent related to the Plaintiffs' harm. It is irrelevant that the state court could have awarded damages on reckless acts. What is important is what the court actually did. Here there are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The state court also considered the additional factors listed above, but the focus remained on willful and intentional acts, and not on a lesser standard like recklessness.

In sum, the state court made specific findings that went directly to the amount of punitive damages. They were necessary to the judgment. So summary judgment is granted on the debt for CUTPA punitive damages.

## IV. Summary Judgment is Denied on Common-law Punitive Damages

In Connecticut, common-law punitive damages are limited to the expense of litigation (attorneys' fees and costs) less taxable costs. *See, e.g.*, *Bifolck v. Philip Morris, Inc.*, 152 A.3d 1183, 1213 (Conn. 2016). The jury charge instructed that common-law punitive damages could be awarded if the defendants' actions were willful, wanton, or malicious.[50] A willful and malicious harm is based on an intent without just cause or excuse.[51] And "the intentional injury aspect may be satisfied if

---

[48] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43, ECF No. 58-2.

[49] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 44–45, ECF No. 58-2.

[50] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[51] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

the resultant harm was the direct and natural consequence of the intended act."[52] But wanton misconduct is defined as "reckless misconduct."[53]

There are bankruptcy cases holding that punitive damages should be found nondischargeable based on findings of willful and malicious injury when the compensatory damages and punitive damages flow from the same conduct. *See, e.g.*, *Macris v. Saxton (In re Saxton)*, No. 10-44412, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). In *Gober*, the Fifth Circuit held that "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober*, 100 F.3d at 1208.

It is logical to presume that the findings of willful and malicious injuries based on defamation and intentional infliction of emotional distress were necessary to the award of common-law punitive damages. But unlike the instructions for defamation and intentional infliction of emotional distress, the jury had a right to award common-law punitive damages based on reckless actions *or* actual intent to cause harm. This proves fatal on summary judgment.

Under Fifth Circuit law, recklessness does not meet the standard for willful and malicious injury under § 523(a)(6). *Miller*, 156 F.3d at 603. And there must be intent to cause the injury, not just an act which leads to the injury. *Kawaauhau*, 523 U.S. at 61–62. The record is not expressly clear on whether the damages were solely based on willfulness and maliciousness. Thus, summary judgment is denied on the debt for common-law punitive damages.

## V.      Summary Judgment does not Violate Policy or Jones's Constitutional Rights

Finally, Jones argues that the Court should not grant summary judgment because the state court judgment was entered in anticipation of this bankruptcy proceeding. But there is no evidence of manipulation that even remotely warrants serious consideration of this argument based on the record before the Court. This ancillary argument, and related arguments by Jones about his disagreements with the state court default judgment order and damages awards do not change the

---

[52] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[53] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

outcome.[54] Again, he can make such argument to the appropriate state appellate court.

## Conclusion

For the reasons stated above:

1.  Summary judgment is granted on the $965 million debt for compensatory damages awarded in the Connecticut Action for defamation and intentional infliction of emotional distress.

2.  Summary judgment is granted on the $150 million debt for CUTPA punitive damages.

3.  Summary judgment is denied on the $321.65 million in attorneys' fees and $1,489,555.94 in costs awarded as common law punitive damages.

4.  All other objections raised by Jones not specifically addressed above are denied.

Signed: October 19, 2023

Christopher Lopez
United States Bankruptcy Judge

---

[54] Jones also makes several arguments best described as grounds for appeal which this Court declines to address (for example, Jones argues that the CUTPA award was improper based on the allegations in the complaints). Def.'s Resp. to Mot. for Summ. J. at 43, ECF No. 61. These arguments are rejected.

18 / 18

APPENDIX C

# EXHIBIT D

**Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**

Docket Number: AC46131
Issue Date: 5/13/2025
Sent By: Supreme/Appellate

---

**Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**

AC46131    ERICA LAFFERTY ET AL. v. ALEX EMRIC JONES ET AL.

Notice Issued: 5/13/2025 9:08:23 AM

**Notice Content:**

**Motion Filed: 4/28/2025**
**Motion Filed By: Alex E Jones**
                **Free Speech Systems, Llc**

**Order Date: 05/13/2025**

**Order: Denied**

By the Court
Notice sent to Counsel of Record

APPENDIX C

# EXHIBIT E

APPENDIX C

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>　　Plaintiffs | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and<br>FREE SPEECH SYSTEMS, LLC,<br>　　Defendants | §<br>§<br>§<br>§ | 261st JUDICIAL DISTRICT |

**DECLARATION OF AVI MOSHENBERG**

1. "My name is Avi Moshenberg.  I am over the age of twenty-one years and am fully competent to make this Declaration.  I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2. "I am an attorney in the law firm of Lawson & Moshenberg PLLC and licensed to practice law in the State of Texas.  I am one of the attorneys of record for Neil Heslin and Scarlett Lewis (collectively, the Texas Families or the Judgment Creditors).  I am authorized to make this Declaration on behalf of the Judgment Creditors.

3. "Judgment Creditors own judgments against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors).  The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 804, Corpus Christi, Texas 78401; Alexander Emric Jones c/o Ben C. Broocks, Broocks Law Firm PLLC, 248 Addie Roy Road, Suite B301, Austin, Texas 78746.  The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760.  The post office address of the

<div align="center" style="color:red">APPENDIX C</div>

<div align="center">- 2 -</div>

Judgment Creditors is the Texas Families c/o Avi Moshenberg, 2301 Commerce Street, Houston, Texas 77002.

4. "Judgment Debtors owe $50,043,923.80 under the Judgments rendered before the 261st District Court of Travis County, Docket No. D-1-GN-18-001835 (the Texas Judgments).  The Texas Judgments are comprised of two documents:  the jury verdict and final judgment.  Authenticated copies that are sealed and signed are being filed contemporaneously with this Declaration.

## Oath

My date of birth is March 16, 1986 and my business address is 2301 Commerce Street, Suite 200, Houston, Texas, 77002, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on July 1, 2025.

_____

Avi Moshenberg

APPENDIX C

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § | 261st JUDICIAL DISTRICT |

**ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC**

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately.  *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) and that the judgment rendered in Cause No. D-1-GN-18-001835 before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment) (collectively, the Judgments, held by, collectively, the Judgment Creditors) are valid, final, and payable.  Judgment Debtor Alexander E. Jones and Judgment Debtor Free Speech Systems, LLC (together, the Judgment Debtors and each a Judgment Debtor) owe, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment and $50,043,923.80 under the Texas Families' Judgment.  There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review.  The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case).  On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy.  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable.  On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgments remain unsatisfied; that Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC own property that is not

exempt from attachment, execution, or seizure for the satisfaction of the Judgments; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtors' nonexempt property to satisfy the Judgments.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)     as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee), and

(ii)    as to Judgment Debtor Alex Jones:

a.  all non-exempt assets, including assets he may acquire in the future, that are not property of the Chapter 7 Estate;

b.  any assets of his Chapter 7 Estate that the Trustee expressly abandons; and

c.  any payments Judgment Debtor Alex Jones is contractually entitled to that are not property of the Chapter 7 Estate, including any payable after June 14, 2024, the date the Bankruptcy Court converted the Jones Bankruptcy Case to chapter 7 (the Conversion Date).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.

**The Court also FINDS that** the Judgments are final and remain unpaid.  Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgments.  The Turnover Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

APPENDIX C

1. **Receiver's Information**.

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2. **Custodia Legis**. The entry of this Order creates a receivership estate wherein all of Judgment Debtors' respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3. **Turnover**. The Judgment Debtors shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtors or their counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtors' control shall turnover such property to Receiver within five days of being served notice of this Order. The turnover by Judgment Debtors shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank

APPENDIX C

statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtors (regardless of date).

4.    **Continuing Effect of Order**.  Judgment Debtors and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgments and this Order are paid in full.

5.    **Receiver's Powers**.  Receiver has the authority to take possession of all of Judgment Debtors' Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgments.  Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtors; (2) all financial accounts

(bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtors that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtors; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtors, except paychecks for current wages; (4) hire a real estate broker to sell any real property and mineral interest belonging to the Judgment Debtors; (5) hire any person or company to move and store the property of the Judgment Debtors; (6) insure any property belonging to the Judgment Debtors; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtors; (8) obtain local, state and federal tax records of the Judgment Debtors; (9) obtain from any landlord, building owner or building manager where the Judgment Debtors or the Judgment Debtors' business is a tenant copies of such Judgment Debtors' lease, lease application, credit application, payment history and copies of such Judgment Debtors' checks for rent or other payments; (10) hire any person or company

APPENDIX C

necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtors may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtors in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtors from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtors from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtors and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtors (including mortgage companies) copies of such Judgment Debtors' credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the Judgment Debtors, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtors or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgments without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtors, an all their directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees

(other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7.      **Duties of Law Enforcement**.  Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8.      **Sales of Real Property Require Notice**.  Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtors and any lien holder on such real property.

9.      **Receiver's Bond**.  No bond is required of Receiver.

10.      **Receiver's Oath**.  Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.      **Receiver's Fee**.  Without further application, notice, or order of the Court, the Receiver shall pay himself as receiver's fees an amount equal to 20% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees.  The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors

from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtors, and as costs, such fees and expenses are in addition to amounts owed under Judgments.  Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after paying in full the Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction and in an amount and proportion pursuant to agreement between the Texas Families and the Connecticut Families.  No receiver's fees exceeding 20% of all proceeds coming into Receiver's possession shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.    **Receiver's Expenses**.  Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment Creditors, including by email with counsel, or (ii) upon application to the Court with notice to the Judgment Creditors.  The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request.  The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtors, and Receiver may collect those expenses from Judgment Debtors in addition to the amount collected to satisfy the Judgment.

13.    **Employ Professionals**. Without further application or order of the Court, the Receiver may retain and reasonably compensate, in Receiver's sole discretion,

collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate without Court approval (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14.     **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtors and their books, records, and their past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtors' counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the

collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.     **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtors, Judgment Debtors' property, Turnover Property, or the Judgments. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.     **Attorney's Fees**.  Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtors. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.     **Exempt Property**.  Nothing in this Order shall be construed to apply to exempt property, if any, of any Judgment Debtor, or any property of the Chapter 7 Estate

(expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtors that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by a Judgment Debtor.

18. **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

19. **Rule 679a Ordering Provisions Against Individual Judgment Debtor**. **Personal Property Rights of Individual Judgment Debtor Alex Jones:** Receiver must comply with Texas Rule of Civil Procedure 679b. **Receiver to Hold Property**: Receiver must not disburse funds to Judgment Creditors or sell property within 14 days after serving Judgment Debtor Alex Jones with the Notice of Protected Property Rights, the Instructions for Protected Property Claim Form, and the Protected Property Claim Form approved by the Supreme Court of Texas, or within 17 days if service was by mail. If the Judgment Debtor Alex Jones asserts an exemption, Receiver may only disburse funds to Judgment Creditors or sell property otherwise belonging to Judgment Debtor Alex Jones with Judgment Debtor Alex Jones's written consent or a court order.

<span style="color:red">APPENDIX C</span>

ISSUED AND SIGNED on _____.


_____
JUDGE PRESIDING

No. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC | § | 261st JUDICIAL DISTRICT |
| Defendants | § | |

**ALEX E. JONES**
**NOTICE OF THE PARTIAL REMOVAL OF CASE TO FEDERAL COURT**

**Removed from the 261st District Court**
**Travis County, Texas**
**State Cause No.  *D-1-GN-18-001885***

Defendant Alex E. Jones (herein "Alex Jones" or "Defendant"), one of the Defendants named in in the *Application For Post-Judgment Turnover Order and Appointment of Receiver to Judgment Debtors' Alexander E. Jones and Free Speech Systems, LLC* (the "2025 Turnover and Receivership Application") filed by certain intervenors in the above captioned state court case, namely Plaintiffs David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (herein the "Connecticut Plaintiffs/Intervenors") and joined directly or indirectly by the Texas Plaintiffs *Neil Heslin and Scarlett Lewis* (collectively the Connecticut Plaintiffs/Intervenors and the Texas Plaintiffs are referred to as "Plaintiffs" or "Movants") has removed to the United States Bankruptcy Court, Western District of Texas (Austin Division) each and every part of the 2025 Turnover and Receiver Application that relates to Alex Jones only – (with reservation of all defenses and rights of Alex Jones) – from the 261st Judicial District,  Travis County District Court for the State of Texas, Case No. *D-1-GN-18-001835* (the "Removal") and

Removal and Notice                Page 1 of 6

further subject to the Motion to Transfer Venue to the Bankruptcy Home Court in the Southern District of Texas (Houston Division) (herein the "Home Bankruptcy Court")[1] and states in support thereof as follows:

## I.
## JURISDICITON IS IN THE UNITED STATES BANKKRUPTCY COURT

1.    **Jurisdiction:** As set forth in the Removal, the removal is proper pursuant to 28 U.S.C. §§ 1334(b) and 1442 (including bankruptcy Trustees), 1452(a)[2] and current Fifth Circuit authority.[3] The Home Bankruptcy Court has original and exclusive jurisdiction under §§ 28 U.S.C. 1332, 28 U.S.C. § 1334 because the Complaint arises under or is related to cases under title 11 and (i) is an effort to avoid the automatic stay applicable to the Defendant Alex Jones;  or the discharge injunction which has not yet exempted the Debts of the Connecticut Plaintiffs; and in both instances, seeks to recover property of the Debtor and property owned by the chapter 7 bankruptcy estate.

2.    This Bankruptcy Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims over which it does not have original federal question jurisdiction because they form a necessary part of the same case or controversy as those claims over which the Court has original jurisdiction.

3.    The Removed State Court Suit seeks to improperly attach or in some manner seize

---

[1]    The "Home Bankruptcy Court" is the Bankruptcy Court for the Southern District of Texas, Chapter 7 proceeding now pending  *In re Alex Jones*, Chapter 7 Case #22-33553 (CML), including Adversary Case No. 23-03035 and 23-03037 (the "Pending Adversary").  The Pending Adversary is an ongoing Adversary brought by the very same Plaintiffs who initiated this receivership Removed Action.

[2]    28 U.S. Code § 1452 - Removal of claims related to bankruptcy cases:
>    (a)    A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

[3]    *See*, *Miller v. Dunn*, 35 F.4th 1007 (5th Cir. 2022).

APPENDIX D

assets of the Jones Estate (both Jones assets and FSS assets): (i) in violation of the exclusive jurisdiction of the bankruptcy court, and (ii) without a final bankruptcy court order finding that the Connecticut Plaintiff has a final non-dischargeable debt.  The Home Bankruptcy Court has exclusive jurisdiction over the Alex Jones Chapter 7 Trustee and the assets of the Alex Jones Chapter 7 Estate until this Bankruptcy Court authorizes the seizure and self-help of any creditor with a final, non-appealable bankruptcy court order declaring the debt and an amount non-dischargeable.

4.      Jones timely files this Notice of Removal of the State Court Litigation filed with the United States Bankruptcy Court, Western District of Texas (Austin Division) under Civil Action or Adversary  25-01034  under miscellaneous Case No. 88-18888 within 30 days of receipt of a copy of the initial pleading *Application For Post-Judgment Turnover Order And Appointment of Receiver as to Judgment Debtors' Alexander E. Jones and Free Speech Systems, LLC* setting forth the claim or cause of action as to Alex Jones sought to be removed, pursuant to Bankruptcy Rule of Procedure 9027(a)(3) and Federal Rules of Civil Procedure §§1332, 1334, 1441(a), (b)(2), 1442, and 1452(a). A copy of the Removal is attached as Exhibit "A".

5.      Immediately upon filing this Notice of Removal, the United States Bankruptcy Court for the Western District of Texas has original jurisdiction over this action, and this state court is divested of all jurisdiction.

6.      The United States District Court for the Western District of Texas has original jurisdiction over this action pursuant to 28 U.S.C. §1334(b) as the State Court Lawsuit arises in, arises under or is related to the Bankruptcy Case.

7.      Jones hereby gives Notice of the Removal of the only the actions seeking relief against Alex Jones, any assets of Alex Jones or his Chapter 7 Estate of Alex E. Jones, including all

Removal and Notice                           Page 3 of 6

assets of Free Speech Systems, LLC now owned and held by the Trustee of the Alex E. Jones Chapter 7 Estate, which divests the state court of all jurisdiction over these claims or property of the Chapter 7 Estate of Alex E. Jones only.[4]

8. Please take notice that Defendant Alex E. Jones has not been properly joined or served with process of an intervention in the above styled and Removed case, nor of any actions taken in this matter nor was Defendant Alex E. Jones property joined and served in the purported domestication proceedings in some State Court of Texas, and accordingly this Notice of Removal, mandated by the federal statutes and rules governing removals, is not an appearance by Alex E. Jones or his counsel in any respect in this Removed State Court case, but filed in compliance with those removal statute and rules including *28 U.S.C. § 1446(d)*.[5]

9. The bankruptcy court has not entered: (i) any final, appealable order finding any liability of Debt of Alex Jones non-dischargeable, nor (ii) any order removing from its exclusive jurisdiction the FSS assets transferred to the Alex E. Jones Chapter 7 Estate, and until the entry of such orders, the automatic stay remains in place as to Alex E. Jones.

---

[4]  *In re Southwestern Bell Tel. Co., L.P.*, 235 S.W.3d 619, 624 (Tex. 2007)—"From the time the case was removed to federal court until it was remanded to state court, the state court was prohibited from taking further action."

[5]  *Barton v. Horowitz,* Civil Action No. 97 N 1980, 1999 U.S. Dist. LEXIS 21979, at *21 n.1 (D. Colo. Mar. 11, 1999)
  Even under Colorado law, which Barton urges me to consider in his supplemental motion for default judgment, (Mot. to Supplement Pl.'s Mot. for J. by Default [filed Mar. 12, 1998]), it is plain that *the filing of a petition for removal of a case into federal court is not such an appearance as will waive the need for proper service. Coombs v. Parish*, Coombs v. Parish, 6 Colo. 296 (1882). It is true that, as Barton argues, certain general appearances by counsel which address the merits of a case may constitute waiver of service. *See, e.g., In re Marriage of Lockwood*, 857 P.2d 557 (Colo. App. 1993) (holding that a defendant enters a general appearance by seeking relief which acknowledges the court's jurisdiction or by other conduct manifesting consent to jurisdiction). *Barton offers no authority, however -- and none is apparent to the court -- which suggests that filing or joining a notice of removal constitutes such a general appearance.*

APPENDIX D

Dated: August 4, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

Ben C. Broocks
State Bar No. 03058800
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**COUNSEL FOR ALEX JONES**

<span style="color:red">APPENDIX D</span>

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, a true and correct copy of the foregoing document was served via e-file/e-mail in accordance with the Texas Rules of Civil Procedure:

**ATTORNEYS FOR THE CONNECTICUIT FAMILIES**

Ryan E. Chapple
rchapple@cstrial.com
Benjamin D. Evans
bevans@cstrial.com
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Avi Moshenberg
LAWSON & MOSHENBERG PLLC
2301 Commerce Street, Suite 200
Houston, TX 77002
Email: avi.moshenberg@lmbusinesslaw.com

**CHAPTER 7 TRUSTEE:**

Joshua W. Wolfshohl
Michael B. Dearman
Jordan T. Stevens
Kenesha L. Starling
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
jwolfshohl@porterhedges.com
mdearman@porterhedges.com
jstevens@porterhedges.com
kstarling@porterhedges.com

Erin E. Jones
**JONES MURRAY LLP**
602 Sawyer Street, Suite 400
Houston, Texas 77007
erin@jonesmurray.com

**POTENTIAL RECEIVER:**

Gregory S. Milligan
Harney Partners
Westech 360
8911 North Capital of Texas Highway, Suite 2120
Austin, Texas 78759
Telephone: (512) 464-1139
milligan@harneypartners.com

*/s/ Shelby A. Jordan*
Shelby A. Jordan

Removal and Notice                    Page 6 of 6



**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
(AUSTIN DIVISION)

NEIL HESLIN and SCARLETT LEWIS §
      Plaintiffs §
       §
       §
v. §   Civil Action _____
       §
ALEX E. JONES and FREE SPEECH SYSTEMS, LLC §
      Defendants §

---

**ALEXANDER E. JONES
PARTIAL REMOVAL OF CIVIL ACTION AND
NOTICE OF THE PARTIAL REMOVAL OF A CIVIL ACTION
AND CONTEMPORANEOUS MOTION TO
TRANSFER VENUE TO THE "HOME" COURT**

_____
**Removed from the 261st District Court
Travis County, Texas
State Cause No. *D-1-GN-18-001835***
_____

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Defendant Alexander E. Jones (herein "Alex Jones" or "Defendant"), the Defendant in the above captioned partially removed state court case (herein the "New Removed Action", removes that part of the *Application for Post-Judgment Turnover Order and Appointment of Receiver as to Judgment Debtors' Alexander E. Jones and Free Speech Systems, LLC* (the " sometimes the "2025 Turnover and Receivership Application" or the "New Removed Action") from the State Court proceedings related to Alex Jones, brought by the Connecticut Plaintiffs David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) and joined directly or indirectly

Removal and Notice            Page 1 of 15

by the Texas Plaintiffs *Neil Heslin and Scarlett Lewis* (collectively the "Plaintiffs" or "Movants") in this New Removed Action from the state district court of Travis County, Texas Case No. *D-1-GN-18-001835* – (with reservation of all defenses and rights of Alex Jones) – to the United States Bankruptcy Court for the Western District of Texas, Austin Division and further subject to the Motion to Transfer Venue to the Bankruptcy Home Court in the Southern District of Texas (Houston Division) (herein the "Home Bankruptcy Court")[1] and states in support thereof as follows:

## I.
## JURISDICITON AND VENUE

1. **Jurisdiction:** As set forth below, removal is proper pursuant to 28 U.S.C. §§ 157, 158, 1334(b) and 1442, 1452(a)[2] and current Fifth Circuit authority.[3] The Home Bankruptcy Court has original and exclusive jurisdiction under §§ 28 U.S.C. 1332, 28 U.S.C. § 1334 because the Complaint arises under or is related to a case under title 11 and (i) is an effort to avoid the automatic stay applicable to the Defendant Alex Jones; or (ii) to avoid the effect of a discharge injunction which has not yet exempted the Debts of the Connecticut Plaintiffs; and in both instances, (iii) seeks to recover property of the Debtor and property owned by the Chapter 7 bankruptcy estate of the Debtor.

2. This Bankruptcy Court has supplemental jurisdiction under 28 U.S.C. § 1367(a)

---

[1] The "Home Bankruptcy Court" is the Bankruptcy Court for the Southern District of Texas, Chapter 7 proceeding now pending *In re Alex Jones*, Chapter 7 Case #22-33553 (CML), including Adversary Case No. 23-03035 and 23-03037 (the "Pending Adversary"). The Pending Adversary is an ongoing Adversary brought by the very same Plaintiffs who initiated this receivership Removed Action.

[2] 28 U.S. Code § 1452 - Removal of claims related to bankruptcy cases:
    (a)     A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

[3] *See, Miller v. Dunn*, 35 F.4th 1007 (5th Cir. 2022).

over claims over which it does not have original federal question jurisdiction because they form a necessary part of the same case or controversy as those claims over which the Court has original jurisdiction.

3.     The New Removed Action seeks to improperly attach or in some manner seize assets of the Jones Estate (both Jones assets and FSS assets): (i) in violation of the exclusive jurisdiction of the bankruptcy court, and (ii) without a final bankruptcy court order finding that the Connecticut Plaintiff has a final non-dischargeable debt. The Home Bankruptcy Court has exclusive jurisdiction over the Alex Jones Chapter 7 Trustee and the assets of the Alex Jones Chapter 7 Estate until this Bankruptcy Court authorizes the seizure and self-help of any creditor with a final, non-appealable bankruptcy court order declaring the debt and an amount non-dischargeable.  The Plaintiffs seek to recover what they describe as post-confirmation assets of Alex Jones without the debt or liability having been declared by final, appealable order, non-dischargeable.

4.     Removal to this Bankruptcy Court is proper as the Removed State Court Case was filed and pending in Travis County, Texas.  The U.S. District Court for the Western District of Texas, Austin Division, is the United States district and division embracing that county, as is this Bankruptcy Court.[4]

5.     **Venue and Motion to Transfer Venue to the Bankruptcy Home Court**: Pursuant to the Bankruptcy Rules of Procedures and the Local Bankruptcy Rules of the Western District of Texas, cases removed by or on behalf of a Debtor or parties related based on jurisdiction arising out of a pending bankruptcy case, must only be removed to the Division and District in

---

[4]     The Order of Reference provides that "[a]ll bankruptcy cases and proceedings filed under Title 11 of the United States Code, or arising from or related to any case or proceeding filed under Title 11, shall be automatically referred to the bankruptcy judges of this district" subject to exceptions that do not apply here. *See*, Rule 9027.

Removal and Notice                    Page 3 of 15

which the State Court case (here, the 2025 Turnover and Receivership Application) is pending. Accordingly, Alex Jones incorporates herein as if set out herein *verbatim* the facts, conclusions and arguments set out in Alex Jones Motion to Transfer Venue to the Southern District of Texas (Houston Division) Bankruptcy Court as the "Home Bankruptcy Court", filed contemporaneously with this Removal and Notice of Removal.

## II.
## TIMELINESS OF REMOVAL THIS PARTIAL REMOVAL

### A.   This Partial Removal is Proper and Timely

6.     Plaintiffs, claiming to be Judgment Holders, filed an intervention and the 2025 Turnover and Receivership Application against Jones and the other named Defendant, FSS, in the then-pending Travis County District Court, Travis County, Texas, Case No. *D-1-GN-18-001835* on July 7, 2025.  A copy of all Plaintiffs' process, pleadings, or orders in the possession of Jones in the 2025 Turnover and Receivership Application is attached hereto and filed concurrently herewith.

7.     This notice of removal is timely under 28 U.S.C. § 1446(b) and Rule 2097(3) because it is filed fewer than 30 days after receipt of a copy of the 2025 Turnover and Receivership Application on or about July 10, 2025.   Jones has not yet been served with any process as of this date. Consent is not required from any non-removing defendant pursuant to 28 U.S.C. § 1446(b)(2)(A) because removal does not proceed "solely under 28 U.S.C. § 1441." *See also, e.g.,* 28 U.S.C. § 1452.  Alex Jones does not consent at the time of filing to the entry of a final order inasmuch as this New Removed Action is related to an Adversary Proceeding brought by Alex Jones now pending in the Bankruptcy Home Court in which a jury is sought.

### B.   Certificate of Service And Failure to Serve Alex E. Jones Is Not Necessary

8.     The relief requested as stated in the 2025 Turnover and Receivership Application

is partially against Alexaner E. Jones, as a Judgment Debtor, and his assets.  Notwithstanding the lack of service of any process issued by the State Court, Alex Jones was made aware of the filing on approximately July 10, 2025, and timely files this removal.

9.      Pursuant to 28 U.S.C. § 1452 "[a]party may remove any claim or cause of action in a civil action …" and, as here, not all parties are the subject of this Removal that only seeks to remove any and all claims, actions and matters against or affecting Alex E. Jones or the Chapter 7 Estate of Alex E. Jones.  For clarity, this Removal does not apply to named Defendant FSS.

## III
## PRELIMINARY STATEMENT

10.      Movants consist of the Connecticut Plaintiffs and the Texas Plaintiffs as described in the 2025 Turnover and Receivership Application.  Initially, no Plaintiff has in this case has: (i) a final, non-appealable, State court judgment against Alex Jones, inasmuch as Alex Jones and FSS have appeared and given notice in the Supreme Court of the United States of the intention to file their joint writ of *certiorari*  and by order of the Supreme Court have until September to do so; nor (ii) a final, non-interlocutory, appealable order of the Bankruptcy Court in the Alex Jones Chapter 7 case finding and awarding any non-discharged debt.

11.      There are pending non-final interlocutory, non-appealable summary judgments finding that a portion of the Plaintiffs' judgments are non-dischargeable, but neither of those interlocutory orders are final or appealable. Likewise, there is pending a Motion by the Connecticut Plaintiffs seeking such a final order, and Alex Jones' opposition thereto.  Importantly, even if all of the Plaintiffs' Judgments were final on appeal, which they are not, any creditor must have an order finding their debt non-dischargeable before that creditor may initiate any action to recover their debt, and then only to the portion that is declared non-dischargeable.

12.      The bankruptcy court has not entered in the Alex Jones case any order discharging

debts and until the entry of such order, the automatic stay remains in place as to Alex E. Jones and his assets.  [*See, infra*, , ¶¶ 23-27]

## IV.
## BACKGROUND OF PLAINTIFFS' REMOVED CLAIMS

13.　　The Connecticut Plaintiffs are 6 of the children who were victims in the Sandy Hook massacre, or  the parents, relatives, and an FBI agent now seeking to collect their combined (by apparently by a contract to do so, the Texas Plaintiffs are joined) nearly $1.3 billion judgment against Alex Jones.   The Connecticut State appeals Court reversed approximately $150 million of that judgment, and otherwise Alex Jones and FSS have exhausted their State Court appeals. Accordingly, the writ of *certiorari* will be timely filed within the time period provided by order of the Supreme Court.   The Texas Plaintiffs State Court judgment remains pending after oral arguments in the Austin Court of Appeals.

14.　　In 2018, almost six years after Sandy Hook, two separate suits were filed (one in Connecticut and the other in Texas) resulting in two trials.  The "trials" although by separate judges and separate juries, were on identical facts and events, yet resulted in massively inconsistent awards. In Texas (if statutory caps on tort recoveries are applied) the total judgment was appropriately $5.6 million for two parents, or $2.8 million to each parent.   In contrast, in Connecticut the award per parent (and one FBI agent who did not lose a child or relative) is slightly more than $100 million each and including approximately $300 million in punitive damages (that the Connecticut Plaintiffs seek an order of dismissal), being a net of slightly less than $1 billion for all fifteen Plaintiffs.  Both trials were controlled and determined by sanction orders and gross violations of Jones due process rights.  Both courts determined that Alex Jones or his business Free Speech Systems, LLC ("FSS") committed discovery abuse, were fined more than $1 million in Texas alone, and additionally had "liability" determined as a sanction.

15.     The jury was instructed on liability but not on the basis for liability nor was there any finding or submission of any issue to the jury on Alex Jones, a public figure, on "malice" as mandated by the U.S. Supreme Court, or on whether his remarks were opinion of a public figure. Thus, the only jury trial was, in theory, one to determine damages. But as the trials turned out, damages standing alone cannot be determined by a jury without all of the background facts, so a substantial portion of "testimony" of background facts became part of the sanctions. This fact cascaded into the reality that the Trial Judges had not contemplated – they had to allow factual testimony on damages and the basis of those damages.  When confronted with this issue, trial courts then systematically allowed hearsay and double hearsay, refused Alex Jones the right to cross examine on much of the testimony, and otherwise refused to permit a defense of even the damages claims.

16.     Both the Texas Judgment and the Connecticut Judgment are on appeal.[5]  Likewise, and as important to Jones, is the finding by the bankruptcy court that a significant portion of the Connecticut Judgment (to the extent surviving appeal) and the much smaller Texas Judgment that went from $2 million actual damages to approximately $22 million in punitive damages (by failing to apply the statutory tort caps).   As to each for the two Texas Plaintiffs, if reversed, there can be no "collection" action at all.

17.     However, it appears to Alex Jones that the Plaintiffs have entered into some form of joint agreement to jointly own and jointly share among themselves any recovery as to any Judgment that survives the pending appeals.  [*See*, ¶ 4, pg. 3, 2025 Application].   And, apparently based on the idea that both Plaintiffs may share the Connecticut Judgment, Plaintiffs seek the appointment of a receiver to sell property owned by Alex E. Jones and property previously held

---

[5]       The Connecticut Supreme Court denied certification and the Connecticut Judgment is a final judgment for certain purposes, although it is pending a Writ of *Certiorari* at the U.S. Supreme Court as noted *supra*.

by FSS that remains in the Chapter 7 bankruptcy estate of Alex Jones. *Id*.

18. The Plaintiffs suggest to the State Court that without a final order finding their debts non-dischargeable, somehow Alex Jones and FSS assets are not subject to the continuing jurisdiction of the Bankruptcy and somehow become available to satisfy their respective judgments. [*See*, ¶ 6, 7 pg. 4 -5, 2025 Application]. Plaintiffs are wrong on the law and the facts.

19. Plaintiffs are referencing in their Application only ***interlocutory partial summary judgments*** entered by the bankruptcy court finding a portion of their claims non-dischargeable and neither Judgment is final such that the Plaintiffs may execute on such judgments. Until there is a final judgment, no creditor of the Jones Chapter 7 Estates, such action will violate the automatic stay or the discharge injunction, and seizure of any of Jones' assets, or any of FSS assets owned by the Chapter 7 Trustee.

20. Likewise, the Plaintiffs allege that they, or a Receiver, may seize any assets owned by the Trustee of FSS, if approved by the Trustee. That claim is likewise false. There are two final bankruptcy court orders vesting title in the Jones Chapter 7 Estate administered by the Trustee. A trustee may not give away Estate assets on his own, and certainly not in this case, without the order of the bankruptcy court.[6] No such motion has been filed by the Alex Jones Chapter 7 Trustee.

21. Likewise, the Bankruptcy Court has not undertaken the trial of those issues remaining and the interlocutory partial summary judgments remain interlocutory until all issues are subject to a final, appealable order of the bankruptcy court.

22. Most importantly, Alex Jones has not been granted a discharge and the entry of a

---

[6] The 2025 Application also states and suggests that the jurisdiction over the FSS assets now held by the Alex Jones Chapter 7 Trustee may be available for their collection actions if the Chapter 7 Trustee agrees or consents. A Chapter 7 trustee may not simply give away assets by agreement or consent. In every instance, if a Chapter 7 Trustee has jurisdiction over assets, only a Bankruptcy Court order (usually pursuant to a Motion by the Trustee to abandon assets) may result in removal of bankruptcy jurisdiction over assets once within the jurisdiction of the bankruptcy court.

"discharge order" determines when the automatic stay expires regarding bringing claims against a Debtor's property or the Debtor. There is a distinction as to when the discharge order is entered between a § 727 objection to the **discharge**, or under § 523 objection to the dischargeabiliy. *See*, 11 U.S.C. §§ 727, 523. The discharge order will not be entered until the § 727 Motion is determined by final order. However, in a § 523 discharge, bankruptcy courts issue a Code form of a discharge order (the Discharge Order) to conclude the case since the form preserves timely filed objections to dischargeability under § 523. No such order has been entered. Upon entry of the Discharge Order the automatic stay is lifted and the discharge injunction takes its place.

