NO. 03-25-00617

**EXHIBIT**

**14**

Alexander E. Jones; 22-33553

exhibitsticker.com

# IN THE COURT OF APPEALS
# FOR THE THIRD DISTRICT OF TEXAS

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
Appellees.

On Appeal from the 459th District Court of Travis County, Texas
Trial Cause No. D-1-GN-18-001835

*APPELLEES' RESPONSE TO THE APPELLANT'S EMERGENCY MOTION FOR IMMEDIATE STAY OF VOID TURNOVER ORDER ISSUED IN VIOLATION OF THE BANKRUPTCY AUTOMATIC STAY*

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellees Neil Heslin and Scarlett Lewis (the Texas Plaintiffs) David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach,

Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Plaintiffs, and together with the Texas Plaintiffs, the Plaintffs) respectfully submit this Response to the Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay. The Plaintiffs would respectfully show the Court the following:

## BACKGROUND

The dispute underlying this appeal involves judgment debts that Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors) owe to the Plaintiffs. Those judgments[1] establish liability and liquidate damages for Judgment Debtors' repeated, malicious defamation of the Plaintiffs in which Judgment Debtors, among other things, asserted that the Plaintiffs faked their own children's deaths at Sandy Hook Elementary. Since the entry of those underlying judgments, Judgment Debtors have unsuccessfully sought to stay the execution of those judgments by filing bankruptcy, serially removing collection efforts, and posting patently insufficient bond amounts.

---

[1] There are two underlying judgments. The Texas Judgment, which was entered by the 261st Judicial District Court of Travis County, Texas, No. D-1-GN-18-001835. And the Connecticut Judgment, which was first entered by the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 and was later domesticated in Texas under the Uniform Enforcement of Foreign Judgments Acts.

The appeal itself involves Free Speech System, LLC's (FSS) most recent attempt to delay the Plaintiffs' satisfaction of their judgments. Two and a half years after the underlying Texas Judgment was entered, FSS filed a check of $10 to act as a bond preventing the collection of the Texas Judgment immediately before a hearing on a request for a Turnover Order by Plaintiffs and Intervenors. FSS purported to provide a deposit under TRAP 24.1, which allows a debtor to supersede a judgment by providing a deposit not to exceed 50% of the debtor's net worth. On August 8, 2025, Judgment Debtors filed a notice stating that "FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones." (Ex. 1, Def. Notice, ¶ 5). Jones' declaration averred that FSS has no assets due to an order that judicially vested FSS assets in the Chapter 7 bankruptcy trustee, Christopher Murray. Jones averred that "[o]n September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones..." (Ex. 2, Jones Declaration). Judgment Debtors' counsel made these averments to Judge Maya Guerra Gamble in a hearing on August 13, 2025. However, Judge Guerra Gamble was also informed by Plaintiffs' counsel that the order vesting assets in the trustee had actually been nullified, and that the

bankruptcy court specifically ruled that the bankruptcy stay was not in effect. Judge Guerra Gamble signed the Turnover Order. Having been unable to obtain a stay in the trial court, this Emergency Motion for Stay followed.

FSS's attempt to enlist this Court to effectuate its latest delay tactic should also fail. The Turnover Order is a final order that FSS must, but has not, supersede in the trial court under Rule 24. Even were the Court to consider the motion for stay under Rules 29 or 52, those inquiries must balance the merits of the parties' respective, substantive rights against the harm that may befall each party if relief is or is not granted. Here, FSS is not only unlikely to prevail on the merits of its appeal, but it will undoubtedly lose. The Court should deny the Emergency Motion for Stay.

## ARGUMENT IN RESPONSE

### I.   The Turnover Order is a final order that FSS has not superseded under Rule 24.

In its typical haphazard fashion, Free Speech Systems LLC (FSS) has not stated which statute, rule, or other body of law grants the Court authority to stay the Turnover Order pending appeal. Given the underlying facts, the granting authority is determinative of whether the Court must deny the stay.

The methods to stay the execution of a trial court order pending appeal are established by rule. Final judgments and orders must first be superseded in the trial court under TEX. R. APP. P. 24. Appellate courts may in the first

instance stay interlocutory orders subject to an interlocutory appeal may under TEX. R. APP. P. 29. And an appellate court exercising its original jurisdiction in a mandamus proceeding may issue stays under TEX. R. APP. P. 52. Therefore, whether and how FSS may stay the Turnover Order depends on the character of the Turnover Order and the type of appeal FSS has filed. Because the Turnover Order is a final order and because FSS has not superseded the Turnover Order under Rule 24, the Court cannot itself issue a stay.

FSS does not contend the Turnover Order is an interlocutory order and has not filed a petition for writ of mandamus. The substance of the Turnover Order also confirms that it is a final order. Generally, turnover orders may be either a final order subject to a traditional appeal or an interlocutory order that is unappealable. *See Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 587 (Tex. 2018) ("[P]ortions of an order can be injunctive in nature and, thus, final and appealable, while other provisions of the same order can be interlocutory and unreviewable because they do not resemble injunctive relief."). A turnover order is final when it is injunctive in nature; it is interlocutory when it leaves unresolved substantive disputes, such as requiring the posting of a bond

while the Court determines who owns the property subject to the turnover order. *Id.*

Here, the Turnover Order contains mandatory injunctions requiring the turnover of property owned by FSS. *See* FSS's App. A, ¶¶ 3, 6. And the Turnover Order does not acknowledge any adverse claims made against the property subject to the Turnover Order, nor has a third party made such a claim.[2] The Turnover Order is thus a final order that may only be suspended under Rule 24.

FSS has not complied with the requirements of Rule 24 regarding the Turnover Order. Specifically, it has not sought to supersede the Turnover Order itself, which would first require Judge Gamble to "set the amount and type of security that the judgment debtor must post." Tex. R. App. P. 24.2(a)(3).

The only efforts FSS has undertaken to suspend the underlying judgments were either unsuccessful or have not yet been completed. Regarding the underlying Connecticut Judgment, the Connecticut courts denied FSS a stay, and FSS has not sought any additional suspensive bond.

---

[2] FSS disclaimed *it* owns any property, claiming that such property has vested in the bankruptcy estate of Alexander E. Jones and is, therefore, subject to the Trustee's control. Notably, the Trustee has not asserted ownership of FSS's property in this or any other proceeding. And, as will be discussed below, Bankruptcy Judge Lopez voided the order vesting FSS's property in Jones' estate.

*See* FSS's App. C, ¶ 1. Regarding the underlying Texas Judgment (which was issued in January 2023), Judge Gamble has not yet expressly ruled on FSS's August 8, 2025 attempt to supersede the $50,000,000 judgment with a $10 bond. The Texas Plaintiffs timely challenged FSS's bond by noting deficiencies in the supporting evidence, including that such evidence was both contrary to applicable law and demonstrably false. Rather than give credence to FSS's unsupported delay tactics, Judge Gamble signed the Turnover Order.

The Court should thus deny FSS's Emergency Motion to Stay.

## II.    FSS is unlikely to succeed on the merits of its appeal, and the Plaintiffs will be irreparably harmed should the Court adopt FSS's delay tactics.

Because FSS has not suspended the Turnover Order as required by Rule 24, the Court need not further analyze FSS's request for a stay. Should the Court nonetheless choose to do so under Rules 29 or 52, a stay is not warranted.

Rule 29, governing interlocutory appeals, and Rule 52, governing mandamus proceedings, are close analogues. *See In re State*, 711 S.W.3d 641, 644 (Tex. 2024). Stays under either are "a kind of injunction" to which "the familiar considerations governing injunctive relief in other contexts will generally apply." *Id.* A fundamental consideration of an appellate stay is to

"preserve the parties' rights pending appeal" by making "a preliminary inquiry into what those rights are." *Id.* "There is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal." *Id.* The parties' respective rights are then balanced with "the injury that will befall either party depending on the court's decision." *Id.* To be entitled to a stay, the applicant must "show that he will suffer ***irreparable*** harm if relief is not granted." *Id.* (emphasis added).

In this instance, an overriding consideration is that there exist final judgments that have already established the merits of the parties' respective, substantive rights. Unlike an interlocutory appeal or mandamus proceeding, the Court need not guess at what those rights are. Both the Texas Judgment and the Connecticut Judgments established that FSS is liable in tort and liquidated the Plaintiffs' damages. And the bankruptcy court has repeatedly issued orders that the bankruptcy stay does not apply and blessed the pursuit of state court collection remedies. FSS is thus unable to show that it is likely to prevail on the merits or that it will be irreparably harmed in the absence of the stay.

### a. FSS will not prevail on its argument that the automatic stay applies because no bankruptcy stay exists, and FSS has misrepresented the status of a nullified order.

While FSS asserts that an order of the bankruptcy court vested FSS assets in the bankruptcy trustee, the bankruptcy court later ruled that the order been nullified by the failure of the auction for which it had been ordered, and the court also ruled that the bankruptcy stay was no longer in effect. As shown below, Judge Christopher Lopez of the Southern District of Texas Bankruptcy Court repeatedly and unequivocally ruled that the order had been nullified, and multiple attempts were made to change that ruling. After those efforts were unsuccessful, Judge Lopez gave his blessing for the creditors to pursue their state court collection remedies.

### i. The February 5th bankruptcy hearing resulted in the nullification of the "Supplemental Order."

Judge Lopez had ordered a plan to liquidate FSS assets by vesting them in Christopher Murray, the Chapter 7 Trustee, who would then conduct an auction. Judge Lopez entered the September 2024 "Supplemental Order" to accomplish that specific purpose. However, Judge Lopez ultimately rejected the result of the sale, which he later held nullified the Supplemental Order as well.

In the February 5, 2025 bankruptcy hearing, Judge Lopez explained that he "entered a Supplemental Order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do." (Ex. 3, February 5th Hearing, 7:10-14). Judge Lopez noted, "The Trustee asked me for a specific order … But it was only for one purpose, to see if he could sell the assets." (*Id.* at 12:6-8). As a result, Judge Lopez concluded it would be improper "to use the Supplemental Order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone." (*Id.* at 13:1-3).

For this reason, Lopez stated, "I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore." (*Id.* at 13:3-5). Judge Lopez then formally ruled that "you can consider **any use of the Supplemental Order null and void**, because the purpose for which it served was the auction of the assets, and we're not doing that anymore." (*Id.* at 14:13-16) (emphasis added). Judge Lopez noted that it would be improper to "use the Supplemental Order … for a purpose in which it was never intended. And I get to construe my own orders and I retain jurisdiction over them." (*Id.* at 15:10-12). In other words, Judge Lopez construed his orders and found that because the sale failed, the Supplemental Order tied to that sale also necessarily became null and void.

In making these rulings, Judge Lopez sought to promote the "finality of the bankruptcy process so that [the families] can pursue whatever it is that they want in judgments in state court." (*Id.* at 14:22-24). Judge Lopez stated, "There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, **<u>there's no automatic stay</u>** stopping -- no one has to come ask me for permission. You have whatever rights you have." (*Id.* at 11:3-8) (emphasis added). Judge Lopez made clear that "[p]eople can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me." (*Id.* at 11:17-25).

At that point in February 2025, Judge Lopez had made it clear to Judgment Debtors and their counsel that the Supplemental Order was no longer in force, and that the automatic stay did not apply. But lest there be any doubt, there were two subsequent attempts at reconsideration.

### ii. FUAC sought a new sale under the Supplemental Order, but Judge Lopez confirmed that it had been nullified.

Following the hearing in which Judge Lopez found that the Supplemental Order had been nullified by the failure of the sale, an entity

known as FUAC, a Jones-allied company seeking to purchase InfoWars, sought reconsideration by filing a "Motion Approving the Sale of FSS Assets." That motion attempted to revive the Supplemental Order and force a new sale. However, in an order on March 19, 2025, Judge Lopez denied the motion, and he reiterated that the Supplemental Order was no longer in effect, writing: "This Court said at a hearing on February 6, 2025 … that parties should consider the Court's Supplemental Order null and void for the reasons stated at the hearing. Nothing has changed." (Ex. 4, Bankruptcy Order, March 19, 2025, p. 1). That order is shown below:

> This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.
>
> Signed on March 19, 2025
>
> Christopher Lopez
> United States Bankruptcy Judge

### iii. Jones and FSS moved for reconsideration.

After the order in March, Jones and FSS moved to reconsider Judge Lopez's finding that the Supplemental Order had been nullified by the failed auction for which it had been created. In their Motion, Jones and FSS recognized that the Supplemental Order was no longer in effect, noting that

"in a subsequent Order entered on February 5, 2025, this Court declared that the Supplemental Order was 'null and void.' This Motion requests the reconsideration of that declaration." (Ex. 5, FSS Mt. to Reconsider, p. 3). Judgment Debtors asked Judge Lopez to reverse course, and they argued that "[h]olding to the position that the Supplemental Order is void will create past, present and future chaos." (*Id.*, p. 5). Thus, the Judgment Debtors "request[ed] this Court reconsider its prior rulings." (*Id.*, p. 9). Implicit in this filing is the acknowledgement that the February rulings are in effect.

### iv. In a June 5th hearing, Judge Lopez declined to grant reconsideration and again blessed the families' intention to pursue state court remedies.

In a hearing on June 5th, counsel for Jones and FSS presented their arguments for reconsideration. The thrust of Judgment Debtors' argument was that Judge Lopez lacked authority to issue his rulings in February because the Supplemental Order had been under appeal at that time.[3] According to Judgment Debtors, federal courts can continue to construe their orders or take steps in aid of their enforcement during an appeal, but they cannot revoke or modify those orders. But the counter-side to that argument was that Judge Lopez did not "revoke" or "modify" anything, but instead, he construed and enforced his original sale orders to find that the

---

[3] The Supplemental Order was appealed prior to the failed auction. By the time of the June 5th hearing, that appeal had been voluntarily dismissed.

