**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 7

                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

ALEXANDER E. JONES,            )  CASE NO: 22-33553
                               )
                               )  Corpus Christi, Texas
                               )
         Debtor.               )  Thursday, June 5, 2025
                               )
                               )  1:00 p.m. to 2:32 p.m.
------------------------------)


                              HEARING

         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                BEN C. BROOCKS
                           Broocks Law Firm PLLC
                           6207 Bee Cave Road, Suite 120
                           Austin, TX 78746

                           SHELBY JORDAN
                           Jordan & Ortiz, PC
                           500 North Shoreline Blvd.,
                           Suite 804
                           Corpus Christi, TX 78401

For Chrsitopher R.         ERIN ELIZABETH JONES
Murray:                    Jones Murray LLP
                           602 Sawyer, Suite 400
                           Houston, TX 7007

                           JOSHUA WOLFSHOHL
                           Porter Hedges LLP
                           1000 Main, 36th Floor
                           Houston, TX 77002

For First United          WALTER J. CICACK
American Companies, LLC:   Hawash Cicack & Gaston LLP
                           711 W. Alabama Street, Suite 200
                           Houston, TX 77006

For Veronique          AVI MOSHENBERG
De La Rosa:            Lawson & Moshenberg PLLC
                      801 Travis Street, Suite 2101, #838
                      Houston, TX 77002

For William            KYLE KIMPLER
Aldenberg:            Paul, Weiss
                      1285 Avenue of the Americas
                      New York, NY 10019


For the U.S. Trustee:  HA MINH NGUYEN
                      Office of the United States Trustee
                      515 Rusk Street, Suite 3516
                      Houston, TX 77002

Court Reporter:        YESENIA LILA

Courtroom Deputy:      YESENIA LILA

Transcribed by:        Veritext Legal Solutions
                      330 Old Country Road, Suite 300
                      Mineola, NY 11501
                      Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here. It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018. And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case. So Subsection 1 doesn't support certification. Subsection 2 also doesn't support certification. There's no conflicting decisions for the standards. And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings.  I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf.  He's been adequately represented and I wouldn't stray from any word that I put in that order.  I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing.  So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit.  I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES:  I think it's been assigned to Judge Rosenthal.

THE COURT:  That's what I understood.  So, and they don't come any smarter --

MS. JONES:  That's correct.

THE COURT:  -- than Judge Rosenthal.

MS. JONES:  I agree 100 percent.

THE COURT:  So and I just, again, I'm relying on the text here.  Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

Whether the granting of a stay would substantially harm the other parties.  The answer is no.  I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest.  I don't, have no -- nothing showing the public interest, and I've read all the papers.  Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself.  It speaks for itself.  So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal.  So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record.  So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay.  I think there was an emergency request for a stay.  I'm going to deny those.  So I'll take a look at these orders and sign them on the docket.

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun.  I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES:  And I don't know if you'd like to address timing or if you --

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT:  So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news.  I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments.  So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter.  So me having status conferences like this is really where I try to get the real information.

MS. JONES:  And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases.  But with respect to what the trustee needs to do, this is, this is where we are.  And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed.  So I think that case, for the most part, it's done.  I don't expect anything else in that case, at this point.

THE COURT:  Okay.  Thank you.  Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler.  From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary?  Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG:  100 percent, Your Honor.  Let me start with the state court cases.  Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG: That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT: No, no. Go ahead.

MR. MOSHENBURG: At the oral argument, the appellate court seemed to focus on two things. One was the default judgment, and then also the cap busting of the punitive damages cap. Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT: No, that's just fine. I just didn't get a sense of timing. If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it? No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG: 100 percent, Your Honor, we'll do that. And that really goes to the adversaries as well. Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally. We were in the -- previously we talked about filing a motion to reconsider. In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG:  Right.  Judge, I think that's a great idea.  We fully --

THE COURT:  I don't know if it's a great one, but it's an idea.  Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG:  Sure.  And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut.  We've reached a settlement on going forward.  And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor.  So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate.  But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT:  And so, but I don't want -- well, Let me hear from others.  What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT:  Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER:  Yeah.

THE COURT:  And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right?  Just to make sure that I'm clear.

MR. KIMPLER:  Correct.  So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT:  Okay.  Okay.  Thank you.

MR. KIMPLER:  The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones.  That is Case Number 24-03279.  That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it.  So let me explain what it is and why it's before you.

That was last August.  We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT::  Mm hmm.

MR. JORDAN:  I mean.  And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have  time to get the cameras and stuff, I mean the audio.  But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here.  It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT:  Mr. Bankston represents the plaintiffs,

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

to you to in this respect. I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless. There's no effect to it. It's nothing because we made another deal with somebody else and no matter what you do. Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff. The appellate court was very focused on what was going on here. And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess. The Courts had no response. They had no emotion, they had no response. They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time. The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this. Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million. So the balance sheet doesn't change and that's where you, that's where you make your auction decisions. But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets. The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them. We want to destroy his brand. Onion said that in the, in the newspaper. We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money. What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator. They did then eventually agree to a mediation and zero happened. So this is not a case

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.   The trustee's lawyer has gotten $800 million too pursuing these auctions.   I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN:  And they purport to -- and we only found these this morning.  We weren't, we weren't ever served any notice, but we weren't parties to these adversaries.  These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these.  And my question, if I may ask the question, I'm not asking for an advisory opinion.  I just, this is the Court's order.  It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS.  And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court.  These were remand motions that I think they're, they're not the ones that we're involved in that's up for today.  But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem.  We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT:  No.

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues.  As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed.  So the Court didn't have to just go watch them.  I said, here are the transcripts.  They objected to that, but I said, I'm just trying to help.  And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away.  And nobody, no court in America has yet ruled on the constitutional issues we raised.  Nobody.  And so, and so they said, well, they were, they were facing the task and they realize that's their duty.  And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure.  We think we satisfied all three of those.  We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless?  I said, absolutely not.  She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was. I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that? And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required. The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are. And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed. The justice says, what could she have done? I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself. There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins. That's

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS:  And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here.  They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air.  That is not a legitimate purpose.  And that is going to be, so that's the essence of our, of our 1983 claim.  Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action.  The New York Times versus Sullivan says that's a state action.  The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit.  That is a judge entering an order that now tips the scale, and that is state action.  Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims.  We believe we're going to assert an amended petition or complaint for abuse of process.  And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT:  Thank you very much.  Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER:  I would, Your Honor.  I'll be brief, but there was a lot of stuff said.  I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court.  I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not.  We are confident that the judgment will stand.  I don't believe the Supreme Court will even take review.  As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal.  So when you ask what's the federal issue for the Supreme Court to look at?  It's a pretty good question.  Mr. Broocks won't agree with any of that.  I don't need to convince you of any of that.  The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't.  They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients.  I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context.  It specifically said we're tired of being hurt on air.  If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.   Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.   I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.   I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

THE COURT: They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.

matter..

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025