C. **Grounds For Removal**

i. **Plaintiffs' Claims are Barred by the Automatic Stay and the Non-issuance of a Dischargeability Order**

23. 11 U.S.C. section 362(c) provides the following:

(1) the stay of an act against property of the estate under subsection (a) of this section *continues until such property is no longer property of the estate*; and
(2) the stay of any other act under subsection (a) of this section continues until the earliest of-
(A) the time the case is closed;
(B) the time the case is dismissed; or
(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, *the time a discharge is granted or denied*.

U.S.C. § 362 applies until certain events have taken place that allows the Chapter 7 Estate to deal to deal with all assets that come into the chapter 7 estate and until objections to the discharge of debts of the Chapter 7 debtor has been determined by final, appealable order. As explained by *In re Prate*, 634 B.R. 72, 76 (Bankr. N.D. Ill. 2021):

The automatic stay in section 362(a) of the Bankruptcy Code halts a variety of creditor actions against the debtor, the debtor's property, and property of the estate during the bankruptcy case. 11 U.S.C. § 362(a); *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 755-56 (9th Cir. 1995) (internal quotation omitted). The stay is "one of the fundamental debtor protections provided by the bankruptcy laws," *Midlantic*

*Nat'l Bank v. New Jersey Dep't of Env'tl Prot.*, 474 U.S. 494, 503, 106 S. Ct. 755, 88 L. Ed. 2d 859 (1986) (internal quotation omitted), because it preserves the estate and gives the debtor some respite from creditors, *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011); *Dean*, 72 F.3d at 755-56. Unless estate property is concerned, the stay remains in effect until the case is closed or dismissed or the debtor is discharged, whichever occurs first. 11 U.S.C. § 362(c).

The 2025 Application states, or at least suggests, that the Connecticut Plaintiffs and Texas Plaintiffs have a final, appealable non-dischargeable judgment. That is simply not true. The law is clear that until an order for discharge has been entered,[7] the automatic stay remains in place preventing any action against property of the estate *or the pre-conversion or post-conversion debtor*:

> The automatic stay applied to the State Court Foreclosure Action upon the commencement of Mr. Pacheco's chapter 7 case on March 29, 2019 and remained in effect until the automatic stay terminated upon the entry of the discharge on August 14, 2019.

*Alarid v. Pacheco (In re Pacheco),* 616 B.R. 126, 131 (Bankr. D.N.M. 2020).[8] Accordingly, the automatic stay remains in effect until it is lifted by the bankruptcy court, or until the discharge

---

[7] In bankruptcy parlance, an objection to discharge of the debtor himself is often referred to as an "objection to discharge," while an objection to discharge of a particular debt is referred to as an "objection to dischargeability." *See, e.g.*, *In re Withrow,* 570 B.R. 452, 455 (Bankr. N.D. Ga. 2017). ("[A]n objection to discharge and an objection to the dischargeability are two distinct and different claims for relief."). There is a distinction as to when the discharge order is entered between a section 727 objection to the **discharge**, or under section 523 objection to the dischargeabiliy. *See*, 11 U.S.C. §§ 727, 523. The discharge order will not be entered until a motion under section 727 is determined by final order. However, in a section 523 discharge, bankruptcy courts issue a discharge order to conclude the case since the form preserves time filed objections to dischargeability under section 523.

[8] *N. Tex. Cap.Partners, L.P. v. Dorvil (In re Dorvil),* 665 B.R. 35, 50 (Bankr. N.D. Tex. 2024):

> Section 362(c) articulates how long the stay is in place. In pertinent part, § 362(c)(2) provides that "the stay of any other act under subsection (a) of this section continues" until: "(A) the time the case is closed; (B) the time the case is dismissed; *or (C) if the case is a case under chapter 7 of this title concerning an individual . . ., the time a discharge is granted or denied..."* This language referencing the stay's continuing operation until "the time a discharge is granted or denied" may lead non-bankruptcy courts and parties in a bankruptcy proceeding to believe that the stay continues to apply until a § 523 dischargeability action is finally adjudicated. Such a belief is incorrect. The pendency of a § 523 has no minimizing effect on the automatic stay.
>
> This confusion over § 362(c)'s "until the time a discharge is granted or denied" language can be resolved by looking to bankruptcy procedure and the interplay between § 523(a) and § 727(a). When a § 727(a) action is commenced to deny the debtor a discharge, which places the debtor's entire discharge in jeopardy, the bankruptcy court typically does not issue a discharge order while the action is pending. *See,* Fed. R. Bankr. P. 7001(4), 7001(6). Thus, the automatic stay remains in force because no discharge order has been entered.

order is entered. It is not until the discharge order is entered that the automatic stay ceases to apply, and the discharge injunction comes into force and effect.

**ii.**    **This Case Involves Parties and Issues "Arising In" or is "Related To" Cases Under Title 11 [the "Home Bankruptcy Court"]**

24.    Alex Jones incorporate ¶¶ 1 through 22 above in the arguments regarding arising in or related to jurisdiction.  28 U.S.C. § 1334(b) provides

"Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or ***arising in or related to*** cases under title 11." (emphasis added).

*See, also* 28 U.S.C. § 157 regarding "… arising in, arising under, or related to" federal question jurisdiction of the federal District Court.   Both of these sections apply in this Removal.

25.    At the time of this Removal there was, and is, an ongoing Chapter 7 bankruptcy case styled *In Re: Alex Jones*, case no. 22-33553 (CML) now pending the United States Bankruptcy Court under the jurisdiction of the District Court for the Southern District of Texas. This District Court (Austin Division) has original jurisdiction over this action pursuant to 28 U.S.C. §1334(b) as the Removed State Court Case is ""arising under", or "arising in" or "related to" the Bankruptcy Case.  All of Alex Jones' exempt and non-exempt assets remain in the possession of the Chapter 7 Trustee until allowed as exempt or until abandoned by the Trustee.

**D.**    **This Case Should be Transferred to the "Home Bankruptcy Court" for Determination of Any Issues of Remand or Abstention**

26.    Jones incorporates herein as if set out herein verbatim the facts, conclusions and arguments set out above and in Jones Motion to Transfer Venue to the "Home Bankruptcy Court" filed contemporaneously with the Removal and Notice or shortly thereafter to accommodate the certificate of conference.

Removal and Notice                      Page 11 of 15

27.     28 U.S.C. § 1452(a) provides that "a party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."

28.     28 U.S.C. § 1334(b) provides that "the *district court* shall have original but not exclusive jurisdiction of all civil proceedings *arising under* Title 11 or *arising in* or *related to cases* under Title 11."[9] 28 U.S.C. § 1334, and the removed lawsuit is a civil action other than a proceeding before the Tax Court or a civil action brought by a governmental unit to enforce the government unit's police or regulatory power as required for removal pursuant to 28 U.S.C. § 1452. Venue is proper before this Court under 28 U.S.C. § 1409. As noted above, Jones incorporates herein as if set out herein verbatim the facts, conclusions and arguments set out in Jones Motion to Transfer Venue to the "Home Bankruptcy Court" filed contemporaneously with the Removal and Notice or shortly thereafter to accommodate the certificate of conference.

29.     Importantly, as described in detail above, the automatic stay (11 U.S.C. § 362) prohibits any action by any creditor against the Debtor or the Debtors assets until (i) the case is concluded; and (ii) a determination has been made as to the dischargeability of any creditors' claim. No such determination has been made and unless a claim is declared non-dischargeable by an order of the bankruptcy court the automatic stay and discharge injunction prohibit exactly what the Connecticut Plaintiffs have attempted in the Removed State Court Case.

30.     Jones incorporates herein the Motion to Transfer Venue contemporaneously filed herewith or shortly thereafter to accommodate the certificate of conference with respect to this issue and argument.

---

9       However, removal pursuant to 28 U.S.C. § 1452(a) is proper directly to a Bankruptcy Court, rather than to a District Court. *See e.g., Industrial Clearinghouse, Inc. v. Mims (In re Coastal Plains, Inc.)*, 338 BR 703 (N.D. Tex. 2006).

31. **Notice**.  Written notice of the filing of this notice of removal will be filed with the Removed State Court state district court where the 2025 Application is pending and furnished or served on all other parties as provided by law.

32. **Attachments Pursuant to Local Rules**.  In accordance with federal statute and local rules of this court, the following were filed when the original Notice of Removal was filed on August 4, 2025 [Docket #1] and have been amended (additional Exhibits accompanies the filing of the Removal):

    a.    Index of Matters being filed with Tabs 1-7;
    b.    List of parties to include counsel of record, including their addresses, telephone numbers, and parties represented; and
    c.    A true and correct copy of the Removed State Court 2025 Application Docket Sheet.

33. **Reservation of Rights to Amend and Supplement**:  Because the 2025 Application involves parties and intervenors and issues not previously involved in that pending case, and because no service of process was made on Alex Jones, (or, in the case of the purported domestication proceeding his due process rights were violated by Plaintiffs) Alex Jones reserves the right to promptly amend or supplement this Removal and Notice of Removal as events and documents are discovered within the time provided by this Court's Rules.

34. **Conclusion and Prayer**:  This Removed State Court Case has been timely and properly brought to this Bankruptcy Court upon multiple basis of personal and *in rem* jurisdiction over Alex Jones, jurisdiction that continues to be exercised by the Home Court.  Defendant Alex Jones requests this Court exercise its jurisdiction and ancillary jurisdiction as may be the case, and transfer venue to the United States District Court for the Southern District of Texas for automatic referral to the pending Bankruptcy proceeding in that District, and upon transfer and consolidation for trial of this Removed State Court Case, render judgment as will be set out in Defendant Alex

Removal and Notice               Page 13 of 15

Jones' full and complete answer and response to the Plaintiffs' Claims in this Removed State Court Case, and for such other and further relief to which Alex Jones may be justly entitled, both at law and in equity.

Dated: August 4, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

Ben C. Broocks
State Bar No. 03058800
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**COUNSEL FOR ALEX JONES**

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, a true and correct copy of the foregoing document was served via e-file/e-mail in accordance with the Texas Rules of Civil Procedure:

| | |
|---|---|
| **ATTORNEYS FOR THE CONNECTICUIT FAMILIES** | Ryan E. Chapple<br>rchapple@cstrial.com<br>Benjamin D. Evans<br>bevans@cstrial.com<br>CAIN & SKARNULIS PLLC<br>303 Colorado Street, Suite 2850<br>Austin, Texas 78701<br><br>Avi Moshenberg<br>LAWSON & MOSHENBERG PLLC<br>2301 Commerce Street, Suite 200<br>Houston, TX 77002<br>Email: avi.moshenberg@lmbusinesslaw.com |
| **CHAPTER 7 TRUSTEE:** | Joshua W. Wolfshohl<br>Michael B. Dearman<br>Jordan T. Stevens<br>Kenesha L. Starling<br>**PORTER HEDGES LLP**<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>jwolfshohl@porterhedges.com<br>mdearman@porterhedges.com<br>jstevens@porterhedges.com<br>kstarling@porterhedges.com<br><br>Erin E. Jones<br>**JONES MURRAY LLP**<br>602 Sawyer Street, Suite 400<br>Houston, Texas 77007<br>erin@jonesmurray.com |
| **POTENTIAL RECEIVER:** | Gregory S. Milligan<br>Harney Partners<br>Westech 360<br>8911 North Capital of Texas Highway, Suite 2120<br>Austin, Texas 78759<br>Telephone: (512) 464-1139<br>milligan@harneypartners.com |

*/s/ Shelby A. Jordan*
Shelby A. Jordan

# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## (AUSTIN DIVISION)

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § § § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Civil Action _____ |
| | § | |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC | § § | |
| Defendants | | |

## INDEX OF MATTERS BEING FILED

| Tab No | Date | Description |
|---|---|---|
| 1. | | Travis County Docket Sheet for D-1-GN-18-001835; Neil Heslin and Scarlett Lewis v. Free Speech Systems, LLC, Alex E. Jones; 261st District Court of Travis County, Texas |
| 2. | 6/21/24 | Original Petition in Intervention and Emergency Motion to Reconsider |
| 3. | 6/21/24 | Plaintiff's Application for Turnover Order |
| 4. | 6/24/24 | Notice of Removal |
| 5. | 7/7/25 | Notice of Filing of Stipulation and Agreed Order Regarding Remand |
| 6. | 7/7/25 | Application for Post-Judgment Turnover and Appointment of Receiver as Judgement Debtors Alexander E. Jones and Free Speech Systems, LLC |
| 7. | 7/17/25 | Stipulation and Agreed Order Regarding Remand |

APPENDIX E

| VELVA L. PRICE | RECEIPT No. 00744 |
|---|---|

**VELVA L. PRICE**
District Clerk, Travis County
P.O. Box 679003
Austin, Texas 78767-9003
512-854-9457

Date: 8/8/2025

Amount: 10.00

Payment Type:

Cash [✓]   Check [ ]   M.O. [ ]   Credit [ ]

Received From: Broocks Law Firm

CASH : Amount of change returned _____

Ref. Cause No.:
D-1-GN-18-001835

CHECK or M.O. #:_____

Received For:   Passport [ ]   Photo [ ]   Other [X]

Ref. Other: Deposit of cash in Lieu of Bond

Check or M.O.        D/L #        _____
Information:         D.O.B.       _____
                     Phone #      _____

Received By
Deputy District Clerk: Autumn Gustavsen

CREDIT CARD REF. # _____

APPENDIX E

**From:** Leidy Elliott <Leidy.Elliott@traviscountytx.gov>
**Subject: Notice of Supersedeas Bond Posted 08/08/2025**
**Date:** August 8, 2025 at 1:11:56 PM CDT
**To:** "RCHAPPLE@CSTRIAL.COM" <RCHAPPLE@CSTRIAL.COM>, "avi.moshenberg@lmbusinesslaw.com" <avi.moshenberg@lmbusinesslaw.com>, "martin@mdjwlaw.com" <martin@mdjwlaw.com>, "BBROCKS@BROCKSLAWFIRM.COM" <BBROCKS@BROCKSLAWFIRM.COM>, "wbroocks@broockslawfirm.com" <wbroocks@broockslawfirm.com>, "ALAN@ALANDAUGHTRYLAW.COM" <ALAN@ALANDAUGHTRYLAW.COM>, "LABOON@MDJWLAW.COM" <LABOON@MDJWLAW.COM>, "AREYNAL@FRLAW.US" <AREYNAL@FRLAW.US>, "mark@fbtrial.com" <mark@fbtrial.com>, "cca@akersfirm.com" <cca@akersfirm.com>, "avi.moshenberg@lmbusinesslaw.com" <avi.moshenberg@lmbusinesslaw.com>, "rrswafford8@gmail.com" <rrswafford8@gmail.com>, "DALLASESERVICE@CROWEDUNLEVY.COM" <DALLASESERVICE@CROWEDUNLEVY.COM>, "eric.nichols@butlersnow.com" <eric.nichols@butlersnow.com>, "MARSHALL.BOWEN@BUTLERSNOW.COM" <MARSHALL.BOWEN@BUTLERSNOW.COM>

Good afternoon,

This is to notify you that a supersedeas bond was posted today with the District Clerk's office in the amount of $10.00 for cause D-1-GN-18-001835 on behalf of FREE SPEECH SYSTEMS LLC.

Should you have any questions, please contact me via email – leidy.elliott@traviscountytx.gov

Thank you,

*Leidy Elliott*
Accountant
Travis County District Clerk's Office
Finance Department
Ph: 512-854-4828

---

This electronic mail message, including any attachments, may be confidential or privileged under applicable law. This email is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this email, you are notified that any use, dissemination, distribution, copying, disclosure or any other action taken in relation to the content of this email including any attachments is strictly prohibited. If you have received this email in error, please notify the sender immediately and permanently delete the original and any copy of this email, including secure destruction of any printouts.

APPENDIX F



United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 25, 2024

Nathan Ochsner, Clerk

|  | § |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043 (CML)** |
|  | § |  |
| **Debtor.** | § |  |
|  | § |  |
|  | § |  |

## ORDER SUPPLEMENTING ORDER DISMISSING CASE
### [Related to Docket No. 956]

1.  Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.  The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

Signed: September 25, 2024

_____

Christopher Lopez
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11 (Subchapter V)** |
|  | ) |  |
| **FREE SPEECH SYSTEMS LLC,** | ) | **Case No. 22-60043** |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## NOTICE OF APPEAL

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), pursuant to 28 U.S.C. § 158(a)(1) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure, appeal to the United States District Court for the Southern District of Texas this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024.  A copy of the Supplemental Dismissal Order is attached hereto as **Exhibit A**.

The parties to the Supplemental Dismissal Order and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

| Party | Party's Attorneys |
|---|---|
| **Appellants**<br><br>Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine | **WILLKIE FARR & GALLAGHER LLP**<br>Jennifer J. Hardy<br>State Bar No. 24096068<br>600 Travis Street<br>Houston, TX 77002<br>Telephone: (713) 510-1766<br>Fax: (713) 510-1799<br>Email: jhardy2@willkie.com<br><br>**WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi (admitted *pro hac vice*)<br>Ciara A. Sisco (admitted *pro hac vice*) |

| | 787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Fax: (212) 728-8111<br>E-mail: slombardi@willkie.com<br>E-mail: csisco@willkie.com<br><br>**LAWSON & MOSHENBERG PLLC**<br>Avi Moshenberg<br>State Bar No. 24083532<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002<br>Telephone:  (713) 449-9644<br>E-mail:  avi.moshenberg@lmbusinesslaw.com<br><br>**CHAMBERLAIN, HRDLICKA,<br>WHITE, WILLIAMS & AUGHTRY, PC**<br>Jarrod B. Martin<br>State Bar No. 24070221<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>Telephone:  (713) 356-1280<br>Fax:  (713) 658-2553<br>E-mail:  jarrod.martin@chamberlainlaw.com |
| **Appellee**<br><br>Free Speech Systems, LLC | **O'CONNORWECHSLER PLLC**[1]<br>Annie E. Catmull (Texas Bar No. 00794932)<br>4400 Post Oak Parkway, Suite 2360<br>Houston, Texas 77027<br>Telephone: (281) 814-5977<br>E-mail: aecatmull@o-w-law.com |

---

[1] O'ConnorWechsler PLLC is Appellee's last known counsel.

Dated:  October 8, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

*Co-Counsel to the Texas Plaintiffs*

3

APPENDIX G

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 8, 2024.

*/s/ Jennifer J. Hardy*

APPENDIX G

# Exhibit A

Case 22-33553 Document 1246-12 Filed in TXSB on 11/29/07/ 05 Page 326 of 552
Case 22-60043 Document 1046 Filed in TXSB on 09/25/24 Page 1 of 1

**APPENDIX G**

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

</div>

| | |
|---|---|
| **In re:** | § |
| | § **Chapter 11** |
| | § |
| **FREE SPEECH SYSTEMS, LLC,** | § **Case No. 22-60043 (CML)** |
| | § |
| **Debtor.** | § |
| | § |
| | § |

<div align="center">

**ORDER SUPPLEMENTING ORDER DISMISSING CASE**
**[Related to Docket No. 956]**

</div>

1.    Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.    The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed:** September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

15564076

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 (Subchapter V) |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) |
| | ) |

**THE TEXAS PLAINTIFFS' STATEMENT OF ISSUES
AND DESIGNATION OF RECORD TO BE PRESENTED ON APPEAL**

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), under Rule 8009 of the Federal Rules of Bankruptcy Procedure, submit the following statement of issues and designation of items to be included in the record on appeal with respect to the Texas Plaintiffs' appeal of this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024.

**STATEMENT OF ISSUES**

1.      Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

**DESIGNATION OF ITEMS FOR RECORD ON APPEAL**

The Texas Plaintiffs designate the following items to include in the record on appeal.  Each designated item shall also include all filed exhibits attached to such item. Because the appeal of the Supplemental Dismissal Order relates in part to the companion bankruptcy action captioned *In*

APPENDIX H

*re Alexander E. Jones*, Case No. 22-33533, currently pending before the Bankruptcy Court of the Southern District of Texas ("Jones Action"), the Texas Plaintiffs also designate items from that docket in addition to the docket of the immediate Chapter 11 case ("FSS Action"). The Texas Plaintiffs also designate this *Statement of Issues and Designation of Record on Appeal* for inclusion in the record on appeal.

| ITEM NO. | DOCKET NO. | FILING DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 707 (FSS) | 8/29/2023 | Debtor's Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 2. | 740 (FSS) | 10/11/2023 | Joint Objection of the Sandy Hook Families to Debtors' Motion to Approve Employment Contract Pursuant to 11 U.S.C. Sections 105 and 363(b) |
| 3. | 741 (FSS) | 10/11/2023 | The Official Committee of Unsecured Creditors' (I) Reservation of Rights in Respect of Alexander Jones's Motion for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. § 503(b)(1) to the Extent Such Motion Is Not Withdrawn and (II) Limited Objection and Joinder in Respect of Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 4. | 823 (FSS) | 2/23/2024 | Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019 |
| 5. | 914 (FSS) | 5/28/2024 | Transcript of Hearing held on May 21, 2024 |
| 6. | 921 (FSS) | 6/2/2024 | Emergency Motion of the Connecticut Families for an Order Pursuant to Bankruptcy Code Sections 105(a) and 1112(b) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 7. | 684 (Jones) | 6/5/2024 | Emergency Motion for Entry of an Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 8. | 928 (FSS) | 6/7/2024 | Transcript of Hearing held on June 3, 2024 |
| 9. | 933 (FSS) | 6/11/2024 | Debtor's Emergency Motion for Court Instructions Regarding (1) Disposition of Debtors Property, and (2) Clarity as to the Chief Restructuring Officers Responsibilities and |

2

| | | | |
|---|---|---|---|
| | | | Authority, in the Event of Either a Dismissal of This Case or Conversion to Chapter 7 |
| 10. | 693 (Jones) | 6/12/2024 | Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on June 14, 2024 |
| 11. | 937 (FSS) / 695 (Jones) | 6/12/2024 | Jones's Witness and Exhibit List for Hearing on June 14, 2024 |
| 12. | 939 (FSS) / 696 (Jones) | 6/12/2024 | Additional Attachments to Alex Jones's Witness List and Exhibit List for Hearing on June 14, 2024 |
| 13. | 942 (FSS) / 697 (Jones) | 6/12/2024 | The Texas Plaintiffs' Witness and Exhibit List for Hearing on June 14, 2024 |
| 14. | 698 (Jones) | 6/12/2024 | The Official Committee of Unsecured Creditors' Notice of Filing of Supporting Parties' Conversion Order |
| 15. | 944 (FSS) / 699 (Jones) | 6/12/2024 | Connecticut Families' Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 16. | 702 (Jones) | 6/12/2024 | Statement of the Connecticut Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 17. | 703 (Jones) | 6/12/2024 | Statement of the Texas Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code (Amended) |
| 18. | 935 (FSS) | 6/12/2024 | FSS's Witness and Exhibit List for Hearing on June 14, 2024 |
| 19. | 936 (FSS) | 6/12/2024 | PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 20. | 941 (FSS) | 6/12/2024 | Additional Attachments to PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 21. | 938 (FSS) | 6/12/2024 | Melissa A. Haselden's Witness and Exhibit List for Hearing on June 14, 2024 |
| 22. | 943 (FSS) | 6/12/2024 | Jones's Response and Objection to Debtor's Emergency Motion for Court Instructions and Motion to Convert |
| 23. | 945 (FSS) | 6/12/2024 | The Texas Plaintiffs' Statement Supporting Dismissal of the Chapter 11 Case and Objecting to Conversion |
| 24. | 950 (FSS) / 706 (Jones) | 6/13/2024 | Connecticut Families' Updated Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 25. | 948 (FSS) | 6/13/2024 | Subchapter V Trustee's Report and Recommendation of Case Disposition |
| 26. | 951 (FSS) | 6/14/2024 | Debtor's Response to Motion to Convert |

3

| 27. | 953 (FSS) | 6/14/2024 | FSS's Revised Witness and Exhibit List |
|---|---|---|---|
| 28. | 955 (FSS) / 714 (Jones) | 6/14/2024 | Courtroom Minutes of June 14, 2024 Hearing |
| 29. | 708 (Jones) | 6/14/2024 | Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 30. | 709 (Jones) | 6/14/2024 | United States Trustee's Notice of Appointment of Chapter 7 Trustee |
| 31. | 956 (FSS) | 6/21/2024 | Order Dismissing Case |
| 32. | 957 (FSS) / 720 (Jones) | 6/23/2024 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 33. | 721(Jones) | 6/24/2024 | Transcript of Hearing held on June 14, 2024 |
| 34. | 959 (FSS) / 725 (Jones) | 6/24/2024 | Connecticut Families' Statement in Support of Trustee's Emergency Motion |
| 35. | 960 (FSS) / 726 (Jones) | 6/24/2024 | The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion |
| 36. | 961 (FSS) | 6/26/2024 | O'ConnorWechsler's Response to Chapter 7 Trustee's Emergency Motion |
| 37. | 732 (Jones) | 6/26/2024 | Chapter 7 Trustee's Witness and Exhibit List for Hearing on June 27, 2024 |
| 38. | 734 (Jones) | 6/26/2024 | Connecticut Families' Exhibit List for Hearing on June 27, 2024 |
| 39. | 758 (Jones) | 7/3/2024 | Transcript of Hearing held on June 27, 2024 |
| 40. | 829 (Jones) | 8/22/2024 | Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 41. | 845 (Jones) | 9/17/2024 | United States Trustee's Omnibus Objection to the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC, and Application to Employ Tranzon and Tranzon360 As Sale Broker |
| 42. | 847 (Jones) | 9/19/2024 | Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 43. | 848 (Jones) | 9/19/2024 | United States Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 44. | 849 (Jones) | 9/20/2024 | Jones's Limited Objection to Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 45. | 850  (Jones) | 9/20/2024 | Statement of the Texas Plaintiffs in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |

APPENDIX H

| 46. | 851 (Jones) | 9/20/2024 | Statement of the Connecticut Families in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 47. | 853 (Jones) | 9/23/2024 | Reply of the Trustee in Further Support of Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 48. | 854 (Jones) | 9/24/2024 | Proposed Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 49. | 859 (Jones) | 9/25/2024 | Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 50. | 861 (Jones) | 9/26/2024 | Transcript of Hearing held on September 24, 2024 |
| 51. | 1020 (FSS) | 9/24/2024 | Trustee's Proposed Order Supplementing Dismissal Order |
| 52. | 1021 (FSS) | 9/25/2024 | Order Supplementing Order Dismissing Case |
| 53. | 1028 (FSS) | 10/8/2024 | Notice of Appeal |
| 54. | 1029 (FSS) | 10/11/2024 | Election to Appeal District Court |
| 55. | 1030 (FSS) | 10/11/2024 | Clerk's Notice of Filing of an Appeal |
| 56. | 880 (Jones) | 10/15/2024 | Transcript of Status Conference held on September 11, 2024 |

## CERTIFICATION REGARDING TRANSCRIPTS

The Texas Plaintiffs hereby certify, pursuant to Federal Rule of Bankruptcy Procedure 8009(b)(1), that they are not ordering any transcripts. All transcripts have been prepared, are on the docket, and are designated in the foregoing designation of record.

## RESERVATION OF RIGHTS

The Texas Plaintiffs expressly reserve the right to (i) withdraw, supplement, amend or modify this Statement of Issues and (ii) move to strike any items included by Appellee in a designation of additional items. This filing is made expressly subject to, and without waiver of any and all rights, remedies, challenges, and objections.

5

Dated:  October 22, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 22, 2024.

*/s/ Jennifer J. Hardy*

APPENDIX I

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Civil Action No. 4:24cv3882** |
| **FREE SPEECH SYSTEMS, LLC** | § | |
| | § | **Bankruptcy Case No. 22-60043** |
| **Debtor.** | § | |

**CHAPTER 7 TRUSTEE'S**
**APPELLEE DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED**
**IN THE RECORD PURSUANT TO FED. R. BANKR. P. 8009**

Christopher R. Murray, in his capacity as chapter 7 trustee ("**Trustee**" or "**Appellee**") for the bankruptcy estate of Alexander E. Jones[1] ("**Jones**") and 100% owner of Free Speech Systems, LLC. ("**FSS**") hereby files this, his *Chapter 7 Trustee's Appellee Designation of Additional Items to be Included in the Record Pursuant to Fed. R. Bankr. P. 8009* (the "**Appellee Designation**") pursuant to FED. R. BANKR. P. 8009(a)(2). The Trustee respectfully states the following:

**PROCEDURAL BACKGROUND**

1.      On October 8, 2024, Appellants[2] filed their Notice of Appeal (Dkt. No. 1028) in the case pending as *In re Free Speech Systems, LLC,* Case No. 22-60043, Southern District of Texas Houston Division ("**FSS Case**"). Appellants are appealing the Order entered by the Bankruptcy Court in the FSS Case at Dkt. No. 1021.

2.      On October 11, 2024, the Clerk of the Court entered its Notice of Filing Appeal from the Clerk of Court [DE 1030] (the "**Clerk's Notice**") with instructions and deadlines in this Appeal.

---

[1] The chapter 7 case of Jones is pending as *In re Alexander E. Jones*, Case No. 22-33553, Southern District of Texas Bankruptcy Court Houston Division ("**Jones Case**").

[2] Appellants include: Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "**Texas Plaintiffs**" or "**Appellants**").

3.      On October 22, 2024, Appellants filed a Statement of Issues and Designation of Record to be Presented on Appeal ("**Appellants' Designation**")(Dkt. No. 1033).

4.      Under the timeline set forth in the Clerk's Notice, the Trustee's Appellee Designation is due for filing by November 5, 2024.  However, on November 5, 2024, the Clerk issued a Notice of Deficiency ("**Notice of Deficiency**") (Docket No. 1034) identifying deficiencies in Appellants' Designation and ordering Appellants to cure such deficiencies with an amended filing within 14 days.

5.       It is unclear how Appellants' deficiencies in the Appellants' Designation and the refiling of same will impact the Trustee's deadline to file his Appellee Designation. Out of an abundance of caution, the Trustee files this Appellee Designation but reserves the right to amend and/or supplement to the extent permitted under applicable rules and/or orders. Copies of the following are filed with the Bankruptcy Court and are therefore not filed again with the Appellee Designation.