Supplemental Order was necessarily nullified following the unsuccessful auction. These issues were discussed during the first part of the hearing. (*See* Exhibit 6, June 5th Hearing, 40:5-7) (The court asking FSS counsel, "That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?"); (*see also* 45:22-23) (FSS counsel acknowledging that "[the court] can't modify it, [the court] can't change it," but "[the court] enforce it or [the court] can interpret it.")

Towards the middle of the hearing, Judge Lopez indicated he was disinclined to grant any relief to Jones and FSS, and that parties could appeal his rulings if they were unhappy:

> This case has been pending since 2022. And folks, it just needs to, it needs to end. Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable. Let the state courts, or the Supreme Court of the United States rule on the issue. Parties can then appeal any orders of mine to the district court or the Fifth Circuit. We got to get there. I'm not moving. (*Id*. at 42:8-15).

Nonetheless, FSS's counsel continued to argue that Judge Lopez lacked authority to find that the Supplemental Order had been nullified, and that "[t]he effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked. (*Id*. at 46:1-3). Judge Lopez entertained Judgment Debtors'

argument, and he agreed that an appeal prevented him from revoking or modifying his orders. But he also noted that it did not prevent him from enforcing or construing his orders. Judge Lopez stated:

> I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it ... But that order has been complied with in the sense that the trustee tried to move under authorization under that Supplemental Order, no question about it. He tried to sell assets under those orders. The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. (*Id.* at 48:13 – 49:5).

Judge Lopez appeared to believe he was within his authority to find that Supplemental Order was nullified and no longer in effect since he had ruled that the sale which it had "supplemented" had been attempted and was unsuccessful, and the order only existed for that purpose. Any future sale would require its own Supplemental Order, which had become nullified after the first sale. Under this interpretation, Judge Lopez was within his authority to construe the Supplemental Order as nullified as a necessity of enforcing the original order and its purpose. Thus, according to this view being discussed by Judge Lopez, he hadn't revoked anything, and there was

nothing to reconsider. He was merely enforcing the purpose and construing the effect of his original orders. Yet regardless of how one interprets Judge Lopez's musings at the hearing, Judge Lopez clearly stated, "Let me think about it. **I don't want to rule today**. I want to think about everything and think about this." (*Id.* at 52:3-5).

A few minutes later, Judge Lopez again emphasized that he was not making any ruling on the reconsideration, stating, "Give me a little time to think about everything that I've heard today, one way or the other. Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5-8).

As the hearing came to a close, counsel for the Connecticut Plaintiffs made sure Judge Lopez knew the families would be pursuing state court collections as Judge Lopez had authorized back in February when finding the Supplemental Order nullified, and counsel pointed out that the reconsideration sought by FSS would be disruptive to those efforts:

> Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies. We've been working with the Texas plaintiffs towards that end. You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive. (*Id.* at 66:9-15).

In response, Judge Lopez assured counsel regarding the motion to reconsider, "I don't think my position has changed in terms of what I said in February." (*Id*. at 66:23-67:1-3). Finally, Judge Lopez heard from counsel for the Texas families, who again made sure Judge Lopez understood that the families would be pursuing collection in state court, which Judge Lopez blessed:

> MR. MOSHENBERG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.
>
> THE COURT: **I'm not**, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. ..." (*Id*. at 68:6-13).

Regarding the Judgment Debtors' motion for reconsideration seeking to overturn the February rulings finding the Supplemental Order nullified, Judge Lopez told Mr. Moshenberg:

> [W]ell, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. ..." (*Id*. at 68:17-24).

Judge Lopez concluded the hearing by telling counsel for the Texas families, "I don't think you need to do anything different, but if anything changes, I'll let you know." (*Id.* at 69:3). Three and a half months after the June 5th hearing, Judge Lopez has made no further orders on the issue.

### v. No reasonable attorney could conclude that Judge Lopez had granted FSS's motion for reconsideration.

Following this hearing, no reasonable attorney could believe that Judge Lopez had reversed his February 5 ruling and his March 19 written order, or that the earlier Supplemental Order had been reinstated, or that the automatic stay was in force. Nonetheless, Judgment Debtors' brief quotes excerpts from discussions in the hearing on their motion to reconsider where they believe Judge Lopez appeared sympathetic to their positions. Yet after the hearing, any reasonable advocate would understand that Judge Lopez made no such rulings. Indeed, any reasonable advocate would understand that the situation had not changed from the situation as it existed prior to the hearing, in which Judgment Debtors' counsel understood Judge Lopez had ruled that the Supplemental Order was nullified.

Further, the excerpts cited by Judgment Debtors merely highlight Judge Lopez's awareness of the substantive argument made in Judgment Debtors' Motion to Reconsider. Judge Lopez clearly understood that while

an order is under appeal, the district court's jurisdiction to act on the order is constrained, and the district court can only take steps to construe those orders or act in furtherance thereof, but it cannot revoke or modify those orders. And it is equally clear that Judge Lopez believed he did not "revoke" or "modify" anything in his February ruling. (Ex. 3, 47:8-13) Judgment Debtors clearly disagree with the idea that Judge Lopez construed and acted in furtherance of his original sale orders to find that the Supplemental Order was nullified following the unsuccessful auction. Yet whether that position is ultimately meritorious is of no consequence here. The exclusive venue for resolving that question is a federal appellate court.[4]

Here, there is no amount of parsing which can explain away the facts and outcome, nor any basis for believing the February ruling or the March order confirming the same had been withdrawn or superseded, or that any reconsideration had been granted. And interestingly, both Plaintiffs and Judgment Debtors' briefs quote some of the same statements by Judge Lopez while reaching very different conclusions about what is being said. This is

---

[4] Judgment Debtors may argue, as they have at the trial court, that this Court can ignore Judge Lopez's nullification of the Supplemental Order on the basis that Judge Lopez lacked jurisdiction. Yet parties may not collaterally attack a bankruptcy court's ruling by arguing that the court lacked jurisdiction if they had the opportunity to make that argument in the bankruptcy court. *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009) ("So long as respondents or those in privity with them were parties to the Manville bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the 1986 Orders.").

exactly why the judiciary does not treat excerpts of colloquy between judges and lawyers in oral hearing as rulings. What judges say during hearings can be helpful in understanding the judge's thought process behind a certain order or ruling, but it is not dispositive of how judges ultimately rule or do not rule. This is especially true when a judge repeatedly emphasizes that they are not making any rulings.

Indeed, the most troubling aspect of Judgment Debtors' brief is the lengths it goes to parse innuendo in excerpts from the early portion of the hearing while completely ignoring the clear and unequivocal statements made by Judge Lopez in the latter portions of the hearing. The brief cites excerpts from pages 40–49 of the transcript, but it fails to even address Judge Lopez's statements shortly thereafter:

- "Let me think about it. I don't want to rule today. I want to think about everything and think about this." (*Id.* at 52:3–5).

- Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5–8).

Further, as the hearing neared its conclusion, Judge Lopez stated, "I don't think my position has changed in terms of what I said in February." (*Id.* at 66:23-67:1-3). This is a reference to the February ruling in which Judge Lopez declared the Supplemental Order had been nullified by the failed

auction, which is the ruling Judgment Debtors sought Judge Lopez to reconsider. Yet in the face of these statements, Judgment Debtors now tell this Court that Judge Lopez actually agreed with them and reconsidered his February ruling. On top of this, the brief also ignores the fact that Judge Lopez gave his blessing to Plaintiffs' counsel request for permission to "pursue our state court remedies." (*Id.* at 68:6–13).

In sum, this Court is faced with an unequivocal ruling from Judge Lopez on February 5th that the Supplemental Order was nullified, followed by an unequivocal written order on March 19th repeating and confirming the same, followed by a June motion to reconsider that resulted in no further ruling or order of the court, but did result in a blessing to pursue state court remedies. There is no arcane interpretation under these facts in which a reasonable advocate could believe that the Supplemental Order had been revived or that the automatic stay was in place.

### vi. An errant citation in the Turnover Order does not revive Judge Lopez's Supplemental Order.

Judgment Debtors claim that the Supplemental Order must be in in force because the order submitted by Plaintiffs and Intervenors contains a citation referencing the Supplemental Order. Judgment Debtors seek to exploit what they know is a citation error in editing the order. Some background is useful.

When dismissing the FSS bankruptcy case in June 2024, Judge Lopez included an order -- which everyone agrees is still in force -- giving the Chapter 7 trustee signing authority over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors, though those assets remained the property of FSS.[5] This order was made at the request of the Texas and Connecticut Plaintiffs, who were concerned that Alex Jones may dissipate FSS assets before those assets could be liquidated.

A few months later, in September 2024, Judge Lopez issued his Supplemental Order for the sale of assets. The Trustee retained his authority, and in addition, the assets were then vested in the trustee for the purposes of an auction. As the Court is aware, the Supplemental Order was later found to be nullified when the auction failed, while the June 2024 order remained in effect.

The Turnover Order proposed by Plaintiffs and Intervenors contained a statement noting that the Bankruptcy Court took action in "dismissing the FSS Bankruptcy Case and vesting authority in the Trustee to take control of

---

[5] Judgment Debtors agree on this point, as they had Jones state in his affidavit:

> On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee.

the Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts." (*See* Proposed Order, p. 3). This statement is accurate, but there was an error in not updating the citation. The statement cites "Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024)." At the time of early drafting, that citation was also accurate, since the June 2024 order gave the trustee signing authority over FSS accounts and the September 2024 Supplemental Order carried that authority forward in preparation for an auction. The proposed order was originally drafted using a procedural history paragraph describing this period when both orders were in force.

However, because the bankruptcy court later ruled that the Supplemental Order had been nullified, the entry for "Dkt. 1021 (September 25, 2024)" on the proposed Turnover Order should have been removed from the citation prior to its filing, leaving only "Dkt. 956 (June 21, 2024)." Unfortunately, by error, it was not. However, the mistake in not removing "Dkt. 1021" from the citation is made evident from the clear position of Intervenors and Plaintiffs when seeking turnover: that the Supplemental Order was nullified and that the assets of FSS are not judicially vested in the Trustee. Nonetheless, pursuant to the June 2024 order, the Trustee still has authority to distribute FSS assets for the benefit of creditors. In other words, the statement in the Turnover Order -- that Judge Lopez placed "authority

in the Trustee to control of Judgment Debtor Free Speech Systems, including its assets and bank accounts" -- is a correct statement accompanied by an inaccurate citation that should have been updated.

Judgment Debtors now seek to turn this oversight into a "gotcha" moment, but it has no consequence. While the citation was in error, and the trial court ultimately entered an order with an inaccurate citation in its procedural recitation, that citation in the trial court's order does not magically breathe life back into Judge Lopez's Supplemental Order or create a bankruptcy stay where none existed.

Notably, Plaintiffs and Intervenors proposed an order that required the turnover of FSS assets "subject only to approval of the Trustee." Judgment Debtors' counsel claims this provision shows that Plaintiffs and Intervenors know the Supplemental Order is in effect. In truth, that statement demonstrates the continuing viability of the **June 2024 order**, known as the "Initial Cash Order," which is the order that gave signing authority to the Trustee and permitted him to dispense assets for the benefit of creditors. Thus, Judgment Debtors' counsel are wrong when claiming that the Trustee's approval would only be an issue if the Supplemental Order had viability. The Trustee's approval is an issue not because the Supplemental Order has continued viability, but because the June 2024 order giving him

signing authority has continued viability. Judgment Debtors know and understand this reality, just as they know the inclusion of a citation to the September order was in error by Plaintiffs and Intervenors. Their attempt to capitalize on that error is cynical and disingenuous.

Here, Judgment Debtors' assertion of a bankruptcy stay is frivolous, and it is for that reason that they have not raised the issue in the bankruptcy court itself. Judgment Debtors know their arguments would not be well-received by Judge Lopez, who has already made it clear that "there's no automatic stay" and "nothing stopping anyone from pursuing any claims in Texas state court." (Ex. 3, 11:3-8).

### b. FSS will not prevail on its argument that the Connecticut Plaintiffs could not intervene.

The Connecticut Plaintiffs filed a motion to intervene in this lawsuit in 2024 and ultimately opted to jointly pursue a receivership with the Texas Plaintiffs. FSS argues that this post-judgment intervention was improper and untimely moved to strike the intervention.[6] FSS's argument on this issue has many facets, including that the Connecticut Plaintiffs have no interest in the Texas Judgment, that the Connecticut Plaintiffs seek to establish substantive rights to collect on the Texas Judgment, and that the trial court's

---

[6] Though FSS did not obtain a ruling on its motion to strike the intervention, Judge Gamble signed the Turnover Order after FSS filed its motion to strike.

plenary power had expired. None of these arguments are correct.

To intervene in a turnover and receivership action does not require an interest in the underlying judgment. Rather, it merely requires the intervenor to have an "interest . . . in the judgment debtor's property." *See Breazeale v. Casteel*, 4 S.W.3d 434, 437 (Tex. App.—Austin 1999, pet. denied). Requiring more would result in a procedural windfall for a judgment debtor. *Id.* This Court clearly wrote on the subject when it allowed a third-party intervention in similar circumstances: "There is no justification for precluding intervention in a post-judgment proceeding on the basis of the cause number under which the motion is brought." *Id.* Indeed, the Court continued, "it would not be possible to intervene *before* rendition of judgment." *Id.* Ultimately, this Court affirmed the intervention even though the plenary power had expired at least six years before. *Id.* at 435 (noting the judgment was dated in 1992, the turnover application was filed in 1988, and the intervention occurred after that).