**APPELLEE'S DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD**

| 1 | 06/23/2024 | FSS CASE Dkt. No. 957 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 2 | 06/23/2024 | FSS CASE Dkt. No. 957-1 | Exhibit A – Texas Plaintiffs' Application for Turnover and related exhibits filed in State Court in violation of Bankruptcy Court Dismissal Order |
| 3 | 06/23/2024 | FSS CASE Dkt. No. 957-2 | Exhibit B – Signed Turnover Order Obtained by Texas Plaintiffs in State Court in violation of Bankruptcy Court Dismissal Order |
| 4 | 06/23/2024 | FSS CASE Dkt. No. 957-3 | Exhibit C – Texas Plaintiffs' Application for Post-Judgment Writ of Garnishment, and associated exhibits |
| 5 | 06/23/2024 | FSS CASE Dkt. No. 957-4 | Proposed Order on Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 6 | 06/23/2024 | JONES CASE Dkt. No. 720 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay |

| | | | |
|---|---|---|---|
| | | | in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 7 | 06/23/2024 | JONES CASE Dkt. No. 720-1 | Exhibit A – Texas Plaintiffs' Application for Turnover and related exhibits filed in State Court in violation of Bankruptcy Court Dismissal Order |
| 8 | 06/23/2024 | JONES CASE Dkt. No. 720-2 | Exhibit B – Signed Turnover Order Obtained by Texas Plaintiffs in State Court in violation of Bankruptcy Court Dismissal Order |
| 9 | 06/23/2024 | JONES CASE Dkt. No. 720-3 | Exhibit C – Texas Plaintiffs' Application for Post-Judgment Writ of Garnishment, and associated exhibits |
| 10 | 06/23/2024 | JONES CASE Dkt. No. 720-4 | Proposed Order on Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 11 | 06/26/2024 | JONES CASE Dkt. No. 732 | Trustee Witness and Exhibit List for Thursday June 27, 2024 |
| 12 | 06/26/2024 | JONES CASE Dkt. No. 732-1 | Exhibit 1 – Order Dismissing Free Speech Systems LLC chapter 11 bankruptcy case |
| 13 | 06/26/2024 | JONES CASE Dkt. No. 732-2 | Exhibit 2 – Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) for an Order Extending Automatic Stay in the Alex Jones Case to Free Speech Systems LLC, and (3) Related Relief (inclusive of exhibits thereto) [Dkt. No. 720] |
| 14 | 06/26/2024 | JONES CASE Dkt. No. 732-3 | Exhibit 3 – Plaintiffs' Application for Turnover Order regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 15 | 06/26/2024 | JONES CASE Dkt. No. 732-4 | Exhibit 4 – State Court Order regarding Plaintiffs' Application for Turnover Order concerning Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas |
| 16 | 06/26/2024 | JONES CASE Dkt. No. 732-5 | Exhibit 5 – Plaintiffs' Application for Post-Judgment Writ of Garnishment regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 17 | 06/26/2024 | JONES CASE Dkt. No. 732-6 | Exhibit 6 – Connecticut Families' Statement in Support of the Trustee's Emergency Motion (inclusive of exhibits thereto) [Dkt. No. 725] |
| 18 | 06/26/2024 | JONES CASE Dkt. No. 732-7 | Exhibit 7 – The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion (inclusive of exhibits thereto) [Dkt. No. 726] |

TRUSTEE/APPELLEE'S DESIGNATION OF
ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD

| 19 | 06/26/2024 | JONES CASE Dkt. No. 732-8 | Exhibit 8 – Notice of Removal regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
|---|---|---|---|
| 20 | 06/26/2024 | JONES CASE Dkt. No. 732-9 | Exhibit 9 – June 21, 2024, Emails with Texas State Court Coordinator regarding Plaintiffs' Application for Turnover Order |
| 21 | 06/26/2024 | JONES CASE Dkt. No. 732-10 | Exhibit 10 – Notice of Removal regarding Neil Heslin and Scarlett Lewis v. Cadence Bank and Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-24-003882, 200th Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 22 | 08/22/2024 | JONES CASE Dkt. No. 828 | Trustee's Application to Employ Tranzon and Tranzon360 as Sale Broker |
| 23 | 08/22/2024 | JONES CASE Dkt. No. 828-1 | Exhibit A – Declaration of Kelly Toney |
| 24 | 08/22/2024 | JONES CASE Dkt. No. 828-2 | Exhibit B – Declaration of Jeff Tannenbaum |
| 25 | 08/22/2024 | JONES CASE Dkt. No. 828-3 | Exhibit C – Bankruptcy Auction Agency Agreement |
| 26 | 08/22/2024 | JONES CASE Dkt. No. 828-4 | Exhibit D – Agency and Marketing Agreement |
| 27 | 08/22/2024 | JONES CASE Dkt. No. 828-5 | Proposed Order on Trustee's Application to Employ Tranzon and Tranzon360 as Sale Broker |
| 28 | 09/16/2024 | JONES CASE Dkt. No. 844 | Order Authorizing Retention of Tranzon and Tranzon360 as Broker |
| 29 | 08/22/2024 | JONES CASE Dkt. No. 829 | Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 30 | 08/22/2024 | JONES CASE Dkt. No. 829-1 | Proposed Order on Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 31 | 09/19/2024 | JONES CASE Dkt. No. 847 | Trustee Witness and Exhibit List for Tuesday, September 24, 2024 Hearing |
| 32 | 09/19/2024 | JONES CASE Dkt. No. 847-1 | Exhibit 1 – Bankruptcy Auction Agency Agreement |
| 33 | 09/19/2024 | JONES CASE Dkt. No. 847-2 | Exhibit 2 – Agency and Marketing Agreement |
| 34 | 09/19/2024 | JONES CASE Dkt. No. 847-3 | Exhibit 3 – Free Speech Systems LLC Operating Agreement |
| 35 | 09/19/2024 | JONES CASE Dkt. No. 847-4 | Exhibit 4 – Order Dismissing Free Speech Systems LLC chapter 11 bankruptcy case |
| 36 | 09/19/2024 | JONES CASE Dkt. No. 847-5 | Exhibit 5 – Alexander E. Jones chapter 7 bankruptcy schedules |
| 37 | 09/19/2024 | JONES CASE Dkt. No. 847-6 | Exhibit 6 – Free Speech Systems LLC chapter 11 bankruptcy schedules |
| 38 | 09/19/2024 | JONES CASE Dkt. No. 847-7 | Exhibit 7 – Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) for an Order Extending |

TRUSTEE/APPELLEE'S DESIGNATION OF
ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD                                    PAGE 4 of 7

| 39 | 09/19/2024 | JONES CASE Dkt. No. 847-8 | Automatic Stay in the Alex Jones Case to Free Speech Systems LLC, and (3) Related Relief (exclusive of exhibits thereto) [Dkt. No. 720]<br><br>Exhibit 8 – Transcript of June 27, 2024, Hearing regarding Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) for an Order Extending Automatic Stay in the Alex Jones Case to Free Speech Systems LLC, and (3) Related Relief [Dkt. No. 758] |
| 40 | 09/19/2024 | JONES CASE Dkt. No. 847-9 | Exhibit 9 – Plaintiffs' Application for Turnover Order regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 41 | 09/19/2024 | JONES CASE Dkt. No. 847-10 | Exhibit 10 – State Court Order regarding Plaintiffs' Application for Turnover Order concerning Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas |
| 42 | 09/19/2024 | JONES CASE Dkt. No. 847-11 | Exhibit 11 – Plaintiffs' Application for Post-Judgment Writ of Garnishment regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 43 | 09/19/2024 | JONES CASE Dkt. No. 847-12 | Exhibit 12 – Connecticut Families' Statement in Support of the Trustee's Emergency Motion (inclusive of exhibits thereto) [Dkt. No. 725] |
| 44 | 09/19/2024 | JONES CASE Dkt. No. 847-13 | Exhibit 13 – The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion (inclusive of exhibits thereto) [Dkt. No. 726] |
| 45 | 09/19/2024 | JONES CASE Dkt. No. 847-14 | Exhibit 14 – Notice of Removal regarding Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835, 261st Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 46 | 09/19/2024 | JONES CASE Dkt. No. 847-15 | Exhibit 15 – June 21, 2024, Emails with Texas State Court Coordinator regarding Plaintiffs' Application for Turnover Order |
| 47 | 09/19/2024 | JONES CASE Dkt. No. 847-16 | Exhibit 16 – Notice of Removal regarding Neil Heslin and Scarlett Lewis v. Cadence Bank and Alex E. Jones and Free Speech Systems, LLC, Cause No. D-1-GN-24-003882, 200th Judicial District Court of Travis County, Texas (inclusive of exhibits thereto) |
| 48 | 09/24/2024 | JONES CASE Dkt. No. 855 | Notice of (I) Revised Proposed Order Granting Trustee's Motion for Entry of an Order  Authorizing the Winddown of Free Speech Systems, LLC and (II) Redline Thereof |

| 49 | 09/24/2024 | JONES CASE Dkt. No. 855-1 | Redline of Revised Proposed Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC and (II) Redline Thereof |
|----|-----------|---------------------------|------------------------------------------------|
| 50 | 09/25/2024 | JONES CASE Dkt. No. 859 | Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 51 | 09/27/2024 | JONES CASE Dkt. No. 862 | Notice of Auction for the Sale of Assets of Free Speech Systems, LLC Free and Clear of Any and all Claims, Interests and Encumbrances |
| 52 | 06/14/2024 | JONES CASE Dkt. No. 709 | US Trustee's Notice of Appointment of Chapter 7 Trustee |
| 53 | 09/05/2024 | FSS CASE Dkt. No. 1014 | Emergency Motion to Direct the Payment of Allowed Professional Fees |
| 54 | 09/06/2024 | FSS CASE Dkt. No. 1015 | Order Granting the Emergency Motion to Direct Payment of Allowed Professional Fees |
| 55 | 09/27/2024 | WDTX ADV.[3] No. 24-01034 Dkt. No. 33 | Trustee's Motion to Transfer Venue and attached exhibits at Dkt. 33-1 through 33-11 |
| 56 | 10/24/2024 | WDTX ADV. No. 24-01034 Dkt. No. 40 | Order Granting Trustee Motion to Transfer Venue |
| 57 | 09/27/2024 | WDTX ADV. No. 24-01035 Dkt. No. 34 | Trustee's Motion to Transfer Venue and attached exhibits at Dkt. 34-1 through 34-11 |
| 58 | 10/24/2024 | WDTX ADV. No. 24-01035 Dkt. No. 41 | Order Granting Trustee Motion to Transfer Venue |

---

[3] The two Western District of Texas Bankruptcy Court matters (Adversary No. 24-01034 and 24-01035) were matters initially removed from the state district court in Travis County, Texas to the Western District of Texas Bankruptcy Court, which recently entered an order transferring the adversary proceedings to the Southern District of Texas Bankruptcy Court. References in this document to the "WDTX Adv. No." refers to the adversary number of the removed matters while still pending in the Western District of Texas Bankruptcy Court. These two adversary proceedings have not yet been docketed in the Southern District of Texas Bankruptcy Court and therefore do not have case numbers assigned in the district that can be used in this Appellee Designation. The Trustee will advise the Court once these cases have been docketed in the Southern District of Texas Bankruptcy Court and whether any corrections or updates need to be made to clarify the record on appeal.

## RESERVATION OF RIGHTS

6.     The Trustee reserves all rights to withdraw, amend, and/or supplement this list of items to be included in the record on appeal.  The Trustee reserves all rights to object to items included in the Appellants' Designation, including but not limited to improperly identified and incomplete items.

Date: November 5, 2024

Respectfully submitted,

**JONES MURRAY LLP**

By:  /s/ Erin E. Jones
    Erin E. Jones
    Texas Bar No. 24032478
    Fed. Id. No. 34157
    erin@jonesmurray.com
    602 Sawyer Street, Suite 400
    Houston, TX 77007
    Phone: 832-529-1999
    Fax: 832-529-3393
    **Counsel to the Christopher Murray,**
    **Chapter 7 Trustee**

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, a true and correct copy of the forgoing Appellee Designation was served upon counsel of record for Appellants via CM/ECF and to all other parties registered to receive such notice.

    /s/ Erin E. Jones
    Erin E. Jones



**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re<br><br>Free Speech Systems LLC,<br><br>         Debtor,<br><br><br>Neil Heslin, et al,<br><br>         Appellants. | Case No. 4:24-cv-03882<br><br>(Appeal from Bankr. Case No. 22-60043) |

**MOTION OF THE CONNECTICUT FAMILIES TO INTERVENE**
**PURSUANT TO RULE 8013 OF THE FEDERAL RULES**
**OF BANKRUPTCY PROCEDURE**

The Connecticut Families[1], as creditors and parties in interest in the above-captioned Chapter 11 case, by and through their undersigned counsel, file this motion (the "Motion") for entry of an order granting the Connecticut Families' motion to intervene as Appellees pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8013(g) in the appeal from the Bankruptcy Court's September 25, 2024 *Order Supplementing Order Dismissing Case* (the "Supplemental Dismissal Order," Bankr. Dkt. 1021[2]). In support of the Motion, the Connecticut Families respectfully state as follows:

---

[1] The "Connecticut Families" are Erica Ash, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker.

[2] Citations to "Bankr. Dkt." refer to the Chapter 11 docket of FSS, Bankr. Case No. 22-60043 (Bankr. S.D. Tex.), while citations to "Jones Bankr. Dkt." refer to the Chapter 11 (now Chapter 7) docket of Alexander E. Jones, Bankr. Case No. 22-33553 (Bankr. S.D. Tex.).



**PRELIMINARY STATEMENT**

1.      The Connecticut Families are, by far, the largest creditors of Free Speech Systems LLC ("FSS")—the subject of this appeal—and Alexander E. Jones ("Jones"), a now-Chapter 7 debtor who used to own and control FSS.

2.      The Connecticut Families have a strong interest in this appeal.  The appeal is an attempt by Appellants to secure the assets of FSS entirely for themselves, rather than through a fair and orderly liquidation process overseen by Jones's bankruptcy trustee.  Such a result would come at the direct expense of the Connecticut Families, who Appellants suggest should recover nothing.  The Connecticut Families actively participated in the briefing and hearing leading to the Supplemental Dismissal Order under appeal, in which the Bankruptcy Court rightly rejected Appellants' efforts.  The Connecticut Families seek intervention in this appeal of the order so they can continue to protect their interests.  Neither FSS nor Appellants would be prejudiced by the Connecticut Families' intervention.  Briefing on the appeal has not yet been scheduled.

3.      Accordingly, and as set forth in more detail below, the Connecticut Families respectfully request that the Court grant this motion to intervene.

**BACKGROUND**

4.      FSS, was formed on November 16, 2007 as a limited liability company. Jones was its sole owner.  The Jones Chapter 7 estate, now administered by a bankruptcy trustee, holds FSS's equity interests.

5.      On July 29, 2022, FSS filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

2



Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). (FSS Chapter 11 Subchapter V Voluntary Petition, Bankr. Dkt. 1.) Jones subsequently filed a voluntary petition for relief under Chapter 11 in the Bankruptcy Court on December 2, 2022. (Voluntary Petition of Alexander E. Jones, Jones Bankr. Dkt. 1.)

6. The Connecticut Families are the surviving relatives of victims murdered in the Sandy Hook Elementary School shooting and one first responder. For years following the shooting, Jones lied to his legions of followers by telling them that the Connecticut Families were "crisis actors" who faked their loved ones' deaths, and urged his followers to "investigate" the Connecticut Families and the Sandy Hook shooting. Jones's followers responded by stalking, harassing, and threatening the Connecticut Families, who suffered severe emotional and reputational harm, for which they ultimately sued and secured judgments against Jones and FSS. As a result, the Connecticut Families are the largest creditors of FSS and of Jones.

7. Specifically, the Connecticut Families hold claims totaling $1.4 billion against FSS and Jones arising from Connecticut state court judgments.[3] (Claims No. 13–16, 19–26, 32, 34–35, Bankr. Case No. 22-60043; Claims No. 7–21, Bankr. Case No. 22-33553.) While Appellants have also filed claims against FSS and Jones arising from claims they asserted in Texas state court,[4] those claims total $49.3 million in liquidated amounts to date. (Claims No. 28–31, 33, Bankr. Case No. 22-60043; Claims No. 23–25,

---

[3] *See Lafferty* v. *Jones*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court, Judgment on Verdict for Plaintiffs (Bankr. (Dkt. 509, Ex. A) (Oct. 12, 2022) and Memorandum Decision on Punitive Damages (Bankr. Dkt. 509, Ex. B) (Nov. 10, 2022).

[4] *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas, Notice of Final Judgment (Bankr. Dkt. 382, Ex. 1) (Jan. 13, 2023) and *Pozner* v. *Jones*, Cause No. D-1-GN-18-001842, in the 261st District Court of Travis County, Texas, Amended Order on Plaintiffs' Motion to Compel and Motion for Sanctions (Oct. 15, 2021). Two of Appellants' claims have yet to be liquidated.

 

27–28; Bankr. Case No. 22-33553.)  In other words, the Connecticut Families hold 96.7% of all liquidated claims against FSS and Jones, whereas Appellants hold 3.3% of liquidated claims.

8.      Of those amounts, at least $1.115 billion of the Connecticut Families' claims are non-dischargeable claims against FSS and Jones.  (Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03037, Dkt. 76.)  In contrast, $4.3 million of Appellants' claims are non-dischargeable claims against FSS and Jones.[5] (Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03035, Dkt. 46).

9.      On June 14, 2024, the Bankruptcy Court entered an order converting the Jones Chapter 11 case to a Chapter 7 case, (Jones Bankr. Dkt. 708), in which all of Jones' personal assets—including his 100% ownership of FSS—would be liquidated by a Chapter 7 trustee.  Because FSS would be an asset of the Jones Chapter 7 estate, the Bankruptcy Court entered an order dismissing FSS's Chapter 11 case on June 21, 2024. (Bankr. Dkt. 956).  However, because the Connecticut Families raised concerns that, unless FSS's case was also converted to one under Chapter 7, a dismissal could result in a "race to the courthouse" among FSS's creditors and inequitable distributions, the Bankruptcy Court specifically authorized the transfer of control and signing authority over the FSS bank accounts to the Jones Chapter 7 Trustee (the "Dismissal Order"), so

---

[5] Jones previously moved this Court for leave to appeal the Bankruptcy Court's interlocutory decisions on summary judgment regarding non-dischargeability.  Finding that Jones did not meet the requirements for interlocutory appeal, this Court denied those motions.  *See* Minute Entry and Order, *In re Alexander E. Jones*, Case Nos. 4:23-cv-04238, 4:23-cv-04240 (S.D. Tex. June 18, 2024).



that they could be administered as part of Jones's Chapter 7 bankruptcy estate and through a fair and orderly process. (Bankr. Dkt. 956).

10.     At the hearing leading to the Dismissal Order, Appellants had represented to the Bankruptcy Court that they were "surprised" by the Connecticut Families' concern about a race to the courthouse, and that they intended to work cooperatively with the Connecticut Families in collecting from FSS. (Jones Dkt. 721 at 178:15–16.) Yet within *two hours* of the Dismissal Order being entered, Appellants secretly filed (i.e., without notice to the Chapter 7 Trustee or the Connecticut Families) an Application for Turnover Order and an Application for Post-Judgment Writ of Garnishment in Texas state court. (Bankr. Dkt. 957, Exs. A [the "Turnover Application"] and C [the "Garnishment Application"].) Appellants immediately "ask[ed] that the [Texas state court] order Free Speech Systems to turn over all its nonexempt property," including money in its bank accounts, to them alone, so that Appellants—holders of 3.3% of liquidated claims against FSS—could recover 100% of FSS's assets, while the Connecticut Families—holders of 96.7% of liquidated claims against FSS—would recover *nothing*. (Turnover Application at 3, 5).   Appellants sought this turnover notwithstanding the Bankruptcy Court's Dismissal Order—entered two hours earlier—vesting control of FSS bank accounts in the Jones Chapter 7 Trustee (Dismissal Order, attached to Appellants' Turnover Application at 13).   The Texas state court granted the application and issued a turnover over approximately an hour later. (Bankr. Dkt. 957, Ex. B [the "Turnover Order"].)  If the Turnover Order were enforced, it would have resulted in Appellants recovering all of FSS's assets for their own sake, to the exclusion of the Connecticut Families.  Indeed,

5

that was the very purpose of Appellants seeking the Turnover Order and failing to give notice to the Connecticut Families.

11.     Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS.  (Bankr. Dkt. No. 957.)  The Connecticut Families filed a statement in support of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors.  (Bankr. Dkt. 959.)

12.     At a hearing on June 27, 2024, the Bankruptcy Court observed that Appellants' seeking of the turnover over clearly violated the intent of the Bankruptcy Court's Dismissal Order.  (*Id.* at 7:24–8:4 ["[I]t appears there's a conflict between what you asked for and got . . . and what I wrote in the order and what we talked about in the hearing.  And I read your motion, and I don't think you explained any of that to the state court judge."], 8:17–21 ["So I write an order turning something over to the trustee in his capacity to then determine, and for the reasons I state on the record, and then you file something on the record several hours later for the trustee to turn that over, right? Did I just get that right?"], 9:7–11 ["Because now you're requiring a Chapter 7 trustee [to turn over FSS bank accounts].  You didn't come to me.  You went to a state court who, quite frankly, had, you know – and you want a Chapter 7 trustee to comply with your – with

6

orders that potentially conflict with orders that I wrote."])   The Bankruptcy Court reiterated that the FSS bank accounts were under the control of the Jones Chapter 7 Trustee as of the original Dismissal Order.  (Jones Bankr. Dkt. 758 at 5:1–10, 17:18–23, 19:16–24.)

13.     On August 22, 2024, the Jones Chapter 7 Trustee moved the Bankruptcy Court for entry of an order authorizing the Chapter 7 Trustee to winddown FSS and sell its assets—including FSS's non-cash assets—pursuant to an auction process under Section 363 of the Bankruptcy Code.  (Bankr. Dkt. 829.)   Rather than challenge the Chapter 7 Trustee's authority to sell FSS's assets pursuant to Section 363 of the Bankruptcy Code, Appellants submitted a statement *in support* of the Jones Chapter 7 Trustee's winddown motion on September 20, 2024.  (Jones Bankr. Dkt. 850).   On September 23, 2024, the Connecticut Families submitted a statement of support as well (although noting that the pending turnover action in Texas state court was still an issue). (Jones Bankr. Dkt. 851.)  The U.S. Trustee, however, objected to the motion to authorize the winddown of FSS, interpreting the Bankruptcy Code to mean that the Jones Chapter 7 Trustee held only the equity interests in FSS, not the intellectual property or other non-cash assets to be sold through the winddown process, and not the ability to sell that property through a Bankruptcy Court-approved sale.  (Jones Bankr. Dkt. 845.)   At a September 24, 2024 hearing in connection with the winddown motion, the Bankruptcy Court stated that it would clarify its Dismissal Order by entering a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy



case, rather than converting such case to one under Chapter 7. (Jones Bankr. Dkt. 861, Sept. 24, 2024 Hr'g Tr. 12:7–13:12, 26:12–28:1.)   Appellants, who appeared at that hearing, raised no objection to the Bankruptcy Court entering such an order.

14.     On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket.  (Bankr. Dkt. 1021).  This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee.  *Id.*

15.     Appellants filed a notice of appeal of the Bankruptcy Court's Supplemental Dismissal Order on October 8, 2024 (Bankr. Dkt. 1028).

**ARGUMENT**

**I.     Intervention of the Connecticut Families Is Warranted**

16.     Section 1109(b) of the Bankruptcy Code provides: "A party in interest, including the debtor . . . may raise and may appear and be heard on any issue in a case under [Chapter 11]."   11 U.S.C. § 1109(b).   Federal Rule of Bankruptcy Procedure 8013(g) provides that a motion to intervene in a bankruptcy appeal "must be filed within 30 days after the appeal is docketed" and must "concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate."   Fed. R. Bankr. P. 8013(g).   The Connecticut Families submit that intervention is warranted and appropriate under Bankruptcy Rule 8013(g) for the reasons set forth below.

8



17.  *Filing Within 30 Days.*  Appellants filed the Notice of Appeal in the Bankruptcy Court on October 8, 2024, which was docketed in this Court on October 11, 2024.  (Bankr. Dkt. 1028; ECF No. 1.)  This Motion is being filed timely within 30 days of docketing under Bankruptcy Rules 8013(g) and 9006 and Federal Rule of Civil Procedure 6.

18.  *Movant's Interest.*  There can be no credible dispute that the Connecticut Families have substantial legal and economic interests in the outcome of the Appeal.  As the largest unsecured creditors of FSS and of FSS's sole owner, Alex Jones, the Connecticut Families have a significant interest in the fair and orderly distribution of FSS's assets.  The Supplemental Dismissal Order was necessitated by Appellants' actions of seeking a turnover order and writ of garnishment mere hours after the entry of the original Dismissal Order in an attempt to secure all of FSS's assets for themselves, as opposed to a fair and equitable distribution to all creditors in their proportionate interests. The reversal of the Supplemental Dismissal Order would jeopardize this process by potentially allowing Appellants to seek to arrogate FSS's assets entirely for themselves, to the exclusion of the Connecticut Families.

19.  *Grounds for Intervention.*  The Connecticut Families seek to intervene to preserve the opportunity to participate in this appeal, including filing briefs and being heard at any argument.  As the largest creditors of FSS (and of Jones), the Connecticut Families are parties in interest in the underlying bankruptcy cases pursuant to Section 1109(b) of the Bankruptcy Code.  FSS is wholly owned by the Jones bankruptcy estate, whose Chapter 7 Trustee is defending the appeal on behalf of FSS.  (Bankr. Dkt. 1035.)

<div align="center">9</div>

However, this appeal challenges the authority of the Jones Chapter 7 Trustee with respect to FSS's assets, and it is therefore essential for the Connecticut Families to be represented in addition to the Chapter 7 Trustee.  Moreover, the Connecticut Families are one of two major creditor groups in the underlying bankruptcy proceedings.  With FSS (via the Jones Chapter 7 Trustee, the sole equity owner of FSS) and the other major group (Appellants) separately represented in this appeal, the Connecticut Families should be afforded the opportunity to participate in the appeal too to preserve their interests.

20.    *Whether Intervention Was Sought in the Bankruptcy Court.*    The Connecticut Families appeared and actively participated in the FSS Chapter 11 proceedings and the related bankruptcy proceedings of Jones in the Bankruptcy Court below.  The Connecticut Families did not need to seek to intervene in the Bankruptcy Court because, as creditors, they were parties in interest to the proceedings with standing to participate.  The Connecticut Families participated fully in all briefing and hearings leading to June 27, 2024 Dismissal Order and the September 25, 2024 Supplemental Dismissal Order at issue in this appeal, including by presenting argument and evidence at the hearing leading to the Dismissal Order.

21.    *Intervening at the Current Stage.*  The Connecticut Families respectfully move to intervene at this time to preserve the opportunity to participate in all aspects of the appeal, with standing to be heard and defend their rights as significant creditors of FSS.  Although the primary purpose of this appeal is to overturn the Supplemental Dismissal Order and thereby revive Appellant's effort to enforce the Turnover Order for their sole benefit (and at the exclusion of any recovery to the Connecticut Families), the

10



APPENDIX J

Appellants somehow failed to identify the Connecticut Families as relevant parties in this appeal, and no other parties to date have sought intervention.  Further, the intervention of the Connecticut Families would prejudice neither FSS nor the Appellants, as the record on appeal has not yet been transmitted to this Court, and no briefing schedule has been set.[6]

22.      *Participation as Amici Curie is Inadequate.*   Finally, it would not be adequate for the Connecticut Families to participate as *amici curiae*.  The Connecticut Families have significant interests in these appeals, which would not be fully protected by participation as non-parties.  Bankruptcy Rule 8017 requires leave of the court or consent of all parties for a non-party to file an *amicus curiae* brief, with such briefs facing a more restrictive page limitation (half of those allotted to parties), as well as leave of the court to be heard on oral argument.  Further, *amici* do not have standing should they wish to appeal any dispositions by the Court.  Given their ongoing and significant involvement in the underlying proceedings, the Connecticut Families should be permitted to participate in all aspects of this appeal as parties without the restrictions imposed on non-parties.

23.      Based on the foregoing, the Connecticut Families respectfully request that this Court grant leave for the Connecticut Families to intervene in the instant Appeal and be treated as "Appellees" for all purposes, as if originally named as such in the Notice of Appeal.

---

[6] On November 5, 2024, a notice of deficiency was issued on this docket indicating that Appellants had not yet designated the record, which had been due on October 22, 2024.  (Dkt. 2.)

11



WHEREFORE, the Connecticut Plaintiffs respectfully request that the Court enter the Proposed Order permitting the Connecticut Families to intervene as Appellees in this matter.

Dated:  November 11, 2024

Respectfully submitted,

| **CAIN & SKARNULIS PLLC** | **KOSKOFF KOSKOFF &** |
|---|---|
| By: */s/ Ryan E. Chapple*_____ | **BIEDER PC** |
| Ryan E. Chapple (Attorney-in-Charge) | Alinor C. Sterling (*pro hac vice* |
| State Bar No. 24036354 | pending) |
| SDTX Bar No. 33327 | 350 Fairfield Avenue |
| 303 Colorado Street, Suite 2850 | Bridgeport, Connecticut 06604 |
| Austin, Texas 78701 | Telephone: (203) 336-4421 |
| Telephone: (512) 477-5000 | |
| Fax: (512) 477-5011 | *Counsel to the Connecticut* |
| | *Families* |
| *Counsel to the Connecticut Families* | |

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (*pro hac vice* pending*)*
Paul A. Paterson (*pro hac vice* pending*)*
Daniel A. Negless (*pro hac vice* pending*)*
Vida Robinson (*pro hac vice* pending*)*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Counsel to the Connecticut Families*

12



## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on November 11, 2024.

/s/ Ryan E. Chapple_____
Ryan E. Chapple



## CERTIFICATE OF WORD COUNT

This document complies with the word limitation set forth in the Court Procedures

of the Hon. Charles R. Eskridge III because, excluding the parts of the document

exempted by Fed. R. Bankr. P. 8015(g), this document contains 2,831 words

*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

APPENDIX K

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| In re | |
| Free Speech Systems, LLC, | Case No. 4:24-CV-03882 |
| Debtor, | (Appeal in Bankr. Case No. 22-60043 (CML)) |
| Neil Heslin, et al, | |
| Appellants. | |

## STIPULATION OF VOLUNTARY DISMISSAL OF APPEAL
## PURSUANT TO FED. R. BANKR. P. 8023(a)

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (the "Appellants") and Appellees Christopher R. Murray solely in his capacity as chapter 7 trustee of the bankruptcy estate of Alexander E. Jones and sole owner of Free Speech Systems LLC, William Aldenberg, Erica Ash, Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Robert Parker, William Sherlach, Carlos M. Soto, Donna Soto, Carlee Soto Parisi, Jillian Soto-Marino, David Wheeler, and Francine Wheeler (collectively, the "Appellees," together with the Appellants referred to herein as the "Parties") hereby enter into this Stipulation and agree as follows:

1.      Appellants wish to voluntarily dismiss this Appeal pursuant to Federal Rule of Bankruptcy Procedure 8023(a).

2.      Appellees do not oppose dismissal of this Appeal.

3.      The Parties agree that each shall bear their own respective costs, fees, and expenses, including all attorneys' fees, incurred in connection with this Appeal.

4.      Federal Rule of Bankruptcy Procedure 8023(a) provides that "[t]he clerk of the district court . . . must dismiss an appeal if the parties file a signed dismissal agreement specifying how costs are to be paid and pay any fees that are due."

5.      Pursuant to Federal Rule of Bankruptcy Procedure 8023(a), the Parties submit this Stipulation requesting the voluntary dismissal of the above-captioned appeal.

Respectfully submitted this 6th day of May 2025.

/s/ Erin E. Jones
**JONES MURRAY LLP**
Erin E. Jones (TX 24032478)
602 Sawyer St., Suite 400
Houston, TX 77007
Telephone:  (832) 529-1999
Fax:  (832) 529-3393
E-mail:  erin@jonesmurray.com

**PORTER HEDGES LLP**
Joshua W. Wolfshohl (TX 24038592)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 228-1331
E-mail:  jwolfshohl@porterhedges.com

***Co-Counsel for Christopher R. Murray,***
***Chapter 7 Trustee***

/s/ Ryan E. Chapple
**CAIN & SKARNULIUS PLC**
Ryan E. Chapple (TX 24036354)

/s/ Jennifer J. Hardy
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (*pro hac vice* forthcoming)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg

- 2 -

303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER PC**
Alison C. Stirling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL WEISS, RIFKIND WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul A. Paterson (admitted *pro hac vice*)
Daniel Negless (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: ppaterson@paulweiss.com
E-mail: dnegless@paulweiss.com
E-mail: vrobinson@paulweiss.com

*Co-Counsel to the Connecticut Plaintiffs*

State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:
avi.moshenberg@lmbusinesslaw.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
Jarrod B. Martin
State Bar No. 24070221
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone:  (713) 576-0388
Fax:  (713) 576-0301
E-mail:  jbmartin@bradley.com

*Co-Counsel to the Texas Plaintiffs*

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 6, 2025.

/s/ Jennifer J. Hardy
Jennifer J. Hardy

- 4 -

APPENDIX L

                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

ALEXANDER E. JONES AND          )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF        )
UNSECURED CREDITORS,             )  Houston, Texas
                                 )
         Debtors.                )  Wednesday, February 5, 2025
                                 )
                                 )  9:00 AM to 9:26 AM
  -----------------------------)


                              HEARING

         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   SHELBY JORDAN
                          ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Corpus Christi, TX 78401

                          BEN BROOCKS
                          WILLIAM BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

For Chapter 7 Trustee:    JOSHUA WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          CHRISTOPHER R. MURRAY
                          ERIN JONES
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

For Connecticut        KYLE KIMPLER
Families:              PAUL PATERSON
                       Paul Weiss Rifkind Wharton &
                       Garrison LLP
                       1285 Avenue of the Americas
                       New York, NY 10019

                       RYAN CHAPPLE
                       Cain & Skarnulis PLLC
                       303 Colorado Street
                       Austin, TX 78701

For Texas Plaintiffs:  AVI MOSHENBERG
                       Lawson & Moshenberg PLLC
                       801 Travis Street
                       Houston, TX 77002

                       JARROD MARTIN
                       Chamberlain Hrdlicka White Williams
                       & Aughtry, P.C.
                       1200 Smith Street, Suite 1400
                       Houston, TX 77002

                       JENNIFER HARDY
                       Willkie Farr Gallagher LLP
                       600 Travis Street, Suite 2310
                       Houston, TX 77002

Court Reporter:        UNKNOWN

Courtroom Deputy:      UNKNOWN

Transcribed by:        Veritext Legal Solutions
                       330 Old Country Road, Suite 300
                       Mineola, NY 11501
                       Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPENDIX L

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity.  They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity.  I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets.  That's what that order was intended to do.  The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process.  I won't recount what happened, but I didn't approve the proposed sale.  I had a – – I think the evidence is clear -- a backup bidder at the beginning.  We didn't even know what the winning bid was.  I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency.  There was a sliding scale in the agreement.  The proposed order submitted originally had the very language showing it was a contingency.  And the Trustee was

telling me that it wasn't a contingency. That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency. And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction. We were here until, what, 10:30 that night? So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.

MR. JORDAN: It is, Judge.

THE COURT: I lose jurisdiction over that immediately.

MR. JORDAN: It's still -- it is still pending.

THE COURT: But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

So the sale didn't happen, and I said, I don't want any more contingencies. If there's going to be a sale of assets, then cash will be king. But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low. Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week. A week, like it was there. That's fine. Then if things get -- I told folks, if you want to sell it, cash will be king. Get back to doing just -- you want to sell the equity? Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families. I know that the Jones side has a motion for reconsideration pending that will run its own course. But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts. And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers. Connecticut family

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

APPENDIX L

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again.  Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate.  Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed.  I can't do that.  I cannot do that.  I don't have authority to do it.  And I'm not going

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

APPENDIX L

I N D E X


RULINGS

|  | Page | Line |
|---|---|---|
| Motion to Approve Sale, Denied | 16 | 8 |

APPENDIX L

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

APPENDIX M

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,            )   CASE NO: 22-33553
                               )
                               )   Corpus Christi, Texas
                               )
            Debtor.            )   Thursday, June 5, 2025
                               )
                               )   1:00 p.m. to 2:32 p.m.
-------------------------------)


                          HEARING

        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                BEN C. BROOCKS
                           Broocks Law Firm PLLC
                           6207 Bee Cave Road, Suite 120
                           Austin, TX 78746

                           SHELBY JORDAN
                           Jordan & Ortiz, PC
                           500 North Shoreline Blvd.,
                           Suite 804
                           Corpus Christi, TX 78401

For Chrsitopher R.         ERIN ELIZABETH JONES
Murray:                    Jones Murray LLP
                           602 Sawyer, Suite 400
                           Houston, TX 7007

                           JOSHUA WOLFSHOHL
                           Porter Hedges LLP
                           1000 Main, 36th Floor
                           Houston, TX 77002

For First United          WALTER J. CICACK
American Companies, LLC:   Hawash Cicack & Gaston LLP
                           711 W. Alabama Street, Suite 200
                           Houston, TX 77006

APPENDIX M

| | |
|---|---|
| For Veronique De La Rosa: | AVI MOSHENBERG<br>Lawson & Moshenberg PLLC<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002 |
| For William Aldenberg: | KYLE KIMPLER<br>Paul, Weiss<br>1285 Avenue of the Americas<br>New York, NY 10019 |
| For the U.S. Trustee: | HA MINH NGUYEN<br>Office of the United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 |
| Court Reporter: | YESENIA LILA |
| Courtroom Deputy: | YESENIA LILA |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

APPENDIX M

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

APPENDIX M

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

APPENDIX M

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification. Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

APPENDIX M

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES: I think it's been assigned to Judge Rosenthal.

THE COURT: That's what I understood. So, and they don't come any smarter --

MS. JONES: That's correct.

THE COURT: -- than Judge Rosenthal.

MS. JONES: I agree 100 percent.

THE COURT: So and I just, again, I'm relying on the text here. Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

APPENDIX M

Whether the granting of a stay would substantially harm the other parties.  The answer is no.  I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest.  I don't, have no -- nothing showing the public interest, and I've read all the papers.  Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself.  It speaks for itself.  So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal.  So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record.  So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay.  I think there was an emergency request for a stay.  I'm going to deny those.  So I'll take a look at these orders and sign them on the docket.

APPENDIX M

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun.  I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

Page 15

the next 30 days and just see what's out there.

MS. JONES: I can --

THE COURT: There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case. And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here. But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me. There are matters pending in other state courts. I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS: That's entirely doable.

THE COURT: Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

APPENDIX M

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell.  It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT:  So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

APPENDIX M

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news.  I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments.  So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter.  So me having status conferences like this is really where I try to get the real information.

MS. JONES:  And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases.  But with respect to what the trustee needs to do, this is, this is where we are.  And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed.  So I think that case, for the most part, it's done.  I don't expect anything else in that case, at this point.