Other courts have also allowed third parties to intervene in receivership actions after plenary power has expired. *See Lerma v. Forbes*, 166 S.W.3d 889, 893 (Tex. App.—El Paso 2005, pet. denied) ("We agree with the Austin Court of Appeals in *Breazeale,* and recognize the unique situation created by the intervenor that has no complaint with the merits of the

judgment obtained in the underlying lawsuit, but only seeks to protect his or her own interest in the post-judgment proceedings. We believe that post-judgment intervention is allowed where such is the case."). In *Lerma*, the El Paso Court of Appeals explicitly authorized intervention after the trial court's plenary power expired. *Id.* ("Here, the issue of the trial court's plenary jurisdiction is irrelevant to our determination of whether the trial court should have granted Appellant's motion to strike Appellee's intervention."). The reason courts may take these actions so long after plenary power expires "is that a trial court's post-judgment enforcement powers can last until the judgment is satisfied." *Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 581 (quotations omitted).

FSS does not reference *Breazeale* or *Lerma* on this issue nor does it apply their reasoning. The primary case it cites is *Donalson v. City of Canton*, which does not address the turnover statute. In that case, Donaldson sought to intervene in a long dormant lawsuit, the final judgment of which determined ownership of real property and issued permanent injunctions against its owners. *See Donalson v. City of Canton*, No. 12-25-00059-CV, 2025 WL 2354740, at *1 (Tex. App.—Tyler Aug. 13, 2025, no pet. h.). Donaldson, who was initially a party to the lawsuit but had obtained his dismissal on the grounds that he was not an owner, sought to intervene four

years after judgment. In substance, Donaldson sought through his intervention an order declaring himself the owner of the real property and sought relief from the injunctions. Unsurprisingly, the court held that "to the extent Donalson sought to have the trial court take any action inconsistent with its final judgment, such as his pleadings seeking relief from or modification of the permanent injunction, the trial court lacked jurisdiction to so act." *Id.* at *4.

Against this background, FSS's argument that the Connecticut Plaintiffs have untimely intervened and the Plaintiffs are seeking to establishing substantive rights and must, therefore, bifurcate their collection efforts is exposed for the wasteful, obstructionist ploy that it is. The joint application does not create competing claims among the Plaintiffs regarding the underlying judgments or the judgment debtor's property that need to be resolved before the Court can act. *See Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 583. Any such issues have been resolved, as is evidenced by the Plaintiffs' agreement to join in collection efforts. Nor are the Connecticut Plaintiffs seeking in this proceeding to establish their rights under the Connecticut Judgment—that has already happened.

In this case, the Plaintiffs do not contest the merits of the other's underlying judgment. Rather, they merely seek to further their shared

interest in the orderly disposition of the judgment debtor's property to satisfy those judgments. In these circumstances and under this Court's precedent, post-judgment intervention is inherently proper.

### c. FSS will not prevail on its argument that no evidence exists regarding FSS's assets.

FSS complains that there is no record evidence establishing FSS's ownership of non-exempt property. This argument is wrong. The application for the Turnover Order attached affidavits swearing to FSS's ownership of non-exempt property and citing FSS's own discovery responses as support. *See* FSS's App. C, ¶ 12. Further, the record includes bankruptcy court orders, transcripts, and declarations that generally discuss FSS's assets and their proposed sale. *E.g.* (Ex. 2, Jones Declaration); (Ex. 4, Bankruptcy Order, March 19, 2025, p. 1); (*See* Ex. 6, June 5th Hearing, 48:13 – 49:5]. Finally, in its motion, FSS concedes that it owns property, it merely incorrectly argues that it "all has been conveyed to the Estate of Alex Jones."

### d. FSS has adequate legal remedies if a stay is not entered, while the Plaintiffs do not.

FSS does not argue that it will suffer irreparable harm should the Court not grant relief. *See In re State*, 711 S.W.3d 641, 645 (Tex. 2024) (requiring showing of irreparable harm). To the contrary, FSS possesses statutory and other remedies.

FSS could file a motion in Jones' bankruptcy asking that court to enforce the automatic stay regarding its assets. But FSS has not done so. FSS presumably has not sought this relief because Judge Lopez already ruled against it on this point in both February and March of this year and did not grant reconsideration in June, and instead expressly allowing the Plaintiffs to pursue the turnover order.

FSS also has statutory remedies in the event the underlying judgments are overturned. FSS can recover either its property or the sales proceeds. *See* Tex. Civ. Prac. & Rem. Code §§ 34.021, 022.

The Plaintiffs, on the other hand, have no adequate legal remedies if a stay is granted. This appeal concerns the Plaintiffs' use of the Texas Turnover Statute to satisfy two final judgments that have not been superseded. At its core, that statute provides that "[a] judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . to obtain satisfaction on the judgment." FSS, through this Emergency Motion to Stay, perverts this purpose by using the statute as an additional, unauthorized means to delay the Plaintiffs' collection efforts and without posting sufficient bond. The Plaintiffs are entitled to immediately satisfy their judgments; anything less is inadequate.

# CONCLUSION AND PRAYER

The Court need not endorse FSS's unauthorized and factually unsupported efforts to delay the Plaintiffs' satisfaction of their final judgments. The Court must deny the Emergency Motion to Stay and grant Plaintiffs any further relief to which they are entitled.

Respectfully submitted this 11th day of September 2025.

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEYS FOR APPELLEES**

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Response- has been forwarded to all counsel of record in accordance with the Texas Rules of Appellate Procedure on this 11th day of September 2025, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan milligan@harneypartners.com |
| *Electronic Service and/or Email* | Counsel for Proposed Receiver | William R. "Trip" Nix tnix@krcl.com KANE RUSSELL COLEMAN & LOGAN, PC 401 Congress Ave., Suite 2100 Austin, Texas 78701 |
| *Electronic Service and/or Email* | Counsel to Neil Heslin and Scarlett Lewis | Mark D. Bankston mark@fbtrial.com KASTER LYNCH FARRAR & BALL LLP 1117 Herkimer Houston, Texas 77008 713-221-8300 713-221-8301—Facsimile |
| *Electronic Service and/or Email* | Counsel to Appellants | Ben C Broocks William A. Broocks BROOCKS LAW FIRM, PLLC 248 Addie Roy Rd, Suite B301 Austin, Texas 78746 (512) 201-2002 - Telephone (512) 201-2034 - Fax bbroocks@broockslawfirm.com wbroocks@broockslawfirm.com  Alan B. Daughtry alan@alandaughtrylaw.com 3355 West Alabama, Suite 444 Houston, Texas 77098 Telephone: (281) 300-5202 Facsimile: (281) 404-4478  Shelby A. Jordan Antonio Ortiz JORDAN & ORTIZ, P.C. 500 North Shoreline Blvd., Suite 804 Corpus Christi, TX 78401 Telephone: (361) 884-5678 Facsimile: (361) 888-5555 Email: sjordan@jhwclaw.com  aortiz@jhwclaw.com Copy to: cmadden@jhwclaw.com |

*/s/ Ryan E. Chapple*
Ryan E. Chapple

NO. 03-25-00617

---

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

---

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK
BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL,
DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO-
MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT
PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY
S. MILLIGAN
Appellees.

---

**DECLARATION OF MARK BANKSTON**

---

I, Mark Bankston, declare under penalty of perjury the following is true and correct and based on my personal knowledge. I am over 18 years of age and competent to make this declaration. My business address is 1117 Herkimer, Houston, TX 77008.

1. The following exhibits are attached to Appellees' Response to the Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay:

2. Exhibit 1 is a true and correct copy of FSS' Notice of Deposit of Cashier's Check Payable to the Clerk in Lieu of Bond under TRAP 24.1.

3. Exhibit 2 is a true and correct copy of Declaration of Net Worth of Judgment Debtor Free Speech Systems, LLC for Supersedeas under Tex. R. Civ. P. 24.2(c).

4. Exhibit 3 is a true and correct copy of the transcript of proceedings in *In Re: Alexander E. Jones* before Judge Christopher Lopez, US. Bankruptcy Court for the Southern District of Texas, on February 5, 2025.

5.    Exhibit 4 is a true and correct copy of Judge Lopez's March 19, 2025 order entered in *In Re: Alexander E. Jones.*

6.    Exhibit 5 is a true and correct copy of Defendants' Motion for Reconsideration filed on April 28, 2025 in *In Re: Alexander E. Jones.*

7.    Exhibit 6 is a true and correct copy of the transcript of proceedings in *In Re: Alexander E. Jones* before Judge Lopez on June 5, 2025.

Executed on September 10, 2025 in Harris County, Texas.

/s/ Mark Bankston
Mark Bankston

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS**
**FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 1

_____

8/8/2025 8:01 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>   *Plaintiffs,* | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | 459th JUDICIAL DISTRICT |
| ALEX JONES and FREE SPEECH<br>SYSTEMS, LLC,<br>   *Defendants.* | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |

## DEFENDANT FSS' NOTICE OF DEPOSIT OF CASHIER'S CHECK PAYABLE TO THE CLERK IN LIEU OF BOND UNDER TRAP 24.1

Free Speech Systems, LLC ("FSS") files this Notice of Deposit of Cashier's Check in Lieu of Bond under Texas Rule of Appellate Procedure §24.1.

1. On January 12, 2023, this Court entered a Final Judgment against Alex Jones and FSS, jointly and severally, in the amount of $50,043,923.80.

2. On April 4, 2023, Alex Jones and FSS, collectively, filed a Notice of Appeal from the Final Judgment. Oral argument on that appeal occurred on May 28, 2025 and the Third Court of Appeals has yet to issue its decision.

3. Pursuant to TRAP 24.1, a Judgment-Debtor may supersede a judgment by filing a deposit in lieu of a bond. *See* Tex. R. App. P. 24.1(a)(3). The amount of the deposit must not exceed the lesser of (a) 50% of the judgment debtor's current net worth, or (b) 25 million dollars. *See* Tex. R. App. P. 24.2(a)(1).

4. A party's net worth is calculated as "the difference between the party's total assets and total liabilities as determined by GAAP." *O.C.T.G., LLP v. Laguna Tubular Products Corp.*, 525 S.W.3d 822, 830 (Tex. App.—Houston [14th Dist.] 2017, no pet.). See also *EnviroPower, LLC v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 1 Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as "the difference between

1

total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from a possible sale.

5. FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones.

6. As a result, FSS has made a deposit payable to the Clerk of the Court in the amount of ten dollars ($10.00), which pursuant to the Texas Rules of Appellate Procedure, is sufficient to supersede the Final Judgment, as a Judgment-Debtor with a negative net worth.

Respectfully submitted,

*Ben Brooks*

Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**BROOCKS LAW FIRM P.L.L.C.**
248 Addie Roy Rd., Suite B301
Austin, Texas 78746
Phone: (512) 201-2002
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com


Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas 78401
Phone: (361) 884-5678
Fax: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR ALEX JONES AND FSS**

2

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, a true and correct copy of the foregoing document was sent to all counsel of record in accordance with the Texas Rules of Civil Procedure.

_____
Ben Broocks

3

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 2

_____

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>   *Plaintiffs,* | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | 459th JUDICIAL DISTRICT |
| ALEX JONES and FREE SPEECH<br>SYSTEMS, LLC,<br>   *Defendants.* | §<br>§<br>§<br>§ | TRAVIS COUNTY, TEXAS |

### DECLARATION OF NET WORTH OF JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC
### FOR SUPERSEDEAS UNDER TEX. R. CIV. P. 24.2(c)

Pursuant to Tex. Civ. Prac. & Rem. Code § 132.001, Alexander E. Jones provides the following declaration in support the Notice of Deposit of Cashier's Check in Lieu of Bond of Free Speech System, LLC ("FSS").

1.    My name is Alexander E. Jones. My date of birth is February 11, 1974, and my address is 3019 Alvin DeVane Blvd., Suite 230, Austin Texas.  I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2.    I am the sole manager of Free Speech Systems, LLC, a Texas limited liability company (previously, "FSS").  I make this declaration of net worth of FSS under Tex. R. App. P. 24.2(c)(1) in my capacity as manager for FSS.

**3.    Based on the facts hereafter set forth, FSS has no assets and liabilities that exceed $1,344,864,850.33.  FSS has a negative net worth.**

4.    On January 12, 2023, a Travis County Jury entered awards against me in this case [*Neil Heslin and Scarlett Lewis, Plaintiffs, v. Alex Jones and Free Speech Systems, LLC*, Case No., D-1-GN-18-001835in the 459th Judicial District Court Travis County, Texas (the "Texas Case)] in the amount of $4,110,000 in compensatory damages [**Exhibit A**] and $45,200,000 in punitive

1

damages [**Exhibit B**] for a total final judgment of $50,043,923.80 including prejudgment interest [**Exhibit C**] see which has been bearing interest at 5% per annum compounded annually from that date and currently equals $56,725,304.33 (herein called the "Texas Judgment"). The Texas judgment has been appealed and oral arguments on that appeal occurred on May 28, 2025.

5.      On November 10, 2022 a trial court in Connecticut entered a final judgment against FSS and me (Alex Jones) jointly and severally in the total amount of $1,436,650,000. **Exhibit D**. In December 2024, the Connecticut Court of Appeals reversed the trial court's award of damages under Connecticut Unfair Trade Practices Act ("CUTPA") which had the effect of reversing $150,000,000 in CUTPA punitive damages, bringing the total amount of the Connecticut Judgment to $1,288,139,546 which has born interest since that date (herein called the "Connecticut Judgment").