THE COURT:  Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler.  From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary?  Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG:  100 percent, Your Honor.  Let me start with the state court cases.  Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment.  So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted.  And so when the court denied the summary judgment --

THE COURT:  But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before?  In other words, I'll make something up.  If the court affirms the punitive judgment, right, that's one thing.  If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that.  I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal.  I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

Page 22

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

APPENDIX M

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

APPENDIX M

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

APPENDIX M

parts of our judgment.  There was the $965 million of compensatory damages.  You ruled that those were non-dischargeable.  Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims.  You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim.  So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it.  So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal.  And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim.  At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable.  We are, if it suits the Court,

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

APPENDIX M

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment.  There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action.  We think he removed it in an untimely basis.  We also think it procedurally is not an action that can be removed.  It's really a procedural, you know, case, but he removed it.  He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims.  That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January.  On that docket, there is a fully briefed motion for remand back to the state court.  There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers.  We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

APPENDIX M

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT::  Mm hmm.

MR. JORDAN:  I mean.  And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have  time to get the cameras and stuff, I mean the audio.  But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here.  It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT:  Mr. Bankston represents the plaintiffs,

APPENDIX M

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

APPENDIX M

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

APPENDIX M

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

APPENDIX M

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

APPENDIX M

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper.  We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

APPENDIX M

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going.  But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal.  That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT:  The reply to which docket?

MR. JORDAN:  I'm sorry, to my motion.

THE COURT:  Oh, yes, yes.

MR. JORDAN:  When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court.  That's their response. And of course my reply then was wait a minute.  That is not how it works.  If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it.  Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal.  That was all correct.  Now it's not.  So now what's the effect of that?

APPENDIX M

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

APPENDIX M

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

APPENDIX M

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT:  Where does the -- let me ask you a question.  It's a good question to ask.  FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical.  We'll just use X dollars in July of 2025 or through August, or the first six months of this year.  Right?  Where does that money go?

MR. JORDAN:  It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent.  So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations.  So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT:  Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones?  If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN:  See that's the dilemma.  If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT:  No, no.  I got it.  I got it.

MR. JORDAN:  Okay.

THE COURT:  It's an -- I understand the point.

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN:  And they purport to -- and we only found these this morning.  We weren't, we weren't ever served any notice, but we weren't parties to these adversaries.  These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these.  And my question, if I may ask the question, I'm not asking for an advisory opinion.  I just, this is the Court's order.  It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS.  And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court.  These were remand motions that I think they're, they're not the ones that we're involved in that's up for today.  But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem.  We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT:  No.

APPENDIX M

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

Page 56

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues.  As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed.  So the Court didn't have to just go watch them.  I said, here are the transcripts.  They objected to that, but I said, I'm just trying to help.  And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away.  And nobody, no court in America has yet ruled on the constitutional issues we raised.  Nobody.  And so, and so they said, well, they were, they were facing the task and they realize that's their duty.  And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure.  We think we satisfied all three of those.  We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless?  I said, absolutely not.  She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

APPENDIX M

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was.  I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that?  And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required.  The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are.  And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed.  The justice says, what could she have done?  I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself.  There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins.  That's

APPENDIX M

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

APPENDIX M

Page 61

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal. We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

APPENDIX M

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

66

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's  really  technically  nothing  for  me  to  reconsider

because there's nothing, I haven't done anything. But I don't think my position has changed in terms of what I said in February. I want this case to continue to move . Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years. And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work. So I want to know, the trustee is going to tee up some non-exempt assets. We'll take those up in the ordinary course. We'll come back and figure it out. In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today. But if there's a lot of money sitting somewhere, then maybe we can think about that. But if courts rule, I'd like to know about them. We'll see where things go. Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing. Yes, sir.

MR. MOSHENBURG: Makes total sense, Your Honor. I completely echo what Mr. Kimpler just said. I just wanted to make sure the Court understood. I don't agree with their characterization. If any of that sticks, I'm happy to answer any questions about it.

Page 68

THE COURT:  They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies.  That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up.  We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION


I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.


*Sonya M. Ledanski Hyde*


Sonya Ledanski Hyde


Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501


Date:  June 17, 2025

APPENDIX N

7/22/2022 1:49 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Adrian Rodriguez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>　*Plaintiffs* | §<br>§<br>§ | IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH<br>SYSTEMS, LLC<br>　*Defendants* | §<br>§<br>§<br>§ | 261st DISTRICT COURT |

---

### PLAINTIFFS' FOURTH AMENDED PETITION

---

Plaintiffs NEIL HESLIN and SCARLETT LEWIS files this Fourth Amended Petition against Defendants, ALEX JONES and FREE SPEECH SYSTEMS, LLC, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.      Plaintiffs sought and secured a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.      Plaintiff Neil Heslin in an individual residing in the State of Connecticut.

3.      Plaintiff Scarlett Lewis in an individual residing in the State of Connecticut.

4.      Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com.

1

APPENDIX N

5.      [Removed].

6.      Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas.

7.      [Removed].

8.      At all times relevant to this Petition, Defendants Alex Jones and Free Speech Systems, LLC operated as a joint-venture, joint-enterprise, single business enterprise, or alter ego.

## JURISDICTION & VENUE

9.      The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

10.     Venue is proper in Travis County under Tex. Civ. Prac. & Rem. Code §15.002 because it is the county of Defendants' residence at the time the cause of action accrued.

## FACTUAL BACKGROUND

11.     Plaintiffs Neil Heslin and Scarlett Lewis are the parents of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School shooting.

12.     This case arises out of accusations by InfoWars in the summer of 2017 that Mr. Heslin was lying about whether he actually held his son's body and observed a bullet hole in his head. This heartless and vile act of defamation re-ignited the Sandy

APPENDIX N

Hook "false flag" conspiracy and tore open the emotional wounds that Mr. Heslin has tried so desperately to heal.

13.     This case also arises out of the intentional infliction of emotional distress committed against Plaintiffs for the past five years through InfoWars' recklessly false statements concerning the circumstances of the death of their child, as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents. Plaintiffs and their family have been specifically targeted in this campaign of harassment.

14.     This conspiracy theory, which has been pushed by InfoWars and Mr. Jones since the day of the shooting, alleges that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using actors, and that the parents of the victims are participants in a horrifying cover-up.

15.     In addition to cruel mockery of the families, InfoWars has spent years advancing a vast collection of grotesque and outrageous falsehoods about the circumstances of the shooting and the subsequent law enforcement investigation and media coverage.

16.     All of these baseless and vile allegations, which have been pushed by InfoWars and Mr. Jones on a continuous basis since the shooting, advance the idea that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using carefully placed actors, or that the families of the victims are also participants in a horrifying cover-up. InfoWars knew its assertions

3

were false or made these statements with reckless and outrageous disregard for their truth.

## INFOWARS' FIVE YEARS OF HARASSING COVERAGE OF SANDY HOOK

17. Beginning in the month of the shooting, in December 2012, InfoWars published multiple videos with false information while claiming the incident was a "false flag" or otherwise staged.

18. InfoWars continued with a video on January 27, 2013 entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones introduced a variety of completely baseless claims which he would continually repeat with malicious obsession for the next five years.

19. On March 28, 2013, InfoWars published an article advancing its hoax claim, entitled "Cover-Up of Adam Lanza Link to Psychotropic Drugs."

20. In an April 9, 2013 video entitled "Obama Gun Grabbing Psyop Speech of Evil," Mr. Jones warned his viewers that recent mass shootings were actually "a government operation," and that Sandy Hook was an "inside job."

21. In an April 16, 2013 video entitled "Shadow Govt Strikes Again," Mr. Jones discussed his allegation that the government was staging various national tragedies. He told his audience: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."

22. On January 27, 2014, InfoWars published an article advancing its hoax claim, entitled "Exposed: Sandy Hook Shooter's Biggest Threat Still Lives."

4

23.     On February 18, 2014, InfoWars published an article advancing its hoax claim, entitled "School Shooting Expert Threatened Over Sandy Hook Investigation."

24.     In a March 14, 2014 video entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones said, "Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

25.     On May 9, 2014, InfoWars published an article advancing its hoax claim, entitled "Revealed: Sandy Hook Truth Exposed."

26.     On May 13, 2014, InfoWars published an article advancing its hoax claim, entitled "Connecticut Tries to Hide Sandy Hook Truth."

27.     On May 13, 2014, InfoWars published a video entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert." Mr. Jones hosted a notorious crank, Wolfgang Halbig, who solicits donations to support his "investigation" into Sandy Hook. Mr. Halbig maintains that the event was staged and that the parents are actors. Mr. Jones agreed with Mr. Halbig during the video, and he asked his viewers to financially support Halbig. Over the coming years, Mr. Halbig was

5

a frequent guest, and InfoWars continued to provide support and encouragement to Mr. Halbig to carry out his campaign of harassment against the Sandy Hook parents.

28.    On September 24, 2014, InfoWars published an article advancing its hoax claim, titled: "FBI Says No One Killed At Sandy Hook."

29.    InfoWars also published a video on September 25, 2014 entitled "Connecticut PD Has FBI Falsify Crime Statistics." Mr. Jones again hosted Mr. Halbig for a lengthy discussion in which they asserted the event was fake. Mr. Jones stated:

> This is not a game…If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.

30.    On September 26, 2014, InfoWars published an article advancing its hoax claim, entitled: "Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime Statistics."

31.    On December 2, 2014, InfoWars published an article promoting the hoax video entitled "We Need to Talk About Sandy Hook."

32.    On December 9, 2014 published an article advancing its hoax claim, entitled "Internet Censors Viral Sandy Hook Truth Documentary."

6

33.    In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones made numerous false claims about Sandy Hook, including his false allegations about "rotations in and out of the building," "blue-screen," "police in anti-terror outfits in the woods," and many others. Mr. Jones described the alleged "acting" by the parents as "just over the top, over the top sick." The video also featured claims that the event was undertaken as a Satanic ritual by global elites.

34.    In a December 29, 2014 broadcast entitled "America the False Democracy," Jones again discussed Sandy Hook, telling his audience, "The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? How do you even convince the public something is a total hoax?" Mr. Jones stated, "It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."

35.    In the same December 2014 broadcast, Jones continued with more false assertions: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

36.    On January 2, 2015, InfoWars published an article advancing its hoax claim, entitled "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

7

37.    In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook. During his discussion, he stated:

> You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."

38.    Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones helped spread involving a Sandy Hook victim whose photograph appeared at vigil for children slain a school attack in Peshawar. InfoWars' story was meant to reinforce Mr. Jones' persistent lie that the victims of the shooting, such as Plaintiff's deceased son J.L., are not real, or that some sinister conspiracy murdered his child.

39.    In a February 12, 2015 video with an unknown title, Mr. Jones continued to repeat his false claims. During his discussion, Mr. Jones stated, "I know they're using blue screens...There are literally hundreds of smoking guns here that this thing doesn't add up."

40.    In a March 4, 2015 video entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones continued to promote Mr. Halbig, hosting him for a

8

wide-ranging discussion accusing the parents of evil acts. Mr. Jones told Mr. Halbig, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake."

41.    In June of 2015, InfoWars sent its reporter Dan Bidondi to Newtown, Connecticut to accompany Mr. Halbig. While in Newtown, Bidondi and Halbig confronted Newtown residents and civil servants. Mr. Bidondi, a former cage-fighter, aggressively berated several individuals with profanity, false claims, and outrageous threats to publicize their crimes. Their activities created a climate of fear in the community.

42.    In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.

43.    In a July 7, 2015 video entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his false claims about Sandy Hook. During his discussion, Mr. Jones stated:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.



9

Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.

We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method...

You've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is...I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick is here. I've got a good suspicion. But when you've got Wolfgang Halbig...He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull. And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented.

44.     On July 10, 2015, InfoWars published an article advancing its hoax claim, entitled "Sandy Hook FOIA Killed by Commission."

45.     On January 5, 2016, InfoWars published an article advancing its hoax claim, entitled "Obama's Crying Fuels Speculation It Was Faked."

10

46.     In January of 2016, InfoWars follower Lucy Richards began stalking and making death threats to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Scarlett Lewis. The threats included messages stating: "Death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."[1] When Richards was later sentenced, Senior U.S. District Judge James Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'…Your words were cruel and insensitive. This is reality and there is no fiction. There are no alternative facts."[2] As part of her sentence, Ms. Richards will not be permitted to access a list of conspiracy-based websites upon her release, including InfoWars.[3] Ms. Richard's arrest and sentencing are an ominous reminder to the Plaintiffs of the danger posed by InfoWars' continuing lies about Sandy Hook.

47.     Mr. Jones and InfoWars were well-aware of the unhinged community of "Sandy Hook Investigators" they had fostered. Defendants knew that a large collection of Sandy Hook deniers were coordinating their harassment against Plaintiffs and other victims. Plaintiffs and their family have suffered harassment and threats from this community. Mr. Jones and InfoWars have frequently communicated with the hoax community and have interviewed or promoted members of this

---

[1] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396

[2] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754

[3] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a

11

dangerous community on their programming. During a February 2015 video, one prominent member of the Sandy Hook denier community issued a threat to a Sandy Hook parent on the air. During the same video, Mr. Jones showed maps and addresses used by the parent. This parent was the leader of a Sandy Hook non-profit who had complained to YouTube about the emotional distress caused by Jones. Since that time, Mr. Jones' open animosity towards the Sandy Hook parents has been on full display.

48.     By November 2016, a growing tide of public outrage caused Mr. Jones to appear on InfoWars and rant about his false Sandy Hook claims for twenty minutes in what he called his "Final Statement on Sandy Hook," published on November 18, 2016.

49.     During the outrageous video, Mr. Jones directly addressed the public outcry over his statements by doubling down on his accusations. For example, Mr. Jones stated: "That shows some kind of cover-up happening. And then I saw Anderson Cooper -- I've been in TV for twenty-something years, I know a blue-screen or a green-screen -- turn and his nose disappeared. Then I saw clearly that they were using footage on the green-screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage...Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training."

50.     The gist of these statements was that Sandy Hook parents are actually participating in a sinister manipulation plan to fool the public, or that a shadowy cabal

12

of elites pre-planned the murder of their children and controlled the coverage of the event through the media manipulation.

51.    During the November 2016 broadcast, Mr. Jones played video footage of Anderson Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We point out clear chromakey, also known as blue-screen or greenscreen being used, and we're demonized. We point out that they're clearly doing fake interviews…and their answer is to say that we said nobody died."

52.    Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't that in Shakespeare's Hamlet? Methinks you protest too much…This particular case, they are so scared of investigation."

53.    Mr. Jones concluded the video by accusing parents seen on television of being actors. Mr. Jones stated, "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."

54.    The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless attacks on the Sandy Hook parents and his assertions that they were liars and actors engaged in a fraud on the American people.

13

55.     As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave some hope to Plaintiffs that Mr. Jones' harassment might be coming to an end after four long years.

56.     Those hopes were soon dashed. Instead, InfoWars continued its cruel campaign in 2017.

57.     In a March 8, 2017 video, Mr. Jones praised the credibility of Steve Pieczenik, who had previously claimed on InfoWars programming that Sandy Hook was "a Homeland Security drill that they passed off as a real event." Mr. Jones admitted that despite his years of prior statements, "I can't prove it one way or the other." Nonetheless, Mr. Jones repeated his accusation that Veronique De La Rosa's interview with Anderson Cooper was faked in front of a blue screen. He also told his audience that Anderson Cooper was in the CIA, hoping to convince them that the agency was part of the plot.

58.     On April 22, 2017, InfoWars published a video entitled "Sandy Hook Vampires Exposed." This video again repeated the large collection of false accusations which Mr. Jones had been using for years to support his ceaseless attacks on the Sandy Hook families, including the false claims that Sandy Hook parent Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper, that the school was closed until that year and was rotting and falling apart in videos, that the children were "going in circles, in and out of the building with their hands up," that port-a-potties had been delivered "an hour after it happened, for the big media event,"

14

and that police were "pulling guns out of cars" and "finding people in the back woods who are dressed up in SWAT gear." Not only did this video continue to advance these hideous and reckless lies about the tragedy, but Mr. Jones and his employee Rob Dew mocked the families as actors and discussed their desire to see photographs of the children's dead bodies.

59.    On June 13, 2017, in a video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook," Mr. Jones addressed what he knew would be a highly embarrassing interview with Megyn Kelly that was scheduled to air several days later. During this video, Mr. Jones pointed his viewers to a list of questions published by Zero Hedge, a notorious anonymous website that spreads misinformation. These questions were all based on Mr. Jones' baseless lies, including his allegation that school's website received no internet traffic in the years before the attack, that there had been reports of other shooters in the woods who fled, that port-a-potties had been delivered within an hour, that FBI crime statistics show no murders in Newtown in 2012, that EMTs were not allowed in the building, and that Mrs. De La Rosa's interview was faked using a blue-screen.

60.    On June 18, 2017, NBC aired Ms. Kelly's profile of Jones. During his interview, Mr. Jones stated that there had been a "cover-up" and "manipulation." He also falsely claimed that children were filmed going in circles in and out of the school.

61.    The following exchange took place:

15

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied…
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.

62.    Mr. Jones and Ms. Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.

63.    On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and see his injury.

64.    During the broadcast, Shroyer said, "The statement [Plaintiff] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."[4]



---

https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/

16

65.    As support for these defamatory statements, Shroyer played video footage where the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person.

66.    Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."[5]

67.    Stroyer continued by stating that Mr. Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."[6]

68.    "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."[7]

69.    At the conclusion of his report, Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[8]

70.    The underlying point or gist of Shroyer's report is that Mr. Heslin's version "is not possible" and "cannot be accurate," and that Mr. Heslin was lying about the circumstances of his son's tragic death for a nefarious and criminal purpose.

71.    Shroyer's report was manifestly false. In addition, a minimal amount of research would have caused any competent journalist not to publish the defamatory



[5] Id.
[6] Id.
[7] Id.
[8] Id.

17

accusation. According to contemporary news accounts, the bodies of the victims were released from the medical examiner into the custody of the families.[9] Funerals where the children's bodies were in the custody of their parents were widely reported on by the press.[10]

72.     On July 20, InfoWars programming featured a segment hosted by Alex Jones in which Shroyer's report was re-broadcast in full. When introducing the segment, Jones demanded that Mr. Heslin "clarify" what actually happened.

73.     After showing the segment, Jones said he told Shroyer, "I could never find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this. But maybe they did. So I'm sure it's all real. But for some reason they don't want you to see [Shroyer's segment]."[11]

74.     Regarding the Sandy Hook shooting, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. But you can't blame people for asking."[12]

75.     Mr. Jones was lying. In the five years following the tragedy, he has repeatedly and unequivocally called the Sandy Hook shooting a hoax.

76.     Over the next year, Mr. Jones continued to gaslight the Plaintiffs by insisting that he admitted for years that Sandy Hook was real. He even claims to have

---

[9] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[10] https://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101; https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100
[11] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333
[12] Id.

18

apologized in a video released on the day of Megyn Kelly profile, on June 18, 2017. Yet his video did not actually contain any apology, and soon thereafter, Mr. Jones continued to publish false facts about the death of Plaintiffs' son. Ultimately Jones waffled and back forth on whether Plaintiffs' son and the other children actually died, but he consistently maintained the event was "phony," and repeats his dozens of recklessly false assertions to support his conclusion.

77. For example, in an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones continued his false claims, including stating that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones also told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

78. Despite his well-documented conduct, Mr. Jones decided to cast the families as dishonest not only about Sandy Hook, but about their own torment at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Mr. Jones once again proved himself to be an emotionally manipulative liar while mocking the parents with a cruel and juvenile imitation:

> I think they almost do this to mess with us or something. I'm serious, man...They go, "Oh, my gosh, why are you doing that? You hurt me." And we're like, "No, no. We're sorry." "You've hurt me." And like five years later, "You hurt me. Stop hurting me." And we're like, "But we're not bringing you up."



19

79.     In truth, Mr. Jones has continuously leveled his accusations against the parents, repeated a collection of false claims about the shooting, and even claimed the incident was phony a few months before the first lawsuits were filed against him.

80.     In the same video on April 20, 2018, Mr. Jones continued to accuse the parents of lying about his conduct, and he falsely claimed that he had not discussed Sandy Hook in many years. In a mocking imitation, he stated, "'Oh, my gosh. Alex has no heart. He is -- nothing is sacred. He brought it up again.' No. You did and lied about it."

81.     In the April 20, 2018 video, Mr. Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents…Who in the hell would try to go after people's parents who have dead children?"

82.     In the April 20, 2018 video, Mr. Jones also continued to make recklessly false claims about Sandy Hook. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the video, he repeated his claim that there was a police "stand down" at Sandy Hook.

83.     In the April 20, 2018 video, Mr. Jones also continued his bizarre allegations about Veronique De La Rosa's interview with Anderson Cooper, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chroma key." Mr. Jones also repeated his claim that Anderson

20

Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

84. Finally, it must be noted that the above descriptions of InfoWars' conduct are not exhaustive. InfoWars has published an enormous amount of video and written content regarding its Sandy Hook hoax claim. Much of that material was removed from the public domain in 2018 and cannot be identified by date and title. It is impossible for the Plaintiffs to present the full scope of InfoWars' actions over the past five years without testimony and documents from the participants.

85. Nonetheless, it is clear that InfoWars did not merely "cover" the Sandy Hook conspiracy. Instead, its malicious allegations about Sandy Hook quickly become a core element of its programming and soon turned into an outrageous five-year obsession. The publications described above were part of a continuous course of conduct in which Mr. Jones promoted false facts about the death of Plaintiffs' son with malicious motives.

## CAUSES OF ACTION

### I. Defamation and Defamation *Per Se* by All Defendants Against Neil Heslin.

86. All previous allegations are incorporated by reference.

87. Plaintiffs are private individuals and neither a public officials nor public figures.



21

APPENDIX N

88. The June 26, 2017 and July 20, 2017 broadcasts by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

89. In viewing the June 26, 2017 and July 20, 2017 broadcasts, a reasonable member of the public would be justified in inferring that the publications implicated the Plaintiff. Individuals who know the Plaintiff understood the publications to concern Plaintiff.

90. The June 26, 2017 and July 20, 2017 broadcasts were also defamatory because they are reasonably susceptible to a defamatory meaning by innuendo. A reasonable person, reviewing the statements in question, could conclude the Plaintiff was being accused of engaging in fraudulent or illegal activity. In context, the gist of the statements could be construed as defamatory to the Plaintiff by an average member of general public. Individuals who know the Plaintiff understood the publications to implicate criminal conduct by Plaintiff.

91. Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

92. Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

93. Defendants' defamatory publications were not privileged.

22

94.    Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

95.    Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

96.    Defendants' defamatory publications have injured Plaintiff's reputation and image, and they have exposed Plaintiff to public and private hatred, contempt, and ridicule.

97.    In light of their prior experience with these kinds of reckless statements, Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence.

98.    Defendants' defamatory publications have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## II.    Intentional Infliction of Emotional Distress by Alex Jones and Free Speech Systems, LLC Against Neil Heslin and Scarlett Lewis.

99.    All previous allegations are incorporated by reference.

100.    Defendants knew or should have known that their videos on November 18, 2016, March 8, 2017, April 22, 2017, June 13, 2017, June 19, 2017, June 26, 2017, July 20, 2017, October 26, 2017, and April 20, 2018 would cause Plaintiffs severe

23

emotional distress and cause their family to be the subject of harassment, ridicule, and threats to their safety.

101.    Defendants made the statements in these videos in bad faith and with malicious motives, knowing the statements were false or in reckless disregard for the truth, and knowing they would cause severe emotional distress.

102.    Defendants consistently published false assertions about the circumstances of the death of Plaintiffs' child in scores of videos and articles for years, long after they should have known their allegations were false and causing emotional distress and danger.

103.    In addition, Defendants have been acting in a continuing course of conduct against Plaintiffs since at least January 27, 2013, when Mr. Jones first made his outrageous and false Sandy Hook hoax allegations. Since that time, Defendants have been engaged in a continuous campaign of cruel and dishonest harassment as detailed above, all of which has caused severe emotional distress to Plaintiffs.

104.    Defendants' malicious statements were part of a continuous pattern of five years of intentional and reckless harassment accomplished through dozens of disturbing videos, a relentless stream of recklessly false articles published on InfoWars.com, harassing social media content, as well as the encouragement, aid, and financial support to third parties in furthering this harassment. The cumulative quality and quantity of the harassment has been extreme and has shocked the nation.

24

APPENDIX N

105. Defendants recognized the distress of the Sandy Hook parents and often addressed the parents directly in their outrageous videos.

106. In light of their prior experience with these kinds of reckless statements, Defendants knew or should have known that their conduct could cause Plaintiffs and their family to suffer harassment and violence. Defendants knew or should have known their reckless conduct was likely to prompt its audience to contact or communicate with Sandy Hook victims in a hostile or harassing manner.

107. Severe emotional distress was the primary risk created by Defendants' reckless conduct, and Defendants knew and intended for Plaintiffs to suffer emotional distress.

108. Defendants' conduct, as a whole, was outrageous and intolerable, going beyond all possible bounds of decency.

109. Defendants' five-year campaign of willful lies and malicious harassment was utterly intolerable in a civilized community.

110. No reasonable person could be expected to endure the emotional distress inflicted upon Plaintiffs.

111. Plaintiffs are private individuals and are neither public officials nor public figures.

112. Defendants' actions were not conducted in a public space. Rather, Defendants' actions were conducted on its own private property for the purpose of profit.

25

APPENDIX N

## DAMAGES

113.   Defendants' actions have and will continue to cause harm to Plaintiffs. Due to Defendants' conduct, Plaintiffs have suffered and continue to suffer substantial damages in an amount to be proven at trial.

114.   Plaintiffs have suffered general and special damages, including a severe degree of mental stress and anguish which disrupted their daily routine and caused a high degree of psychological pain.

115.   Plaintiffs are also entitled to exemplary damages because the Defendants acted with gross negligence, ill-will, and malice.

116.   Plaintiffs are entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

117.   Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs are seeking an amount in relief which exceeds $1,000,000.

## JURY DEMAND

118.   Plaintiffs demand a jury trial and tendered the appropriate fee with their Original Petitions.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiffs ask that the Court issue citation for each Defendant to appear and answer, and that Plaintiffs be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiffs are justly entitled.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax


### CERTIFICATE OF SERVICE


I hereby certify that on July 22, 2022, the forgoing pleading was served upon all counsel of record via electronic service.


MARK D. BANKSTON



27

**APPENDIX N**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST
Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 7/22/2022 1:49:53 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |
| William R.Ogden | | bill@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |



APPENDIX N

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph C. Magliolo | 12821600 | jmagliolo@frlaw.us | 7/22/2022 1:49:53 PM | SENT |



<span style="color:red">APPENDIX N</span>

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/22/2022 1:49:53 PM | SENT |
| Andrew Grant | | aj@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/22/2022 1:49:53 PM | SENT |



<span style="color:red">APPENDIX N</span>

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST
Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Federico Reynal | 24060482 | areynal@frlaw.us | 7/22/2022 1:49:53 PM | ERROR |

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 05/16/2023 07:58:00

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH



| Speaker 1: | 00:00:02 | Waging war on corruption. It's Alex Jones. (singing) |
|---|---|---|

**Alex Jones:** 00:00:09 — Ladies and gentleman, this is such an incredible time to be politically alive. So much change, so much being discovered, so much good happening, but also so much bad. Riveting! Amazing! We've seen the death of David Rockefeller. We've seen the death of Zbigniew Brzezinski. David

Rockefeller was the modern architect of corporate world neocolonialism, crony capitalism, world government. Dead 2017. His top henchman, his top operative Brzezinkski dead, and now John McCain fighting for his life, whereas I never wish any harm on a living creature and have empathy. This is a man that funded Al-Qaeda in Arab spring that killed over a million people and blew up hundreds of churches, killing hundreds of thousands of Christians. So he has lived a life of serving death and serving the destruction of America, and now he is in line to meet his maker, and I hope he gets right with God.

Talking about Russia hysteria, Mueller's expanded probe to Trump businesses. This is a witch hunt to infinity and beyond. Here's some of the Democrats and Republicans in their hysteria.

**Bob Barr:** 00:01:17 — If it weren't serious it would be funny, uh, some of the what I call the, uh, the post-factual statements that, uh, that the left, uh, makes continuously. The problem partly is that if you say something, whether it is true or false, whether it is outrageous or rational, if you simply say something over, and over, and over again people actually start to believe it and will act on it.

**Speaker 2:** 00:01:45 — Fox is a propaganda network. It- it functions off of the idea of breaking people up into teams, so they are aiding and abetting the enemy. They are aiding and abetting those people we are- are currently at war at with, uh, the Russians.

**Howard Stern:** 00:02:00 — If I hear one more conservative talking about, like, all of this ... I don't know what happened to conservatives. They were the guys who were anti-Russia, who were like, "Well, it's not so ... The Russians aren't so bad." You know, because they're defending Trump, and I'm like, "Are you out of your ... mind? This guy kills journalists for having an opinion or for d- digging into the facts or disagreeing with them.

**Speaker 3:** 00:02:21 — [crosstalk 00:02:21]

**Howard Stern:** 00:02:21 — They back, uh, terrorist governments. They ... hate us. They're our enemy.

EXHIBIT

B-42

tabbies



| | | |
|---|---|---|
| Alex Jones: | 00:02:27 | That's McCain that backed the terrorists. |
| Howard Stern: | 00:02:29 | And you know what? Do not be talking to Russians and getting any kind of help from them. |
| Speaker 3: | 00:02:33 | That's the [crosstalk 00:02:33] |
| Speaker 4: | 00:02:34 | How dare you take a phone call. |
| Speaker 3: | 00:02:35 | You don't talk to them. |
| Howard Stern: | 00:02:35 | Right. |
| Speaker 3: | 00:02:35 | Say- |
| Speaker 5: | 00:02:36 | I think what we're learning, uh, with the Trump Junior meeting is when you meet with any Russians you're meeting with Russian intelligence and therefore, President Putin. |
| Speaker 6: | 00:02:47 | This is a reality that will become the only reality until this country rids itself of Donald John Trump. He is not a President. He is a puppet put in power by Vladimir Putin. |
| Maxine Waters: | 00:03:00 | Uh, so many of us are attempting in every way that we possibly can- |
| Alex Jones: | 00:03:04 | No, you're the puppets. |
| Maxine Waters: | 00:03:05 | ... uh, to- |
| Alex Jones: | 00:03:06 | You're the enemies. |
| Maxine Waters: | 00:03:07 | ... unveil the criminal activity, the unconstitutional activity of this President and his family. |
| Alex Jones: | 00:03:15 | Russia kicked out the oligarchs. |
| Maxine Waters: | 00:03:17 | I have dubbed them- |
| Alex Jones: | 00:03:17 | That's the only things we have in common. |
| Maxine Waters: | 00:03:19 | ... the, uh, criminal clan a long time ago, and as many of you know, I stepped out a long time ago and said I thought he should be impeached. |
| Speaker 7: | 00:03:28 | The- the investigation, it- it's not ... uh, nothing is proven yet, but we- we're now beyond obstruction of justice in terms of |



what's being investigated. This is moving into perjury, false statement, uh, and even into potentially treason.

Speaker 6:            00:03:41            The nation and all of our freedoms hang by a thread, and the military apparatus of the country is about to be handed over to scum who are beholden to scum. Russian scum.

Alex Jones:          00:03:53            Yup, they had their foot on the neck of Russian for a long time, the Hollywood crowd, the globalists, and now they want us.

Speaker 6:            00:04:01            Resist. Peace.

Alex Jones:          00:04:03            Ladies and gentlemen, thank you so much for joining us on this live Thursday global transmission. The 20th day of July 2017. We've known that Mueller is a operative of the deep state who covered up the Clinton's, the Bush's, and the globalists committing unbelievable crimes. He sat back as FBI Director, as did Comey, while the Clintons got tens of billions of dollars to specifically sell out US infrastructure, US minerals, US energy, US technology, including defense. We're talking about nuclear reactors, an ICBM launch and re-entry technology to China and North Korea, and that's all mainstream news. That's confirmed.

Illegal servers. Unbelievable crimes. Pedophile parties. None of it, none of it being prosecuted. And now Trump got the word yesterday, and he came out and he said, "Listen, your special council investigative powers are to look into Russia collusion in the election," which there is none. It's not collusion to have his son meeting with somebody about dirt on Hillary. That's called doing your job. The Democrats all did that and they admit that. But now Mueller announces this morning on the heels of Trump, Mueller expands probe to Trump business transactions, and now it's a criminal investigation to find out if Trump or any of his associates ever had contact with a Russian, including renting Russians apartments in New York, DC, Miami, Florida. You name it.

I mean, that's the proof now. Now it's gonna be they rented apartments or sold apartments to Russians when Russia, since they become quasi-free-market have thousands and thousands of millionaires and close to 100 billionaires buying ships, buying yachts, buying helicopters. They've bought 'em from all the different elites. They gave Hillary Clinton 100 plus million dollars into her foundation. 30-something million to the Podestas for uranium, but none of that matters. Those are deals where Hillary's in the email saying, "I'm gonna meet with the Chinese ambassador. Put the money in the account, and I'll meet with



him on policy." Boom! Arrest her! That's when she was Secretary of State.

If Trump gets caught doing something like that, caught with the Chinese ambassador or the Russian ambassador saying, "Give me money." If he ... Uh, if- if Rex Tillerson, the counterpart of Hillary, was in meetings and in- and in Wikileaks saying, "You give the money to the foundation and I'll meet and get that policy done with you next week," you put the money in and you get the policy out, classic bribery, I would call for Rex Tillerson to be put in prison for 50 years. If you give somebody military secrets it's called treason and you get your next hung 'til your vertebrae pop, until you crap your pants and die.

But it doesn't matter. I've got three clips from yesterday, David Knight and Owen did a great job, I was listening to the show, uh, workingcation, and there are the clips with Democrats on TV saying the entire administration, Rex Tillerson, you name it are all guilty of treason for trying to go into Russia and get great deals on all their rare earth minerals, their oil, their gas, their brains, their engineers. Of course, we should be working with Russia! We're capitalists. That's what we do. They're capitalists now.

But all the left that was always in love with Russia back when they were communist ... Hollywood, Howard Stern, all of it, literally say, "You don't talk to Russians. Any Russian is a Russian agent. Any Russian is like talking to Putin." These are quotes from CNN, MSNBC, Congressman Quigley, Howard Stern.