6.      On December 2, 2022, I declared personal bankruptcy and on June 14, 2024, my bankruptcy was converted into a Chapter 7 liquidation and Christopher Murray was appointed as the Chapter 7 Trustee (herein referred to as the "Trustee") of all my assets, excluding those that were exempt. My personal bankruptcy is still pending in Bankruptcy Court in Houston, Texas, in the case styled *In re Alexander E. Jones, Debtor*, Case No. 22-33553, In the United States Bankruptcy Court for the Southern District of Texas, the Honorable Judge Christopher Lopez presiding.

7.      On July 29, 2022, I caused FSS to file bankruptcy in Bankruptcy Court in Victoria, Texas, in the case styled *In Free Systems, LLC, Debtor*, Case No. 22-60043, in the United States Bankruptcy Court for the Southern District of Texas, which was transferred to the Houston Division and continued with the Honorable Judge Christopher Lopez presiding.

8.      On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee of my personal bankruptcy [Case No. 22-33553], namely Christopher Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander E. Jones.  **Exhibit E**.

9.      On September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and was under the control of the Trustee, whom the Bankruptcy Court also authorized to operate the business of FSS absent further order of Judge Lopez in the Bankruptcy Court (herein called the "*September Order* or "*Supplemental Order*," in Docket entry 1021 in Case No. 22-60043).  **Exhibit F**.

10.     Given the fact that Bankruptcy Judge Lopez's June Order and September Orders vested ownership of all FSS cash and property of the Estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets.  Hence it does not have a positive net worth for that reason alone.

11.     As to liabilities, the Texas Judgment in the amount of $56,725,304.33 and the Connecticut Judgement in the amount of $1,288,139,546, means that FSS has a significantly negative net worth even if the assets of FSS now vested with the bankruptcy Trustee were to be considered as belonging to FSS.

12.     I provide this declaration of net worth by stating the current assets and liabilities of FSS under the standard provided by *EnviroPower, LLC v. Bear, Stearns & Co., Inc.,* 265 S.W.3d 1

Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as only "the difference between total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from such a sale.

FURTHER DECLARANT SAYETH NOT

EXECUTED on August _7_, 2025 in Travis County, Texas.

_____
Alexander E. Jones

4

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 3

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND              )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF           )
UNSECURED CREDITORS,                )  Houston, Texas
                                    )
          Debtors.                  )  Wednesday, February 5, 2025
                                    )
                                    )  9:00 AM to 9:26 AM
------------------------------)

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Alexander E. Jones:  SHELBY JORDAN
                         ANTONIO ORTIZ
                         Jordan & Ortiz, PC
                         500 N. Shoreline Blvd.
                         Corpus Christi, TX 78401

                         BEN BROOCKS
                         WILLIAM BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

For Chapter 7 Trustee:   JOSHUA WOLFSHOHL
                         KENESHA STARLING
                         JORDAN STEVENS
                         Porter Hedges LLP
                         1000 Main Street
                         Houston, TX 77002

                         CHRISTOPHER R. MURRAY
                         ERIN JONES
                         Jones Murray LLP
                         602 Sawyer Street
                         Houston, TX 77007

For Connecticut         KYLE KIMPLER
Families:               PAUL PATERSON
                        Paul Weiss Rifkind Wharton &
                        Garrison LLP
                        1285 Avenue of the Americas
                        New York, NY 10019

                        RYAN CHAPPLE
                        Cain & Skarnulis PLLC
                        303 Colorado Street
                        Austin, TX 78701

For Texas Plaintiffs:   AVI MOSHENBERG
                        Lawson & Moshenberg PLLC
                        801 Travis Street
                        Houston, TX 77002

                        JARROD MARTIN
                        Chamberlain Hrdlicka White Williams
                        & Aughtry, P.C.
                        1200 Smith Street, Suite 1400
                        Houston, TX 77002

                        JENNIFER HARDY
                        Willkie Farr Gallagher LLP
                        600 Travis Street, Suite 2310
                        Houston, TX 77002

Court Reporter:         UNKNOWN

Courtroom Deputy:       UNKNOWN

Transcribed by:         Veritext Legal Solutions
                        330 Old Country Road, Suite 300
                        Mineola, NY 11501
                        Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity.  They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity.  I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets.  That's what that order was intended to do.  The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process.  I won't recount what happened, but I didn't approve the proposed sale.  I had a -- I think the evidence is clear -- a backup bidder at the beginning.  We didn't even know what the winning bid was.  I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency.  There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency.  And the Trustee was

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers.  Connecticut family

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again.  Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate.  Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed.  I can't do that.  I cannot do that.  I don't have authority to do it.  And I'm not going

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone.  I'm very much inclined to vacate that order because it serves no purpose.  I'm not allowing a sale of the assets anymore.  Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering.  But at its core, it's something I can't approve.  Would come -- you know...

And so, I know...  I read the revised settlement. Read the revised order.  Bankruptcy lawyers know I can't do this unless we get really, really, really creative.  And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this.  I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one.  I've now approved the two matters in which there's 9019s and the two settlement matters.  Money's going to go out the door.  You don't have to tell me now.  I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

INDEX

RULINGS

|                                 | Page | Line |
|---------------------------------|------|------|
| Motion to Approve Sale, Denied  | 16   | 8    |

INDEX

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

matter..

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS**
**FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 4

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-33553 |
| ALEXANDER E. JONES, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | CHAPTER 7 |

**ORDER DENYING FUAC'S MOTION SEEKING LEAVE TO FILE A MOTION
APPROVING THE SALE OF FSS ASSETS AND REQUEST FOR STATUS CONFERENCE
(RE: ECF NO. 1089)**

This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

Signed on March 19, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 5

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE: ALEXANDER E. JONES | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor | § | Chapter 7 |

**MOTION FOR RECONSIDERATION OF THIS COURT'S
DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS
ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTRATE**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate) which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the "Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-debtor company, Free Speech Systems, LLC ("FSS") [Collectively Jones and FSS are sometimes referred to as "Jones"].

**I.
PRELIMINARY STATEMENT**

1.      Jones has the statutory and common law authority to represent Free Speech Systems, LLC ("FSS") as manager and in the common interest of preservation of value of the FSS assets including (i) preservation of the ongoing appellate proceedings; (ii) defense of the pending

Page 1 of 34

dischargeability proceedings, and (iii) matters before this Court, including this Motion seeking reconsideration of the Order of this Court bench order of February 5, 2025, to the extent that:

(a) this Court has exercised jurisdiction to enter, then "void," its order that is now on appeal; and

(b) Jones' desire to be heard involves his personal and financial rights and pecuniary interests in such orders and assets, giving Jones standing to assert these matters; and

(c) Jons responds to the Plaintiffs' misstatement and misrepresentations in their recent opposition to FUAC's request for an auction of the FSS assets.

2. Jones seeks reconsideration of the status of the "Supplemental Order" of this Court [FSS Dkt. 1021, September 25, 2024], that has twice previously been the basis of the Trustee's proposed auction of the FSS assets and twice manipulated and improperly orchestrated by the two largest creditors (herein collectively the "Plaintiffs" and separately the "Connecticut Plaintiffs" or the "Texas Plaintiffs") in coordination with this Court's Trustee to accomplish an illegitimate purpose and intent of the Supplemental Order. The cost to the Jones Estate of these two improper efforts was almost $2+ million in attorney's and professional fees.

3. Importantly, this Motion raises issues not considered by this Court, or at least not expressed in the record of its ruling and the most recent denial of the proposed continuation of an FSS asset auction raised by FUAC, LLC. Court determined FUAC had no standing to seek that relief.

4. Although this Motion points out that the total chaos caused by the Trustee and Plaintiffs in their now well-documented manipulations of an otherwise simple bankruptcy auction process, that is not the basis of this Motion. That wasteful chaos caused by a tortured attempt to manipulate this Court's Supplemental Order to accomplish a purpose never intended by this Court, should not result in the punishment of the other creditors or the Jones and FSS interests, as the

case may be. Jones summarizes this Motion and Jones' arguments as follows:

a.     **THIS MOTION SEEKS RECONSIDERATION OF THE COURT'S IMPROPER DECLARING THE SUPPLEMENTAL ORDER "NULL AND VOID."**     On June 21, 2024 this Court entered its Order giving the Trustee control of FSS bank accounts and cash (the "Cash Order")(FSS Dkt. 956). Then on September 25, 2024 this Court entered its so-called Supplemental Order which *supplemented* the prior Cash Order and gave the Trustee control of and supervisory powers over FSS's assets that were generating the new cash in addition to the Cash Order (Dkt. 1021). At a hearing on February 5, 2025 this Court discussed its lack of jurisdiction to void the Supplemental Order. However, in a subsequent Order entered on February 5, 2025[1] this Court declared that the Supplemental Order was "null and void." This Motion requests the reconsideration of that declaration as the Supplemental Order, now on appeal, cannot be declared null and void, as a matter of law, as previously stated by this Couret.[2] This Court, in making its most recent ruling from the bench (that the Supplement Order is now considered "null and void") does not consider its earlier acknowledgment that the Supplemental Order is on appeal and, as this Court previously stated that because *such Supplemental Order is on appeal, this Court lacked jurisdiction to void the order*:

> 15.     *-- no, I should back up and mention that the*
> 16.     *supplemental order was appealed by the Texas families. I*
> 17.     *think that matter is still pending.*
> 18.     *MR. JORDAN: It is, Judge.*
> 19.     *THE COURT: I lose jurisdiction over that*

---

[1]     This second order noted that First United America Company ("FUAC") lacked standing to request reconsideration. As will be explained infra, there is no question of Jones's standing given his personal and financial rights and pecuniary interests which unquestionably give Jones standing to assert these matters.

[2]     *Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal).

Page 3 of 34

*immediately.*

[*See*, **Exhibit "1"** Hearing transcript, February 5, 2025, pg. 8, lines 15-19.]. The Court was clear that although it would likely set aside the Supplemental Order (out of pure frustration over the efforts to pervert the purpose of its entry), it had no jurisdiction to do so. The Court's observation was correct when first made and remains correct now.[3] However, the non-stayed appeal does not prevent this Court from enforcing its unstayed orders even if on appeal:

> "In addition to its remaining jurisdiction on matters unrelated to the appeal, a *bankruptcy court retains substantial jurisdiction as to the order that is the subject of the interlocutory appeal*." *Id.* 'T*he appeal only deprives the bankruptcy court of the power to alter, expand or vacate the order at issue.*' *Id.* (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). "*The [lower] court retains jurisdiction over [\*7] all other matters that it must undertake to implement or enforce the judgment or order* [that is on appeal]." *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007).

*In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at \*5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added] [*See*, Note 3 *Supra*]. This appeal is active, and no stay has been sought or entered.[4] Accordingly, this Court may implement and enforce the Supplemental Order, which is the relief sought by this Motion.

The Court's act of voiding the Supplemental Order was imminently justified, borne from frustration of the combined machinations of the Trustee with the assistance of the 15 Connecticut Plaintiffs and the two Texas Plaintiffs (collectively, the "Plaintiffs") who thwarted this Court's clear instruction for the Trustee to conduct a simple bankruptcy

---

[3]     *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at \*20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, \*12 (D. Del. Mar. 27, 2024).

[4]     *See*, pending *Case No. 22-60043* - Judge Charles Eskridge, U.S District Court, SD-TX.

auction. However justified the Court's frustration, the remedy of declaring the Supplemental Order void, was (i) legally impermissible, (ii) inequitable, (iii) creates virtually insurmountable complications and chaos of undoing events of the past 7 months; and (iv) overlooks the much more practical remedy of simply Ordering the auction, even if required to replace the disobedient and compromised Trustee. Holding to the position that the Supplemental Order is void will create past, present and future chaos. It would mean that for now, everything previously done under the authority of that Supplemental Order was invalid and must be reversed. In the present sense, it makes the companion Cash Order currently in place meaningless and makes the Trustee an intentional tortfeasor in retaining property he seized that belongs to FSS and has not returned. But perhaps the most pernicious is the fact that the Plaintiffs will act as though it is void and begin collections only to find that it is not void, and their actions violated the automatic stay or the discharge injunction, and thus themselves are void. The ripple effects from this one improvident act, will reverberate in numerous directions.

b.      Second, Jones is continuing his appeals of the Plaintiffs judgments, the reversal in whole or in any substantial part, will likely render Jones Estate solvent. Jones, as the sole manager of FSS, is also continuing the appeals on behalf of FSS, at no expense to the Jones Estate, likewise if reversed on appeal will render FSS solvent. For this and several other reasons and recent Supreme Court authority discussed below, Jones has standing to seek the relief requested herein and this Court has the jurisdiction to order the relief sought.

c.      Third, this Motion seeks to inform the Court of not only the need pursue its prior-ordered auction, considered ordinary in most every Chapter 7 case (specifically, the Chapter 7 Trustee's conducting of a public, non-collusive, auction of assets to the highest

bidder for cash) but also a matter *now opposed* by the Plaintiffs *and silently ignored by the Jones Estate Trustee* in furtherance of the same history of manipulation. This Court may take judicial notice that (i) a § 363 Sale with title vesting free and clear of all liens, claims and encumbrances, greatly enhances the public's participation in an auction and thus, a bankruptcy Trustee's public sale to the highest bidder is generally considered the premier way to recover the highest return for creditors and the bankruptcy Estate. This is true primarily because it is promoted, advertised, and conducted only by professionals in such process, (including the professional Trustee, his legal counsel and retained auction professionals, all supervised by a business Bankruptcy Judge).[5] Contrast this professional approach to the Texas state ordered Writ of Execution and auction by a Sheriff's or Constable's sale, where the officer's only participation is to levy the property and at the auction read the contents of the writ of execution before asking for offers, that is if anyone shows up other than the judgment holder planning on making only a "credit bid."

d.      Fourth, in addition to the gross disparity in auction results, contrast that process to (i) the fact that the Connecticut Plaintiffs were stayed from all collection efforts by both Connecticut Statute and recent ruling of the Connecticut Court of Appeals during the two prior Ordered auctions the Plaintiffs attempted to manipulate;[6] and (ii) the likelihood that both judgments will be stayed because Texas, by statute, *mandates a stay*

---

[5]      The bankruptcy bidding process is neither complex nor out of the ordinary. It is a mainstay of bankruptcy estates' ability to satisfy the maximum recovery, of critical importance in circumstances that likely will not pay 100% of the creditors' claims. And as Jones argues, it is a matter of judicial notice that a State law Constable's or Sheriff's sale is conducted exclusively by a deputy sheriff or constable with no obligation to advertise or otherwise maximize the sale price, and where other bidders must compete with credit-bidding of the judgment holder that significantly chills the bidding, the price obtained never reflects, much less reaches anywhere near the fair market value.