And now Trump shuts down CIA program to arm Syrian rebels that the Pentagon five years ago told Obama to stop doing, and said, "We're not going to go along with your military invasion of Syria because you are putting in Al-Qaeda, Al-Nasra, which is all the same group, now ISIS. And you are throwing a quasi-Christian country, one of the only Muslim countries that actually is inclusive and is secular, you're going to overthrow that when they didn't attack us? An-" And does what the military, what the Pentagon is saying ... The Pentagon's telling him, "Sir, the CIA, at the top," not in the middle and the bottom, a lot of those folks are actually Patriots, but at the top is big globalist foundation, big New World Order, anti-America. Carnegie, Ford endowment, skull and bones, Yale, Harvard. That's who set up the CIA in '47. It's a shadow globalist government. That's declassified. That's admitted now.

Barry Goldwater talked about it in the '50s and '60s. And so they said, "Mr. President, you wanna beat ISIS and not have our



soldiers, green berets, and people getting killed every week over there fighting ..." There's been lots of training accidents with Navy SEALs and Army soldiers dying. Lots of plane loads going down and blowing up, which is a classic tactic to cover up the real number that are dead. I don't think it's even needed to be done. Just report on what's happening. And Trump's like, "We still have agencies funding the rebels when 98% in congressional hearings they've confirmed 98%, the intel is unanimous, are Al-Qaeda, are Al-Nasra, are Wahhabists?" Wahhabists out of Saudi Arabia, the dominant religion of Islam, the dominant sect, that's what Al-Qaeda, Al-Nasra, ISIS is. It's all the same black flag, all the same Arabic g- uh, writing. All the same slogans, the same people, the same system, the same plan, the same global operation, the same cancer.

So Trump kills that yesterday and they go even more ape. Look at this Washington Post Headline. Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria: A Move Sought By Moscow. Yes, five years ago, General Dempsey, the Chairman of the Joint Chiefs, went to Obama on Saturday night, we reported it a year before it was in the news, it was confirmed, our sources, both on and off air. Colonel Shaffer was one of them. And they come to them and they say, "We're not gonna be the Al-Qaeda's air force," and then Senator Cruz comes out, and Rand Paul comes out and says the same thing. And they say, "This is wrong. We've got a deal with the Russians to let them come in, kick Al-Qaeda and ISIS out, then they will remove themselves but they'll keep their deepwater port they've always had in the Mediterranean, their only one, and then Assad will step aside after elections."

We're now five years later and Assad is now making noises of stepping aside after elections. They gotta deal with what's left of America in the Pentagon to not be immoral and to not put Al-Qaeda in charge of there. That's what happened, and then they turn around and act like Trump's a Russian again. Well, yes, they're ... A deal was made by our military and by people in our government with Russia. We told you first. Sy Hersh, Pulitzer Prize winner has been on three years after we broke it to say we broke it, we were right. I'm not bragging. It's just that's a hat tip. Do you understand?

They think you're stupid. They've launched a bunch of fake chemical attacks to blame it on Assad. Because Obama said, "I'll go in if you use chemicals." Why would he ever do that when he's winning and now ISIS is almost beaten? And now they're coming out pushing this garbage, and saying now they're looking into all his finances. Oh, did ... Was there any campaign



APPENDIX O

finance violations. The FBI's looking into that. Not about Russia. They're looking at bank accounts. They're looking at transactions, they're looking at everything to "find money laundering", to find any discrepancies in campaign money, and they'll call any mistakes they find money laundering.

Hillary can openly commit mass crimes. Go to Morocco and get 12 million and then sell out her whole phosphate industry, and use taxpayer money, as we reported, to send 90 million there to pay to move our jobs. That's okay, but Trump actually turns our economy on, restores our republic, follows what the Pentagon a- actually has a plan to defeat the globalists, and they call him a Russian agent. The only truth is Russia pulled out from the control of the globalists. Russia is breaking free of the New World Order partially. We are too and other nations are saying, like the UK, and Iceland, and Sweden, and Denmark, and Australia, and Brazil, and all these other places are saying, "We wanna be free too! We want a nation-state that's for our interest, not to be looted by robber barons like Zuckerberg and Bezos."

And then they call it Russia. Russia, to make it something foreign so every nation trying to pull out from globalism, be it Italy, Greece, Spain, Catalonia, they can say, "Oh, you don't really wanna pull out. The Russians made you do that." And they build the Russians up like they're superheroes. When we come back we're gonna look at McCain and his brain tumor.

| Speaker 1: | 00:14:05 | KDR- |
|---|---|---|
| Alex Jones: | 00:14:06 | I'm gonna get into John McCain and his fast-acting, very aggressive brain tumor he had removed yesterday, and how Tim Kaine calls him the- the chairman of [inaudible 00:14:19] operations, uh, because that's exactly what- what he is. That's coming up. But something I wanted to mention to everybody here and I want it to sink in for the listeners of this transmission, we're on over 200 radios stations, and we're on Facebook, and Google, and YouTube, and a lot of other video platforms, and on every platform the Democrats and the liberals have organized into groups that go around making false copyright claims and false community claims. Now, I've announced, and I don't wanna do this 'cause I'm litigious, I have to. The next person that files a slap suit, the next person that files a fake suit for publicity, I'm gonna come down on them like a ton of bricks to defend my free speech and my rights.

'Cause people sue me to get publicity and then they wanna drop the suits right away. In fact, they wanna pay me money to drop |



the suits, but it has to all be secret. That's how this works. And then there's this whole meme put out that I'm fake news and all this garbage, so I understand now I can't get out of the suits, I've gotta counter-sue people. So whoever wants to line up next, I'm going to sue you, and I mean really sue you. Depositions, everything. And I'm gonna announce this. The next person puts a fake copyright strike, I swear to God on my children I am going to sue you and I'm gonna sue your companies, and I am gonna come after you politically with 100% of the law. You got that?

'Cause during the break, they didn't tell me when I was doing my workcation we had the community guidelines, a whole swarm of folks come through and they're ... YouTube is announcing that they're looking at shutting down and- and- and basically kicking us off YouTube for people complaining that I've reported on Sandy Hook and had Wolfgang Halbig, a former school, uh, safety administrator on, for a debate about whether the official story was true or not. Then the media misrepresents what I say, saying that I say it never happened, when I've looked at both sides, but it doesn't matter.

I have my right ... If I was an idiot, black nationalist, racist, I could be a racist black person. If I wanted to be a KKK person, an idiot, I could be that as long as I don't hurt innocent people. And if I wanted to say that I don't believe that babies out of incubators and had their brains bashed out to get us in the Iraq war, which is true, didn't happen, it's my right to say it. And then I can question big PR events like Sandy Hook when there are major anomalies like them saying none of the parents were allowed to see their kids that day at the school. Then they had people on NBC saying they held their kid dead at the school.

People see that. They see blue screens. They see kids going in circles in and out the building. They say it looks like a drill. Why were no rescue choppers sent? Why were port-a-potties there an hour later? Uh- uh- uh, I'm not saying it didn't happen because I'm not sure. I don't wanna go that far. I've gotta be sure. I have a right to question that. But regardless, they wanna shut our channel down because of three-year-old videos, but see, I can't find out who did that specifically. I can sue, and they know ... They know I've already got the law firm that's in DC and others ready. They know I'm going to sue whoever files a fake copyright claim again.

I am going to sue you. I cannot wait. Because people put these fraudulent claims out constantly. It's amazing, and I'm done. I'm done playing games with all these people because I'm gonna


APPENDIX O

defend the First Amendment and I'm going to come after the people that violate it. This is a microcosm, uh, going back 10 years ago. I was even on access TV anymore here in Austin where I started 20-something years ago, but they were getting rid of free speech. They were banning libertarians and conservatives, and I sued them, got the evidence what was happening, and out of that came a criminal investigation, and the director of it was found guilty of embezzling over $300,000 and sent to the state pen in East Texas. Huntsville. He only spent a couple years, but ... And it went higher than that in the city, but they killed the investigation.

So I'm- I'm not a litigious person, but if I do come after you legally you're going to- you're going to understand. And Google got caught hiring a company to de-list us, and- and they got caught and they had to pull back. They admitted they did it, and they had us de-listed two weeks ago where you couldn't see Info Wars at the top. And I told them, "I'm gonna sue you privately," and they put it back up at the top because they understand I have the audience not just the money and we're gonna expose you bullies. You understand? Next person, you're sued, so line up. You wanna get in a big, fat lawsuit with me, whoever you are, I don't care who you are, you make up crap, you lie about us, you try to take my free speech and gag me, and take my speech so you can have your way with my family and my children, it isn't happening anymore.

Now, we got a little comfortable around here too with just having our rights taken. We're like, "Yeah. Well, yeah, they're bullying us, saying we have no free speech. Let's just go back to sleep." Wake up everybody. We're in a fight against the globalists. They're trying to put our pri- our- our president in prison. They're making up ... They're funding radical Islamists and terrorists and saying our president's a Russian agent because he didn't wanna fund Al-Qaeda. If they're able to shut us down, they're gonna shut everybody else down. If they're able to say Trump's a Russian agent with no proof, they're gonna go after everybody. It's gonna be a new inquisition. This is a total war, people!

Ladies and gentlemen, the way the new globalist system works is if anyone is offended by what you say or do, there's no judge, there's no jury, you're kicked off YouTube, you're kicked off Facebook, you're kicked off Twitter. And then under the Chinese model that's Zuckerberg's pushing, you have an internet ID that puts your real-world activities that are tracked digitally by companies and corporations, from your gas bill to, you know,



going to eat at McDonald's into an algorithm and then it gives you a score about what type of person you are.

Last year they made a, uh, black mirror special, a show basically about how nightmarish that future would be, but this is their plan. So later in the broadcast, we're gonna have an article on infowars.com about strikes on Info Wars blocking our live streaming right now on YouTube, on our regular YouTube channel, the Alex Jones channel, with millions of views because we had the headline Zero Heads Discovers Anomaly in Alex Jones' Headpiece. And it's us showing Megyn Kelly talking to the father of one of the victims, saying he went and held his dead son there at the school. And then it cuts to the coroner and everybody saying no one was allowed to go in and see the kids.

Now, we just said, "See, that's why people ask questions." It's a very nice little piece, but see, oh, you're not allowed to even sit there and point that out. And then there's other ones from years ago. Sandy Hook Victim Dies Again in Pakistan, which shows the photo of one of the kids with people in Pakistan holding up his picture saying he died in a terror attack over there. Clearly showing that was some PR event over there where they were just printing off images of kids and using it. We weren't even saying that- that man's child didn't die. We're saying, look at how there's these other PR events just like the dead babies in the incubators.

But they're using Sandy Hook and they're using the victims and their families as a way to get rid of free speech in America. That's the plan. Hillary said it back during the campaign. She was gonna get into office. This was gonna be their move. They called for, you know, ongoing criminal investigations, uh, the FBI last week into myself, Matt Drudge, and Breitbart with no proof at the Federal Elections Commission. And then the Republicans on the commission killed the ongoing congressional hearings but still, they have the FBI going around doing a counter-espionage investigation to see if we're funded by Russians. Welcome to the witch hunt, folks.

People say, "Wow. How are you taking it?" I'm taking it great because the ... I mean, I'm engaging the globalists that have high-jacked our country. I'm engaging the globalists that are trying to bankrupt us, and turn our power off, and- and jack up our prices, and make us feudal serfs. We're fighting for America in a 21st-century war, ladies and gentlemen, and it takes getting past the intimidation and getting in their face. That's where the victory is. Getting past the political correctness, getting past being called names.



It's not our fault they call us names. It's their fault. They discredit themselves. They're the scum. They're the anti-fallout beating up peaceful people in the streets of America and shooting cops in the back. They're the ones engaging in this, not us. They're the ones that wanna get rid of free-market. They're the ones that hate Christians. They're the ones that call us flyover country and better clingers. They're the ones pushing racial division, not us, and worldwide humanity's awakening. The tide of globalism's going out. Corrupt neoliberalism is hated worldwide and globalist owned publications admit that they're in trouble, but they say, "We've gotta stir up even greater division now."

This is a rearguard action while they basically escape the countries they've destroyed. The New World Order is dead and signifying that is David Rockefeller,  Zbigniew Brzezinski, and now John McCain. I wonder if they'll announce soon that there's a very fast-acting brain tumor in George Soros.

The world is watching. The world is waiting as the clock ticks down on judgment on these type of individuals. I wish no harm upon them, their miserable souls, but they've dealt death. They've dealt corruption. They've dealt anti-American activities, anti-Christian activities. I mean, McCain openly funded the Al-Qaeda ISIS rebels, met with them, and now he's got a fast-acting brain tumor. I'm gonna talk about that in a few minutes.

But listen, the fact that they're trying to shut us down, the fact that they're trying to ban our speech, the fact that they're trying to set those precedents, that's a badge of honor. That's a badge of courage. That will only make Info Wars bigger, this entire Streisand Effect. If our enemies are successful shutting one of our big YouTube channels, I guarantee you it will only make everything we do and everything we cover that much more explosive.

Our YouTube channels, with a combined four billion views, and if you count all the other videos out there it's tens of billions that other people have on their platforms because I'm copyright free, you can post our material as long as you don't try to monetize it or take it out context. And I- and I even leave that alone 99% of the time. As long as you're fighting the globalists, I- I ... people post it. And every time they try to suppress us we only get bigger.

I mean, just last week looking at six or seven videos that we produced or videos I was in, we had over 30 million views just of videos I was in last week. They don't have any way to compete



with that. They don't know what to do. Take PewDiePie, last time I checked he has close to 18 billion views on one YouTube channel and almost 60 million subscribers, and he was never political but they tried to call him racists, and evil, and bad to-to- to prepare to shut him down because the big network executives and folks are jealous that he is able to actually have his free speech and do what he wants. And they're scared he might start becoming political, he might do something.

Just like in China they put you in prison or execute you if you're caught Photoshopping Winnie the Pooh with the Chinese president. That somehow became popular over there. It was friendly. It was nice. Folks thought it was cute. You go to prison for that in China. Well, they don't like PewDiePie, but his YouTube channels, one channel has almost 16 billion, the other has a couple more billion. Almost 18 billion views. They are threatened by 18 billion views.

Nickelodeon's average show only has a couple hundred thousand people viewing, but young people and teenagers watch PewDiePie. They don't watch all the Disney programming as much as they watch PewDiePie over in Sweden who's his own guy. Of course, PewDiePie's big crime is playing my videos and Paul Watson's videos, and that's the type of thing that scares them, so they say, "Oh, we're gonna demonetize you. Oh, we're not gonna let people share your videos," and it only backfires.

So I'm gonna get into McCain and the rest of it, but here's the bottom line. When I saw you need to sp- spread articles, and videos, and material, and information we put out, folks, it's a war. They're actively, in mainstream news, talking about how they need to shut us down and how we're dangerous. They're in Washington Post admitting yesterday that we're wildly popular and are exploding as old media's dying. They don't know what to do, and a lot of new media says, "Oh, great. We'll be bigger if Alex Jones isn't around."

That is the most ignorant thinking on the planet. We're in a non-zero sum game. Everyone that is promoting libertarian free-market ideas is only expanding and making the world a better place culturally, economically, spiritually. We're in a war against authoritarianism. We're not in competition. I'm not in competition with Sean Hannity. I'm not in competition, uh, with Matt Drudge. I'm not in competition with WorldNetDaily. I'm not in competition with Breitbart. I'm in a total war against the globalists allied with orthodox radical Islam that admits it wants



to extinguish the free-market open free societies classical liberalism, and they wrap it all in the term liberalism.

We're in a total and complete war and we're beginning to win, so the enemy's going from their stealth approaches to openly saying, "Silence us," openly saying they're gonna gin up evidence the everybody that opposes them is a Russian agent, or if you don't back Al-Qaeda or ISIS you're a Russian agent. That's in the Washington Post today, and you say it doesn't make sense. They don't care. They only wanna cover for their own people to say we're outsiders and we're bad and to persecute us.

This is classical authoritarianism, so I'm gonna tell you right now, if you wanna fight the globalists, take every article on infowars.com, take every video, copy them to your channel. Put them on your own platform. Play them on your local radio station. You're a station owner, take our broadcast if you're- if you're re-airing it at night put it on primetime. And listeners, support those local stations. We're in a war. Even if it's just calling them and letting them know or sending them $100 dona-

PART 1 OF 6 ENDS [00:30:04]

| Alex Jones: | 00:30:00 | More. Even if it's just calling them and letting them know or sending them $100 donation. And buy products at infowarstore.com so we can do more to have our own platforms. It costs me like 50 grand a month on average just to stream out to millions of people every day at infowars.com with our own streams that we're about to upgrade and make even better. They're pretty good but I'm going to make it even better. We're about to renegotiate a whole nother deal for our streams. |

And try to get a better price. The point is, it costs money. People say, "Oh, well just have your own videos or have your own social network or do your own thing." We, we're, we're trying here, we're fighting as hard as we can but we need your financial support and we make it easy. Great supplements, great nutraceuticals, great patriot apparel, great water filtration systems, great air purifier systems, great game changing products at very competitive prices. Most of it made right here in America. Infowarsstore.com.

And ladies and gentlemen, we have the summer mega specials that are going to have to end today. I have a whole new group of specials tomorrow, but if you want DNA force's 20% off, if you want X two, if you want these products, if I had the specials



I was going to do, and Jiminy Cricket, somebody came in here and got in my pile. Here, I found it right here, I'm in a bad mood right now folks. Super male vitality and survival shield X two specials are ending today. Quantities are running low so act now and save 30% off, and we have shipping through the month of July, but it's about to end, and I had to already end the product ... the brain force plus. Already had to end that special because it was close to selling out. I'm going to have to end the super male vitality, or female vitality, the X two survival shield, and a bunch of the other products that are 20 to 40% off right now at infowarsstore.com or by calling toll free triple 8, 253-3139.

We have a little bit of brain force left, it'll be probably a month or so until more comes in so I, I, just before stuff sells out now I just go back to regular price, which is already discounted 10%. We've also got some other new products also now available at infowarslife.com, uh, like our new whey protein that is made by the, one of the largest, biggest respected organic suppliers in the country and five to 10 dollars less that you'll find for the very same whey, we're private labeling that you can buy in major health food stores. But whey is known as the best protein there is from milk. It's organic, it's supercharged, it's got the glutathione and some of the other amazing things in it, but it's got the type of glutathione you can actually absorb. Glutathione is absolutely critical. Find out why going back to the time of Hypocrites, thousands of years ago, the father of modern medicine, he said whey was the most important food and one he prescribed to his patients.

True whey protein contains nine essential amino acids your body needs but cannot produce itself. So, check it out for yourself ladies and gentlemen, it's got CLA, it's got so many other great products and it's supporting American dairy farmers right here at home and it's also grass fed with non GMA RBGH, that's the growth hormone, free. Infowarslife.com or triple 8 253-3139. But as I said, we're going to have to end the specials, this is 25% a- off out of the gates with the new info wars whey protein, we also have 25% off out of the gates of Cave Man, the ultimate bone broth formula that's been sold out for months, it's now back in stock as well and it's also, uh, chalk full of bee pollen, chocolate mushroom, tumeric root and many other super foods and it is the most concentrated, from our research, bone broth formula out there. The ancients were obsessed with bone broth, this is truly amazing, it comes from chicken bones and this is now the number one bone broth seller in the country. Research it for yourself, Cave Man is now back in stock



at Infowarslife.com or triple 8 253-3139. That's triple 8, 253-3139.

We'll have some new specials tomorrow on some of the other supplements that we do have in stock, uh, but I'm going to have to end that special today. Again, if you want the X two or if you want super male vitality or some of the other products that are 25 to 40% off, infowarslife.com or triple 8 253-3139. You can, uh, again, just know this, they hate us, they hate our guts, Hilary hates our guts, Obama hates our guts, they're all coming after us, doing everything they can to destroy us and I just have faith in God and I have faith in you, but beyond financially supporting us and getting great products you need, if you'll just commit on your email list and on Facebook and on Twitter and on YouTube and on every platform to just point out Info Wars is under attack, Info Wars is the tip of the spear, if they can shut them down, if they can shut them up they'll shut everybody up.

And in the face of this, that's why I'm launching all these new broadcasts and all these new shows and all these new Facebook channels and all these new YouTube channels and we're launching Periscope channels and we're launching other third party channels and we're keeping our video streams and expanding them and we're launching a new website tomorrow, I'm going to make that announcement now and I'm going to come back in the next segment and, uh, announce the $20,000 winner of the meme contest, just to honor you, the great memes you've made that are fighting the globalist.

But whatever you do, get in the information war today, and expose these enemies because they are now openly expanding the, uh, quote espionage probe of Trump to all of his financials, all of his associates of financials and saying anything, a check that bounced, they're going to try to move for impeachment against the president, but he has the house, the senate, the legislative, obviously the executive, the judicial, so these scumbags don't matter, unless they can brain wash us into accept it, he needs to move against them for their criminal activities now. They're sell outs to communist China, they're sell outs to Russia, he needs to take the gloves off right now and the word is, he's getting ready to.

So Hillary and Obama and Clapper and Brendan, all you, you want to fight, get ready for a fight, McCain.

Speaker 8:          00:36:35          In a land of timeless beauty, he was a man of piece.



| Speaker 9: | 00:36:42 | Fake media tried to stop us from going to the White House but I'm president and they're not. |
|---|---|---|
| Speaker 8: | 00:36:56 | But when they threatened his world and the woman he loved, he was driven to war. |
| Speaker 10: | 00:37:07 | I don't like [inaudible 00:37:16] they turned the freaking [inaudible 00:37:19]. |
| Speaker 9: | 00:37:07 | Get them out of here. Get out. |
| Speaker 11: | 00:37:24 | Go home to mommy. Go home. Bye. |
| Speaker 9: | 00:37:34 | You are fake news. |
| Alex Jones: | 00:38:12 | Trump Nation made both these great memes. [inaudible 00:38:16] the winner. If you're a radio listener, infowars.com/show. |
| Speaker 12: | 00:38:20 | Super hero landing. You're going to do a super hero landing. Wait for it. |
| Alex Jones: | 00:38:25 | Remember, they're trying to sensor all this you're saying. |
| Speaker 12: | 00:38:28 | Super hero landing. That's really hard on your knees. Very impracticable, they all do it. You're a lovely lady, but I'm saving myself for [inaudible 00:38:35] that's why I brought him. |
| Speaker 13: | 00:38:36 | I prefer not to hit a woman, so please- |
| Speaker 12: | 00:38:44 | I mean, that's why I brought [inaudible 00:38:51]. Oh no, finish your Tweet. It's na- that's fi- just give us a second. There you go, hash tag it. Go get them, Tiger. |
| Speaker 14: | 00:39:04 | The season premier begins tonight. |
| Alex Jones: | 00:39:10 | That's Trump Nation and I want to get whoever made those videos on and I want to hire you. I told Paul Watson he could pick the winner and personally, I think the Brave hart one is the winner, I would say the one you're about to see that won is second place and then the last one, with the dead pool, that'd be third place, but Trump Nation did not win, but Trump Nation, I want to hire whoever did the editing. I want you working for us. You work for Trump Nation, too, they're great folks, but David Knight didn't win a report contest five years ago, but he did win a reporter job, now he's going to launch his big syndicated show that the word is, well over 50 stations are |



ready to pick it up the first week when it starts on August 22nd. It'll probably get hundreds of affiliates. So very, very excited. See where he is now? So just because you enter and don't win doesn't mean that you lose. So we're gong to go to break and come back and I'm going to play the winner, according to Paul Watson, and I think it's excellent, it's very well done, it's a very close second, I don't think it's the best, but you know what? Paul Watson was the judge. Believe me, we got thousands and thousands of video memes, thousands and thousands more, something like eight plus thousand once the contest, uh, you know, time ended last Wednesday. So we're going to now start going through all these and posting them, promoting them, and exposing the globalists and fighting for free speech. The answer to them trying to shut us up is to just intensify what you're doing.

But listen, don't take the broadcast for granted. I keep explaining that. They are doing everything they can to take our sponsors, to kick us off YouTube. It, it, it is just out of control what's going on. And then I'm going to get into McCain, all of it. There's these huge new second hour, tell everybody tune in, it's an active resistance. We can overpower them.

| Speaker 15: | 00:39:10 | You are listening to GCA- |
| --- | --- | --- |
| Alex Jones: | 00:41:08 | But you've gotta take action, [crosstalk 00:41:11]- the animating [inaudible 00:41:12] of liberty. You are the resistance and I salute you. Feeling good, feeling right. All right, I gotta stop it. Yeah, these ladies, they had a plan. (laughs) Dennis Hastart had a plan too, didn't he? Grab your kids and rape them. So does the pope's deputy. He got over 100 kids reported. Procured them out to all the little devil worshiping rape gangs. Those devil worshipers love to get those priest robes and rape kids. It's all part of defiling everything, overthrowing reality, destroying the, the flower of the youth. |

Until they die and enter hell. Now, let's get to the winner. Drum roll ladies and gentlemen. The winner by contested decision, Chris Killer did a great job putting this together. He's launching a new YouTube channel, don't dox me, bro, that is a great name. I want to work with this guy. I want to work with him, too. I want to tell you, he's a close second, but he, he's the winner, $20,000 to don't dox me, bro.

Name of the video, he only sent it to us, he never uploaded it yet, now he's doing what we did, uh, it is official Info wars CNN meme war 20k winner. I'm going to reupload it to Facebook with a cool name, I mean, what is it? Trump is our Toto, Trump



broke the Matrix, um, Trump flipped the paradigm. Trump exposed that we're living in a false realty? I mean, I don't know. Here is the winner of the 2017 round one meme war.

20K winner announced.

| | | |
|---|---|---|
| Speaker 16: | 00:43:39 | [inaudible 00:43:39] You are fake news. |
| Speaker 17: | 00:43:40 | How? |
| Speaker 18: | 00:43:40 | He is the one. |

Alex Jones:  00:44:29  Once you know they're a joke, it's all over. You're a better cleaner. I'm just going to make sure you got sterilized. Break the floor up. No, who do you think you are? The world belongs to us. I went to this late. We're going to come back and play it all, we got a special guest, we got a ton of news, we'll talk about McCain straight ahead.

Micheal Snyder is with us for the next 30 minutes. The founder and one of the owners of Compound Media who just went to Iraq to actually witness the final days of Al- Qaeda and Isis under President Trump and the military's bombardment. He'll be joining us as well. Micheal Snyder's written a story today that's up on infowars.com and on his website, Micheal Snyder for congress dot com. Getting Trump elected was not enough. We need 1000 liberty candidates to run for office all over the nation and he's doing it. I think it's in Utah. With his millions of readers and followers. And whether he wins or loses, he wins by participating, by educating people in the process.

The democrats are in the news today swearing they're going to take Texas. Yeah, by fraud. So realize what we're going to live under if the globalists win. The republican establishment has killed the appeal of Obama care, because they wrote it. [inaudible 00:45:43] democrats. Big banks wrote Obama Care bipartisanly to screw you. They're on CSPAN bragging saying, "Thank God you're so dumb."

Health care is worse than it's ever been. It's designed to wreck it. In fact, here's Senator Rand Paul talking about it.

Rand Paul:  00:46:00  The insurance industry doubled their profit under Obama Care. They made six billion a year before Obama Care, they now make 15 billion. My concern is that we're going to pass a republican bill and we're going to make their profits 30 billion a year. It's not the job of government to be dolling out money to private



industry, so what I've said is that, if you insist that you want it, they should put that on a separate bill that the democrats like, democrats typically like spending bills, put it on a spending bill and put the repeal, make it more of a repeal bill and I'll vote for it. But, uh, and I still think it's not perfect, but I'll vote for something less than perfect as long as it's not obnoxious, and obnoxious to me is subsidizing rich corporations.

Alex Jones:          00:46:41          That's right, that use government to make you buy it and then limit competition to jack the price up and then the left runs around ... one year after Obama Care got partially implemented three years ago, I was reading the Wall Street Journal on an airplane and it was, it was insurance companies bragging. It was like headline, "Lobbyist love Obama Care." It was like, globally, our profit's up 47% just on the America people's backs. Worldwide, 47% increase in profits. It was like 2015. I mean, galactic level screw jobs.

Now joining us is Micheal Snyder who is so on target. I mean, I saw CNN with the headlines, "Trump's done 900 plus tweets since he was elected six months ago but no major legislation." Because most of what they've done is executive tyranny. TPP, open boarders, carbon taxes. He's devastated them. We've got a supreme court justice that isn't a total communist. We've got 69%. It was 63%, down illegals coming across and felons are down even more.

Deportations of felons way up. Uh, the economy trying to battle back. I mean, I don't want to just sit here and cheer lead Trump, but it's a total war. They have the FBI, former director, brought in by the democrats and the globalists, uh, put in there, uh, by Sessions that I guess balked and chocked and I gotta agree with Trump. I mean, you know, Sessions has been going after them for all the crimes they committed. We're a five or six special counsels or criminal counsels, uh, special prosecutors, not just counsels, should be all over Hilary because if Trump did something, which he hasn't, it, it, it's like a microscope finding a little dot of dirt while a whole cess pool, uh, sewage treatment plant which is oceans of sludge, uh, it, it, it makes the hedge spin.

And now, Mueller is saying that they're looking at all the finances of all his campaign, all his associates, all his businesses, you're going to find something. I've got 70 something crew members, they're great people, I bet people bounce checks, I bet there's some folks smoking some pot, I bet somebody did something wrong before. I mean, imagine if you had tens of thousands of employees. This, this is a new word for dragnet,



fishing expedition, witch hunt to infinity, Micheal Snyder, this is an incredible time to be alive, is it not?

Michael Snyder: 00:49:10 It really is, Alex, and you know, people need to understand that we are in a war because the establishment, they want to destroy Donald Trump, it's kind of like a foreign body has invaded the system and they want to get that foreign body out of their system-

Alex Jones: 00:49:22 And they know they're losing, they know they're losing, so they're going to go after everybody. Once they get him, it's everybody else. This is a death battle. Sorry.

Michael Snyder: 00:49:30 Oh you're right, Alex, that's why they're going after you. They want to shut Info Wars da- down because they know how effective you've been. They want to shut me down, the economic collapse blog, they want to shut all of us in the alternative media down. They want to get rid of us because they saw the power we had in the last election. So we're actually in a war for the future of this country and we don't have to settle for the future of the globalist. You know, I lik- I talked to a lot of people that are awake and they're saying, "Oh, the globalist, they're too, they're too powerful, we can't defeat them. One world government is coming."

Well you know what? We don't have to settle for that. We don't have to, we don't, we don't have to just sit back and take whatever they take. You know, our founding fathers, if, if we would have had a defeatist attitude back then, if our founding fathers had said, "No, we can't take on the mighty British empire." The rest of the world thought we were crazy when our founding fathers said, "We're going to take on the mighty British empire, we're going to declare independence." They put everything on the line, and because they did, because they were willing to risk it all, the United States of America exists today.

Alex Jones: 00:50:24 Take, take, take Vietnam. Ho, Ho Chi Mihn first wanted to be, be a, uh, capitalist, he was a communist, uh, during world war two, he was our ally, they didn't want to make a deal with him because the, the french and others wanted the opium and to exploit the classically free market, Vietnamese. And so despite the fact that we spent the equivalent of trillions of dollars, uh, hundreds of thousands of [inaudible 00:50:47], we couldn't beat them because they refused to submit and they had a communist ideology.

If you refuse to submit with a Christian, conservative, libertarian, free market, Renascence, you cannot be defeated.



| | | |
|---|---|---|
| Michael Snyder: | 00:50:59 | That, and that now, that's what we need to do, we need to work together and that's why I love Info Wars so much, because you're all about working together. Those that love liberty, those that love freedom, those that love the constitution. If we work together, we can win. Donald Trump showed us that, that we can win the presidency. Here in Idaho, if everybody listening to this program today that lives in my district votes for me, I'm going to win no matter what. We just gotta get everybody out to the poles and involved because we are going to win because we have the numbers. We're waking more people up every day. My websites, your websites, your show, people all over the country, we're raising up an army and we can do this, if we work together. |
| Alex Jones: | 00:51:35 | And by the way, uh, you know, I have a small crew, I've been meaning to do it, will you call my crew today? I want to carry your books, uh, because I've read several, they're all excellent, but, uh, you're living a life that really matters, things like that, and you're doing just such important work and again, I'm so glad that despite the fact you had been successful in your own private business and successful in education, and successful, uh, you know, in news, that you're running for congress. I mean, this is really such a manly thing to do, and I don't mean to be cheesy, being manly means putting your family on the line, putting your name out there, and, and getting engaged and involved. |
| | | Because you've got a great family, I know, so we just admire what you're doing, Micheal. |
| Michael Snyder: | 00:52:13 | Well thank you, Alex, and even though I just announced I'm running officially two weeks ago, the attacks are already coming in. They're already attacking me, they're attacking the people I'm associated with, and, and so, I'm already ... it's kind of like walking into a hornet's nest, but we've gotta do this, because, they, I believe this is the most critical time, if, if, if they end up, if the democrats take control, if they impeach Trump, if they get rid of him and they, you know, they start shutting down alternative media, we could lose everything. But, if, if 1000 people all over the country start running for office, taking back state legislatures, taking back congress, taking back the powers of structure all over the country, we could have a revolution and turn this country back to limited government, liberty, freedom, the second amendment, the things we care about, the things we've been fighting about for seven years. |
| | | You know, Alex, my articles have been appearing on Infowars.com for seven years now. We've been fighting |

together, we've been fighting this battle, we've been trying to wake people up, you know, and now we need to go to the next stage because now the war has got hotter than ever before and if we don't win, the, the, the elite, the globalists, they are going to try to en- entirely destroy us.

| | | |
|---|---|---|
| Alex Jones: | 00:53:24 | You're absolutely right, Micheal Snyder, let's talk about the Mueller situation because Trump has gotta go with his instincts. He's absolutely right. They got bamboozled, they got hoodwinked, they got stampeded, and I really like Senator Sessions into this recusal so that his deputy could then put Mueller in. If it was somebody else that wasn't best friends with Comey, didn't cover up for the Bush's and the Clintons, then I would say, "Okay, have a special counsel" |

If Mueller presided for a decade over some of the greatest abuses bipartisanly we've ever seen, he took off the list radical Islam and would not let the FBI investigate radical Jihadis and basically ordered them to stand down, that's confirmed. This guy is a globalist. You've got Brennan, you've got Clapper, they're all just incredibly arrogant. I want to get into that, but first let's get into McCain.

I don't wish harm on anybody and I've had family that have had cancer and brain tumors. It's no joke. I also know from a friend who had a brain tumor and didn't make it, they got very aggressive, very paranoid the last year of their life before they even knew they had a brain tumor and it killed them in about two months once they learned about it. Uh, McCain has been acting very erratic the last year, he's been acting very crazy. Remember back at the Comey hearing people said, even his own supports said something's wrong with him.