[6]      The stay of the Connecticut Judgment is problematic at this point since the Connecticut Supreme Court denied certification of the Jones and FSS appeal, and a stay is limited in duration until, and if, the Connecticut Court of Appeals agrees to extend the stay, or the US Supreme Court grants a stay pending *certiorari* or pending a ruling if *certiorari*. is granted.

when a money-judgment debtor posts a bond or collateral equivalent to 50% of the judgment debtor's **_net worth_** (the "net worth" of FSS is a negative multi-millions of dollars);[7] and the fact that neither Judgment is supported by a final order of non-dischargebility, thus, no execution is appropriate (which did not stop the Connecticut Plaintiffs form seeking to violate the Connecticut Stay by making false claims to the State Court *of this Court's orders*, including the claim that this Court had entered a *final order* determining the Judgment to be nondischargeable.[8] Instead of this chaos,[9] this Court should simply and clearly order the bankruptcy auction to liquidate all assets of the Chapter 7 estate and thereby (i) stop all of the extravagant legal and Trustee's fees from continuing to support Plaintiffs' manipulation of the bankruptcy process; and (ii) allow the appellate processes to conclude. The Estate, at that point, needs no further "administration" and

---

[7]     Fifth, with both judgments stayed, both Jones and FSS will then be entitled to remain in possession of their assets (with, as to FSS, only "ordinary course operations allowed") until the appellate stays are lifted by final orders of the Connecticut and Texas courts, *and* only if these judgments are not reversed on appeal. This totally re-adjusts **_back to this Court's expressed intention_** to conduct a bankruptcy auction and to not allow the manipulation of its orders to frustrate the auction process and send the auction (writ of execution) process to State Court to deal with any sale. Instead of this Court sending matters back to State Court where (i) a stay of all collection will be in place for potentially both judgment holders; (ii) this Court's jurisdiction is lacking to void the Supplement Order while on appeal (an unstayed appeal), and (iii) the Trustee remains in possession of all of those operating assets which Jones continued efforts have protected and increased.

[8]     Although the Connecticut Plaintiffs Judgment has always been subject to a stay of any execution or effort to recover on the non-final Connecticut Judgment, as this Court may note, the Connecticut Plaintiffs nevertheless attempted to have an Austin State District Court appoint a receiver pursuant to, and execute on the Connecticut Judgment over Jones' assets, falsely telling the Austin District Court that this Court had entered a "final order" finding the Connecticut Judgment non-dischargeable **and** not mentioning to the Austin District Court that their collection efforts were stayed by the State of Connecticut's statutory stay of money judgment. That case was removed to the Federal Court and referred to this Court by the District Court, Western District of Texas (Austin Division). [*See, also infra*, Note 23].

[9]     As discussed below, the Connecticut Plaintiffs previously ignored the stay of collection and filed in the State District Courts an action to seize Jones property and appoint a receiver over Jones property, (i) telling the State district court that this Court bankruptcy court ruled the Connecticut Judgment non-dischargeable *by final order*; and (ii) telling the State district court **nothing** about the Connecticut statutory stay from execution, as also ordered in Connecticut by the appellate courts. As a result, the action was timely removed to Federal District Court where a counterclaim was filed based on diversity and bankruptcy jurisdiction against the Connecticut Plaintiffs. That case was transferred to the US District Court for the Houston Division and referred to this bankruptcy court. It is now pending a Motion to Dismiss pursuant to Federal Rule 12(b)(6) incorporated into the Bankruptcy Rules of Procedure.

because it has been liquidated, simply remains open until the judgments are reversed or affirmed in whole or in part.

        e.        Fifth:  The Obvious Abuse of Process Must Be Eliminated:  Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction.  It is the sale proceeds that must then be applied to those Judgments as credits of the sale proceeds, and depending on the outcome of the appeals, may allow payment in full of one or both of these judgments.  Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the auction concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than a fair, non-collusive § 363 Auction.[10]  Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself   but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment right).[11]  In fact, abuse of process conduct it is contrary to the

---

[10]     Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[11]     *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

bankruptcy fresh start, even where a claim is found non-dischargeable. If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts. This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[12] Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[13]

5. For the reasons set out above and below, Jones request this Court reconsider its prior rulings and order what this Court originally ordered. This Court should order the Trustee or the Trustee's replacement (without manipulation or interference by the Plaintiffs or their affiliates) to do what the Trustee and Plaintiffs have thus far have refused to accomplish without abusive manipulations of the simple bankruptcy auction process. Although this Court has made clear its

---

The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.'). *Id.* at 428.

[12] "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[13] *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020). Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

frustration and distrust "of the process" conducted by the current Trustee, the injury to the other creditors, admittedly small (but only in comparison to the Plaintiffs *non final Judgments*) and to Jones' and FSS's rights to a fair process, compels this result.

## II.
### JURISDICITON

6.      This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).  Here the basis for reconsideration is the injustice to the parties and bankruptcy system itself. Fed.R.Civ.P. 60(b)(6) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "***the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process***." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).   Such is the case here.

## III.
### STANDING OF JONES TO SEEK THIS RELIEF

7.      Plaintiffs, through Paul Weiss, wrongly assert that Jones and FUAC are parties that have no economic standing in the case— [*See*, Connecticut Plaintiff's Response to FUAC's request for status conference, pg. 2, ¶1, Dkt. 1113]:

> The Families no longer see any benefit to pursuing a costly and litigious sale process in this Court. [*See*, pg. ¶ Response to FUAC Auction Motion]; …. Another contested sale process would significantly harm creditors' recoveries—which have already been delayed by years, *while millions of dollars are paid to estate professionals*. Counsel to the Trustee alone has incurred over $1.4 million in fees through January 31, 2025. Nearly $800,000 of such fees were incurred between November 2024 and January 2025, the period of time during which the first contested sale hearing took place. *See* Interim Fee Application.  [*See*, pg. 6, ¶ 9 Response to FUAC Auction Motion].

8.      This Court, however, has previously recognized Jones standing regarding the auction orders.   In fact, Jones, as the Chapter 7 Debtor and FSS as a party in interest, has constitutional and bankruptcy code standing to bring this request for relief,[14] and for the purpose of both of the appeals of the Plaintiff Creditors' Judgments (and objections to their claims) and the enforcement of this Courts Supplemental Order to conduct a public auction. In both instances, standing is individually and as the sole managing member of FSS, a party in interest.

9.      Additionally, the standing doctrine is required by the Constitution's text including the due process clause of the Fifth and Fourteenth Amendments.  The Due Process clause prohibit courts from depriving a person of "life, liberty, or property without due process of law."  As Justice Amy Coney Barrett has explained, *stare decisis* can often function similarly to preclusion, and

---

[14]     Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

> "*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

•. *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding.*"];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

 ; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U. S. 1, 7 (2000);

•. *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

> [I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

•. *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection];  *See, also, In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim. The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

consequently the application of *stare decisis* can deprive litigants of their life, liberty, or property rights without due process of law.**15**

10.    Jones Standing in this case is supported not only by the recent instruction of the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "… *to entities that are potentially concerned with or affected by a proceeding.*"], but also on the merits and nature of the constitutional rights of Jones set out in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987), *citing with approval Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979).   The Fifth Circuit in *Henry* v. *First National Bank of Clarksdale* dealt with collection of a judgment and non-final appeals and the avoidance of irreparable harm for particular constitutionally driven appealed cases such as the Judgments against the NAACP and here, Alex Jones dealing with "*fundamental constitutional rights.*" *Id. Pennzoil at* U.S. 23. as discussed in *Pennzoil* dealing precisely with the issues before this Court (in rejecting Texaco's argument to avoid its own bankruptcy).  *Pennzoil*, however, made two critical distinctions in its holdings significant to this case.  In contrasting to a case involving a politically sensitive defendant (the NAACP [or here, Alex Jones]) efforts to appeal a judgment it could not pay nor afford the appeal bond:

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, *valid on its face*, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.

Next, the Supreme Court made specific reference to the reason Texaco was note entitled to relief because of the size of the required bond, noting the distinction where relief would be appropriate:

> the claim [of Pennzoil] that the Texas bond and lien provisions violated the due process and equal protection clauses was without merit, because (a) the New York company could exercise its right to appeal even if it were forced to file for

---

15    Stare Decisis and Due Process, https://scholarship.law.nd.edu/lawfacultyscholarship/450/

bankruptcy, and (b) *the underlying issues in the case--arising out of a commercial contract dispute--did not involve fundamental constitutional rights.*

*Id. Pennzoil,* 107 S. Ct. at 1535 [Brennan, J., joined by Marshall, J., concurring] (Emphasis Added). The Supreme Court, in rejecting Texaco's right to receive relief from an un-affordable appeal bond, cited the Fifth Circuit case where special relief was justified:

> "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, *could not effectively advance the organization's interests on an appeal*"[16]

*Id. Pennzoil,* 107 S. Ct. at 1529 [Justice Scalia, with whom Justice O'Connor joins, concurring], *citing* with approval, the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979) that did, in fact, deal with the deprivation of "*fundamental constitutional rights*":

> (bankruptcy of NAACP would make state appellate review of First Amendment claims "so difficult" to obtain that federal injunction justified), cert. denied *sub nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

11. The Supreme Court, in recognizing that the rights to seize a judgment debtors assets by State law execution and order a sale of the judgment debtor's assets, held that notwithstanding the state statute that required a cost bond that would bankrupt the NAACP, the exception recited in *Henry v. First National Bank* "… involved fundamental constitutional rights" that would be lost if the execution went forward. In *Henry v. First National Bank*, because "…the underlying issues *did involve fundamental constitutional rights*" to boycott, and having suffered a $3 million

---

[16]  Here the Chapter 7 Trustee of Jones, in his campaign to damage Jones, was willing to allow Jones' Connecticut Appeal to lapse by not permitting Jones to file, at his own cost, his and the Free Speech Systems, LLC appeal brief for certification to the Connecticut Supreme Court. Further, the Trustee proposed to this Court a "settlement agreement" among only the Jones Estate and the Plaintiffs that provided that the Trustee could dismiss the appeals or could *sell to Plaintiffs* as assignees the Jones and FSS right to appeal and they could dismiss, or cause the dismissal of, the appeals to satisfy the appellees' desire to have an allowed claim *untested by the due process rights to a full appeal.* This Court denied that relief.

judgment in Mississippi state court for supporting a boycott of certain white-owned businesses, federal injunctive relief (to permit an unbonded appeal) was appropriate.[17]

12.     This is precisely the standing Jones relies, and the fundamental First Amendment constitutional rights of Jones as a media defendant his free speech rights, that must be protected until the opportunity for Supreme Court review.

## IV.
## RELEVANT BACKGROUND FACTS TO THE RELIEF REQUESTED AND THE PLANTIFFS RESPONSIVE MISSTATEMENTS

13.     This Court previously ordered the dismissal of the Chapter 7 Free Speech Systems, LLC, ("FSS") Chapter 11 case (the Debtor-Jones 100% owned limited liability company) but included in such order the transfer all of the "cash" account assets of FSS to the Trustee's Chapter 7 estate of Jones (the "**Initial Cash Transfer Order**").  That cash was significant (in excess of $4 million, and through Jones' continued service to the Trustee, the cash has grown to more than $7 million, less $3 million paid by the Trustee to the Trustee's law firm and the Trustee's special counsel and retained professionals, and other costs of administration.

14.     At the request of the Trustee of the Jones Estate for a clarifying order as to the ownership of the Debtor-Jones' company FSS *non-cash assets*, this Court entered an order clarifying that all FSS assets would be transferred to the Jones Estate (the "**Supplemental Order**").