But this is a guy that was part of the Keating Five. This is a guy who want's to say that everybody that's against him is a Russian agent. This is a guy who funded Al-Nusra, Al-Qaeda, and Isis and went and met with them in Syria and admitted it. This is a guy on the news who is proxy saying Trump's a Russian agent. That's in the Washington Post today, uh, because he, eh, is working with Russia to take out Isis and Al-Qaeda, that predates Trump getting in. The Pentagon made that deal. So now battling radical Islam and you're supposedly Isis, or, or, or battling radical Islam, you're supposedly, uh, a, a, a, a Russian agent, that's the Washington Post saying that today, this has reached new levels. He's got this brain tumor, some people might say it's foul play, they do have viral based weaponized cancer. You can actually spray on somebody and they can breath and it actually does create these type of cancers in the cerebral context, but you

know, McCain's old, and, uh, this is probably naturally occurring, uh, though brain cancers of this type have magically increased. SV-40 that's in a lot of the, uh, vaccines, uh, you know, has also been linked to this. That's one reason this cancer has increased.

So we can use his tragedy to hopefully inform some people you know, I hope McCain get right with God, I don't wish any harm against any living thing. I don't take pleasure, uh, uh, you know, out of a cow dying even if I eat a steak. Uh, but you know, and, and I don't take pleasure in an evil person having a brain tumor because I still have empathy for them but talk about an omen. David Rockefeller, the founder of modern world government, founder of the modern UN, uh, David Rockefeller dead this year, [inaudible 00:56:22] one of this generals, uh, for world government dead and, and now we see, uh, McCain, you know, the current ... Tim Cain called him the leader of their movement, their, their chairman, and he his quarterbacking the attempt to stop, uh, the make America great again movement, so this is an omen.

What do you make, uh, and I just wonder, will George Soros get fast acting cancer, not delivered by patriots and the CIA, but by God?

| | | |
|---|---|---|
| Michael Snyder: | 00:56:51 | Well Alex, a lot of these,  [inaudible 00:56:52] comes a lot of these globalists, they are getting older, they're dinosaurs now and they, they're starting to die off, they're starting to retire and so we need to replace them with fresh blood, with, but with McCain, I found it interesting that he has brain cancer because something else that's been linked to cancer are cell phones and what I've been finding out is that, a- as I've been digging into this a- you know, what you, members of congress, they spend more time out of their day on the phone than anything else. In fact, when new members of congress, when they go, what they're told is they're supposed to spend about two hours a day on the floor and in committee actually doing their jobs, and they're actually supposed to spend about four hours a day on the phone, dialing for dollars, 60 minutes did a big expose of this where what they do, they spend more, our members of congress, when they're working, they spend more time during the day, uh, dialing for dollars, they spend more time during the day, uh, calling people up asking for money than anything else.

And that's when they're working. Members of congress only, uh, for example, the house will- |
| Alex Jones: | 00:57:50 | Exactly, and Johnny Cochran died from the type of brain tumor that's associated with cell phones. It was concerned decades |



ago in rat studies that it does heat up the DNA, it causes it to rattle and then it breaks the chains, then that causes mutations in the brain tissue. Everybody should be using hands free. No one should let their kids, uh, you know, be on these unless they're using a hands free or blue tooth and it's still dangerous. Uh, you're absolutely right, but notice, the Atlantic can say did it give him a brain tumor because they're establishment media. If we say cell phones are linked, it's a conspiracy theory, but they are having that debate now.

Michael Snyder:      00:58:24       Oh, it's very true. And, and so people, people need to be aware, when you're holding that cell phone up to your head for you know, endless hours, you're literally cooking your brain on, at a very low level. But, uh, you know, me- but these members of congress, they spend more time on the phone than anything. If that's when they're working. Er, the, the, the house of representatives, Alex, will only be in session for 147 days this year. That means they have 218 days off. They work, they work for less than three days a week, and when they're working, like I said, most of the time they're on the phone. The republicans and the democrats, they're not allowed to make calls directly from their own offices, so they've got these giant call centers very close to the capital.

And what they do, wa- the reason why you almost always see the house chamber or the senate chamber empty, because they're all over at these call centers, they're calling people trying to raise money for the el- next election, trying to keep the establishment in power, that's how congress really works.

Alex Jones:      00:59:16       That's right, and major courts have ruled that cell phones are causing brain cancer. It's a fact, just like glyphosate literally grows cancer, but they told us it was healthy to drink. This is incredible. Why have the elites allowed glyphosate, cell phones, all of this, all this wifi, all of it, when they know specifically it rattles DNA into pieces, then when you have DNA in pieces, that is a mutation, cancer of course is the most classic mutation with malignant tumors.

Michael Snyder:      00:59:43       Well I think for the sa- some of the same reasons why they are putting fluoride in the water. They know fluoride is a neurotoxin. They know that it has effects on the development of young children, they know that it's dumbing down the population but they're putting it in there anyway. They say, oh, it's good for our teeth, when it shows no, it actually causes some very serious conditions for teeth, now we-

PART 2 OF 6 ENDS [01:00:04]



| Michael Snyder: | 01:00:00 | So, no, it actually causes some very serious conditions for teeth. Now we got children all over the country with those little white spots on their teeth. That's from the fluoride in the water. |
|---|---|---|
| Alex Jones: | 01:00:09 | And the American Dental Association says children under six should not brush their teeth with fluoride and the media calls me a conspiracy theorist when that's the American Dental Association, six years ago, forced to come out and say that in like 2011. People can pull that up. And admitting it increases bone cancer in boys. Admittedly causes lower IQ's, Harvard study. But they don't care, they just call us conspiracy theorists. |
| Michael Snyder: | 01:00:34 | Yeah or Alex, vaccines in California, where they passed that bill making it mandatory to have vaccines if you want to go to a public school. Now they want to bring out a bill where it's gonna make it mandatory for every child in California to get vaccines. You know what, and these, these laws are starting to spread all over the nation. There's talk that they want to start pushing 'em here, in Idaho a deeply red state. We've gotta fight this we've gotta let people know. These vaccines, you know, uh, uh, that, why, why has autism just exploded because of these vaccines. Kids are getting shot with these, these vaccines, and one day- |
| Alex Jones: | 01:01:04 | And by the way, there are thousands of studies admitting that Thimerosal causes autoimmune results in the brain and other things and they just say conspiracy, conspiracy, our vaccine is safe and effective. Never hurt anybody. The, the, the insert say's it can kill you or cause an autoimmune disorder or give you type I diabetes by killing your pancreas. On and on and on and on and on and on and on. But people won't read the insert. They just say conspiracy theory! It doesn't matter while you were talking we put Scientific American on. We put even the Washington Post on. Even CNN on. Even Newsweek, admit all this now. We've been totally vindicated.

But they pre-tell you it won't hurt you to make you comfortable so that your brain decides it's safe, like them tellin' folks cigarettes were good for your lungs in the forties and fifties. Even though they knew it caused cancer. So that you go ahead and get addicted to the cell phones. Go ahead and give em to your kids and then later to cover their ass, they tell you actually, it kills ya. So I tell ya, very diabolical plan by these lawyers. |
| Michael Snyder: | 01:02:03 | Yeah and then something else that's in our water Alex is all the pharmaceutical drugs.  Where, you know, We're the most drugged up society in the history world. But all that gets in the water and so a major study was done not to long ago where they looked at the water, they looked for traces of |



|  |  | pharmaceutical drugs and they found that more than half of the water systems in the entire country have more than twenty four different pharm ... traces of pharmaceutical drugs in them. |
|---|---|---|
| Alex Jones: | 01:02:27 | And it's causing massive mutations in mam ... mammals, amphibians, fish, you name it. And they make big jokes out of that as well. Since you mentioned it, let's go ahead and go to this clip. Former director of National Intelligence, James Clapper totally sold out the country. Trump is making Russia great again. Uh, uh in, in Ukraine, I mean, Soros overthrew an elected government. They started a civil war. Russia jut took control of the east and their pipelines, this is making Russia great again. Here it is. |
| Chris Matthews: | 01:02:55 | Do you think, uh, our President's helping, uh Russia be great again? |
| James Clapper: | 01:03:01 | Uh, in a, in (laughs) yeah in a way I guess, he is. Uh, particularly, if, uh, as Putin, you know gets his way in a Syria. And if nothing is done to push back on the Russians in the Ukraine um, yes. |
| Alex Jones: | 01:03:21 | Helping the Russians push back in Ukraine when George Soros and the State Department of Obama over-threw the elected government. Look at this Washington Post headline "Trump End's Covert CIA Program to Arm Anti Assad Rebels in Syria, A Move Sought by Moscow." A, sought by our Pentagon that testified to Congress in close session five years ago, that we then had guests on and was later confirmed. Uh, yes. Russia is against radical Islam too. Yes, we shouldn't be funding the very rebels were fighting. I mean, again, if Trump puts his shoes on right, they claim the Russians did it. If Trump doesn't want everybody to live under Islamic rule, it's the Russians. Yes the Russians are against radical Islam too. What do you make of this, Michael Snyder? |
| Michael Snyder: | 01:04:03 | Well I'm so glad that Trump made that move. It's a giant step in the right direction. But you know what the neo-cons, both Democrats and Republicans, they want us to be the police of the world. And that's why we need more people like Ron Paul who says we can't be the police of the world. First of all we can't afford to do that and secondly when we keep poking our nose in everywhere, then we have to send our boys and girls over there to bleed and die, and you know and, and, and the rest of the world starting to hate us 'cause we're constantly interfering or constantly starting wars. Were constantly the military industrial com, com, complex, constantly wants more war. They constantly want more ... |



| Alex Jones: | 01:04:36 | And finally Trump is over there cleaning up Obama's mess in the middle east, cleaning up the North Korean mess. It's a president pragmatically, actually pro free market and not a pedophile and not out to get us. Michael Snyder for congress.com. Folks should support ya. And get involved in that. It's we the people that are backing you if you win, not the Russians. Again they're telling us we're all losers. You didn't know the Russians had your wife have that baby too. And when you breathe Mr. Snyder, it's not you breathing, the respirator is provided by the Russians as well. And when I got up this morning and made eggs for my family, that was the Russians as well. Ladies and gentleman you didn't elect Trump, it was the Russians. Michael Snyder, thank you so much. We have the founder of the Rebel Media straight ahead, stay with us. |
|---|---|---|

(singing)

Only way the globalist can win is if you remain asleep.

(singing)

I'm committed.

(singing)

Sworn to avenge.

( singing)

I'm Alex Jones, your host.

(singing)

And I am the sentinel. We're all, no matter what color we are or where we came from, if we want justice. If we love truth. If we love to take care of the innocent. If we want to be honorable. If we wanna be strong. If we wanna take on bullies. Then that's the spirit God put in ya. That's the light shining out in the dark. Were all brothers and sisters in that fight.

We're getting our next guest on. Got a bunch of other guests today. Ton of news to get to. But there's no doubt now, their coming after Trump. The corrupt, evil Mueller, who covered up for just outrageous Islamic terror, crimes, Clinton corruption, espionage for the communist Chinese. Is now saying their going to look into every bank account, every transaction stuff that's non-Russia related. Tryin to bring down President Trump,



because he told the special interest that had hijacked our country and transferred the power to the TPP and to NAFTA and GATT and these international agreements. He said "no! We're not turnin off all our coal when nobody else does. We're not gonna have wide open borders and order the border patrol not to stop people comin across illegally." And that's down sixty-nine percent. And so they're panicking.

Now briefly, we've got free shipping until the end of July. And we're selling out a lot of the best selling items like Super-Male Vitality, uh, X2, Brain Force Plus. So I'm already stopped selling Brain Force Plus at thirty percent off. I ju, just had to, 'cause we're about to sell out. Probably out of it for like a month. Um, so those specials are gonna end today on Super Male on X2, the good halogen, that goes in and obviously blocks the bad halogen fluoride. It's amazing. It's the cleanest, purest Iodine out there from deep earth crystal sources. We have Caveman it's the ultimate bone broth, Paleo diet formula. And by Paleo diet, I mean what the ancients ate across the board knowing the bones, uh, had all the trace minerals, the elements in it. The co-factors, the stem cells, all of it. Then you got the chaga mushroom and the rest of it in there. It's simply the very best out there. The tumeric, the bee pollen and many other high quality ingredients that help. For healthy muscles, bones, fights free radicals and so much more.

Caveman is back in stock after being sold out for months and this is now the top bone broth seller in the country. And bone broth as you know is very, very hot. But compared to just something you cook on your stove this is very, many, many, many, many, many times more concentrated. It is chocolate naturally flavored. It's all organic. Infowarslife.com. Caveman is back in stock and, and other brands of bone broth formulas are, in some cases twice as much. Usually about 20 percent more. So it's also a very, very good deal, then you're funding this operation, our expansion.

Infowarslife.com, infowarsstore.com or triple eight, two-five-three, three-one, three niner. But a lot of the specials are going to have to end today, the free shipping continues throughout the month. Take advantage of that. We now have one of the top manufacturers of organic whey. From grass fed non GMO cattle. With none of the growth hormones, non of it. We now have one of the top brands in the country, lets us private label it and again it is way less expensive than it would be in stores. Buying it direct from us, private label, true whey protein.



We know we're under a microscope plus we want you to get great products so you come back and get em again. It's a win-win. This is one of the top makers in the country. We private label it. It's super high quality totally tested. True whey protein, premium quality with nine essential amino acids just came out today. Infowarslife.com or triple eight, two-five-three, three-one, three-nine.

And they do have community guidelines, like the old Soviet Union. Oh the community doesn't like you, you're gone now. And, and, and google's in trouble for doing this. They got anti-trust suits going on where they let leftists groups and they expunge the internet for Hillary and cover up all her corruption and Obama and the rest of it. Where they let these little knighted groups, these little super mods go round and say "oh we find this offensive," "we find that offensive." And then just put a strike on your account and their set to shut down our channel. Which is, I've already told google before and the last time they pulled this and they backed off. Lawsuits ready. We've got your internal documents, where you hired the company to de-list us, we've got a bunch of other stuff too. Which is fine.

And I know it's a big, huge corporation and everything else, you let your little communist mods go around and do that. You give us the standing take down the channel with billions of views and you are going to have a big publicized, big fat juicy successful lawsuit on your butt. And you think the stuff in Europe's big, just get ready. And I, I don't want to sue people, but it's all ready and I'm done. So you people thinking your having a victory out there trying to shut us down, just get ready. And the next person puts a false copyright claim in too. I'm, I, I, I promised and it's ready. And I'm going to sue you. It's gotta be done. i've made the decision. i'm done.

Oh and people that like to sue us and then secretly pay us to, to drop the lawsuit. I figured that scam out where you want to make it look like were fake news, you're gonna get sued too. Anybody else false lawsuits you're getting sued. Guaranteed! Set your watch and warrant by it, put it in the bank, you can guarantee it! You can guarantee it!

Now joining us is an individual who was successful in libertarian, conservative media in Canada. And of course inside shenanigans went on to blow that up, uh and he joins us, Ezra Levant, founded therebel.media. It reaches hundreds of millions of people, now, every month. They've had their share of folks tryin to censor them and shut em down. They're international. I really admire their lineup of folks. From Tommy Morrison, right


APPENDIX O

through to Gavin McIness and so many others. But again I'm not in competition with the rebel, I'm glad they're there. We're in this together. Therebel.media subscription base, just like you buy our products to support us, you just subscribe with them. And you're building a new media and the more of us there are the better. The safer it is. (laughs)

So he just got back. We almost sent Joe Biggs to do this but it fell through. And, and, and other groups were involved. To go in with other former special forces and some patriots, we'll just leave it at that. Uh, I don't know about other groups, not this particular one. Uh, but, I know for a fact Eric Prince does good stuff out there. They call him a mercenary, he's not in my view. To expose the pedophile rings, you name it. I don't know if that's the group financed him, but to go in and actually save Christians being murdered, slaughtered, put into sex slavery, in the few cities left that ISIS slash Al Qaeda has control of, so that's something I know Erik Prince has been doing for years, behind the scenes. Saving thousands and thousands of Christians every few months. Well this gentleman went into Iraq into the most dangerous areas. Ezra Levant, he just got back so uh we wanna thank him for his courage and what he's doing to talk about this.

And the Washington Post saying Trump's a Russian agent today, basically, for going along with the Pentagon program that's five years old, of not backing ISIS and telling em the Democrats "no." They're now saying that that's a Russian program helping Moscow, that we're not backing the lobbyists, ISIS Al Nusra, Al Qaeda. Well you just came back from there, where they admittedly sometimes rape little girls to death! So Ezra Levant founder of therebel.media, thanks for joining us.

| Erik Levant: | 01:13:16 | Well Alex, it's a pleasure to be here and, and first of all, thank you for your kind words about the rebel. You're a real trail blazer in alternative media and that's what we need these days. To cover stories that are off the official narrative. And Alex, the media and politicians and diplomats never stop talking about Muslim migrants, they call them Syrian refuges. Most aren't Syrian, most aren't true refugees. But ignored are the Christian refuges who are actually at risk of genocide. Here's a quick fact for ya. In two-thousand seventeen, the official United Nations budget to help Muslim refugees is four point seven billion dollars. But no one is waging a genocide against Muslims. There's no ethnic cleansing of Muslims. But there is ethnic cleansing of Christians in the middle east. And they're not even allowed to go to these UN refugee camps 'cause those UN refugee camps are dominated by Muslim extremists. The |



Christians, if they flee there, will be violently assaulted there. So these Christians are forgotten and we went to these ancient Christian towns where they're literally being ethnically cleansed by Muslim terrorists.

Alex Jones:    01:14:32    Break it down because this is simply amazing. These are the forgotten people.

Erik Levant:    01:14:36    Yeah.  I mean these are ancient Christians who actually still pray in Aramaic, that is Jesus's language. Some of these Christian communities have been there for fourteen hundred, fifteen hundred, sixteen hundred years. And it used to be a Christian area. Just like Egypt used to be Christian, just like Turkey used to be Christian, Istanbul used to be called Constantinople. But over time, wave after wave of Muslim jihad, has ethnically cleansed the Christians. They kill the men and they take the women as rape slaves. Because that is officially permitted in the Koran. And so we, I met a Yazidi woman in Germany, when I was on another trip, Yazidi's are not Christian's. They're not Muslim's they're, uh, uh individual ethnicity. But they have blond hair and blue eyes, Alex. So the Muslim terrorists prides these women as rape slaves. I met a Yazidi rape slave, who said she lost track after she was raped two hundred and forty times. And ya have to understand in the Islamic state that's not a crime. That's actually officially sanctioned. That's one of the ways they pay their terrorists is in stolen property-

Alex Jones:    01:15:55    And Linda Sarsour won't even come out and criticize it.

Erik Levant:    01:15:59    No. And what breaks my heart Alex, is I went to these Christian towns and I saw these all Christian refugee camps. These people are completely ignored. Politicians, the media, diplomats, NGO's they favor the Muslim refugees but they ignore the Christians. I say, we've gotta sort the lambs from the wolves, Alex. Most of the people flooding into Europe are not lambs. They're wolves.

Alex Jones:    01:16:26    Well even Interpol admitted eighty percent are military aged men, but expanding on that, I've seen the statistics. Where less than one percent, in fact it was just a few sub-points of the refugees are Christian, and then Obama jokingly about a year ago, said "well we just can't only let in the Christians. We gotta let in the Muslims." But in truth he laughed about it, because he knows the U.N. program discriminates and doesn't even let Christians get out, because they're slated for extermination. Why is that?

Erik Levant:    01:16:56    Well it goes back to the Koran, the Koran talks about converting any infidels. And so when we were in Iraq we saw an Islamic



state edict. Remember the Islamic state is like a proto country, so they have judicial announcements they're called fatwas. And any Christians in these little towns, these little towns that have been there for more than a thousand years, Alex, they, they're given an ultimatum. Either flee, uh, pay the jizya tax out of submission or be killed by the sword. So this is rooted in the Koran. And they kill the men, they rape the women. I went to a church in the little Christian town of Batnaia, that was conquered by ISIS, held by, for two years and only recently liberated. The Christians have not yet returned to this ancient town. I went into the church and I saw anti-Christian graffiti, like "we will kill you," "leave or be killed," " this is muslim property," "there are no Christians allowed in the Islamic state." It was written in arabic, but it was also written in German. And that tells me Alex that there were German muslims that went to Iraq to rape and plunder and desecrate these churches.

| | | |
|---|---|---|
| Alex Jones: | 01:18:22 | And under this whole Islamic rebellion Arab spring that the democrats, the globalists, NATO and others, the UN have been behind publicly. Military aged men go like on hajj basically, but jihad were it's like a pillaging, raping vacation where they go out to earn their bones and have their rights of passage, raping, killing, murdering. I mean this is all admitted and the UN brags that this is all a part of their replacement plan for Europeans. I mean, why is the left so in love with orthodox Islam? |
| Erik Levant: | 01:18:59 | Well, I suppose it's the same reason why the left was so sympathetic to the Soviets during the cold war. Leftists always side with the most acute enemy of western civilization. Until the fall of the Berlin wall, leftists sided with the Soviets. Um, because they thought, well that's the counter-weight to western civilization. Today it's radical Islam. It, so it's not just that the radical Islam is the enemy of the west, it also is an opportunity for these virtue signaling leftists to show how open minded they are that they will tolerate their own enemies. Which, so, what's so ironic to me, and this is what I never understand Alex- |
| Alex Jones: | 01:19:38 | That's why we've seen a lot of these leftists women go to be the sex pleasure objects. Including quite attractive women from all over Europe and the US, go to literally live in fleas and ticks with guys that wipe their butts with their left hands and just stink like pig demons. But they just, women just go and worship the filthiness and worship the, the, the fleas and ticks and lice. I'm no- I mean I'm not kidding, these women are just loving this. Because I guess, their so cuckold from men groveling and kissing their butts in the west and putting em on a pedestal, they don't like that. But to be savagely just treated like slaves, they love it. |

APPENDIX O

| | | |
|---|---|---|
| Erik Levant: | 01:20:14 | It's terrifying in Mosul, which is the big city that the Islamic state recently lost to allied forces. There were some Canadian women who voluntarily went out there. They either go to be halal prostitutes to service these men or their duped in some way or they're, or they want to be part of the jihad. It's really troubling, but you make a good point. A lot of these, uh, terrorists, they come from the west, go to Syria and Iraq. They get a taste of terrorism, rape, murder, defacing Christian objects- |
| Alex Jones: | 01:20:50 | And then they come back to Europe and go to the anti racism concerts to openly rape and the police just stand there and guard the raping and then judges rule, well this is a muslim, he's allowed to rape it's his culture. |
| Erik Levant: | 01:21:01 | Well and the thing is their coming back as battle hardened veterans in a way. Because they, they did it in Iraq and Syria, so they've tasted blood and whatever moral compunction they might have had, they're over it, so they're numb to violence, they, they love it, they practice it and now they've returned to the west. And throughout Europe and we've seen this terrorist attacks in Belgium and France in particular have been from Isis terrorists who learn their trade in Iraq and Syria and have come back to the west- |
| Alex Jones: | 01:21:34 | And you know what's crazy? We have Ezra Levant the founder of the rebel.media, amazing uh, uh, television, radio network, news-site that's reaching tens of millions a day now. We were not exaggerating. I can't come up with words to describe how much worse it is than were saying because by the minute more insanity comes out. I mean we have videos at in Sweden and Germany of them holding women down and lines of men raping them and the police are fifty feet away and do nothing. I mean, it, it's, I, I mean they literally rape little kids in pools and the police say well that's their culture. I, I mean it is just insane asylum. Ins-eh-ye-I-I-I'm just wondering, and meanwhile, their saying Trump's a Russian agent because he just killed the Obama program to arm Isis. |
| | | We'll be right back, stay with us. |
| | | Ezra Levant, (singing) therebel.media, the founder of it. He's heading back on soon about his whole story, you know having his successful, uh, kind of the Fox news of Canada but more libertarian. Uh that all got shut down and then it was successful and he started this a year and a half ago or so. But, but just getting back to Iraq and what's happening, as the final cities of the liberal globalists Saudi Arabian backed ISIS Fall. We have the Washington Post saying "Trump Ends Covert CIA Program to |



Arm Anti Assad Rebels in Syria, a Move Sought by Moscow." Well the Pentagon said stop doing it five years ago, to Obama. So, just because Russia is aligned, not wanting to back radical Islam, blowing up every church, sex slavery-ing everyone. How does that make Trump bad? I've got democrats all over the news saying no one is allowed to talk to Russians. Why Trump at a dinner at the G20 talked to Putin? It was a dinner! They seated his wife by him! The G20 did it on purpose probably to say Trump was some agent. They're trying to paralyze the president. How do you think all this is going?

Erik Levant:     01:23:29     Yeah, well, I tell ya, it has been terrifying that all of these so-called militias in Syria, they have undermined Basher Assad who I'm not gonna say he was a good man in any way, but he was at- at least a protector of the Christians. Same way, eh I mean, without him look at the anarchy. Same thing in Libya. Muammar Qaddafi not a liberal civil-right's lover, like we expect in the west, but at least he held back the Islamist wave. Same with Hosni Mubarak in Egypt. So we ... we made the perfect the enemy of the good. I'm not saying I would like to live under any of these Arab dictators. But the hell that was unleashed when they were toppled, was far worse, and let me say the Christian community in Iraq, it really is being ethnically cleansed. That's why we went over there. Alex, I'm a jew and so I looked at this ethnic genocide against Christians through the eyes of someone who understood the holocaust and I see so many analogies. And-

Alex Jones:     01:24:36     Or the Armenian genocide. It touches everybody's heart to just see people being, whole families hunted down, the men killed the women raped, murdered thrown away.

Erik Levant:     01:24:46     Well and that's the thing. Armenia was just north of there. So these Christians have a really tough go. So we went there to document the Christian genocide and to bring a little bit of humanitarian relief. And if people want to see our videos they can go to savethechristians.com, we've put up about fifteen videos, including from these destroyed churches. You can see them at savethechristians.com and if you want to help with our humanitarian efforts, you can do that too. It's a, and, and I want to tell the story of these Christians, 'cause so many people ignore it. They're obsessed with the muslim refugees. No one's killing muslims in an-

Alex Jones:     01:25:22     You're absolutely right and again, the UN is basically not letting Christians get out. We should do another video, remember Obama laughing last year going "hah we can't let the Christians

out, we can't just take care of them." No he's blocking them on purpose, because he is a closet Islamist. It's been proven.

| Erik Levant: | 01:25:39 | Yup. Well, and, and hopefully those numbers will change now that Donald Trump is, a, choosing the refugees. But so far- |
| Alex Jones: | 01:25:45 | But like you said, the Christians can't go to refugee camps to begin with, 'cause they'll be killed by the religion of peace! |
| Erik Levant: | 01:25:51 | Yeah, that's true. Well, listen Alex, I, I appreciate you spreading the word about this and thank you for your kind words. We're gonna keep up this fight, because it's the one group it's okay to demonize in western civilization is Christians and it not, it ought not to be that way. And I know you stand up for their civil rights and we do to my friend. |
| Alex Jones: | 01:26:10 | Absolutely. Well, uh folks can find out more again at therebel.media, and I absolutely for the nightly news wanna get you back on and review some of the boil down or highlights of the amazing video you've got posted, this is real journalism and dangerous. So thanks for doing that, uh Ezra Levant. |
| Erik Levant: | 01:26:29 | Thank you my friend. |
| Alex Jones: | 01:26:29 | Alright, hour number three. Were gonna get to a ton of news items ahead, more on McCain, more on the witch hunt against Trump. More on the economy, so much more- |
| Speaker 19: | 01:26:39 | Thank you for listening to [inaudible 01:26:39]. |
| Alex Jones: | 01:26:38 | We've got john Rappaport comin up too, stay with us. |
| | | At the bottom of the hour, I'm gonna take some of your phone calls. We're gonna be joined by Jon Rappaport comin up here in the next segment [inaudible 01:26:47] and the host of Fourth Hour. |
| | | John McCain, you know I'm not a fake, and so, I'm not gonna sit here and tell you that I am having nightmares over the fact that John McCain has a big fat brain tumor, or had it removed and that it's probably not gonna be operable. And that he won't be with us for too much longer. So not gonna lie to you and tell you I'm losing sleep over it. But I'm also not gonna tell you I'm glad he's dying. 'cause I'm not. I'm very sad for John McCain. He's a very, very twisted person. He's been compromised since the Keating Five, which was totally illegal. Ripping people off with fake bonds. And you go back to Hanoi Hilton where he was |



APPENDIX O

taken care of for given em all the secrets. That's been confirmed. The guy is not a hero in my view. Of course Donald Trump knows that when he said that McCain's no hero. His dad was an admiral. The head of the pacific fleet. He's a consummate insider. But that said death is the great equalizer. And I don't take pleasure when I heard David Rockefeller died. I don't take pleasure when I heard Zbigniew Brzezinski died. I won't take pleasure when I hear that George Soros is dead. But I'll tell yeah this, I will feel relief. Because these are very, very, very, very bad people.

And I'm not gonna play along with everybody, that's virtue signaling saying oh, our hopes and prayers go out to John McCain ... and just for the mere reason of sounding like I'm a loving compassionate person, because its hard to say nice things about john McCain when he's so evil and funded Al Qaeda and funded Isis and get all this. The bible says, pray for your enemies. So I can't help but say pray for John McCain. But I don't even like saying it, I'm just being honest. But I guess pray he wakes up. Pray he, ya know, jus, turns around, and that there's some good left in him. And that he, repents for funding and, and, and supporting the massive middle eastern destabilization turning radical Islam loose on other muslims Christians, you name it.

I mean it's just, the guy he quarterback, as Tim Caine said, he was, is the chairman. Let's pull up Tim Caine's tweet. I saw it last night at about seven thirty, right when it went out. I was searching McCain news, when the brain tumor news broke. There it is. Thinking about my hero. My chairman. My friend John McCain. Stay strong. His chairman. 'Cause let me tell you something. He is chairing, not just committees, he's chairing the operation to bring down the Make America Great Movement and to put the deep state back in full control. And he's all about bringing in radical Muslims and going after our guns and he supported original Obama care.

But of course we haven't seen Obama care repealed. Because it's what the republican scumbags at the top wanted. They're the same ones against Trump. The never-Trumper filth. The, the, they have some good rhetoric. They have some good talk.

PART 3 OF 6 ENDS [01:30:04]

Alex Jones:       01:30:00       Th- th- th- they have some good rhetoric, they have some good talk, but they don't deliver. So, the media will probably edit what I've said about McCain, take it out of context and say I'm glad he's dying. I'm not. I've told you what I really think. It's



nuanced because it, the world is complex. I don't like McCain, but on a spiritual level, it feels like bad luck to me to say, you know, he's getting what's coming to him or something like that hypothetically because I don't take pleasure in it, but when somebody is a convicted pedophile or been caught with hundreds of kids, like Sandusky, uh, and, and, and, and the deputy pope and people and they're particularly in priest robes because you know they love to care out the satanism that way because it's more blasphemous and it, they're just such defilers that ... I mean, I'm glad when pedophiles die.

I'm glad when child kidnappers die. And I'm not a violent person, I don't enjoy violence but my very instincts are very sharp towards these people and I've always said, you know, when they convict these folks of pedophilia, they convict these people of kidnapping kids, I personally, I will flip the switch to run electricity through their brains.

800-259-9231. Coming up at the start of the bottom of the hour segment, I will play a video that YouTube says violates their community standards for pointing out an article by Zero Hedge, that pointed out an anomaly in an NBC news report concerning Sandy Hook. And so I'm going to air this again and I'm going to challenge that it doesn't violate, uh, the rules as being selectively enforced and that's it's a form of civil rights violation of the first amendment and discrimination. It's just like a big, uh, credit card processing company that we're looking at suing, I just have to do this. I have to start some lawsuits against violators just to, just to fight for my rights.

They told us, "We're not going to let you process credit cards and debit cards with us even though you have a, you know, Triple A standing, five star rating, absolutely established 22 year credit card processing company, that has the other big three credit card processors hooked into our system, not just PayPal, we're not going to let, do business with you," and they were dumb enough in emails to say, "Because of our political views."

You think a gay couple can sue and win money because somebody wouldn't make a cake but then you guys say because of my political views and what's misrepresented that I am not allowed to engage in commerce? You people are crazy. I've run this by litigators, top law firms, it's win, win, win, win, win. And I don't want the money from these suits. I don't want two years and then they get to depose me and I get to depose them. But, I'm going to, I'm going to subpoena CEOs and people. I'm gonna start going after folks because I can't put up with it anymore.



So we're going to air what YouTube says you're not allowed to see. Coming up, it's only four minutes long, it's Owen Shroyer with a zero hedge headline. And we're going to go to your phone calls with our guests, John Avaport. But hey, good luck guys because I'm launching more shows, more video platforms, our own video platform has millions and millions of viewers, every few days, we're not backing down, we're not giving up, we're getting more affiliates across the United States because America is done being intimidated. America is done bowing. America is done being called racists because you didn't want Obama Care written by insurance companies and republican fat cats to screw everybody over with the democrats.

American's across the board of every political strip, of every skin color, of every religious background including Muslims that don't want to be under radical orthodox Islam are sick of oppression and we want freedom and we want it now. Coming up the bottom of the hour, I'll show you the letter from YouTube and what they say is not allowed. We're going to play the evil video. Zero Hedge discoveries anomaly in Alex Jones's hit piece. And all it is is Owen Shroyer playing two clips off the news side by side. And if they can sensor that and if they can shut us down for that, they can shut anybody down and Twitter announced today< "We've begun 10 times the censorship we were doing last year of anybody criticizing people we don't like." They can have the left sing kill Trump, kill me, whatever, but let me tell you, you call somebody a liar, you call somebody an idiot, oh, they're going to shut you down. They got their trendy CEO up there. They got their trendy ... yeah, click on that for TV viewers. This is how it's happening.

Notice YouTube and Twitter and Facebook are all announcing the massive censorship launces now. Well, Google, we have the internal purchase order, millions of dollars to shut down Info Wars, saying Ron Paul's not credible, saying that the Syrian rebels were caught launching their own chemical attack and reading a UN report. No, it's that Ron Paul is credible and they said, 'Due to him opposing a Syrian war, and Jones having on these guests, we're going to delist him. But we're going to do it secretly because it's not credible.' And they listed Ron Paul and that I then played a clip of a congressman, and that it was, that it was too influential. They said, "He, he plays a congressman and then he plays Ron Paul and then he, he has a Sy Hurst clip and it's just not credible."