15.     The Texas Plaintiffs' did not appeal the Initial Cash Transfer Order which is a final order.   The Texas Plaintiffs' (after attempting a state court Turnover of the FSS assets and that proceeding's removal by the Trustee to this Court) appealed the Supplemental Order and the

---

[17]     The Fifth Circuit upheld the District Court's injunction prohibiting the execution on the judgment involving all of the Mississippi NAACP assets including the name NAACP owned by the Mississippi Chapter, and all the confusion that would have caused, until the NAACP could prosecute its appeal of the Constitutional right to boycott. Ultimately, the Supreme Court decided the case on the merits and reversed the state court judgment as constitutionally infirm. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S. Ct. 3409 (1982).

appeal is ongoing. [*See, supra* Note 3].[18]  The Texas Plaintiffs did not seek a stay pending that appeal of the Supplemental Order and accordingly, this Court has unfettered jurisdiction to *enforce* that order, it cannot vacate the order. *In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added].  This principal has been affirmed time and again.[19]  As such this Court's pronouncement that the Supplemental Order is void, is itself void.  The Supplemental Order still exists and is enforceable in accordance with its terms.[20]  Both the Jones Estate through its Trustee and/or Jones have consented to the sale of substantially all of the assets of FSS now in the Court-ordered possession of the Jones Estate Trustee.  If sold at a bankruptcy Auction as sought herein, the estate could be administratively closed until the Plaintiffs claims are allowed and distributions of those proceeds are made.  If this is not done, and both Judgments are stayed, the assets may simply remain idle.    If   ultimately the State Courts become the arbiter of the method and manner of the writs of execution or otherwise there will be no prompt sale of those assets remaining in the possession of the Trustee.  The auction sale, already ordered by this Court is the only prompt solution to this dilemma.

16.     And active participants are awaiting a fair sale auction.  The Trustee has *never initiated any bidding procedures as an ordinary course asset auction, nor has the Trustee even attempted  to deal the outstanding $8 million cash offer*.  In the prior two Trustee attempts at an auction driven by the Plaintiffs, neither the cash bidders nor the Debtor, nor FSS did anything to

---

[18]     Judge Charles Eskridge, U.S District Court, SD-TX, *Case No. 22-60043.*

[19]     *See e.g., Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal); *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] *citing In re Port Neches Fuels, LLC,* No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[20] Even the Texas Plaintiffs successfully moved to dismiss their appeal, this would not retroactively affect the invalidity of the initial voiding or remedy the consequences herein stated.

interfere with the bidding process – only the Plaintiffs and their partner the Global Tetrahedron

(the "Onion") and their acting agent, the Trustee. Thus, because there is no stay pending the appeal

of the Supplemental Order and enforcement of the Supplemental Order is what this Motion seeks,

by ordering a simple auction for sale at the highest cash price obtained through the sales effort and

sale by the current Trustee or his successor replacement.[21]

## V.
## "THE RISK OF INJUSTICE TO THE PARTIES' AND THE RISK OF UNDERMINING THE PUBLIC'S CONFIDENCE IN THE JUDICIAL PROCESS."[22]
-----------------------------------------------------------------------------
### ALL EQUITIES FAVOR ORDERING AN AUCTION

**A.    Equity Abhors Manipulation and Loss of Rights or Property by Forfeiture or Loss of Basic Constitutional Rights - Equity will not allow a trust to fail for want of a trustee.[23] Equity delights to do justice, and not by halves[24]**

17.    The auction process has been manipulated by the Plaintiffs and the Trustee to assure

the Plaintiffs win. Each time the Trustee initiated the out-of-the-ordinary process and each time

this Court refused to approve the Plaintiffs-driven process adopted by the Trustee. If the State

Court is to auction FSS assets, that will not occur until the Texas State Judgment is final on appeal

---

[21]    **THERE IS A SIMPLE SOLUTION:  REPLACE THE TRUSTEE AND CONDUCT AN AUCTION:**  There is no question that the Court's declaration that the Supplemental Order was void was precipitated by the Trustee's stubborn and persistent unwillingness to obey the Court's stated purposes to affect a sale of FSS assets for the benefit of all creditors. It was for this purpose the current Trustee himself prevailed on this Court to issue the Supplemental Order in the first place. The remedy for such recalcitrance is, among other remedies, the replacement of the Trustee, not a legally improper declaration the Supplemental Order is void.

The simple solution is to appoint a replacement Trustee who will obey the Court and conduct an auction. Any creditor looking to get paid, would welcome this as it assures the highest recovery. The Plaintiffs DO NOT want this because they don't want money; they want Alex Jones and his business as a trophy they can display at their political fund raisers and social events where their abuse of the legal system to achieve ridiculous and indefensible judgments is worn as a badge of honor. This Court should not countenance that unmasked, naked hatred.

[22]    Proof of which is grounds for amending or altering a decision of a court. *See, Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).

[23]    *See, e.g., Fulk & Needham, Inc. v. U.S.*, 288 F. Supp. 39, 44 (M.D.N.C. 1968).

[24]    *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990).

and there is final or unstayed judgments ruling the Plaintiffs' proofs of claims non-dischargeable in whole or in part. If reversed as anticipated, an auction will not happen until a retrial. The Connecticut Appellate Court and Connecticut Statute stayed the Connecticut Judgment. However, the Connecticut Supreme Court has denied Jones' and FSS's Motion for Certification and both Jones and FSS are seeking a continuation of that stay pending their Petition for *Certioraria* with the U.S. Supreme Court pursuant to the Connecticut statutory provision allowing for a discretionary stay.

    **B.**    **Even If This Court Could Declare the Supplemental Order Void, To Do So Is Facially Inequitable And Rewards The Wrongdoers**

18. The Trustee's negotiations on their illicit "settlement agreement" took several months, during which Trustee *never initiated any bidding procedures ordered by this Court* to deal with the outstanding $8 million cash offer. When they finally reached the terms of the "settlement agreement" the Court again rejected the Trustee's proposed Settlement Agreements and for good reason and the Trustee has gone silent on holding the ordered auction.

19. While the second round of misconduct is referenced above, a few more details shed light on the radical inequities perpetrated as the tip of the tension among the Plaintiffs that was revealed in the first farcical auction, primarily revolving around how to split the FSS carcass the Plaintiffs hoped their non-final judgments would recognize. Anxious not to wait for any appellate outcome, the Texas Plaintiffs were adamant that the split should be 75/25 and threatened to disrupt the Connecticut Plaintiffs collection efforts if agreement were not reached. According to the fifteen Connecticut Plaintiffs, they had collective judgments totaling approximately $1,500,000,000, whereas on the other hand, two Texas Plaintiffs (Heslin and Lewis) claimed judgments totaling only approximately $50,000,000. Thus, the split should have been 97% Connecticut and 3% Texas. However, the Texas Plaintiffs flipped that argument putting the

Connecticut Plaintiffs' ridiculous judgment at risk. They argued that the same Sandy Hook events had occurred *to all plaintiffs* and their damages should have been the same but for the prejudice of the Connecticut plaintiffs trying the case approximately 28 miles from the murder site, since liability was judicially decreed in both Texas and Connecticut and only damages were to be tried. *Yet for the same event* the fifteen Connecticut Plaintiffs received as non-punitive damages, at total of $965,000,000 – or approximately $65,000,000 each – *whereas for the same event the Texas plaintiffs received only $2,000,000 each*, or 3.5% of the Connecticut non-punitive damage amount. The Texas plaintiffs' receipt of only 3% of what the Connecticut Plaintiffs got, was unfair and only explainable as the result of local prejudice.[25] Instead, the Texas Plaintiffs proposed a different view simply "counting heads" as that was the only rational way to divide FSS up given that other means based on the sizes of the respective judgments was indefensible. And as there are three other Texas Plaintiffs who have not even proceeded to trial and thus had and have no judgments, counting them resulted in 15 Connecticut Plaintiffs and 5 Texas Plaintiffs – or a compromise division of 75/25.

20. The problem with this was that (a) judgment creditors are counted by the dollar amounts of their claims, not on a "per capita" basis which if pursued by Connecticut risked exposure by Texas and (b) the prospect that either or both judgments were very likely to be

---

[25] While this Court has declared most aspects of the Connecticut and Texas judgments non-dischargeable, making that interlocutory ruling final will require this Court to explain how the same event – Sandy Hook – where liability was judicially decreed in both Connecticut and Texas, resulted in "victims" who sued in Connecticut receiving awards 32 times greater than "victims" who sued in Texas. While this fact will be difficult for the Court to explain, so will its disregard of the requirements of the Connecticut Supreme Court stated in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) that collateral estoppel rules were not to be applied mechanically as the Connecticut plaintiffs convinced this Court to do, but were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*. Equally difficult for the Court will be its explanation of its disregard of *Jackson v. R.G. Whipple, Inc*., 627 A.2d 374, 380 (Conn. 1993), which in the context of collateral estoppel involving default judgments, re-emphasized the Restatement of Torts' comments that where the prior action was a default, the matter was not actually litigated, creating yet another basis for finding dischargeability which this Court ignored.

radically reduced if not eliminated on appeal, would throw their respective division of the financial body of Jones and FSS into complete jeopardy. Thus, instead of continuing the auction, the Trustee and the Plaintiffs devoted their time and FSS's treasure to reaching a completely illegal arrangement where in summary, (a) the two Texas Plaintiffs' $50,000,000 judgment would be deemed fully "allowed"; (b) the fifteen Connecticut Plaintiffs claims of $1,438,139,546 would be deemed fully "allowed," even though the Connecticut Court of Appeals had reversed $150,000,000 of that related to CUTPA punitive damages; (c) *the three Texas plaintiffs* whose cases had yet to be tried would be given deemed "allowed" claims of more than $375 million, which coupled with the $50,000,000 held by the other Texas Plaintiffs would yield a dollar amount as between Connecticut and Texas equal to 75/25; (d) the Texas Plaintiffs would drop their appeal of the Supplemental Order; and (e) since the Texas claims had not yet been bonded and the Connecticut Plaintiffs were statutorily precluded from collection, the Texas Plaintiffs would assign their new allowed claim of $425 million to Connecticut. Plaintiffs would then proceed to collect *in this Court* on the Texas judgement and the Trustee would pay the Texas Plaintiffs $4,000,000 from cash he held belonging to the Jones Estate (including mainly FSS money). The fact that the claims were deemed "allowed" would mean, critically, that nothing that occurred on appeal would disturb their rights. And importantly, among other things, the Connecticut Plaintiffs proceeding to collect on the Texas judgment would effectively mean there would be nothing left to auction. Hence once again the Court's intentions of the Supplemental Order were intentionally and unfairly thwarted.

21.    On both occasions denying the proposed auction procedure, this Court expressed at length its concerns and displeasure with the proposals that did not come close to resembling a normal bankruptcy public bid process. Exhibit "1" illustrates again this Court's frustration over the Trustees continued efforts to "arrange" matters to encumber a simple bidding procedure and

auction to favor Plaintiffs. Neither the cash bidder nor the Debtor nor FSS had anything to do with these manipulated bidding process – only the Plaintiffs and their agent-Trustee.

### C. The Manipulation Continues As the Abuse of Process Continues

22. When FUAC filed its motion seeking a status conference based on its outstanding $8 million non-responded-to cash bid, an interesting response from the Trustee and the Plaintiffs resulted. Notably, the *Trustee responded by silence*, likely fearing the rath of the Plaintiffs as their position has done a 180-degree change to not wanting an auction that they could not control.

23. Even though twice before the Plaintiffs and Trustee were actively pursuing his version of an auction process, not so this time– *it is now the Connecticut Plaintiffs and the Texas Plaintiffs that do not want a bankruptcy auction – in truth, not an auction **that they cannot control*** and win. [*See*, Plaintiffs' objection to FUAC's Request for Status Conference (and notice of its bid, Dkt. 1113]. And whatever the Plaintiffs demand the Trustee follows. Even with the opportunity to re-establish the Court's and the public's confidence in the Trustee's supervision of a fair bankruptcy auction process, the Trustee stands down, to not conflict with the Plaintiffs new position of no auction.

24. The impact of the Creditors' manipulations and overt efforts to ignore the economics of this bankruptcy and to seek only a political goal of removing Jones from the airways and destroying the "InfoWars" brand, is all designed to prevent news media-Jones' First Amendment rights by censoring his ability to exercise those rights.[26] This ulterior motive has not

---

[26] Set out below are only a few of the many examples of the Connecticut Plaintiffs and the Texas Plaintiffs declared purpose in bringing and prosecuting the suits against Jones and FSS was political and sought to deny Jones his right to freedom of the press and free speech. Motivating this litigation is not, and never has been, the recovery of a monetary damages for an actual and legally recognized injury (which has yet to be fairly determined), or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive to accomplish the goal to taking Alex Jones and incredibly popular "The Alex Jones Show" of the air and "out of the public discourse" by demanding exaggerated and illegal recoveries of punitive damages:

only thwarted Jones efforts at a legitimate bankruptcy resolution (including Plaintiffs rejection of multiple proposals to resolve these claims *by payments to these Plaintiffs in the high 8-figures*) but reflects manipulation that goes well beyond this Court's limits in protection of creditors and imposes risks on debtors and the bankruptcy process that is repugnant to any bankruptcy right or policy.

25.     Even if, however, the prospect of a resolution with these Plaintiffs is not available because of the political agenda of the Plaintiffs, the bankruptcy code and bankruptcy policy still require this Court to consider the *economics and motives* of creditors, including these Plaintiffs, as an element of most every decision the Court has, and is, to make.  Just as a non-creditor claims-purchaser cannot acquire a creditor's claim (for the purpose of obtaining standing), then file the claim, and then assert the claim in bankruptcy to block a reorganization, *if there is an alternative motive to the mandated "open and honest" economics of claims recovery* the bankruptcy code will impose a remedy.[27]  In this case of such high stakes and profiled, the issue of "motive" permeates

---

> **"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.   Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."**
> https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

> ***Damages "should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse* …."**
>
> Quotes from *Texas Plaintiffs' closing arguments; See, also Connecticut Plaintiffs opening statement YouTube* https://www.youtube.com/watch?v=xFaxgchQczg "take Alex Jones platform … away … and make certain he cannot rebuild the platform.  Take him Jones out of this discourse … that is punishment.)