Because it's admitted that the Syrian rebels launched at least three chemical attacks. Congress has had hearings on it and confirmed it. The UN admits it, be se- because it was so credible



that I went bam, bam, bam, here's the clips, and said, "We shouldn't get in a longer war and deep state wanted, that." Then they shut it down. There it is, Ron Paul, zero chance Asad behind chemical weapon's attack in Syria, likely a false flag. I played that clip, I play Cy Hurst and I played a sitting congressman saying the same thing, and because it had consensus and because they showed the UN report, and then we showed the rebels admitting they did it, because it was so credible, they put out a multimillion dollar contract to delist me. And then guess what? Congress is investigating it and so is the White House for antitrust, that case.

And you notice now, that contract's been canceled and google came out a week later and said, "We did that on accident, we're canceling that contract." And then they started relisting us. Well, does Google think I'm dumb? When you've got your little knighted social justice warriors that are given these little chevrons? They actually give them little shield symbols and their email that they're super mods and then they can go ban our videos. (laughs) I can't wait to depose them. I can't wait to get their ISPs and drag them into court. You unamerican trash.

You want to shut us up because we are credible. You want to shut us up because you know we're pulling back the curtain. Look right here, Trump ends covert CIA program to arm anti Asad rebels in Syria, a move sought by Moscow, the Washington Post. Our pentagon five years ago on record, went to Obama and said, "We're not going to be part of being their air force." And said no, and then worked with the Russians to clear out the bad rebels and now Asad's preparing to have elections and leave.

And because our patriot military didn't go along with the deep state, we stopped a wider war. Now YouTube calls them YouTube heroes where you gain points going around shutting down free speech and you get directives, Google owns YouTube, they hire an outside group that then goes and then gives the orders to the mods so that Google can claim they weren't behind it. It's like hiring somebody to rob your neighbor's house or I guess kill your wife or something.

So, so, but you didn't do it yourself, you see. And they admit all this like we're idiots. Don't you know people, even though these are encoded emails are giving us the information? Showtips@infowars.com, whistleblowers@infowars.com, if you're working as part of these groups to do this, send us the data. This is how we're going to defeat deep state.



(laughs) Joining us is Jon Rappoport at nomorefakenews.com, he had that name 15 years ago for his website. He worked for some of the biggest TV and, uh, networks and news gathering and news papers as investigative journalist until he got de- disgusted with it over 20 years ago, he's a film maker, author, artist, you name it, nomorefakenews.com, and he joins us to break this down. What do you call this moment we've reached? Because they're coming for us, but every time they do, it causes a Streisand effect.

Jon Rappoport:    01:39:17    Yeah, that's exactly what it is. And because more and more people are waking up, and coming to the defense. You know, seeing what's really happening. They're fading. They keep trying and trying and trying but you know, these poles that show that six percent of the people are really interested or concerned about this whole Russia collusion insanity story that's being promoted and so on, all this give them a clue. They're operating in this gigantic echo chamber and hoping to convince people that because they all tell the same lies to each other, that other people are interested. Well it turns out that most of the people don't care.

Alex Jones:    01:39:59    I have a name for that. It's called a circle jerk.

Jon Rappoport:    01:40:01    Yeah. They don't give a crap about any of this. (laughs) You know? And so this gets exposed time and time again and the liars keep on lying. They can't turn back now. You know, it's like when you're, you've already jumped off the cliff and now you say, "Gee I wish I hadn't jumped off the cliff. I don't think that was such a great idea. Is there any way I can turn around in space and walk back up to it?" No, you're already falling. So what are you going to do on the way down? You're just going to keep screaming the same lies over and over and over again until you hit bottom.

Alex Jones:    01:40:34    So it's like Wiley Coyote when he runs out on the edge of a cliff and realizes he's already run too far and a second later-

Jon Rappoport:    01:40:40    Right.

Alex Jones:    01:40:40    He drops. They've already kind of hit that point, but what do they have to lose?

Jon Rappoport:    01:40:43    (laughs) Your guys are really quick here. They're putting it up and the screen already. Yeah. There is he is off the, uh, too late. Couldn't do it. Couldn't come back. Hovered in midair for a second.



| Alex Jones: | 01:40:57 | You said three or four years ago with Piers Morgan that it was a crack in the façade, it pulled back, people got deprogrammed for a moment, Trump's like a 10,000 times better than that moment, they are so panicked, don't they get that even if they destroy him, Toto already pulled the curtain back? |
|---|---|---|
| Jon Rappoport: | 01:41:11 | Yeah, they don't, they're hoping that's not true, but it is, you see, because as I keep saying, time and time again, it's, don't just think it's Trump. You know, it's everybody. It's everybody who wants freedom and demands it, freedom from surveillance, censorship, oppressive laws, child protective services, medical cartel, mandates that you have to get vaccinated with poisons. I mean, you can just stretch out the whole nine yards. It's everybody who's sick and tired of the government intruding on their lives and causing them pain, suffering and death saying, "We've had enough. Now we want something positive." Those people, all of us, we're not going anywhere. Where is there to go? |
| Alex Jones: | 01:41:58 | And there's nothing the globalist can do to convince us to go back with them. It's over. |
| Jon Rappoport: | 01:42:03 | Yeah. There's no way that you know, they can say, "Well come back on our side because we didn't really mean that or you know, we're not as bad as you think." No, they're worse than we think and we know that. I mean, we've had them in our sights for a long time. |
| Alex Jones: | 01:42:17 | How many top Catholics and university heads are caught running giant child rape operations? |
| Jon Rappoport: | 01:42:23 | Yeah, how many do we need before we understand the whole picture there? |
| Alex Jones: | 01:42:26 | These are literal devil worshiping pedophiles, folks. That's why they're into GMO and fluoride and poison and cancer and evil, because they literally are demon possessed. And I'm, I'm not kidding. I mean, it, when you come down to it, these are, these are just evil people. We'll be back.

Ladies and gentleman, we are back live, I'm your host Alex Jones, Jon Rappoport's our guest, he's got a bunch of issues he wants to get into. You know, Bill Clinton invited Russia to interfere on a US presidential election publicly. (laughs) Tell them to have the EU, the Saudi's, the pope, uh, all these foreign companies saying, "Don't elect Trump." I mean, it's just crazy that they keep pushing, pushing all of this, but just minutes ago, |



OJ Simpson walked out of his parole hearing, it's over, uh, and the word is they're probably going to go in, deliberate and then decide to release him after nine years in prison for stealing back some of his me- memorabilia in a, in a robbery, and I, I'm not an OJ Simpson fan, I, I'm just telling you folks that he spends nine years, Dennis Hastart rapes little boys, procures them for the republican party and others, they cover it up and he gets 13 months in federal prison and then is suing one of the people that he admittedly raped.

He carried the kids across state lines, reportedly. Uh, but he wants his money back. So again, what's wrong with this world? It's not that Simpson's black that he's been persecuted, uh, compared to Hastert, it's that he's not an elitist. You better believe if Simpson's crime was rapping little kids, he probably never even would have been in prison.

Instead, his crime is being an average citizen pretty much, uh, and not being involved in an elite type of criminal operation. What do you make of all this, Jon Rappoport of No More Fake News?

| | | |
|---|---|---|
| Jon Rappoport: | 01:44:19 | Well I think there's ... oh God, where do we start here? I mean, it's basically about Hastart and all the other pedophiles. They protect each other. They're in positions of power. They are the ones who can take a priest from here, uh, let's move him to Tasmania or you know, the arctic so that he's never prosecuted. Let's collude with politicians, fellow politicians who are also involved in the pedophile networks so that the case never goes to court or some small time bit player gets sent to jail but none of the elites ever get to jail. |
| Alex Jones: | 01:44:56 | So it's a big club and we ain't in it- |
| Jon Rappoport: | 01:44:57 | Exactly. |
| Alex Jones: | 01:44:57 | Why historically in every ancient culture is there a cult that takes over, whether it's African, meso-america, Europe, Asia, in certain periods, cults take over, build temples, and then rape and kill children. You know, in the bible they talk about different tribes taking virgins and killing them. Well virgins just means children. Why does this keep, uh, through sociology, anthropology, psychology, archeology, why does it keep raising it's ugly head? What's at the bottom of the rabbit hole? |
| Jon Rappoport: | 01:45:28 | You know, you said these people are evil. I don't think you really have to go much further than that. I mean, you can analyze why |

and so on and you can give lots of reasons, that's easy to do. But evil people turn out to be evil. That's what they are.

Alex Jones:         01:45:46         And the more they get away with, the more they do.

Jon Rappoport:      01:45:48         Yeah, of course. And then it piles up. In other words, whatever thrill they get out of being evil, it's not enough so they have to go further. And they have to keep on going. This amount of control and destruction is not enough. We have to expand it. And that's where they actually commit suicide. Because it gets to a point where the people are fed up and have had enough because they see what's actually going on and we're at that cross road when we talk about what the globalists are doing.

Alex Jones:         01:46:18         I agree, because you said they're in their own echo chamber, they even admit that now. Everyone's even turning ... I mean it was like 20 something percent a few months ago thought Russia was important, now it's six percent in their own Gallup poles, everyone I know knows it's a total joke and, and, and so what comes next? They're in their echo chamber, they're getting more extreme, they're going to try to remove Trump, what's going to happen?

Jon Rappoport:      01:46:39         Well they're just going to continue to beat the drum any possible way they can. I'm sure that they're going to get some more psychiatrists to try to come forward and say that he's mental ill and he's incompetent to serve, uh, the reason that they're not filing impeachment proceedings is because they know they don't have a chance. So they're looking around desperately to try to find something and all they can do right now is to keep on screaming about the Russia story because they don't really have anything else. And when it's reported that fewer people are coming across the southern border, for example, and certain you know, progress is being made along that front, because with open borders, you just can't vet who's coming into the country, uh, then there's a whole lot of people that are very, uh, ha- happy about that. So that makes it even worse for them. They don't know what to do.

Alex Jones:         01:47:34         That's right, because, because, eh, they can't kill the economy quick enough to blame Trump, plus they now know they're getting the blame anyways for trying it, but they can't help themselves, like you said, they're Wiley Coyote ran over the edge. When we come back though, Muller has said, "Okay, I can't find any Russia stuff." He's going to look at every Trump associate, every campaign person's finances, total drag net, total fishing expedition, what does Trump do at this point with this rogue element, what do we do?



All right, we got well over two million subscribers on just one of our YouTube channels that a fan made five, six years ago, Dave Thomas, not of Wendy's, his name's really Dave Thomas. Great guy, he, he works for us now. From Oregon where he's a chicken farmer with his family. Who's your daddy. Does he live in a free country like me? It always, during the break, I was talking to the crew, they're like, uh, we're, uh, they're glad I'm really considering having to sue Google and YouTube and other people that put in false copyright claims because this isn't Russia during the old Soviet Union, this isn't communist china, we have free speech in this country. And I'm sick of people with false copyright claims they never back up once I file, once I file a challenge to it, they never put up or shut up and file suit on me.

And then now they claim that I'm harassing Sandy Hook families because the media said I am and the media said I said go harass their families. And then they take down our videos where I actually clarify going back three, four years ago that I simple questioned because our media lied about dead babies in incubators and said they got their brains bashed out and so my listeners didn't buy the official story, so we looked at it and I said, "I don't know the truth." I'm not ready to say kids didn't die and point my finger at parents and say they're liars.

Is there a blue screen when Anderson Cooper's face disappearing? Are there kids going in circles in the video shots? Did they hold back the helicopters? Did they have porta pottys there in an hour and a half? Did they run it like a big PR operation? Do they get all these conflicting stories in the media? Absolutely. And we have a right to question it. If, if they said there were new babies thrown out of incubators in some country and we questioned it because they've lied before and it turned out that they did actually kill babies somewhere, would I then hate the families that lost their babies? No. I'm questioning known liars in the media.

But in the 1990 event where they said hundreds of babies had their brains bashed out and their skulls kicked in, there were no babies. There were no incubators. It was a red shirt to bring us into a war and now over a million Iraqis have died of starvation, a half million under the Clinton's intensified sanctions that were children.

But see, we don't humanize those Iraqi children and we overthrew a secular government that had swimming pools and movie theaters and Play Boy sold in the stores. I'm not saying that's a great thing or a good thing or a bad thing, the point was it was becoming westernized. The globalists don't want that.



They destroyed it. And they put radical Islamist in charge. But see, I'm not supposed to sit here and have a big thought like that. I looked at the five videos that they have said are evil and bad, and put a strike on us to shut the channel down, zero hedge discovered anomaly in Alex Jones hit piece. That's what they're saying we're not allowed to question. So let's play the censored report with Owen Shroyer analyzing other people's reports and playing the anomaly and asking the question and quite frankly, the father sees, he needs to clarify, NBC needs to clarify because the coroner said none of the parents were allowed to touch the kids or see the kids and maybe they meaning at the school, I'm sure later maybe the parents saw their children. The point is, is that because the media lies so much, you can't blame the public asking questions and you can't ban free speech of people that are asking questions and for us to simply look at the Megyn Kelly public even where someone sat down and was interviewed and to politely discuss it. If you ban that, you ban free speech in total. Very, very dangerous. Here it is.

| | | |
|---|---|---|
| Owen Shroyer: | 01:52:01 | So folks now, here's another story. You know, I don't even know if Alex knows about this to be honest with you. Alex, if you're listening and you want to, uh, or if you just want to know what's going on, Zero Hedge has just published a story Megyn Kelly fails to fact check Sandy Hook, Sandy Hook father's contradictory claim in Alex Jones' hit piece. |

Now again, this, this broke, I think it broke today. I don't know what time, but featured in Megyn Kelly's expose, Neil Heslin, a father of one of the victims, during the interview described what happened the day of the shooting and basically what he said, the statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim.

Now, according to a timeline of events and a coroner's testimony, that is not possible. And so, one must look at Megyn Kelly and say, "Megyn, I think it's time for you to explain this contradiction in the narrative because this is only going to fuel the conspiracy theory that you're trying to put out, in fact." So, and here's the thing, too.

You would remember ... let me see how long these clips are. You would remember if you held your dead kid in, in your hands with a bullet hole. That's not something that you would just misspeak on. So let's role the clip first, Neil Heslin telling Megyn Kelly of his experience with his, with, uh, with his kid.

| | | |
|---|---|---|
| Megyn Kelly: | 01:53:52 | At Sandy Hook elementary school, one of the darkest chapters in American history, was a hoax. |
| Neil Heslin: | 01:54:00 | I lost my son. I buried my son. I held my son with a bullet hole through his head. |
| Megyn Kelly: | 01:54:07 | Neil Heslin's son, Jesse, just six years old, was murdered, along with 19 of his classmates and six adults on December 14, 2012 in Newton, Connecticut. |
| Neil Heslin: | 01:54:19 | I dropped him off at 9:04 that's when we dropped him off at school with his book bag. Um, hours later, I was picking him up in a body bag. |
| Owen Shroyer: | 01:54:33 | Okay, so making a pretty extreme cl- claim that would be a very thing vivid in your memory, holding his dead child. Now here is an account from the coroner that does not collaborate with that narrative. |
| Speaker 20: | 01:54:49 | Uh, we did not bring the bodies and the families into contact. We took, uh, pictures of them, um, uh, of their facial features. You have, uh, uh, it's easier on the families when you do that. Uh, there is, uh, a time and a place for up close and personal in the grieving process, but to accomplish this, uh, we felt it would be best, uh, to do it this way and, uh, you can sort of, uh, you can control situation, uh, depending on your photographer and I have very good photographers. Uh, but, uh- |
| Speaker 21: | 01:55:28 | It's gotta be hard not to have been able to actually see her. |
| Speaker 22: | 01:55:34 | Well, at first I thought that and I had questioned maybe wanting to see her. |
| Owen Shroyer: | 01:55:44 | Okay. So just another question that people are now going to be asking about Sandy Hook. The conspiracy theorist on the internet out there that have a lot of questions that are yet to get answered, I mean, you can say whatever you want about the event, that's just a fact. So, there's another one. Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. (laughs) So now they're fueling the conspiracy theory claims. Unbelievable. We'll be right back with more. |
| Alex Jones: | 01:56:10 | All right, now that's the full clip that's been censored on YouTube that's hateful and evil they say and that we're harassing people with. It's national television. It's a piece attacking me. Okay? That's a clip from a national piece televised everywhere, misrepresented what I said about Sandy Hook. I'm |



not allowed to respond to a report about me that isn't even accurate and then you've got CNN and MSNBC both with different groups of parents and the coroner saying we weren't allowed to see our kids basically ever, what they sound like they're saying, but we see a father, a grieving father saying that he dropped him off with a book bag, got him back in a body bag.

And, and, and, you know, regardless, Bloomberg said they don't let a good crisis go to waste. So did the White House Chief of Staff Robert Manuel at the time. And, and bottom line there was massive PR around this. This was used to blame the American people to say gun owners were at blame for this and to, and that we had killed these children. So that's why America rejected it and said it was fake because in total, saying gun owners are responsible for what somebody on Prozac does is, is, is not true. If I kill somebody with a car on purpose, it's not your fault because you own a car that I did something wrong with a car. Like, if I stabbed my neighbor with a butcher knife, or you do, then we're not guilty for, for what another person does. So we're sick of this.

Do mass shootings happen? Absolutely. Can I prove that New Haven didn't happen? No. So I've said for years, we've had debates about it, that I don't know, but you can't blame people for asking. But now, in a national Megyn Kelly NBC headpiece that another publication, very respected, Zero Hedge, comes out and breaks, I'm not even allowed to report on a report about me from NBC and Zero Hedge with my other reporter who didn't harass anybody. That was a month ago. He said, "I wouldn't hold my breath looking for a response." We've not seen a clarification. I'm the one that called him up after I saw the show that night and I said, "You know Owen?" And we're going to go back to our guest, could be that, you know, we need to get clarification on what went on, and I couldn't ever find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this, but maybe they did.

So, I, I'm sure it's all real. But for some reason, they don't want you to see those clips together.

Nomorefakenews.com, he hosted an hour a week, going to be hosting a lot more soon, I gotta get it set up with him, uh, but, uh, he's here with us, of course it's Jon Rappoport, Jon what do you make of this?

Jon Rappoport:    01:58:54    (laughs) Just, report on the report on the report on the report is suddenly you know, licenses to take away access. You can't do that. Absolutely not. Absolutely inappropriate. Inappropriate,

right? Because there is an unanswered question. So where does that leave us? Well, let's say that somebody decides to publish on YouTube a whole list of the ingredients in vaccines. You know, here it is from the CDC. And I have a question because if you'll notice, there's aluminum, aluminum, aluminum, aluminum, aluminum, and now here is a statement from official organization, medical organizations about how neurotoxic aluminum is that's being injected this way and I'm asking questions about this. Well, that ... let's throw that away, too. That's no good. We can't have a video like that. We can't have that either. I mean, as you say, if they're going to th- if they're going to throw out that-

PART 4 OF 6 ENDS [02:00:04]

| Jon Rappoport: | 02:00:00 | That either. I mean, as you say. If they're going to throw, if they're going to throw out that video by Shroyer, then everything is up for grabs. You can't say anything that wouldn't be censored if somebody wants to censor it. |
|---|---|---|
| Alex Jones: | 02:00:14 | Well, I'm not supposed to ask you because of this intimidation. What do you think about Sandy Hook? I mean, I said it has more holes in it- |
| Jon Rappoport: | 02:00:14 | Yeah. Right. |
| Alex Jones: | 02:00:19 | Than ... I said it has more holes than Swiss cheese. I'm not personally attacking anybody. Just like, as I said, if a new baby incubator story came out, I would question it. It may come out that the new attack on babies is real. But am I bad? Am I attacking individual parents because I question the media that runs hoaxes? |
| Jon Rappoport: | 02:00:38 | And here's the other thing because they have to find their hook to come after you. You know? You've covered what? In all the years you've, you've been in in it for what it is? I don't know. 15,000, 20,000 stories. Okay. So let's find one that we can twist. Make it incredibly controversial. And make it sound like he's some sort of an inhuman monster. And now let's push that on national television. And say, "You see folks. You see what we're dealing with here. With the so called independent media." I mean, that's the other aspect of this. Which is completely insane. You know?<br><br>If there was anybody rational at any of these networks, they would sit down with you and they would say, "Well, apparently you're a very controversial figure. And also apparently you have |



|  |  | untold millions. I mean, it just keeps getting bigger of listeners. So what is it that you stand for? Why are you so popular? What are you saying?" And, you know, a long forum interview. And then they would bring in and say, "Well, here's a story you covered. And this is what you said." |
|---|---|---|
| Alex Jones: | 02:01:50 | Listen I told them I thought the kids probably did die and that we were simply questioning because the babies in the incubators, they wouldn't put it. They won't let me even say that- |
| Jon Rappoport: | 02:01:50 | That's right. |
| Alex Jones: | 02:01:59 | That, that, that they've twisted it and I, because they want to take off what I really said. And then say false things about me so I can't respond. |
| Jon Rappoport: | 02:02:06 | Exactly. So if you say, "Well, let's compare the Sandy Hook thing to the incubator baby thing." They're not even going to put that on television. They don't want to hear that. They don't want to say, "Well, gee. He does have an analogy. No. No. We don't want to even consider that because people are going to realize hey. Well. Yeah. That was a totally fake story about how the, the war in Iraq was, uh, promoted and launched. So he has a right to question what happened at Sandy Hook or what happened anywhere about anything." I mean, come on. What's, what's the story here? You ask a question. You ask a number of questions. And all of a sudden you're censored for that.

These people want you to get down on your hands and knees and pray to ABC, NBC, CBS, CNN. Etc. Etc. That's what they want. Just like Chris Como says on CNN, in what has to be for me one of the most insane things ever uttered by anybody. "You the public don't have a right to look at these leaked emails. Only we the media can. And then we tell you what to think and then you accept it." |
| Alex Jones: | 02:03:18 | (laughs). He actually said it just like that. |
| Jon Rappoport: | 02:03:20 | Right. And people, you know? The, people all over the world. Like if I was walking through an airport where they have these contracts from CNN and I heard that, I'd say, "Forget about my flight. I'm dropping my bags. I got to watch this idiot. This is unbelievable." Right? You know? Where does this guy come from? |



| Alex Jones: | 02:03:37 | He goes further. He goes, "You're not allowed to. It's illegal. No. No. We're allowed to and then you get it from us." I mean, he actually the most, when I saw that clip first the day it happened, I thought it was a joke. And we went back and found the full context. |
| --- | --- | --- |
| Jon Rappoport: | 02:03:50 | (laughs). |
| Alex Jones: | 02:03:50 | I mean he really talked to them like they're three year olds. |
| Jon Rappoport: | 02:03:53 | Yeah. He really means that. You say well, this is a guy that, you know? Megan. Hello. Interview Chris Como. Okay? Find out what makes this incredible moron tick. You know? I mean, where did you come up with this idea? We the media will tell you what it means. Otherwise you have no access to it. I mean, where did, where was he hatched? How did he come in to being as some sort of reporter? I mean, do they just, I know his name is Como so he's from the political family. Right? But I mean, they just grab them off the street and say, "You're our anchor." When you say something like that? I mean, there we see what the media is actually thinking about themselves. |
| Alex Jones: | 02:04:40 | Exactly. I want to go to some phone calls. I'm going to skip this break so we have some more time with John Rappaport. But just briefly, Pooty Pie has like 15 plus billion views on one channel. And a couple billion on another. And other channels. I mean, it, it's, it's 18 billion views. And it's bigger than all comedy channels, entertainment stuff together. And he never was political. I'd only seen some of it. But they hate the fact that his main demographic is about 18 and younger. But I've seen his stuff. It's pretty funny. Even when he makes fun of me. |
| | | Uh. Regardless in the, in the, in the, in the marketplace of ideas, he's winning. They begin to call him racist, Hitler, say shut him down. Because the big executives are jealous. The Zucker's of the world. That he has something they don't have. He has the real star appeal. They've all failed. Nothing they force feed works. So I've talked to a lot of these folks. Not Pooty Pie. But others. All these big channels. Including a lot of big kind of main line, uh, liberal channels that are independent. They're getting targeted and shut down. And it's a bullying. And then YouTube comes along behind the scenes and says, "Work with us. Start doing a few things we want. We'll fully monetize you and help you." So it's muscling. Stop saying that Pootie Pie and others. |
| | | They're scared of you because they saw you putting down our stuff at Watson's. They know you could turn around and somebody like you could be a thousand times more successful |

than even myself or Donald Trump. They don't know who the Pootie Pie is that's just kind of doing their own thing. Whose, who then clicks because there's this algo rhythm awakening. So Pootie Pie needs to know they're always going to envy you and try to shut you down. The answer is really take your destiny in your hands. Don't just be super popular and have all the super hot girlfriends. And make 30 million dollars a year. Or whatever. Really change the destiny of the world. And, and, and if it's not going to be Pootie Pie, it's going to be somebody else. Because I turned down 10 million dollars a year. 16, 17 years ago. Sounds like a lot of money. It's nothing. Money means nothing once you get self sufficient.

They use it to control you. To always feel like you're going to arrive someday if you were just with them. Now it's not saying money is bad to have. It's just that it is not your God. They try to keep money limited. Resources limited so they can be the gatekeeper between that. Right now though OJ's verdict is coming in. Dennis Hastert goes free after 13 months. We'll see if, uh, OJ does for, uh, robbery. Uh. Already serving nine years. Let's go to that feed live.

| | | |
|---|---|---|
| Speaker 23: | 02:07:10 | And I concur with Commissioner Corda. And grant parole. And in addition, our decision, although difficult, is fair and just. |
| Speaker 24: | 02:07:22 | I concur with the Commissioner, uh, Corda and agree to grant parole. |
| Speaker 23: | 02:07:29 | Um. Mister Simpson. Before I cast my vote. Um. I want to let you know that we believe that we're a fair board. We believe that we're a consistent board. Um. I will let you know that that consistency also goes to parole. And, um, we do not look kindly upon parole violations. Um. And if I cast my vote to grant and it, and it concludes the hearing, uh, our expectation would be that you not violate even the simplest condition of parole. Having said that, um, I am prepared to cast the vote. I am prepared to ask the commissioners to set conditions. Um. If, if that happens, um, we will produce an order sometime in the next 15 to 20 minutes that will be faxed to you or presented to you at the institution. And it will become a public record. So based on all of that, um, Mister Simpson I do vote to grant parole when eligible. And that will conclude this hearing. |
| OJ Simpson: | 02:08:37 | Thank you. |
| Alex Jones: | 02:08:37 | You know? Simpson looked arrogant and somewhat corrupt before. But after nine years in prison, he looks very genuine. Very contrite. And he looks very, like he has a lot of, I never |



studied his genetic background. But I think he has a lot of native american in him or something. Because he looks, uh, a lot of native american now that he's lost a lot of weight. Uh. But, uh, but there you go. Nine years in prison for robbing back some of his own memorabilia. I'm not defending what he did. But there was a dispute. Um. And then I've never done it myself. But sometimes in business you get a little bit mad. People screw you over. And I'm not saying that's what happened there. The wife thing. All that. Both sides. They tried to set him up. He probably did it. It's just a mess.

Crime of passion. Yeah. I mean, basically cut their heads off. Or I mean he was found civilly guilty. The point is it's hard to hate him when these globalists are committing all these crimes. John McCain's funding Al Qaeda and ISIS. They're murdering Christians by the hundreds of thousands. And then all these pedophiles are going free. Um. We haven't scripted this. We're live. We're going to go to your phone calls. Shawn, Josh, Andrew, Dustin, and others. But what is your view John Rappaport?

| | | |
|---|---|---|
| Jon Rappoport: | 02:09:45 | You know I just thought what would happen if he put up a YouTube video with Hastert being released. Next to OJ. See maybe that would be censored too. Oh. Oh. Oh. Oh. We don't want any comparisons of this. No. No. Just side by side. The last two minutes of this from Simpson. And Hastert pedophile, he gets off. Let's present that. Let's show, you know? What do you think of this folks? You think this sounds fair? Does this sound equitable? Does this sound like the justice system is actually working? When this guy serves nine years and this guy serves, what? 13 months? Really. Unbelievable. |
| Alex Jones: | 02:10:27 | Well, I know if you look at Simpson, you can't fake that. He looked real humanity, really upset. Really wanting to get out. I mean, you, you can't hide that. That was real. And then you look at somebody like, like, uh, you know? Mister blue eyes over there. At, at the republican party. Paul Ryan. He just radiates I'm a psychopath. |
| Jon Rappoport: | 02:10:44 | (laughs). Yeah. |
| Alex Jones: | 02:10:47 | We're going to go to break here in a moment and take a few calls. John Rappaport. No more fake news dot com. Before we go any further, ladies and gentlemen, we need your financial support. They're trying to shut us down. I want to expand. Not just stay the same size. Because we're going to expand or be destroyed. It, it, there is no staying the same size. We need you to go to infowarstore.com. Where we have amazing [inaudible |



02:11:04]. Free shipping for another 10 days or so. And a bunch of the stuff. Like super male, which is this great concentrated herbs. The X2. The amazing good, uh, halogen. Uh the deep Earth clean iodine. Not the garbage iodine that you get in the store. You know? Probably eat holes in your belly. Infowarslive.com has it all but it a lot of the specials got to end today. Just like brain force had to end a few days ago because it's about to sell out.

I'll have some new specials tomorrow. But these are our best sellers. They're still no sale right now infowarslive.com. Or triple 8-2-5-3-3-1-3-9. But that's how we fund ourselves. Over 75 percent of the funding is you buying products. CNN is fake news. On the back, infowars is real news. Great shirt to meet like minded people, to spread the word, to stand up for free speech. Caveman is back in stock. [inaudible 02:11:52]. Knock out the fungus and stuff in your gut. [inaudible 02:11:55] the probiotic. It's back. Now we've got our new super high quality whey. That I haven't even had time to get into yet today. It's our new product launch today. Haven't even launched it because so much is happening.

So we'll take your phone calls coming up. I appreciate you holding. We don't get to everybody, I'm going to send everybody a keg of this, uh, new premium whey protein. It's from one of the biggest high quality manufacturers. Hormone free, grass fed, uh, cows would produce the milk. True whey, uh, protein. Super high quality. Infowarslive.com. Or triple 8-2-5-3-3-1-3-9. No reviews yet because it just came out today. But we have tens of thousands of reviews by third party site power reviews and others. On average four point eight stars. No one else that we've seen has it. Infowarslive.com. Infowardsstore.com is the umbrella site.

But even if you can't buy the product from us to help support the broadcast, just spread the link. Spread the articles. Spread the videos because we are fighting everyday to simply stay here and keep putting the truth out. And we'll change the world because of your support. Hour number four. With your calls. Anthony Cumia. The conclusion of no more fake news dot com with John Rappaport. Stay with us.

Alright look. I hogged the airtime. I gave the number out 30 minutes ago. I haven't gone to your calls. I apologize. It's Rappoport is our guest. Let's talk to Shawn in New York then Josh in other. Shawn, you're on the air. Shawn? We're going to let you go. Let's go to Josh in Colorado. Josh, you're on the air.



| Bob Barr: | 02:13:28 | Hey guys. Uh. Long time listener. Um. I just wanted to talk to you about future technology. Um. I'm an independent researcher. I led an energy movement. And I, I'm seeing something that's coming. Um. There's a break away civilization. And they have revolutionary energy technologies. They're going to build three printed robots. They're engineering robots into bio mechanical with dogs. I had to leave the movement because of the weird stuff I was starting to hear. There is something really strange going on in this world. And- |
|---|---|---|
| Alex Jones: | 02:14:02 | Yeah. I know. They got computers that predict the future. I mean they've got computers that predict the future. Then you can control the future. They've had [inaudible 02:14:09] for 30 plus years they admit. And, and now they're admitting it all but, but not showing it so that's the big question. Have we already reached the Atlantean moment? Whatever they've discovered they're on such power trips. They act like we just don't even exist anymore. Then there's Trump in the middle of it trying to rally billions of people against it. Uh.<br><br>Rappaport what do you think is going on? |
| Jon Rappoport: | 02:14:32 | They have tremendously advanced artificial intelligence in terms of systems. Because that's what they're trying to do to the planet. Here we've got these systems and we're going to impose them on you. You are the little units that we put in to the slots of our systems. So naturally when you have that viewpoint and that's what you want to make the world into. One gigantic machine. Then you're going to use artificial intelligence and robots and androids and everything automatic that you can get your hands on. |
| Alex Jones: | 02:15:04 | And I said they're using the artificial replacement of us to make us obsolete as a way to dictate the terms of our surrender to the technocracy. This has been designed to make us obsolete. To dictate what's left of the middle class. Accepting the extermination and phase out of the general public. And that's the admitted plan. Josh? |
| Bob Barr: | 02:15:24 | Well, it's, it's being shown in Hollywood if you have the eyes to see what the new energy technologies are going to be. And how actual natural energy works. They, uh, they've actually really engineered it. They don't want anybody that's done it independently to be funded. They're funding their own people to come up through this system. And they're going to put the information out that the, the way they want it to- |



| | | |
|---|---|---|
| Alex Jones: | 02:15:47 | Sure. I mean, that's what they do. They always have quote, you know, the billionaire guy. The Bill Gates. The whatever. The Zuckerberg. That pops up. That's been partially declassified as the free market front so people don't even understand what's happening. It's all Trojan horsed. |
| Bob Barr: | 02:16:00 | They can actually synthetically create most elements nowadays with nano technology and nano super [crosstalk 02:16:07]. |
| Alex Jones: | 02:16:07 | Well, when I was a kid, in, in, in third grade they talked about those big machines they've got that create the new elements. I mean, alchemy is now real. You want to comment on that Rappaport? |
| Jon Rappoport: | 02:16:16 | Yeah. You can go all they way back to IG carbon. The infamous Nazi cartel of the 1930's. That was their whole program. To be able to synthesize, you know? They were talking about oil and rubber and so forth. But basically these guys that they had over there wanted to synthesize anything from anything else. That was their plan. That was their program. That's the whole idea is the synthesize existence basically. |
| Alex Jones: | 02:16:43 | We're seen as like an infestation of weavles or something that's eating their resources. But then they've trained us to be like the weavles. So that, so that we follow that form. And I'm just like, whoa. This is uncool. |
| Jon Rappoport: | 02:16:54 | Yeah. Who wants that? We want individuals who are free, strong, alert, creative, independent. |
| Alex Jones: | 02:17:01 | Hey Josh. Give us your name and number. If you want to give us documentation because I want to start talking to more deep tech people not just deep state. Because deep tech is the bottom of deep state. So if you want to give us your info I'd like to see documentation and have you on. I mean, hell. They tried to hire my dad to build cyborg's in the 80's. It wasn't even that special. They were trying to hire all the top oral surgeons that were doing implants at the time because that was new. Uh. Am-, amazing John Rappaport. Thank you so much my friend. We'll talk to you soon. |
| Jon Rappoport: | 02:17:26 | Thank you Alex. |
| Alex Jones: | 02:17:27 | Powerful always to have him on bantering back and forth. I'm going to introduce Anthony Cumia. Of the Anthony Cumia show on Twittercompoundmedia.com. You know? He had big popular [inaudible 02:17:43] syndicated radio. And got kicked off that. |

And then of course he, uh, hosted the Opie and Anthony show and he criticized Black Lives Matter. Killing cops literally. And he was fired off of that. So now he's got his own compound media with a lot of other hosts that's very, very popular and successful but the reason I raise that is YouTube, for us showing Megan Kelly interviewing one of the fathers of a Sandy Hook victim saying he held his son after he was shot. Then we show CNN and MSNBC saying the coroners didn't let people get to their kids. And we said, "That's why people question."