[27]     The law is clear that an ulterior motive and purpose, and malice to cause damage to an estate bars the right to purchase a claim and utilize the claim in a bankruptcy case. *In re Lichtin/Wade, LLC,* No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10-11 (Bankr. E.D.N.C. Dec. 17, 2012) explains the prohibited process, citing the Ninth Circuit, noted:

> If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. ***On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a***

every aspect of the Plaintiffs counter-intuitive, abnormal demand to *destroy the value of the Jones Estate and FSS assets* and destroy the ability of Jones to earn a living so as to pay the Plaintiffs claims, while at the same time demanding their debt be both allowed and found nondischargeable. This abuse of process conduct, or "lawfare" in more current political terms, should not go unaddressed, when Plaintiffs make economic demand of this Court for their creditor rights and treatment of their claims, yet motivated to impede the entire bankruptcy case by destruction of the real value of the Estate's assets and thereby destruction of the Debtors' ability to earn an income by the exercise of their First Amendment rights to uncensored media and free speech. Those constitutional rights are valued in the millions yet in this case the Plaintiffs want that value to be as near as zero as they can possibly manipulate to take Jones "off the air" and out of the public discourse (reciting opening and closing jury arguments in the Plaintiffs' respective trials).

26. This bankruptcy "lawfare" has not, however, gone unnoticed. The Paul Weiss law firm as purported "*pro bono*" counsel to the Sandy Hook Plaintiffs (all of whom have received multi-million-dollar settlement funds from the Remington $70+ million-dollar settlement payment), has recently settled its similar "lawfare" litigation after being sued by President Trump for their participation with prosecutor Alvan Bragg in the New York City prosecution of the victimless crime of real estate valuations by the affiliated entities owned by President Trump. Paul Weiss agreed with President Trump to settle his claims by Paul Weiss performing $40 million of "*pro bono*" *non-political*, legal work in exchange for a release of the damages claims made by the

---

*competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.*
*Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am.* (*In re Figter Ltd.*), 118 F.3d 635, 638-639 (9th Cir. 1997) (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10 (Bankr. E.D.N.C. Dec. 17, 2012) ("The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)).

President.  Upon information and belief, there is a written settlement agreement, but Jones does not have a copy.

27.     In this reorganization case and later in the Chapter 7 case, it has been Paul Weiss that has directed that Plaintiffs actions throughout these two bankruptcies.  Paul Weiss has directed the same lawfare conduct that its firm admittedly attempted against President Trump.  Apparently unknown to the President, Paul Weiss considers *pro bono* representation of millionaires in this bankruptcy (the Connecticut Plaintiffs shared in the $70+ million settlement of the gun manufacturer litigation).  The Connecticut Plaintiffs and their espousing their ideological political agenda of gun control by partnering with the Onion, was all designed to acquire "InfoWars" brand and IP and *remove Alex Jones from his career as a news media and champion of free speech and freedom of the press*, and according to Paul Weiss' webpage, it considers these Plaintiffs to be as "pro bono" work (hardly in compliance with its settlement of the President's claims.)[28]

28.     In truth, Plaintiffs' counsel, including Paul Weiss, have adopted and pursued lawfare[29] in the handling of the Plaintiffs' purported judgment claims "as if" the Plaintiffs were creditors holding claims that were being pursued for the economic recovery of those claimants.  Nothing is further from the truth in this case.  As the Fort Worth Court of Appeals recently noted:

> Lawfare is an ugly tool by which to seek the … policy changes the California Parties desire, *enlisting the judiciary to do the work that the other two branches of government cannot or will not do. …*"

---

[28]     On the Paul Weiss web site, the firm continues to claim that the Connecticut Plaintiffs representation is *pro bono*, although *pro bono* legal work is generally not considered representing politically aligned millionaires to destroy someone's constitutional Free Speech rights.  It is believed that this position by Paul Weiss is being investigated as a breach of their settlement agreement.

[29]     "Lawfare" has been defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021):
> The term "Lawfare" is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people. Here, Plaintiff motions to prohibit Defendant Barbounis from using Lawfare under Rule 402 and 403, alleging that it is unduly prejudicial and irrelevant.

*City of S.F. v. Exxon Mobil Corp.,* No. 02-18-00106-CV, 2020 Tex. App. LEXIS 5226 at 58-59 (Tex. App. June 18, 2020).[30]  More to the specifics, "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy.  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448.  And these Jones and FSS Bankruptcy cases have been the textbook example of "lawfare," as here:

a.      a creditor obtains a judgment that it brings to the bankruptcy court, files both the claims **_and_** an objection to the dischargeability of that claim (*i.e.*, wanting to appear to be legally seeking to be paid notwithstanding all other creditors discharge in the bankruptcy);

b.      yet these participants with an ulterior motive, using the claims "standing" and with the help of third party "partners" (in one instance, the Trustee, and another, the Onion, indirectly affiliated with Bloomberg, a well-known advocate of gun control) seek to acquire all of Jones' and FSS's assets, not for their economic value, but *for the express purpose of destroying the InfoWar brand's value and thereby Jones ability to earn an income*; and

c.      done all in the pursuit, not of a financial return on their claim, but implementation of an ulterior motive and purpose in the claims filing and objection to dischargeability *to further a political agenda of depriving Jones and FSS of their Constitutional rights to the free exercise of the First Amendment through freedom of the press and freedom of speech by which both earned their individual and corporate living.*

29.      It is not only the bad faith that ulterior motives in filing the claims are pursued (*e.g.*, refusing to mediate in good faith, and seeking to control the bankruptcy process so as to acquire the Jones and FSS assets as cheaply as possible and for the purpose of destruction of those assets

---

[30]      More generically "Lawfare" is defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021) as follows:
    The term 'Lawfare' is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people.

value, only to further their ulterior motive to destroy these debtors ability to exercise their "fundamental constitutional rights". *Id. Pennzoil,* 107 S. Ct. at 1535 [*See, Supra*, pg. 12]. The intention and goal of using a claim in bankruptcy for the purpose of depriving a debtor of its rights to free speech and freedom of the press, and to earn a living, makes this case and the conduct of the Connecticut Plaintiffs and the Texas Plaintiffs repugnant to every bankruptcy policy approved by the Supreme Court of the United States. Once this Court refused to allow the Plaintiffs to manipulate the auction process, they simply pivoted to opposing *any* bankruptcy auction. Now the agenda is to use the State Court system to continue the same unlawful abuse of process.

30.     Below Jones will address the most egregious misstatements set out in the Plaintiffs' Response to the FUAC auction motion, in which they now oppose any bankruptcy auction sale, in favor of a state court action *that they are prohibited from participating pursuant to the stay (and expected stay) pending the appeal of their Judgment*.[31]

**VI.**
**THE CONNECTICUT PLAINTIFFS' LAWFARE IN PURSUIT OF THE**
**ULTERIOR MOTIVES AND PURPOSES**

**"The Sandy Hook Families have not yet received—and are no closer to receiving—*a single***
***dollar in distributions* from either Jones or FSS through the bankruptcy cases**
**[Plaintiffs' *Joint Objection to an Auction* Pg. 1, ¶1]**

31.     It is important to recognize that this statement on behalf of the Plaintiffs in support of their sudden reversal of their position on an auction, is intended to mislead and obfuscate the Plaintiffs' ulterior motive - that these bankruptcy cases *are not about distributions or money*, but about taking Alex Jones out of the public discourse and off the air, and the motive is shared by other significant players in the political arena. Below Jones will address the misstatements set out

---

[31]     As pointed out herein several times, simply because Paul Weiss is prohibited by a court and a statute from taking an action does not mean Paul Weiss will not take the action (*e.g.* the WD-TX removed case now in this Court where Paul Weiss attempted to obtain a receiver over all of Alex Jones assets by false representations to the State Courts. Paul Weiss simply ignores this Courts stays and likely its injunctions.

in the Plaintiffs Response to the FUAC auction motion in which they now oppose any bankruptcy auction sale, in favor of a state court action they are prohibited from participating pursuant to the stay pending or prospective stays of the appeal of their Judgment, or the automatic say or the discharge injunction.

**A.    Alex Jones Estate Received approximately $6 Million From FSS and Post-Conversion Alex Jones Services During These Bankruptcies, That Has Now Been Reduced to $4 Million as a Result of Administrative Costs Pursuing Auctions and Plaintiffs Claimed Settlements**

32.    Plaintiffs, in obtaining the grossly unfair and unconstitutional Judgments, were permitted to argue to the jury that Alex Jones should be punished by an award *that assured he could never continue in his profession*.  [*See, supra*, Note 18].  The Connecticut Plaintiffs and their announced partner, the Onion, told the public that the purpose of acquisition of the FSS assets was to destroy the InfoWars brand and business and use the customer data to further a parody of the InfoWars brand to its customers.[32]  All during this process Alex Jones continued to broadcast his show and, in the process, allowed FSS to amass more than $6 million in cash (net of the over $2 million the Trustee's lawyer and professionals have spent on fees).  The order placing that cash in the Jones Estate is a final order.

33.    Just like the auction orders, and although ordered twice by this Court, the Plaintiffs refused to mediate, first of all, at all with Hon. Judge Isgur, and the second time, not in good faith, conduct wholly consistent with the goals of the Plaintiffs.  And all during this time Jones continued to profitably render his services to FSS or through FSS, InfoWars and its brand, for the Estate.

**B.    The Jones/FSS Litigation and This Bankruptcy Has Increased the Sandy Hook Foundations by Hundreds of Millions of Dollars**

---

[32]    Although nothing would have prevented the Connecticut Plaintiffs from bidding at any Jones Estate auction for assets, that is not what the Connecticut Plaintiffs did.  In addition to other manipulations the Connecticut Plaintiffs attempted to use their *non-final stayed judgment as if some sort of cash equivalent* for the purpose of that bidding – in other words, to "collect" on their judgment in violation of the Connecticut Statute, and currently, the Connecticut Court of Appeals, stay of all collections.

34.     After having negotiated a $70+ million settlement with the gun manufacturers and sellers, several of the Connecticut Plaintiffs formed charitable foundations in support of gun control (Jones does not yet know how many have been formed, but at least three are known. Those foundations received public donations to further their purpose. However, with modest contributions through five years after the Sandy Hook tragedy, the Connecticut Plaintiffs finally decided to sue Jones and FSS along with an immediate, well-financed, public campaign of adverse public-relations "news releases" all raising the claims and allegations of these plaintiffs in the post-suit public press. On information and belief, the PR firms used later became the same PR firms used in the New York suit against President Trump, bragging at the time that it worked against Jones as a test of its success.

35.     Thus, when Jones and FSS were sued in 2018 for defamation in 2018 and the news releases began flooding the news, not surprisingly and almost immediately the funds began to increase. However, the major increases were leading up to the trials, including (shortly before *each trial was to begin*) grants from the United States Department of Justice, and other governmental agencies that reached a highpoint at the beginning of the Connecticut trial. This multi-million government funding allowed, for example, one foundation's founding member and Sandy Hook parent, to earn in excess of $240,000.00 plus in her annual salary from the foundation that, according to published records, used 46% of all donations for salaries.

36.     Jones has reviewed the ".gov" public records of at least three (3) Sandy Hook foundations whose contributions were flat for the several (up to 4+ years prior to the litigation), and that upon suit and publicity of the trial, doubled or tripled or more, through among other things, **<u>DOJ grants</u>**, and public contributions in excess of $100,000,000.00 to these three Connecticut Plaintiffs' charitable foundations – increases almost singularly driven by the Alex Jones suit and

the professional publicity of public relations firms that have bragged about their success in the Jones case.

C.   **The Going Concern Value of FSS and Alex Jones Operations Could Gross $50 Million or More a Year, Yet Plaintiffs Want All Operations to Cease – and Retain Their Non-Dischargeable Debt**

37.   Since his appointment, and at the suggestion of Jones, Trustee Murray has never stopped production work through the use of the FSS assets and leasehold estate, work headed by Jones and aided by the Supplemental Order, which work has earned the Estate several million dollars and preserved the assets intact, such that the bid price with all assets intact has risen from $4m to $8m.  This success has been after all of the adverse publicity of the Plaintiffs' bankruptcy.

38.   However, as the Court recalls, immediately upon "announcing" (without Court review or approval) that the Onion was the winning bidder based on judgment credits, the Trustee shut down and took "dark" the InfoWars production and web presence.  This was accompanied by the Onion publicly announced its intention to only use the Website and IP for parody of Jones and to support gun control.  In other words, a business enterprise valued in the multi-million dollars was to be acquired for parody, in fact designed to destroy the brand and destroy the income that the InfoWars brand earned up to the date the Trustee claimed to have sold it the Onion.

39.   In face of the continued monetary success of Jones continuing FSS's operations, Trustee Murray has continually reflected an attitude that is impossible to explain.  For instance, when he would not agree that FSS and Jones Connecticut appeals were authorized to be filed, and claimed he intended to allow the appeals to expire for lack of briefing (and actually criticized Jones and threatened the lawyers that timely filed those briefs).  Other examples include the Trustee's unconventional conduct in pursuing two failed auctions and joining in a settlement with the Plaintiffs that at a minimum would have violated the law.  Finally, after ignoring the $8 million second offer of FUAC for two months in favor of those failed "settlement agreement" negotiations,

when FUAC wanted to participate in an auction as the Court had instructed the Trustee to do, the Trustee remained silent and refused to take a position (or even seek to initiate bid procedures) on the FUAC's second $8 million cash bid.