We're not even questioning that kids died. That's been questioned. Our listeners question it. We're simply saying this is why people question it. Showing a zero edge story. That's been removed. And they said they're looking at banning us on YouTube. That story is up on infowars.com. If they do that to us, they can do it to anybody. So we've got to stand up against this. And we've got to understand they're doing this because we're destroying them because of their own lies.

Six percent of Americans in a big gallop poll think Russia's a big story but this globalist that took radical Islam off of the FBI's list when they're investigating a mosque or Al Qaeda or ISIS. They can't even say they're investigating an Islamic group. Mueller who covered for the Clintons. All of it. Bush. All of it. Saudi role 9-11. All of it. He now has expanded it to all of Trump's associates. All his businesses. All of his buildings to see quote if they rent any condos or sold stuff to Russians. Or campaign money. Or just money laundering period. Which they could call bouncing a check.

So it's gone from witch hunt to the greatest fishing expedition that history has ever seen. And our pentagon five years ago came to Obama when we first broke this. They said we're not going to be Al Qaeda's air force. This is ISIS. And Trump comes in and he's like we're going to defeat ISIS, which he said he'd do in 2016. Now six months in, it's basically in two cities. 95 percent defeated. Trump ends covert CIA program that was Obama and McCain funding these cribs to arm anti Assad rebels in Syria. A move sought by Moscow. And of course they said that at the G20 event two days of dinners and lunches, that G20 sat Melania next to Putin. And then Trump came over and talked to him in front of world leaders with a Japanese, uh, interpreter that could speak Russian and English. And asked a few questions. And, and, you know? Talked to him. And they're calling that a secret Russian meeting.

That's what you do at diplomatic dinners. And so now the new talking point from Howard Stern, heaven love him. Not a bad



guy. Been on his show. Whatever. To CNN and NBC is you don't talk to Russians. If you talk to a Russian, close quote. That's the talking points. All over the news. You're a Russian agent. So this is the, meant to paralyze Trump. Anthony I want you to take over and host this hour. It's why you're here. [inaudible 02:20:54] media dot com. But it's not working. But they don't care. They're just going to continue to move forward to try to impeach the president. And I agree with him.

Sessions, you know, shouldn't have recused himself. And Sessions has been a good guy on many fronts. But I mean where are his juevos? Why aren't we seeing special prosecutors or indictments of the Clintons when they got money from Russia? I mean, I've got an article right here. Bill Clinton, remember back when he called for Russia to interfere in our elections? I, I mean these, everything they say Trump's done, they've done. And I'm sick of putting up with them and almost no one supports him. You know?

It came out that the bots, the computers, the Google algo rhythms knew that Trump was going to win. He was 15 points ahead. Hillary tried to steal it but failed. And now they're saying, "Oh he's only, you know, 55 points of 50. Or 47 points in the polls." You know it's 60, 65. In fact the corporate bots show he's at about 60.

They have put a dent on him with some people. But it doesn't matter. I mean, this is so epic, what do you expect him to do now? And I'm turning it over to you. Go ahead my friend.

| | | |
|---|---|---|
| Owen Shroyer: | 02:21:56 | I'm stunned that anybody still looks at what is main stream media traditional news. Which, uh, by the way is newsertainment. Uh. That anybody believes this is news anymore. What, what has to happen before everybody in this country says, "We are being so bamboozled by mainstream media that I will not accept one thing." If I saw something transpire in front of me that is, uh, classified as news. And then saw an accurate depiction of it on mainstream media, I still wouldn't believe it. We need people to realize at this point that they are feeding you. They are feeding you an agenda driven menu. |
| Alex Jones: | 02:22:41 | Well, they said the sky was blue. I would go out and look at it for myself. |
| Owen Shroyer: | 02:22:45 | I sta-, and if I saw it was blue, I still wouldn't believe it. |

| | | |
|---|---|---|
| Alex Jones: | 02:22:48 | (laughs). |
| Owen Shroyer: | 02:22:49 | They're proving themselves on a daily basis that they are, uh, fake news. |
| Alex Jones: | 02:22:55 | So where do they go now? Because I really want to know your opinion on this. I, I just, where do they go now that's six percent believe their BS? |
| Owen Shroyer: | 02:23:00 | Uh. Uh. I honestly think people need to go to alternative sources for, for their news. And, and are we supposed to believe the polls? Are we supposed to believe the news after they were proven, uh, liars over the course of the entire campaign and election? Now we're supposed to believe that that Trump is 50 percent or under 50 percent? Or 30 percent I hear in certain, uh, circles? And, and we're supposed to go, "Oh. Oh yeah. Sure." |
| | | When, when will we all realize that this is a TV show? All news shows are a TV show. |
| Alex Jones: | 02:23:37 | It's the Truman Show. |
| Owen Shroyer: | 02:23:38 | Just like Game of Thrones. And everything else you enjoy to watch. They're making money. Putting on a program. And that program is driven by what more people will watch. Has nothing to do with fact anymore. Nothing. |
| Alex Jones: | 02:23:51 | I agree. But it's also what the corporations owning that media want because sure. Some of it's for ratings but, and that's come out in the memos. You're right. But it's also about what will get them ratings that the boss's are authorizing? Kind of those two points go together. Because I mean imagine. Uh. True information is super popular. Or people will at least trying to tell the truth. So I think what really handicaps them is they're trying to get ratings with a few things they're allowed to do. |
| Owen Shroyer: | 02:24:16 | Yeah. Well, when you see something like, uh, what? Kate, Katie Couric is saying fake news is ripping apart, uh, America at the seams. She's part of it. How, how, they're trying to- |
| Alex Jones: | 02:24:29 | They had an MSNBC piece a month ago- |
| Owen Shroyer: | 02:24:32 | Take all their personalities because they know- |
| Alex Jones: | 02:24:33 | They had, uh, and I'm leaving because i just can't stop listening to you. But I just got to make this point. A month ago they had |

Brian Williams with a report on fake news on MSNBC. This is the king of fake. It's like having Hitler running a holocaust museum. I'm sorry. Go ahead and take over Anthony.

Owen Shroyer:        02:24:49        (laughs). Absolutely Alex. It's insanity. The hypocrisy. The, the blatant insult to the American people that they do certain things to say look how stupid you are. That you're actually buying this. And we keep pumping out this garbage. And, and you will buy I. Uh. Its insulting. It's, it's blatant, uh, dishonesty to the American people. Yet so many still eat it up. Uh. And, and, and it, like I said, Katie Couric saying that fake news is ripping, uh, America apart at the seams. Katie Couric was the one, uh, doing, uh, a special on guns in this country. That edited, uh, and took a, uh, comment uh from a panelist that was, uh, in the documentary completely out of context. To change. Absolutely change what the person was saying.

That is fake news. And now she's saying that it's ripping America apart? Their only defense is to go out there and try to make the people believe they're the ones that aren't fake news. And people like Alex. And myself. And, uh, Gavin McGinnis and all the other people that are presenting facts to you and allowing you to voice your opinions on them are the fake news. And we're the dangerous ones. We're dangerous to them. I agree with that. We're dangerous to them. But how is it dangerous to inform the American people. Give them the absolute facts and then let them build their own opinions on it. When you watch mainstream media these days, you don't get the news. You get people's, uh, uh, interpretation based on the company that owns that, uh, news organization. Uh. And what their agenda is.

That's what you're getting. And, uh, believe me it is a far cry from the facts when it finally, uh, reaches, uh, the American people. Uh. And I'm talking about everything. Look, I appear on Fox News. Uh. On, uh, various programs over there. But I am not, uh, one of these people that take everything that goes on over there as gospel either. They have their agenda. Just like CNN and MSNBC and all of them. We really need to separate ourselves from mainstream media. And, and look elsewhere for, uh, uh, the facts of a story. It's not easy. It's not easy to find, uh, factual information on a lot of stories.

But look. That's part of it. It's very easy to sit down and watch some of these shows and see these, uh, uh, beautiful, beautiful stunning talking heads. Uh. Blathering on. Uh. Uh. About uh what, what they, uh, are feeding you as news. Uh. But you're not getting the full story. Uh. Donald Trump's presidency has been, uh, the campaign and the presidency has been just an



APPENDIX O

amazing example of, uh, the mainstream media saying, "Well, throw it all out the window. We don't care about cred, credibility anymore. What we care about is our agenda. And putting it across."

So when years ago there was this plausible deniability that there was some type of journalistic integrity. Uh. Now it's completely gone. There is no. I can't imagine anyone with any sense or brains in their head actually believing that it's the news. So what you get. Yes. Absolutely. The greatest witch hunt in American political history. We, uh, listen to people. Um. That have, that have absorbed what mainstream media is feeding them on, uh, Trump, the election, what he's done since he's been elected. His accomplishments. He Russia thing. And people actually believe this speculation and innuendo, and outright lies. They believe it as fact. They go on social media. It spreads it's tentacles. And, uh, it becomes the new truth.

And, and people will argue and debate you based on absolute lies. And you try to, uh, uh, inform them. Uh. Because you've done your research. And, and, uh, they don't want to believe it because they've been infected, infected by mainstream media and the, the crap that they're spreading around as, uh, as real news. Uh. Back in a couple of, uh, seconds. Don't go anywhere. Anthony Cumia for infowars.

Thank you. Hey summer specials ending soon. Super male vitality and survival shield. X2 specials ending today. Quantities are running low. So act now to save 30 percent off each product. Caveman is back at 25 percent off. Secret 12 is back. 25 percent off. DNA force is back at 20 percent off. Get, uh, health support pack micro, micro, uh, uh, ZX and biome defense 50. That's 30 percent off. Living defense. 20 percent off. Pro pure G2.0 traveler is 30 percent off Z shield 30 percent off. [inaudible 02:29:55] select stor able food 30 to 40 percent off. Plus free shipping store wide. Many of these products are going to sell out soon so now is the t-

PART 5 OF 6 ENDS [02:30:04]

| Owen Shroyer: | 02:30:00 | ...store-wide. Many of these products are gonna sell out soon, so now is the time to secure your order at infowarsstore.com. |
| Owen Shroyer: | 02:30:10 | Hello, people. How you doing? Um, man, if, if, if, if you need any proof that, uh, the media will do anything to make Donald Trump look bad, um you're out of your mind. It's, it's all out there. We see it. Uh, this is no longer, um, uh, uh, a fact finding. This is a, like they said, a witch hunt, a fishing expedition, um, |

but something a little more light, something lighter transpired last week when Trump complimented Emanuel, uh, Macron, uh, complimented his wife, the, um, of course, uh, French President, Emanuel Macron. Uh, they were together, over there in uh, in uh, France. And Donald Trump told uh, his wife, uh, told Macron's wife, "Hey, you look good! You're in good shape. Beautiful."

And the media loses its mind. Loses its mind, saying that this was terrible, this was uh, inappropriate, my god, sexist, misogynistic, blah, blah, blah. Um, get this, get this, it's 2017, I believe, right? Yeah, 2017. Complimenting a woman is now just completely off limits. What, does, does it take a lot to really think this through and see how insane this has gotten? And, and, and, and try your hardest to reverse this? I do believe ... now I haven't done much research on this, but I do believe men have been complimenting women for millennia. I honestly believe ... now you could, you could uh, argue why. You could argue, hey is the guy, uh, complimenting the woman uh, because she's uh, beautiful? That he appreciates this? Is he trying uh, does he has some nefarious uh, ideas perhaps? He's trying to uh, go out with her or something?

That's up for debate. But the, the, what isn't up for debate is that for the existence of man and women, men have been complimenting women, I'm sure it happened in a cave somewhere, "Oh dear, you look wonderful. That pelt, that pelt is marvelous on you." Uh, but, but here in 2017 we've reached an insane crescendo of, of political correctness garbage that a world leader can no longer compliment the uh, beauty of another world's, lea- worl- world leader's wife. Uh, so the media lost its mind.

When, when are we all gonna see this? I, look, I'm no amazing visionary here. I, I don't believe I'm seeing things long before, uh, the rest of humanity. So when I see something like this, and see the level of madness that we've reached, uh, not only in this country but in the, in the whole world, uh, I, I, I wonder how many people are also seeing this and what we are gonna do to combat it. Because this is, if this was just one instance, uh, you know, it would be a funny laugh and you'd blow it off and be like, okay. But this is a symptom of a disease that is going on in, in uh, this country and, and the world, of political correctness run amok, fake news, and this, uh, uh, crucifixion of our president, Donald Trump.

Uh, you know when they get to the level of "Donald Trump complimented a woman and that's a problem," that they really



have run out of things to uh, to say about him. Uh, you know, they're still going with the Russia thing, which we'll get into in, in a moment. I love how Trump is handling that. Um, I don't like how he's handling some other things, we'll also uh, get into that. I uh, I enjoy the, the uh, dressing down he's giving Sessions, I like that whole thing. But uh, if you can't compliment a woman in 2017, we're done. We're done as a race of, of, uh, people and humans. Be back in a second, don't go anywhere. Anthony Cumia in for InfoWars.com.

| Owen Shroyer: | 02:34:46 | Welcome back. |

| Owen Shroyer: | 02:34:49 | Bad bad thing. Welcome back, uh, Anthony Cumia, InfoWars.com, uh, I wanna talk about um, Trump blasting Jeff Sessions, Attorney General uh, Jeff Sessions. Uh, Trump said if he knew Jeff Sessions was gonna recuse himself from this Russia investigation, he wouldn't have hired him. And again, ah! They're losing their minds in the media, losing their minds. Uh, isn't it refreshing to have, uh, an honest politician at the helm in the presidency? Isn't it refreshing? Uh, the media would have you believe this is one of the uh, biggest liars that's ever held office, uh, Donald Trump. I see him as one of the most honest people ever to hold the office, because he will say, "Look, this Jeff Sessions, if I knew he wasn't gonna be uh, loyal and uh, he was gonna recuse himself, I never would've hired him." |

And a lot of people would think, "Wow, maybe you should've kept that under wraps, maybe you shouldn't have said that." I love it. I love that uh, he's speaking his mind and telling the American people how he feels about certain things. And you know what? He's right! You hire a guy as your Attorney General who is supposed to look into uh, he's, he's like the head, uh, muckity muck as far as law goes in the, in this country. And now you have an investigation about Russian collusion, and again there has never been any proof that Donald Trump was involved in any collusion uh, with Russia, to um, influence the election in any way.

So why recuse yourself? It's another instance that we have seen, uh, oh my god so many times, of the GOP bowing down uh, to the Left and the media, and the uh, the mob, the pitchfork and torch wielding mob that uh, will never be satisfied. "Oh you recused yourself, and we'll put this guy in. Yeah, we're still not satisfied." Uh, wow, uh, I am convinced Donald Trump could come up with a cure for cancer, and the headline would be, "Donald Trump Puts Millions of Doctors Out of Work." That seems to be, uh, his destiny, is to just be



criticized on every single thing he's done or wants to do uh, in this country.

But yeah, you got an Attorney General that you uh, you give the job to, you want something called loyalty. Now that is a dirty word I guess, in Washington, I don't know why. Um, it, it, if you put a team together, just calling it a team kind of, uh, makes you think that they would be loyal to, to the, the team, um. You put a team together, you want everyone on that team to be loyal. Not to a point where they're going to break the law for you, uh, or cover up any, anything you've done, but was there any proof that Donald Trump was involved in, in any kind of collusion with the Russian government uh, for the election? To, to influence the election? No.

So then why would Jeff Sessions recuse himself if not for one thing, the pressure from people that want to see Donald Trump fail ... fail. They wanna see him arrested, they wanna see him strung up, um, in some cases I guess uh, thrown off a cliff? Is that what Rosie O'Donnell uh, was doing? She was saying that Donald Trump should be thrown off a cliff and apparently there was some type of um, game where uh, Donald Trump gets pushed off of a, a cliff and uh, she was, she was very excited about that. Again, the hypocrisy on the Left is insane.

Um, but you want loyalty. You want uh, your team to back you and back your uh, policies and ideas. But for some reason, uh, the left sees that as some type of Nazi Hitler thing to do. I don't, I don't know. Things have become bad words. Loyalty, nationalism. Nationalism is horrible. This used to be something that was looked at with pride, there was a pride in your nation. Uh, every day ... I remember going to school, you would never dream of not putting your hand on your heart and, and, and pledging your allegiance to the flag. I didn't even know what it meant as a kid, uh, "And to the republic for which it stands." I used to think, for which it stands was one word. It sound like someplace in Russia, for which it stands.

But I didn't know what it meant, like, word for word, but I knew it, uh, it, it, its essence was that uh, we lived in America, it was a great nation, and we were proud of uh, our country. Well, now uh, that's a bad word too. That's a bad word, to be proud of your country, to be proud that you're American, to be proud of your heritage, for certain people is uh, a bad thing. You're not, you're not allowed to be proud of um, of uh, achievements that people of your heritage have made over the years, because that's, yes, very good everyone, racist. It's racist to be uh, proud of things that your ancestors have uh, have achieved.



APPENDIX O

We are only supposed to look at the horribleness, uh, and, and pain that we have dished out over uh, uh, the course of our, our history. Um, other people though have free reign to just uh, talk about their, their pride and their culture. Um, which brings me to something else that uh, I just, just remembered that is absolutely insane.

There is a uh, a movie coming out that looks fantastic, Dunkirk. This is the story uh, in 1940, right about, it's uh, you know, sort of the beginning of World War II, um, British sol- soldiers were trapped on the beach by the Nazis, and um, uh, it was about uh, 400 thousand of them. And they were, their backs to the ocean man. That is the worst position you wanna be in. And uh, and uh ... people from England, from uh, the U.K. came over, on their own personal boats and anything they could carry people in and evacuated all those British uh, soldiers, off of the beach. Just an amazing story, I'm so glad it's being told and done, uh, in this fashion. I love historic movies like this.

Well, there's a problem folks, there's a problem. Uh, the problem is, not enough diversity in the cast! No women, and no people of color. Someone in USA today actually wrote this as a review of the movie, that that was an issue. Again, we've reached this insane point in our, uh, uh, history where an accurate depiction of a historical event is not good enough because it's being portrayed accurately. (Laughs) Is this a hate movie? Is this hate cinema because there aren't enough women or people of color in it?

I gotta tell ya, I wasn't there, but I've uh, done a lot of uh, research on old W W II, and um, that beach was full of a lot of pasty skinned Brits that uh, needed to get off the beach. And a lot of pasty skinned Brits went and got them, that's about it. And as far as the enemy goes, well, they were Nazis. Not gonna find a lot of uh, people of color, uh in that Messerschmitt, Messerschmitt that's uh, flying over the uh, beach. But again, it's a problem.

Diversity for the sake of diversity. It ... they, it makes no sense, uh, especially with a, a movie that is trying to uh, base itself in fact. Um, but again, that's where we are. That's where we are. We, we ... we are constantly told that we need diversity, that diversity is our greatest strength, and um, if it, if something works out well with a diverse group of people, that's wonderful. But that isn't because it was diverse (laughs), you see. Why are we, uh, always being led to believe that that's um, that's the truth.

Uh, yeah, there it is, the complaints that people again- look at that picture, uh, let me try to see, that's an actual picture of some of the soldiers from, uh, back in 1940. Uh, yeah, I don't see many women, I don't see many people of color. Yeah, yeah, wow, an accurate depiction is now a terrible thing. Do you see how we're being lied to? And do you see this indoctrine- we always think of college campuses as being the place that this indoctrination is going on, and oh it is. But college kids, let's be real, are stupid.

They're kids. Uh, they're gonna say dumb things. I never went to college, but I was a dopey kid, and I did stupid things, I believed stupid stuff, and I said stupid stuff. So you can almost cut them some slack for their moronic statements, and this, their moronic belief system, uh, of what this country and world is all about.

When you see things like this, and things that are advertised on uh, uh, TV commercials, TV shows, that is an indoctrination that is being fed to everyone, not just impressionable children. We are being told that um, straight white men are the dumbest people you'll ever find. I have uh, wonderful, uh, evening text sessions, with the, uh, inimitable Gavin McInnes. On a nightly basis we trade videos (laughs) and uh, texts of commercials and TV shows and stuff that just depict straight white men as the world's idiotic little clowns, walking around incapable of doing anything.

Something as simple, I believe there's an insurance company, uh, that's doing a commercial now, where a guy suggests this ... obviously he's married to the woman, he's white and he's a man. Straight white male. He makes this insane assumption that he might've been able to fix a leaky pipe in the ceiling. Well his wife has to say, "No!" Cuts him off, yells "No" at him, and he's just kinda, "Yeah. Yeah I'm a guy, I couldn't possibly fix a pipe or paint a ceiling."

And again, you might go, "Oh Anthony, why be so serious? Whey get so worked up over?" Because it's constantly happening. There it is. Look, look, he's just trying ... he looks at the pipe, with a dumb face of course, he's like, "I might be able to fix that." And then "No!" She just yells no. Like he's gonna try to perform brain surgery. "Maybe I could cut our kid's head open and perform br-" "No!" It's a pipe, lady, relax.

But this is constant. It's a constant, uh, uh, nonstop buffet we're being fed of this uh, propaganda and indoctrination. Nothing and no one could be honest to, uh, the American people. Uh, another prime example of this, uh, John McCain. John McCain



is, I'll say it, pretty ill. (Laughs) he's pretty sick. Um, we just learned he has brain cancer. Uh, God bless. Uh, he's got brain cancer.

Now, every single time a politician goes into the hospital, for anything, we are told, "Everything's fine. He has a splinter in his head, we pulled it out and he's joking with the staff already." You know, it's always some nice, funny scenario. And then as time goes by, they feed us the inevitable horrid truth that uh, you know, he's got one foot in the grave and another on a skateboard.

Uh, but they cannot be honest with us. The politicians and the mainstream media are incapable of being honest with us, and I feel it's because they deem us too stupid, and uh, sensitive to accept the truth about anything, so it has to be fed to us in, in stages like you would, like you would tell a, uh, a child about an impending divorce of their parents. You don't just go, "Yeah! Me and your mom are splitting up." It's gotta be done gently. They treat us like children.

Um, and this has been done constantly. If you remember when um, Ronnie Reagan was shot, uh, years ago, we uh, we were pretty much told, "You know, he caught the bullet, he threw it, he joked with the staff and uh, was back at the White House." Uh, for a while, for a while we were, we were told that. And it turns out that guy was just about dead. Uh, when you watch documentaries on the Reagan uh, attempted assassination now, you realize it was a grave situation. But even as far back as that, they just lied to us and um ... it hasn't stopped, it has only gotten worse. Only gotten worse.

The investigation that's going on, the Russia investigation by um, Mueller, the um, guy in charge, the, the uh, guy in charge of the investigation, there he is, Robert Mueller. Um, he's now investigating Trump's business dealings and uh, business transactions. Where did this come from? How is this relevant uh, to the investigation? Did they find something that made it relevant to the investigation? That's, that's important, I believe. Uh, if they did find something, oh, uh, Trump colluded, he said, uh, "We'll take this info and I'll give you this, and we will exchange, uh, things that are valuable to each other, and uh, that'll be great." Yeah, that would be a problem.

I've heard or seen nothing that proves that happened between him, or Trump Junior, or anyone else in Trump's organization that that happened. You'd be hard pressed to um, to find that on mainstream media though, they're making all kinds of uh,



APPENDIX O

accusations and speculations that are being fed to you on social media as fact. But uh, now they're looking into business dealings. Does anyone remember uh, what Trump did before he was president? Anyone? You? Who should I pick, you, alright you, who? What did he do?

That's right, he was a business man! He did business! He wasn't a career politician, that's why he won the election by the way. Being a businessman, a world, global businessman, he did business with, anyone? Yes, world leaders and world organizations! Absolutely, very good. So (laughs) so you can't then say he was uh, doing anything inappropriate just for doing business with other uh, countries. That's what business people do. Now again if there were any um, illicit or inappropriate dealings, that's another thing. Again, nothing has come forward that shows there was.

So if you have a life politician, lifetime politician that is doing business with foreign governments, that might get you like, "Huh, maybe something's going on here." But if you have a businessman doing business, that's called success. That's called doing what he was supposed to do. And the fact that they are now, they got their grimy, uh, paws in, in that whole thing is um, par for the course, and astounding. But typical of what we've seen. Uh, we'll be back in a very short moment, don't go anywhere. Anthony Cumia in at InfoWars.com.

Thank you so much, deep voice guy. Love that guy. Uh, yes, welcome back, Anthony Cumia in at InfoWars.com. Uh, I wanna finish up uh, today with uh, praise the Lord and pass the ammunition, OJ's out. The Juice is loose, ha ha! Uh, he's not out yet, I believe uh, they have to ... boy that's gotta be tough, huh? Like you know you're out, i believe October, beginning of October OJ will be released. He's been paroled after nine years in prison for um, armed robbery, kidnapping, knocking down people's mailboxes, driving through back yards. Got a girl in the car, that's a [inaudible 02:53:04]. Uh, Sheriff [inaudible 02:53:06] Justice. Uh, yeah, he's um, he's gonna get out, he's been paroled.

Uh, the parole hearing was interesting. Uh, OJ does not shut up. He's gonna, he's gonna be arrested for talking people to death uh, when he gets out, it must be um, it must be odd after nine years you're gonna be out and about and famous. Like you know, most people, they get out of prison and uh, might remember an old guy named Brooks. They put him in the uh, in the grocery store, he was bagging groceries. Then he went back



to his house and uh, carved "Brooks was here," and then hung himself. Uh, I don't see OJ doing that.

But it's gotta be weird, you get out of prison, you're on parole, a probation, um, and, uh, uh, and your paroled, and um, you're famous, you're OJ. That's crazy! But uh, he is out and he's gotta wait now, what is it July through August, September ... he's gotta wait like a couple of months. That's gotta be the hardest time. Remember when Quint in Jaws was talking about when uh, that big old PBY came flying down, and he goes, "That's when I was most scared. Thinking it was my turn." Like, right before you get on the plane you think that last, you're the last one the shark's gonna get? Like, OJ's gotta be scared that he's gonna get shanked or something.

He better not skew, steal any um, any of the white supremacist's cookies or anything in, in prison. He just better do some, some easy time. Or could you see if he gets in a fight and winds up killing somebody? Like OJ has to kill somebody in prison, and they're just like, "Yeah, you're in there forever now OJ, sorry. You killed someone." Um, well OJ Simpson paroled after nine years, uh, the, the humorous note, he did kill two people, remember? Remember when he killed two people?

Uh, I, I didn't think he was gonna get out, I was watching the hearing and uh, OJ does not seem to place uh, responsibility on himself. He went off about the episode that happened in that Las Vegas hotel room where him and uh, a bunch of other guys uh, burst in the room to co- reclaim what he said was his sports memorabilia, uh, with a guy with a gun, uh, they held people against their will, and uh, took this merchandise back. Um, and from what I was watching on the hearing, OJ seemed to blame everyone in the room except OJ (laughs).

But, you know, in the uh, wisdom of the uh, panel, that uh, was in front of OJ, uh, they let him go. His uh, daughter made a statement saying that uh, OJ is um, a great guy, just wants to spend time with his kids. And the victim of the crime testified in OJ's defense, and said that in the interim between the crime and now they have, re uh, kindled their friendship and everything is uh, hunky dory. So I am really looking forward to OJ on Twitter, Facebook OJ. OJ actually said, uh, he might do a podcast or uh, a web, uh, show of some sort. A bl, b- a vlog. I am ... I am there, regardless of what this maniac, murderer does, I will watch.

Uh, thank you so much for tuning in. Thank you to Alex Jones for having me. Um, Anthony Cumia, over at



compoundmedia.com, in right now and uh, loving every minute of it at InfoWars.com, I'll see you in a couple of weeks.

PART 6 OF 6 ENDS [02:56:46]

APPENDIX P

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and FREE SPEECH | § | 261st DISTRICT COURT |
| SYSTEMS, LLC | § | |

### FINAL JUDGMENT

On July 25, 2022, this case came before the Court for trial by jury.[1] Plaintiffs Neil Heslin and Scarlett Lewis appeared personally and through their attorney of record and announced ready for trial. Defendants Alex E. Jones and Free Speech Systems, LLC appeared personally and through their attorney of record and announced ready for trial. After a jury of twelve qualified jurors was duly selected, impaneled, and sworn to try the case, the jury heard the evidence and arguments of counsel. After the evidence was closed, the Court submitted this case to the jury. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record.

Based on the evidence presented during trial, the jury returned a verdict in favor of Plaintiffs and against Defendants. The questions submitted to the jury and

---

[1] Initially, this case was filed as three separate lawsuits by Plaintiffs, which were then consolidated. *See* Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas.



the jury's findings are attached as Exhibits 1 and 2 and are incorporated by reference into this final judgment. The jury's findings, along with the Court's default judgment and resulting admissions, entitle Plaintiffs Neil Heslin and Scarlett Lewis to a judgment against Defendants Alex E. Jones and Free Speech Systems, LLC as set forth in their Fifth Amended Petition. Alternatively, to the extent that a necessary element of their recovery has been omitted, the Court implies a finding to support it.

It is therefore **ORDERED** that Plaintiffs Neil Heslin and Scarlett Lewis shall have and recover of, from, and against Defendants Alex E. Jones and Free Speech Systems, LLC the following:

1.  the amounts of $26,810,000 to Plaintiff Neil Heslin and $22,500,000 to Plaintiff Scarlett Lewis; plus

2.  Prejudgment interest at the annual rate of 5% from the day this case was filed by Plaintiffs until the day before the date of the judgment in the amounts of $323,150 to Plaintiff Neil Heslin and $284,250 to Plaintiff Scarlett Lewis; plus

3.  Costs of court previously assessed by the Court in the amount of $126,523.80; plus

4.  All other court costs shall be taxed against Defendants Alex E. Jones and Free Speech Systems, LLC.

It is further **ORDERED** that postjudgment interest shall accrue on the amount of $50,043,923.80 at the rate of 5%, compounded annually, from the date the judgment is signed until all amounts are paid in full.

It is further **ORDERED** that all writs and processes as may be necessary in the enforcement and collection of this judgment or the costs of court shall issue as necessary.

Of importance to the Court is that no party sought a judgment addressing the constitutionality, either in general or as specifically applied in this case, of the limitation on the amount of recovery prescribed by Tex. Civ. Prac. & Rem. Code 41.008(b). Instead, Plaintiff's Fifth Amended Petition includes a cause of action referenced in Tex. Civ. Prac. & Rem. Code 41.008(c), which exempts this judgment from the exemplary damages limitation. Upon taking office a Judge swears to uphold both the Constitution of Texas and the Constitution of the United States. I am withholding my own judgment on the question at this time, confident that should the Plaintiffs' Fifth Amended Petition be struck for some reason the constitutionality of Tex. Civ. Prac. & Rem. Code 41.008(b) at least in this case will be raised at that time.

This judgment finally disposes of all claims and all parties and is appealable.

Signed on January 12, 2023.

JUDGE PRESIDING
MAYA GUERRA GAMBLE

-3-

**NO. D-1-GN-18-001835**

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| v. | § | 459th JUDICIAL DISTRICT |
| | § | |
| ALEX JONES and FREE SPEECH | § | |
| SYSTEMS, LLC, | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## UNSWORN DECLARATION OF SHELBY A. JORDAN

Pursuant to Tex. Civ. Prac. & Rem. Code §132.001, I provide the following declaration in support of Defendants' Opposition to Applications for Post-Judgment Turnover Order and Appointment of Receiver and Motion to Strike Intervention.

1. My name is Shelby A. Jordan. My date of birth is October 17, 1948, and my address is 500 N. Shoreline Blvd., Suite 804 Corpus Christi, Texas 78401. I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2. I am an attorney licensed to practice in all State and Federal Courts in Texas.  I am an attorney of record for Alexander E. Jones in the case styled *In re Alexander E. Jones*, Debtor, Case No. 22-33553, In the United States Bankruptcy Court for the Southern District of Texas. Accordingly, the facts as set forth herein are within my personal knowledge.

3. Christopher Murray, as the Trustee for the Chapter 7 Estate of Alexander E. Jones ("Trustee"), has been vested with the title to the assets of a prior affiliated debtor, Free Speech Systems, LLC, and I am familiar that the Trustee has not sought the authority to abandon any of the FSS assets.

4. I am board certified in Business Bankruptcy Law by the State Bar of Texas and the American Bankruptcy Institute, and I am familiar that the Trustee has not sought the mandatory

Court's authority by motion, filed on notice and hearing to the debtor, creditors and parties entitled to such notice, seeking to abandon or in any manner transfer title to the FSS assets to any third party.

FURTHER DECLARANT SAYETH NOT

EXECUTED on August 11, 2025 in Travis County, Texas.

_____

Shelby A. Jordan

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kay Smith on behalf of Ben Broocks
Bar No. 03058800
ksmith@broockslawfirm.com
Envelope ID: 104941748
Filing Code Description: Motion for Emergency Relief
Filing Description: EMERGENCY MOTION FOR IMMEDIATE STAY
Status as of 8/28/2025 8:10 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Shelby Jordan | | sjordan@jhwclaw.com | 8/27/2025 5:38:53 PM | SENT |
| Ben  Broocks | | bbroocks@broockslawfirm.com | 8/27/2025 5:38:53 PM | SENT |
| William Broocks | | wbroocks@broockslawfirm.com | 8/27/2025 5:38:53 PM | SENT |
| Antonio Ortiz | | aortiz@jhwclaw.com | 8/27/2025 5:38:53 PM | SENT |
| Chrystal Madden | | cmadden@jhwclaw.com | 8/27/2025 5:38:53 PM | SENT |
| Alan Daughtry | | alan@alandaughtrylaw.com | 8/27/2025 5:38:53 PM | SENT |
| Ryan Chapple | 24036354 | rchapple@cstrial.com | 8/27/2025 5:38:53 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 8/27/2025 5:38:53 PM | SENT |
| William Nix | 24092902 | tnix@krcl.com | 8/27/2025 5:38:53 PM | SENT |