40.     To be clear, Christopher Murray is a capable and competent Trustee but has at best "frozen at the wheel" in both his logic and capabilities because, insofar as Jones believes, and capitulated to the Plaintiffs' demands on, and possibly expressed or implied threats made to, the Trustee, with repercussions if the Trustee did not do as the Plaintiffs' demand to permit them to dictate the auction process that both times was rejected by this Court.  This belief would explain the following:

     i.     Why the Trustee arranged the terms of the first sale process so randomly and incompletely, simply because that was the extent to which the Plaintiffs wanted to be bound, and it guaranteed their success.

     ii.     Why the Trustee would need to drive at 5:00 AM from Houston to Austin on the day of his intended announced selection of the Plaintiff's & Onion joint partnership bid, to order the "shut down" of FSS operations and require the FSS broadcast crew take the Alex Jones Show "dark" (dropping weekly sales from an average of more than $80,000 to less $20,000.00 when re-started 48 hours later) while at the same time the Onion announced to the public through news interviews and redirection of the FSS URL to the Onion new URL – falsely <u>announcing that it had purchased "InfoWars.</u>

     iii.     Why the Trustee, after what is reported as over $12 million spent on accounting investigations and fraud auditing of FSS and Alex Jones by the Chapter 11 Committee and professionals, there were no assets or transactions (save a single vehicle) omitted from the FSS and Jones schedules and disclosures, he decided to retain in the Chapter 7 case additional professionals to investigate Jones Chapter 7 FSS business conduct and spent $2 Million in

administrative costs pursuing two Trustee-driven failed auctions.

iv.     Why, when the Trustee received on December 19, 2024 an $8 million offer to acquire the assets of FSS, the Trustee never initiated a sale process but for some reason substituted his "negotiations" for the next six-weeks *with the Plaintiffs* to ultimately propose giving the Texas Plaintiffs an allowed claim more than 10 times the amount of their judgment, and giving an "allowed" claim in the full amount of the Connecticut Plaintiffs Claims even though no Plaintiffs' claims was allowed because both were, and are, still on appeal and stayed by the Connecticut statutes and Connecticut Court of Appeals Order and the automatic stay.  This belief is also based on the announced motives of the Plaintiffs, to take Alex Jones off the air and destroy his ability to continue in the public discourse.  This motive, stated by both the Connecticut and Texas Plaintiffs in the opening and closing jury arguments, explains why the Onion announced after it claimed it won the bid, that it would shut down all FSS operations and use Infowars for Alex Jones parody – by utilizing his database of customers and followers.

41.     This conduct clearly evidences the ulterior motives using and driving these bankruptcy cases to accomplish a political agenda, initiated by Plaintiffs' trial counsel and continued by Plaintiffs' bankruptcy counsel.  This Court has the jurisdiction and power to prevent such unfair and unlawful conduct which should not be simply sent to the State Courts to repeat the injury.   The Fifth Circuit instructs on this Court's ability to control this conduct:

> Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages").  *Id.* at 427-428.

*Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).

**D. This Court Should Not Reward These Abuses of the Bankruptcy Process to Continue the Lawfare of the Plaintiffs**

42. As remarkable as it sounds, the multiple large international law firms including Paul Weiss and Akin Gump, see nothing wrong with announcing a strategy to deprive Alex Jones of his freedom of the press and his right to free speech. It was Paul Weiss that settled the lawfare suit against President Trump, by acknowledged the wrongdoing of its former partner Mark Pomerantz in the New York Alvin Bragg litigation and agreed to dedicate the equivalent of $40 million in non-political "*pro bono legal services*". Contrast Paul Weiss' settlement with President Trump to the Paul Weiss current web page claiming that its current partner Kyle Kempler:

> "maintains a significant pro bono practice. *He is currently representing a group of families of the victims of the Sand Hook Elementary School Shooting in the bankruptcy proceeding of ... Alex Jones and Jones' wholly owned Company Free Speech Systems ....*"

It is generally accepted that Lawyer "pro bono" work means free legal representation to those who cannot afford the legal fees or by representing non-political public interest groups without funds to advance their public cause. Pro Bono work is not claiming to be doing free work for rich people pursuing a political agenda or doing free work to pursue the censoring of an individual's freedom of the press and free speech.

43. In fact, all of the Plaintiffs' lawyers and the purported *pro bono* law firms, have repeatedly claimed that they are not interested in the money, but in taking Alex Jones off the air and out of the public discourse forever. This is the ultimate form of censorship by abuse of process – to be allowed to argue to a jury that they the jury has the power through an award of punitive damages, to take away a person's constitutional right to freedom of the press and free speech, then use that success to force a bankruptcy and then intentionally destroy the debtor's ability to earn a living. These lawyers have argued this ulterior motive repeatedly over and over and even including the Onion (that their partnership with the Connecticut Plaintiffs was to acquire the FSS assets and

the name and brand "Infowars" so that it can be destroyed by their use of it to parody Alex Jones and his right to freedom of the press and free speech (certainly not to realize its brand value).

44.     This is exactly what President Trump experienced and exactly what President Trump thought he was ending by the terms of this settlement. Not so - Paul Weiss simply "repackaged" their definition of "pro bono" into representing rich individuals for free if the political message is correct.  Notwithstanding that the families are neither poor nor, according to their lawyers, interested in money damage (not only have many of the Connecticut Plaintiffs shared the $70+ million payment by Remington and other gun manufacturers, but the several foundations that many of the families have set up or participate in, have received over $100 million in DOJ grants, loans from the US Government and public donations) according to the governmental databased ".gov."

## VII.
## CONCLUSION

45.     Notwithstanding the above, Plaintiffs, through "Pro Bono Paul Weiss", assert that Jones and FUAC are parties that have no economic standing in the case to complain of their conduct. — [*See*, Supra, ¶ 7, pg. 10].  This Court has previously recognized Jones standing regarding the auction orders.

46.     This Court should exercise its jurisdiction to enforce all of its prior auction-related orders, including the Orders authorizing an auction as well as the Supplemental Order.  This Court should enter its order for the Trustee, or a replacement Trustee if requiring replacement [*See, supra* Note 21] to conduct a sale that is not controlled or driven by the Plaintiffs and simply allow the process to conclude.   All parties in interest, even the Plaintiffs as bidders, and the public, will have a fair opportunity and right to participate in a fair and honest outcome if not controlled by Plaintiffs. All other matters arising from the lawfare conduct of the Connecticut Plaintiffs will be left to other

Courts or other proceedings to determine, but as to this Court and its clear jurisdiction to accomplish fairness in the auction process, and the public policy of having its orders observed and not manipulated, this Court should order the auction of the assets covered by the Supplemental Order.

WHEREFORE, Movant Alexander E. Jones individually, and a manager of Free Speech Systems, LLC, seek an order as above requested, and for such other and further relief to which Movants may be justly entitled, at law and in equity.

Dated: April 28, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on April 28, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 6

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,                    )  CASE NO: 22-33553
                                       )
                                       )  Corpus Christi, Texas
                                       )
             Debtor.                   )  Thursday, June 5, 2025
                                       )
                                       )  1:00 p.m. to 2:32 p.m.
-------------------------------)


HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                 BEN C. BROOCKS
                            Broocks Law Firm PLLC
                            6207 Bee Cave Road, Suite 120
                            Austin, TX 78746

                            SHELBY JORDAN
                            Jordan & Ortiz, PC
                            500 North Shoreline Blvd.,
                            Suite 804
                            Corpus Christi, TX 78401

For Chrsitopher R.          ERIN ELIZABETH JONES
Murray:                     Jones Murray LLP
                            602 Sawyer, Suite 400
                            Houston, TX 7007

                            JOSHUA WOLFSHOHL
                            Porter Hedges LLP
                            1000 Main, 36th Floor
                            Houston, TX 77002

For First United            WALTER J. CICACK
American Companies, LLC:     Hawash Cicack & Gaston LLP
                            711 W. Alabama Street, Suite 200
                            Houston, TX 77006

For Veronique              AVI MOSHENBERG
De La Rosa:                Lawson & Moshenberg PLLC
                           801 Travis Street, Suite 2101, #838
                           Houston, TX 77002


For William                KYLE KIMPLER
Aldenberg:                 Paul, Weiss
                           1285 Avenue of the Americas
                           New York, NY 10019


For the U.S. Trustee:      HA MINH NGUYEN
                           Office of the United States Trustee
                           515 Rusk Street, Suite 3516
                           Houston, TX 77002

Court Reporter:            YESENIA LILA

Courtroom Deputy:          YESENIA LILA

Transcribed by:            Veritext Legal Solutions
                           330 Old Country Road, Suite 300
                           Mineola, NY 11501
                           Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay. Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay. Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT: I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES: Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification.  Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES: I think it's been assigned to Judge Rosenthal.

THE COURT: That's what I understood. So, and they don't come any smarter --

MS. JONES: That's correct.

THE COURT: -- than Judge Rosenthal.

MS. JONES: I agree 100 percent.

THE COURT: So and I just, again, I'm relying on the text here. Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007.  While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

Whether the granting of a stay would substantially harm the other parties.  The answer is no.  I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest.  I don't, have no -- nothing showing the public interest, and I've read all the papers.  Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself.  It speaks for itself.  So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal.  So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record.  So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay.  I think there was an emergency request for a stay.  I'm going to deny those.  So I'll take a look at these orders and sign them on the docket.

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun.  I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT:  So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news.  I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments.  So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter.  So me having status conferences like this is really where I try to get the real information.

MS. JONES:  And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases.  But with respect to what the trustee needs to do, this is, this is where we are.  And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed.  So I think that case, for the most part, it's done.  I don't expect anything else in that case, at this point.

THE COURT:  Okay.  Thank you.  Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler.  From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary?  Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG:  100 percent, Your Honor.  Let me start with the state court cases.  Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT:  Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER:  Yeah.

THE COURT:  And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right?  Just to make sure that I'm clear.

MR. KIMPLER:  Correct.  So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT:  Okay.  Okay.  Thank you.

MR. KIMPLER:  The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones.  That is Case Number 24-03279.  That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it.  So let me explain what it is and why it's before you.

That was last August.  We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple. So if you have any other questions, I would, I would call for a lifeline.

THE COURT: No, no, this was very helpful. I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER: The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court. We are trying to do that. We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT: Thank you. Great. Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE: That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT:: Mm hmm.

MR. JORDAN: I mean. And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have time to get the cameras and stuff, I mean the audio. But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here. It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT: Mr. Bankston represents the plaintiffs,

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this.  "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?"  Now, I'll stop there for just a second.  I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it.  I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself.  "What is, what is accomplished by this appeal?  The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties."  And then, Your Honor, this, this second page, I don't, I think that's all we've got.  I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did.  So that's okay.  I'm not willing to do that.  And, and so I want to point that out

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless. There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel.  I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper.  We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there.  I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call. That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue. And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them.  We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to.  Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked. It is a final order that permits the trustee, because remember your supplemental order did two things. You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell." Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered. I think that's foolish, but that's their argument. But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception. Your final judgment is a final judgment on the law. That is, can I, could I authorize to do that in the state of Texas? Yes, I can. I have a final order. Everybody knew about it. Even the person that complained about it withdrew his appeal. So it's fine.

THE COURT: The question is, do we do round two?

MR. JORDAN: I'm sorry, Judge?

THE COURT: There's already been a round one. The question is do we open it up for a round two. That's the real question, right?

MR. JORDAN: Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something.  That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion.  It's not on sua sponte of the Court.

THE COURT:  Oh, I agree with that.

MR. JORDAN:  Okay.  So no one has asked you to do anything.  They've said, oh, it's all moot --

THE COURT:  No, I agree.  I don't know how people are construing it.  Maybe I can provide some clarity there.  There is an order out there.  That order, there was a sale, a proposed sale under that order.  He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard.  The trustee can move if he wants.  I know you can sell the equity.  And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before.  But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to.  Truste's got an offer.  Trustee will weigh.  Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not. But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it. He tried to sell assets under those orders.

The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor? It's more complicated now than it was six or seven months ago.

MR. JORDAN: Well, I agree. I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs. They know that a state court auction by a constable is worthless to value. They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid. Nobody gets any cash. There's no change. They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all. There's not a whole lot of them, but

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN: And they purport to -- and we only found these this morning. We weren't, we weren't ever served any notice, but we weren't parties to these adversaries. These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these. And my question, if I may ask the question, I'm not asking for an advisory opinion. I just, this is the Court's order. It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS. And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court. These were remand motions that I think they're, they're not the ones that we're involved in that's up for today. But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem. We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT: No.

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was. I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that? And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required. The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are. And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed. The justice says, what could she have done? I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself. There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins. That's

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS:  And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here.  They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air.  That is not a legitimate purpose.  And that is going to be, so that's the essence of our, of our 1983 claim.  Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action.  The New York Times versus Sullivan says that's a state action.  The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit.  That is a judge entering an order that now tips the scale, and that is state action.  Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process.  And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT:  Thank you very much.  Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER:  I would, Your Honor.  I'll be brief, but there was a lot of stuff said.  I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.  Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

THE COURT:  They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently.  We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

                            CERTIFICATION


     I certify that the foregoing is a correct transcript from

     the electronic sound recording of the proceedings in the

     above-entitled matter.

     matter..

     *Sonya M. Ledanski Hyde*


     Sonya Ledanski Hyde








     Veritext Legal Solutions

     330 Old Country Road

     Suite 300

     Mineola, NY 11501


     Date:  June 17, 2025