

**EXHIBIT**

**D**

Alexander E. Jones; 22-33553

7/7/2025 1:50 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Max Hernandez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § § | 261st JUDICIAL DISTRICT |

## APPLICATION FOR POST-JUDGMENT TURNOVER ORDER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS' ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC

Plaintiffs Neil Heslin and Scarlett Lewis (the Texas Families) and Intervenors David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Families and, collectively with the Texas Families, the Judgment Creditors) respectfully request that the Court grant this Application for Turnover Relief and Appointment of a Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) against Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors). Judgment Creditors would respectfully show the Court the following:

1.      **Connecticut Families' Judgment**. The Connecticut Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Connecticut Families in the amount of $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court. The Connecticut Supreme Court has

denied further review.  *See* **Exhibit B, Denial of Certification of Review**.  The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review.  *See* **Exhibit A, Declaration of Alinor C. Sterling**.  The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024.  Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case).  On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1]  *See* **Exhibit C, Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones**.  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed.  The Connecticut Appellate Court denied that motion on May 13, 2025.  *See* **Exhibit D, Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**.  The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

2.      In the Free Speech Systems, LLC Chapter 11 Case, the Bankruptcy Court for the Southern District of Texas issued an order dismissing the case and vesting authority in the Trustee in the Jones Chapter 7 Case (the Trustee) to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts.  *See* Dkt. 956 (June 21, 2024).  Accordingly, this Application only seeks relief relating to Judgment Debtor Free Speech Systems, LLC if approved by the Trustee in the Jones Chapter 7 Case.

3.      **Texas Families' Judgment**.  The Texas Families own a judgment against the Judgment Debtors.  Judgment Debtors are obligated to the Texas Families in the amount of $50,043,923.80 under the judgment rendered before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment).  *See* **Exhibit E, Declaration of Avi Moshenberg**.  The Connecticut Families' Judgment and the Texas Families' Judgment are collectively referred to as the Judgments.

4.      The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

5.      For the avoidance of doubt, the Judgment Creditors are **not** seeking any relief that would be inconsistent with the pending Jones Chapter 7 Case, including seeking any relief with respect to assets that Judgment Debtor Alex Jones owned on or before

June 14, 2024, as such assets constitute property of the Jones Chapter 7 Bankruptcy Estate.

6. However, any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, do not constitute property of the Jones Chapter 7 Bankruptcy Estate and are thus available to satisfy the Judgments. Further, any assets of Free Speech Systems, LLC, subject to the approval of the Trustee are available to satisfy the Judgments.

7. Accordingly, Judgment Creditors seek to **only** execute upon the following categories of assets, and, in each case, solely to the extent necessary to satisfy the Judgments (collectively, the Receivership Assets):

(a) any non-exempt assets Judgment Debtor Alex Jones has acquired post-conversion or may acquire in the future;

(b) any pre-conversion assets of Judgment Debtor Alex Jones which are expressly abandoned by the Trustee such that they no longer are property of the Chapter 7 bankruptcy Estate;

(c) any post-conversion payments Judgment Debtor Alex Jones is contractually entitled to; and,

(d) subject to the approval of the Trustee, any assets of Judgment Debtor Free Speech Systems, LLC.

8. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors. A courtesy copy of this Application is being served on the Trustee.

9. Judgment Creditors file this Application pursuant to pursuant to Texas Civil Practice and Remedies Code section 31.002(d) that provides: "The judgment creditor may move for the court's assistance under this section in the same proceeding in which the

judgment is rendered or in an independent proceeding." The proposed receiver, Gregory S. Milligan, resides in Travis County.

10. **Turnover and Appointment of Receiver**. Chapter 31 of the Texas Civil Practice and Remedies Code provides that: "A judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities." TEX. CIV. PRAC. & REM. CODE § 31.002(a) (as amended Acts 2017, 85th Leg., R.S., Ch. 996 (H.B. 1066), Sec. 1, eff. June 15, 2017).

11. The court may "appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." *Id.* § 31.002(b). Appointment of a receiver is prudent to provide for an orderly distribution of assets given Judgment Debtors have multiple creditors as detailed herein and given the attention that must be given to delineate the Jones Chapter 7 Bankruptcy Estate.

12. **Property**. Pursuant to Judgment Debtor Jones's sworn discovery responses attached to this application, he has non-exempt property. *See* **Exhibit A, Declaration of Alinor C. Sterling**. Pursuant to Judgment Debtor Free Speech Systems, LLC's sworn discovery responses attached to this application, it has non-exempt property can be used to satisfy the Judgments. *Id.*

13. **Turnover and Receiver**. Judgment Creditors request that Judgment Debtors be ordered to turn over all non-exempt, non-bankruptcy estate property and appoint Gregory S. Milligan, CTP, whose address is 8911 North Capital of Texas Highway

Suite 2120 Austin, Texas 78759, (512) 892-0803, milligan@harneypartners.com, as Receiver over such non-exempt, non-bankruptcy estate property. Mr. Milligan has served as post-judgment turnover receiver in numerous cases before courts of the State of Texas and federal courts; he is a certified turnaround professional; and he is qualified to serve. Judgment Creditors request no bond be required. *Childre v. Great Sw. Life Ins. Co.*, 700 S.W. 2d 284, 289 (Tex. App.—Dallas 1985, no writ).

14.     **Notice to Judgment Debtor**.  Notice and a hearing are not required before issuance of a turnover order.  *See Thomas v. Thomas*, 917 S.W.2d 425, 433-34 (Tex. App.—Waco 1996, no writ).

15.     **Attorney's Fees**.  Pursuant to Texas Civil Practice and Remedies Code section 31.002, Judgment Creditors are entitled to recover their reasonable costs and attorney's fees incurred in attempting to collect their judgment.

16.     **Prayer**.  Judgment Creditors pray that the Court grant this Application, order turnover of Judgment Debtors' non-exempt property that is not part of the Chapter 7 bankruptcy Estate, appoint Gregory S. Milligan as Receiver, award Judgment Creditors reasonable attorney's fees and expenses, and grant all further relief to which Judgment Creditors may be entitled.

Respectfully submitted this 7th day of July 2025.

        */s/ Ryan E. Chapple*
        Ryan E. Chapple
        State Bar No. 24036354
        rchapple@cstrial.com
        Benjamin D. Evans
        State Bar No. 24081285
        bevans@cstrial.com
        **CAIN & SKARNULIS PLLC**
        303 Colorado Street, Suite 2850
        Austin, Texas 78701
        512-477-5000
        512-477-5011—Facsimile
        **ATTORNEYS FOR**
        **THE CONNECTICUT FAMILIES**

        */s/ Avi Moshenberg*
        Avi Moshenberg
        State Bar No. 24083532
        **LAWSON & MOSHENBERG PLLC**
        2301 Commerce Street, Suite 200
        Houston, TX 77002
        Telephone: (713) 449-9644
        Email: avi.moshenberg@lmbusinesslaw.com
        **ATTORNEYS FOR**
        **THE TEXAS FAMILIES**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Application for Post-Judgment Turnover and Appointment of Receiver has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 7th day of July, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Chapter 7 Trustee | Christopher R. Murray<br>chris@jonesmurray.com<br>crm@trustesolutions.net<br><br>Erin Jones<br>erin.jones@jonesmurray.com<br><br>Joshua Wolfshohl<br>jwolfshohl@porterhedges.com |
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan<br>milligan@harneypartners.com |

       */s/ Ryan E. Chapple*
Ryan E. Chapple

# EXHIBIT A

## DECLARATION OF ALINOR C. STERLING

THE STATE OF CONNECTICUT    §

   §

COUNTY OF FAIRFIELD    §

1.     "My name is Alinor C. Sterling. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2.     "I am an attorney in the law firm of Koskoff Koskoff & Bieder PC and licensed to practice law in the State of Connecticut. I am one of the attorneys of record for David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively, the Connecticut Sandy Hook Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3.     "Judgment Creditors own a judgment against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Vickie L. Driver, 2525 McKinnon St., Suite 425, Dallas, Texas 75201; Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 900, Corpus Christi, Texas 78401. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the Judgment Creditors is the Connecticut Sandy Hook Families c/o Alinor C. Sterling, Koskoff Koskoff & Bieder PC, 350 Fairfield Avenue, Bridgeport, Connecticut 06604.

1

4.     "Judgment Debtors owe $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court.  The Connecticut Supreme Court has denied further review.  The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. True and correct copies of these documents are being filed contemporaneously with this Declaration.

5.     "Pursuant to the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code, domestication papers related to the Connecticut Families' Judgment were filed on August 1, 2024. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in

2

bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1]  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed.  The Connecticut Appellate Court denied that motion on May 13, 2025.  The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

6.　　　"The Judgment Creditors have counsel in the State of Texas.  Their counsel is Ryan E. Chapple of Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, Texas 78701."

## OATH

My date of birth is May 16, 1967.  My business address is 350 Fairfield Avenue, Bridgeport, Connecticut 06604.  I have read the foregoing Declaration, and I declare under penalty of perjury that the foregoing Declaration is true and correct.

Executed in Fairfield County, Connecticut on June 23rd, 2025.

Alinor C. Sterling

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

# EXHIBIT 1

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.   COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                              $60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $60,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$120,000,000.00

2

LM

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                     $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 30,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                        $ 55,000,000.00

3

LM

TO PLAINTIFF FRANCINE WHEELER:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                              $24,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                    $30,000,000.00
 · (PAST AND FUTURE)

        TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF FRANCINE
        WHEELER AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)
                            $54,000,000.00

4

LM

TO PLAINTIFF JACQUELINE BARDEN:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                   $10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                       $18,800,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)
                                                    $ 28,800,000.00

5

LM

**TO PLAINTIFF MARK BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                           $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $32,600,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                               $57,600,000.00

6

LM

TO PLAINTIFF NICOLE HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                $ 32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 41,600,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF NICOLE
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 73,600,000.00

7

LM

**TO PLAINTIFF IAN HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $38,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $43,600,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF IAN
> HOCKLEYAND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $81,600,000.00.

8

**TO PLAINTIFF JENNIFER HENSEL:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)

$21,000,600.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)

$31,000,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$52,000,000.00

9



**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $30,000,000.00
   (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)
                                              $48,000,000.00

10

LM

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                       $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES             $36,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                            $66,000,000.00

11

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                        $18,600,000.00

B.  EMOTIONAL DISTRESS DAMAGES              $39,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLOS
MATHEW SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 57,600,000.00

12

LM

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $38,800,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 68,800,000.00

13

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                   $45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                       $45,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**                           $90,000,000.00

14

LM

TO PLAINTIFF ERICA LAFFERTY:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $18,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES          $58,000,000,00
    (PAST AND FUTURE)

        TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF ERICA
        LAFFERTY AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)
                                        $76,000,000.00

15

## TO PLAINTIFF WILLIAM SHERLACH:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES         $ 27,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
SHERLACH AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 36,000,000.00

16

LM

## II.   AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.

If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

## WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.

☒ **YES**  (reasonable attorney's fees and costs to be awarded by the judge at a later date)

☐ **NO**  (judge will award $1)

17



FOREPERSON SIGNATURE

10/12/2022

DATE

18

# EXHIBIT 2

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . .   . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . .   . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach v. Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

2

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

3

gain.    In  fact,  by  May,  2013,  Jones  was  alleged  to  make approximately $10 million annually.  Specifically, Jones began telling  his  audience  that  the  Sandy  Hook  shooting  was  "a government-sponsored hoax designed to lead to gun control . . . ."    In  furtherance  of  this  objective,  Jones  began  making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning  to  come  out  that  points  more  and  more  in  [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who  have  been  given  cue  cards,  people  who  are  behaving  like actors."    In  that  video,  Jones  stated  that  plaintiff  Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

5

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

7

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

<u>Common Law Punitive Damages</u>

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

11

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* supra, 193

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472,493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier.* . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

and cases cited therein. More recently, in *Bifolck v. Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

16

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

19

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million;  as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million;  as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million;  as to Jennifer Hensel, $17.33 million;  as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million;  as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million;  as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million.  Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

20

<u>Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a)
Any person who suffers any ascertainable loss of money or
property, real or personal, as a result of the use or employment
of a method, act or practice prohibited by section 42-110b, may
bring an action . . . to recover actual damages. . . . *The court
may, in its discretion, award punitive damages* and may provide
such equitable relief as it deems necessary or proper."
(Emphasis added.)   "The language is clear and unambiguous; the
awarding of punitive damages is within the discretion of the
trial court."   (Internal quotation marks omitted.)   *Bridgeport
Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d
703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

21

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier.  Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation.  See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration.  Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material."  (Citation omitted; internal quotation marks omitted.)  *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA.  "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

26

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.)  Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA.  It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law.  Id., 489.  The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .'  Id., 489-90.  After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

27

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

28

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich v. Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed. These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

30

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."   (Citations omitted; footnotes omitted; internal quotation marks omitted.)   *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

31

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

33

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.'   *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.   Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.   In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)].   The Court further

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

36

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co. v. Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC v. Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth.  On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs.  In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident."   (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion." (Citation omitted; footnote omitted.) Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

39

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information—the plaintiffs clearly established that the defendants' conduct was motivated by

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

41

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

42

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

43

plaintiffs.   This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

### Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA

punitive damages in the amount of $150,000,000.00.

421277

Barbara N. Bellis

# EXHIBIT 3

| AC 46131 | : | STATE OF CONNECTICUT |
| ERICA LAFFERTY, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46132 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46133 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

## PLAINTIFFS-APPELLEES' MOTION FOR RECTIFICATION

Pursuant to Rule of Appellate Procedure § 66-5, the plaintiffs-appellees hereby move the trial court to rectify the record in conformity with the verdict and judgment entered thereon.

Throughout the case, by agreement, the parties referred to Erica Lafferty, rather than the trustee of her bankruptcy estate, Richard Coan, as a plaintiff. Judgment entered in the total amount of $111,429,303.73 ($76,000,000.00 in compensatories plus $35,429,303.73 in punitives) in favor of Mr. Coan as Trustee of the Bankruptcy Estate of Ms. Lafferty. However, the verdict form and parts of the punitive damages Memorandum of Decision refer to Ms. Lafferty rather than Mr. Coan. To make the record crystal clear for the

1

reviewing court, plaintiffs seek rectification. The requested relief does not alter the amount or character of the judgment. It simply clarifies the record for a reviewing court.

## I.    BRIEF HISTORY OF THE CASE

The plaintiffs in this case are members of eight families who lost loved ones in the Sandy Hook Elementary School Shooting and one first responder. The plaintiffs brought suit against defendants Alex Jones and Free Speech Systems, LLC (collectively, "the Jones defendants") alleging invasion of privacy by false light; defamation per se; intentional infliction of emotional distress; and violation of the Connecticut Unfair Trade Practices Act. On June 18, 2019, the trial court (Bellis, J.) sanctioned the Jones defendants for discovery non-compliance and because Alex Jones threatened plaintiffs' counsel on his show. Reviewing pursuant to General Statutes § 52-265a, this Supreme Court affirmed. *Lafferty I*, 336 Conn. 332 (2020).

Following the affirmance of the sanction, the Jones defendants continued their obstruction of discovery. The trial court entered a default against the defendants and subsequently struck their notice of defenses. DN 574, 11/15/21 Default Ruling; Ex. B, DN 620.20, 12/24/21 Order Striking Notice of Defenses. The case proceeded as a hearing in damages before a jury, with evidence commencing September 13, 2022. The jury rendered a verdict in favor of the plaintiffs on October 12, 2022, awarding a total of $965,000,000.00 in compensatory damages and determining that common law punitive damages were warranted. The trial court assessed $323,139,555.94 in common law punitive damages and $150,000,000.00 in CUTPA punitive damages, for a total of $473,139,555.94. DN 1026, 11/10/22 Punitives MOD (Ex. A hereto). Final judgment entered on December 22, 2022,

2

when the defendants' motions for remittitur and to set aside were denied. DN 1043, 12/22/22 MOD Denying New Trial and Remittitur.

Jones appealed that judgment on December 29, 2022: AC 46131, *Erica Lafferty, et al. v. Alex Emric Jones, et al.*; AC 46132, *William Sherlach v. Alex Emric Jones, et al.*; and AC 46133, *William Sherlach, et al. v. Alex Emric Jones, et al.* On December 30, 2022, the three appeals were consolidated. On January 6, 2023, the Jones defendants filed a Corrected Appeal Form, adding FSS to the appeal.[1] On February 23, 2023, the plaintiffs-appellees filed a motion to transfer the consolidated appeals to the Supreme Court. That motion, Mot SC 220201, is pending.

## II.   SPECIFIC FACTS RELIED ON

On October 20, 2021, Erica Lafferty was removed as a party plaintiff and Richard Coan, Chapter 7 Trustee of the Bankruptcy Estate of Erica Garbatini a/k/a Erica Lafferty, was substituted in as a party plaintiff to prosecute the interests of Ms. Lafferty's bankruptcy

---

[1] FSS filed bankruptcy on July 29, 2022 in the United States Bankruptcy Court for the Southern District of Texas. On August 29, 2022, the Bankruptcy Court (Lopez, J.) lifted the automatic stay to allow trial and any subsequent appeal to proceed. See Order Modifying Automatic Stay, *In re Free Speech Systems, LLC*, Case No. 22-60043, (Bankr. S.D. Tex.), ECF No. 117. On December 2, 2022, Alex Jones filed bankruptcy in the same court. On December 19, 2022, the Bankruptcy Court lifted the automatic stay so that this appeal could proceed. See Order Modifying Automatic Stay, *In re Alexander E. Jones*, Case No. 22-33553, (Bankr. S.D. Tex.), ECF No. 58.

3

estate. DN 459.20, Substitution Order.[2] Throughout the proceedings at trial, however, the parties agreed to refer to Erica Lafferty as a plaintiff, rather than referring to Mr. Coan. *E.g.* Ex. B, 10/4/22 Tr. Vol. III at 36:21-37:7. This agreement also applied to the jury interrogatories and verdict, which referred to Ms. Lafferty as a plaintiff, rather than to Mr. Coan. *Id.* The resulting verdict thus reads as an award in favor of Ms. Lafferty of $76,000,000, but is in fact in favor of Mr. Coan, as representative of Ms. Lafferty's bankruptcy estate. *See* DN 1010, Jury Verdict (attached as Ex. C).

In order to make it clear to a reviewing court that the compensatory damages verdict and punitive damages assessment that comprise the total damages award are in favor of Mr. Coan in his capacity as trustee for Ms. Lafferty's bankruptcy estate, the plaintiffs seek rectification of two references to Ms. Lafferty in the Memorandum of Decision on punitive damages, DN 1026 (Ex. B). These requested rectifications are:

(1) Page 9: after "(14) as to Erica Lafferty, $76 million" add "(pursuant to the parties' agreement that references to Ms. Lafferty on the jury verdict and interrogatories are to be treated as references to Mr. Coan in his capacity as trustee of Ms. Lafferty's bankruptcy estate, this verdict amount enters in favor of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty)"

---

[2] Erica Lafferty has also been known as Erica Garbatini. *See* DN 459, E. Lafferty's Mot. to Substitute Party at ¶1; DN 460, E. Lafferty's Memo. ISO Mot. to Substitute Party at ¶1. On December 5, 2018, Erica Lafferty a/k/a Erica Garbatini filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Erica L. Garbatini*, Case No. 18-51587, Ch. 7 Petition (Bankr. D. Conn. Dec. 5, 2018) (ECF No. 1). On September 16, 2021, plaintiff Erica Lafferty filed a Motion to Substitute Richard Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, for Individual Plaintiff Erica Lafferty in *Lafferty v. Jones* (DN 459). The court granted Ms. Lafferty's Motion to Substitute on October 20, 2021 (DN 459.20).

(2) Page 20: change "as to Erica Lafferty, $25.33 million;" to "as to Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, $25.33 million."[3]

Rectification of these references will ensure that the terms of the judgment are crystal clear to a reviewing court.

## III.   LEGAL GROUNDS ON WHICH MOVING PARTY RELIES

The plaintiffs rely on Rule § 66-5, which authorizes clarification of the trial court record via a motion for rectification.

## IV.   CONCLUSION

For these reasons, the plaintiffs request that the relief sought be granted.

THE PLAINTIFFS-APPELLEES,

By:   /s/ Alinor C. Sterling
      ALINOR C. STERLING
      CHRISTOPHER M. MATTEI
      JOSHUA D. KOSKOFF
      KOSKOFF KOSKOFF & BIEDER
      350 FAIRFIELD AVENUE
      BRIDGEPORT, CT 06604
      asterling@koskoff.com
      cmattei@koskoff.com
      jkoskoff@koskoff.com
      Telephone: (203) 336-4421
      Fax: (203) 368-3244
      JURIS #32250

---

[3] Other references in the Memorandum of Decision require no alteration because they refer to "plaintiffs."

## CERTIFICATION

Pursuant to Rule of Appellate Procedure § 62-7, I hereby certify that on this date, a true and correct copy of the foregoing has been delivered electronically to the last known email addresses of each counsel of record for whom an e-mail has been provided, as indicated below; that the foregoing document has been redacted or does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order or case law; and that the foregoing document complies with all applicable rules of appellate procedure.

***For Alex Emric Jones & Free Speech Systems, LLC:***
Norman Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Telephone: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com


/s/ *Alinor C. Sterling*
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

# EXHIBIT 4

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

3/31/2023

ORDER

The following order is entered in the above matter:

ORDER:

The motion for rectification, filed by the plaintiffs on March 29, 2023, is granted, without objection.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# EXHIBIT 5

*********************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

*********************************************

<hr>

Lafferty *v.* Jones

<hr>

## ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46131)

## WILLIAM SHERLACH *v.* ALEX JONES ET AL.
### (AC 46132)

## WILLIAM SHERLACH ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46133)

Moll, Clark and Eveleigh, Js.

*Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of the trial court rendered following jury verdicts for the plaintiffs in three underlying consolidated actions that arose out of the 2012 mass shooting at the Sandy Hook Elementary School in Newtown. The court had defaulted the defendants as a sanction for their repeated, wilful failure to fully and fairly comply with the plaintiffs' discovery requests and for violating a protective order. The cases then proceeded to a hearing in damages, after which the plaintiffs were awarded compensatory damages, attorney's fees and costs and, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal, the defendants claimed, inter alia, that the court incorrectly concluded that the plaintiffs' allegations were sufficient to support a legally viable CUTPA claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and a protective order.

The trial court's default order was a sanction that was proportional to the defendants' wilful noncompliance and misconduct in repeatedly failing to produce critical documents that the plaintiffs needed to prosecute their case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the cause of the harm they suffered, as the effect of the trial court's default order was to conclusively establish the defendants' liability, thereby leaving the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly limited the scope of J's testimony was deemed abandoned.

---

Lafferty *v.* Jones

---

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter,

Lafferty *v.* Jones

the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part; judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

_____

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert

Lafferty *v.* Jones

in the underlying consolidated tort actions[3] arising out
of the 2012 mass shooting at Sandy Hook Elementary
School in Newtown. On appeal, the defendants claim
that the court improperly (1) defaulted them as a sanc-
tion for violating certain discovery orders and a protec-
tive order, (2) construed the effect of the default to
relieve the plaintiffs of the burden to prove the extent
of their damages, (3) restricted the scope of Jones'
testimony at the hearing in damages, (4) denied their
motion for a remittitur, and (5) concluded that the plain-
tiffs' claim asserting a violation of the Connecticut
Unfair Trade Practices Act (CUTPA), General Statutes
§ 42-110a et seq., was legally sufficient. For the reasons
that follow, we disagree with the defendants' first, sec-
ond, and fourth claims, and deem the defendants' third
claim to be abandoned as inadequately briefed. We
agree, however, with the defendants' fifth claim.
Accordingly, we reverse in part the judgments of the
trial court.

Parker is a plaintiff in the third case. On December 17, 2018, the court
granted the motion to consolidate the cases. Jeremy Richman died while
this action was pending, and, on June 7, 2021, the court granted the plaintiffs'
motion to substitute Jennifer Hensel, executrix of the estate of Jeremy
Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel,
in her capacity as executrix of the estate of Jeremy Richman, withdrew her
claims against the defendants. On October 20, 2021, the court granted Erica
Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy
estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as
a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn.
App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court
granted a motion to substitute Erica L. Ash, also known as Erica Lafferty,
as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of
Erica L. Garbatini. All references in this opinion to the plaintiffs are to the
remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel,
as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of
the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated
actions were largely identical, and the jury verdict returned in each action
was the same. In the interest of simplicity, unless otherwise deemed neces-
sary, we refer to the motions, pleadings, and other documents filed in the
controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of
Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

Lafferty *v.* Jones

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis, J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order.

Lafferty *v.* Jones

Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

---

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

*Lafferty v. Jones*

abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied,      U.S.     , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain throughout this opinion, we decline to review any claims that the defendants have abandoned as a result of inadequate briefing.

I

The defendants first claim that the trial court improperly defaulted them as a sanction for violating certain discovery orders, as well as a discovery related protective order. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Shortly after the underlying consolidated actions had been commenced, the Jones defendants filed special motions to dismiss the actions pursuant to Connecticut's anti-SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The plaintiffs moved for limited discovery vis-à-vis the special motions to dismiss; see General Statutes § 52-196a (d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections raised by the Jones defendants to the plaintiffs' requests for production seeking, inter alia, marketing data, sales analytics, and web analytics that the Jones defendants

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation' . . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts, which made changes to the statute that are not relevant to these appeals. Accordingly, we refer to the current revision of the statute.

"own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.'"

Lafferty *v.* Jones

program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019 broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal

Lafferty *v.* Jones

pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

Lafferty *v.* Jones

over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free

Lafferty *v.* Jones

Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

Lafferty *v.* Jones

were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

---

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

Lafferty *v.* Jones

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of Practice Book § 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

Lafferty *v.* Jones

accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary

---

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

Lafferty *v.* Jones

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the

Lafferty *v.* Jones

appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced were not the originals but, rather, constituted altered trial balances that Roe had manipulated prior to production. On October 7, 2021, the Jones defendants filed an objection. On October 18, 2021, the plaintiffs filed a reply brief, and on October 20, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from the parties over the course of three days between October 20 and November 15, 2021, the court issued an oral decision defaulting the Jones defendants as a sanction for violating (1) the protective order and (2) its discovery orders.[20] With regard to the protective order, the court found in relevant part that (1) the Jones defendants acknowledged that the motion to depose Clinton contained information obtained from a deposition that was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order, (2) the Jones defendants argued that the protective order did not preclude them from publishing such confidential information so long as they did not identify the witness from whom the information was obtained, which position "did nothing but reinforce the court's August 5, 2021 order and findings that the [Jones defendants'] cavalier actions constituted wilful misconduct and violated the

_____

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor of the court defaulting the Jones defendants for their misconduct. On October 20, 2021, the Jones defendants filed a memorandum of law in opposition to a default order.

---

Lafferty *v.* Jones

---

court's clear and unambiguous protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that

---

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

Lafferty *v.* Jones

the [Jones] defendants, through Roe, had to correct."
The court further stated: "The Jones defendants argue
that Roe combined some accounts that were not used
consistently and consolidated some general accounts
because various transactions all involved the same
account and those records created by [Roe] were the
records that were produced. But these records that
removed accounts and consolidated accounts altered
the information in the reports that [Flores] had pro-
duced, and they contain trial balances that did not bal-
ance. These sanitized, inaccurate records created by
Roe were simply not responsive to the plaintiffs' request
or to the court's order."

The court next addressed the Google Analytics data
requested by the plaintiffs, stating: "With respect to
analytics, including Google Analytics . . . the [Jones]
defendants on May 7, 2019, represented that they had
provided all the analytics that they had. They stated
with respect to Google Analytics that they had access
to Google Analytics reports but did not regularly use
them. . . . The [Jones] defendants also claim that, on
June 17, 2019, they informally emailed zip files con-
taining Google Analytics reports to the plaintiffs, but
not [to] the codefendants, an email the plaintiffs state
they did not receive and that the court found would
not have been in compliance with our rules of practice.
On June 28, 2021, the Jones defendants filed a notice
of compliance stating that complete, final supplemental
compliance was made by . . . [Jones] and Free Speech
Systems, LLC, and that Infowars, LLC, Infowars Health,
LLC, and Prison Planet [TV], LLC, quote: 'Had previously
produced all documents required to be produced,' . . .
representing that with respect to the Google Analytics
documents, Free Speech Systems, LLC, could not
export the dataset and that the only way they could
comply was through the sandbox approach. Then on

Lafferty *v.* Jones

[October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

---

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

Lafferty *v.* Jones

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants'

Lafferty *v.* Jones

failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

---

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-à-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of

---

Lafferty *v.* Jones

---

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021]

this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief').''), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Lafferty *v.* Jones

§ 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be

---

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373–74.

## A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available

conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC*, 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

Lafferty *v.* Jones

to the public, the defendants plainly violated the protective order.

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation*, and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged

failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

### B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the

Lafferty *v.* Jones

defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery

Lafferty *v.* Jones

orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's orders regarding the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See Practice Book § 13-9 (a)[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

---

Lafferty *v.* Jones

## C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably

---

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d 1165 (2006) (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

*Lafferty v. Jones*

concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows

deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful non-compliance and misconduct. The court further found that "the Jones defendants were not just careless. Their

Lafferty *v.* Jones

failure to produce critical documents, their disregard
for the discovery process and procedure and for court
orders is a pattern of obstructive conduct . . . ."[31]
Thus, this factor militates in favor of the court's
default order.

With regard to the prejudice factor, the court found
that the purpose of the plaintiffs' discovery requests
was to determine (1) what the defendants published
and (2) the defendants' revenue, which purpose was
thwarted by the defendants' failure to produce the ana-
lytics data, the subsidiary ledgers, and the trial balances
requested by the plaintiffs. The court further found that
the defendants' conduct "interfere[d] with the ability
of the plaintiffs to conduct meaningful discovery and
prevent[ed] the plaintiffs from properly prosecuting
their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22,
35–36, 198 A.3d 103 (discussing importance of unpro-
duced discovery and its effect as to plaintiff's case when
examining prejudice), cert. denied, 330 Conn. 958, 198
A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336
Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the
court stated in its August 5, 2021 order addressing the
filing of the motion to depose Clinton that (1) the defen-
dants, in filing the motion to depose Clinton, made
information designated as "Highly Confidential-Attor-
neys Eyes Only" under the protective order available
on the Internet, (2) the defendants took no corrective
action thereafter, and (3) it had "grave concerns" that
there would be "a chilling effect on the testimony of
witnesses who would be rightfully concerned that their
confidential information, including their psychiatric
and medical histories, would be made available to the

[31] As we concluded in part I B of this opinion, we reject the defendants'
claim that the court's finding that they wilfully violated the discovery orders
was clearly erroneous.

public." The court iterated these concerns during argument preceding its sanction order, stating in relevant part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive materials. The court reasonably determined that a lesser sanction

Lafferty *v.* Jones

would not suffice under such circumstances. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

Lafferty *v.* Jones

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing

Lafferty *v.* Jones

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff

to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

Lafferty *v.* Jones

is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving

---

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

---

Lafferty *v.* Jones

---

that the amount of damages claimed is derived from
the injuries suffered and is properly supported by the
evidence. . . . We, therefore, cannot agree with the
court's conclusion that the plaintiff's claim must fail
because he did not provide evidence that [the defaulted
defendant's] negligent conduct proximately caused his
injuries . . . ." (Citation omitted.)), cert. denied, 258
Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the
defendants' claim fails.

### III

The defendants also claim that the trial court improp-
erly restricted the scope of Jones' testimony at the
hearing in damages. We conclude that the defendants
have abandoned this claim by failing to brief it ade-
quately.

The following additional procedural history is rele-
vant. On September 6, 2022, the court granted motions
in limine filed by the plaintiffs seeking to preclude evi-
dence or argument at the hearing in damages concern-
ing, inter alia, (1) the defendants' "maximum total
amount of Sandy Hook coverage or percentage or pro-
portion of Sandy Hook coverage" and (2) the court's
ruling defaulting the defendants. Additionally, on Sep-
tember 13, 2022, the court granted a motion for sanc-
tions filed by the plaintiffs on the basis of additional
discovery misconduct by the defendants. The court
sanctioned the defendants by prohibiting them from
presenting evidence or argument "that they did not
profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in dam-
ages, the plaintiffs called Jones as a witness. Outside

---

[35] The defendants cite the following language in *Murray* to support their
claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove
that the damages claimed were caused by the conduct alleged.' " *Murray*
v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however,
is the trial court decision that this court reversed on appeal. See id., 332–35,
340. The defendants' reliance on that language, therefore, is untenable.

Lafferty *v.* Jones

of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the

Lafferty *v.* Jones

defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the

Lafferty *v.* Jones

sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

Lafferty *v.* Jones

that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages

---

[37] The jury submitted several notes during its deliberations.

Lafferty *v.* Jones

or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be

Lafferty *v.* Jones

given in favor of its correctness. . . . The chief rationale that has been articulated in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy, partiality, or prejudice."[38] (Citations omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n ruling on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . A generous award of noneconomic damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have

---

[38] The defendants assert that we should exercise plenary review over their claim because the jury's verdict "shocks the sense of justice" in violation of their due process rights. The defendants provide no legal authority in support of this assertion. We, instead, apply the well settled standard of review and examine the court's decision for an abuse of discretion.

Lafferty *v.* Jones

reached a different [result] is not in itself decisive. . . .
The court's proper function is to determine whether
the evidence, reviewed in a light most favorable to the
prevailing party, reasonably supports the jury's verdict.
. . . In determining whether the court abused its dis-
cretion, therefore, we must examine the evidential basis
of the verdict itself . . . . [T]he court's action cannot
be reviewed in a vacuum. The evidential underpinnings
of the verdict itself must be examined." (Internal quota-
tion marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442,
457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic
damages cannot be computed by a mathematical for-
mula, and there is no precise rule for the assessment
of damages. . . . The plaintiff need not prove damages
with mathematical exactitude; rather, the plaintiff must
provide sufficient evidence for the trier to make a fair
and reasonable estimate." (Internal quotation marks
omitted.) Id., 457; see also *Commission on Human
Rights & Opportunities* v. *Cantillon*, 347 Conn. 58,
68–69, 295 A.3d 919 (2023) ("Noneconomic damages,
such as emotional distress, pain and suffering, are, at
best, rather indefinite and speculative in nature. . . .
For more than fifty years, this court has rejected the
idea that any specific yardstick can be applied to cabin
the discretion of the trier of fact when calculating a
fair and appropriate award of noneconomic damages."
(Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's
verdict was necessary because the plaintiffs failed to
submit sufficient evidence to establish their damages,
such as medical evidence or expert testimony concern-
ing their emotional distress, leaving the jury without
a means to determine damages other than relying on
passion, prejudice, and speculation. The defendants
maintain that, rather than prove their damages, the
plaintiffs "focus[ed] . . . on arousing sympathy,

Lafferty *v.* Jones

directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may

Lafferty *v.* Jones

testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages

articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert* v. *Halle*, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

Lafferty *v.* Jones

was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported the jury's verdict and, although substantial, the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 782. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a)[42] of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

---

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

*Lafferty v. Jones*

of a method, act or practice prohibited by [General Statutes §] 42-110b . . . .” (Footnote added; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 788, 219 A.3d 767 (2019). Section 42-110b (a), in turn, provides: “No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” Section 42-110a (4) defines “ ‘[t]rade’ and ‘commerce’ ” as “the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.”[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants “unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,”[44] (2) the defendants engaged in a “campaign

_____

[43] CUTPA “refers to ‘trade or commerce’ in the substantive provision, § 42-110b (a), but contains a definition of ‘ “trade” ’ and ‘ “commerce” ’ in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning.” R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, “[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones’] [I]nternet based and broadcast radio shows, the . . . defendants hawk ‘open currency’ precious metals, prepackaged food and dietary supplements, ‘male enhancement’ elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 ‘lower receivers’ (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager

*Lafferty v. Jones*

of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that

to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

Lafferty *v.* Jones

"the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part:

---

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

Lafferty *v.* Jones

"With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies

---

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." General Statutes § 42-110b (a). The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in non-commercial speech outside of the scope of CUTPA. The plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England*, *LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly

Lafferty *v.* Jones

admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*,

177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey* v. *Stamford Hospital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019) (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA

Lafferty *v.* Jones

claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in § 42-110a (4) (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

Lafferty *v.* Jones

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is

---

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 67.

Lafferty *v.* Jones

clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of

invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

# EXHIBIT 6

STATE OF CONNECTICUT
**APPELLATE COURT**

Date: Hartford, December 10, 2024

*To the Chief Clerk of the Appellate Court.*
The Appellate Court has decided the following case:

ERICA LAFFERTY ET AL.
*v.*
ALEX EMRIC JONES ET AL.

*Opinion by Moll, J.*

WILLIAM SHERLACH
*v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL.
*v.*
ALEX EMRIC JONES ET AL.

Docket Nos. AC 46131 /AC 46132 /AC 46133
Trial Court Docket Nos. UWYCV186046436S /UWYCV186046437S /UWYCV186046438S

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

Chief Judge

Rescript

# EXHIBITS 7-8

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

### CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.


ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S,
UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

# EXHIBIT B

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

### CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

/s/
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

    v.

ALEX EMRIC JONES ET AL.

## ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

          /s/
        Carl D. Cicchetti
        Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

# EXHIBIT C

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 19, 2023

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 22-33553** |
| **ALEXANDER E. JONES,** | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |
| **DAVID WHEELER,** *et al.*, | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. 23-03037** |
| | § | |
| **ALEXANDER E. JONES,** *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM DECISION ON CONNECTICUT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST JONES

Plaintiffs are parents of children murdered in the Sandy Hook Elementary School tragedy and a first responder. Before this bankruptcy case started, the Plaintiffs sued Alexander E. Jones and other defendants in a Connecticut state court. Three years into the litigation, the state court entered a default judgment against Jones based on repeated violations of discovery orders. The default judgment made Jones liable for the defamation and emotional distress claims. And, under Connecticut law, deemed Jones to have admitted all allegations in the Plaintiffs' state court petition. A jury awarded about $1.4 billion in compensatory and punitive damages for defamation, intentional infliction of emotional distress, and the Connecticut Unfair Trade Practices Act claims.

Jones and an entity he owns named Free Speech Systems, LLC filed separate bankruptcy cases in 2022. Free Speech elected to proceed under Subchapter V of the Bankruptcy Code. Jones is in a traditional chapter 11 case, not Subchapter V. This decision involves Jones's case only.

The Bankruptcy Code provides that some debts are excepted from a bankruptcy "discharge" and remain enforceable against the debtor even after a bankruptcy case ends. Plaintiffs started this adversary proceeding seeking an order stating that the debts related to the state court action are excepted from discharge under § 523(a)(6) of the Bankruptcy Code. They also believe that the state court record, including court orders and jury awards, prove that there are no material

1 / 18

issues of disputed fact and that summary judgment is warranted as a matter of law. Jones disagrees.

After careful consideration, and for the reasons explained in detail below, the Court grants summary judgment on all claims, except common-law punitive damages.

## Background

In May 2018, thirteen of the Plaintiffs started the lawsuit captioned *Lafferty, et al. v. Jones, et al.*, UWY-CV-18-6046436-S, in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court.[1] Then in December 2018 and January 2019, two substantively similar complaints—captioned *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046437-S and *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the *Lafferty* complaint (the "**Connecticut Action**").[2] Plaintiffs alleged the defendants were liable for, among other things, (i) invasion of privacy, (ii) defamation and defamation per se, and (iii) intentional infliction of emotional distress.[3] They also alleged the defendants violated the Connecticut Unfair Trade Practices Act ("**CUTPA**").[4]

In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct."[8]

---

[1] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 1, ECF No. 57-4.

[2] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 2, 3, ECF Nos. 57-5, 57-6.

[3] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 336–84, 2 at ¶¶ 329–77, and 3 at ¶¶ 416–64, ECF Nos. 57-4, 57-5, 57-6.

[4] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 385–94, 2 at ¶¶ 378–87, and 3 at ¶¶ 465–74, ECF Nos. 57-4, 57-5, 57-6.

[5] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74, ECF No. 59-24.

[6] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.

[7] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:15–18, ECF No. 59-24.

[8] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 15:1–4, ECF No. 59-24.

2 / 18

The Connecticut Action proceeded to a jury trial on damages for intentional infliction of emotional distress, defamation/defamation per se, invasion of privacy, and CUTPA claims against Jones and Free Speech.[9]

The state court issued lengthy jury instructions. The court instructed jurors that under applicable law, each defendant was responsible for the other's conduct and the entirety of the harm to the Plaintiffs.[10] Here are some of the jury instructions for defamation and intentional infliction of emotional distress:[11]

| Defamation | Intentional Infliction of Emotional Distress |
|---|---|
| Certain defamatory statements, whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages . . . | The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct. |
| The defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. | The conduct was extreme and outrageous. The conduct was the cause of emotional distress experienced by the plaintiffs. The emotional distress sustained by the plaintiff was severe. |
| The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. | It is established that the defendants inflicted such emotional distress on the plaintiffs. |
| [D]efendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public | The court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her |

---

[9] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, 11–12, ECF No. 57-21.

[10] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, ECF No. 57-21. Thus, any argument that findings about the defendants' conduct do not apply to Jones individually is wrong.

[11] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 12, 14, 15, 23, ECF No. 57-21.

| to investigate and look into the plaintiffs and to the stop the people supposedly being the Sandy Hook hoax. | character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended and aggrieved. |
|---|---|

The state court also instructed the jury it could award common law punitive damages if the defendants' actions were willful, wanton, or malicious.[12] A "willful and malicious" harm was one inflicted intentionally, and "wanton" was "reckless misconduct."[13]

The state court also determined that the defendants were liable for violating CUTPA because "their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous."[14] The jury charge states that the CUTPA claim would be assessed separately by the state court.[15]

In October 2022, the jury awarded the Plaintiffs a total of $965 million in compensatory damages for defamation and emotional distress.[16] The award consisted of $403.6 million in defamation damages and $561.4 million in emotional distress damages. They also awarded common-law punitive damages in an amount left for the state court to award separately.

The Plaintiffs also moved for an award of punitive damages under CUTPA, which Jones opposed.[17] Under Connecticut law, CUTPA claims are determined by a court, not a jury. In November 2022, the state court issued a memorandum opinion setting the jury's award of common-law punitive damages for attorney's fees at $321.65 million and costs of about $1.5 million and awarding CUTPA punitive damages of $150 million.[18] The court found that the defendants (including Jones) engaged in intentional and malicious conduct certain to harm the Plaintiffs:[19]

---

[12] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23–24, ECF No. 57-21.

[13] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[14] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[15] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[16] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 19, ECF No. 57-22. The emotional distress damages consisted of damages for invasion of privacy and damages "for other emotional distressed suffered." *See* Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 21, ECF No. 57-21.

[17] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 20, ECF No. 57-23.

[18] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 45–46, ECF No. 58-2.

[19] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43–44, ECF No. 58-2.

4 / 18

> The defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

> The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience.

> The record also establishes that the defendants repeated the conduct and attacks on plaintiffs for nearly a decade, including the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs.

> This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.[20]

In December 2022, Jones filed his chapter 11 bankruptcy petition.[21] Soon after, this Court entered an agreed order involving Jones, Free Speech, and the Plaintiffs.[22] The agreed order modified the automatic stay to allow the state court to rule on post-trial motions and for any appeals by the defendants to proceed.[23] The Plaintiffs also agreed not to object to an application by Jones and Free Speech to employ their requested appellate counsel.[24] With the automatic stay modified, the state court denied a motion for new trial and Jones appealed the judgments to a Connecticut appellate court.[25]

The Plaintiffs started this adversary proceeding to determine the nondischargeability of the judgment debts against Jones.[26] They seek summary judgment mainly on the theory that the damages opinion, jury verdict, and admitted allegations from the Connecticut Action satisfy the requirements of

---

[20] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 41–44, ECF No. 58-2.

[21] *See* Voluntary Ch. 11 Pet. of Alexander E. Jones, Case No. 22-33553, ECF No. 1.

[22] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[23] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[24] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[25] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 23, 24, ECF No. 58-3, 58-4.

[26] Brief in Supp. of Mot. for Summ. J. at 1, ECF No. 60.

collateral estoppel on the issue of willful and malicious injury under § 523(a)(6).[27] In the alternative, they believe that the state court record establishes willful and malicious injury.[28]

Jones argues that summary judgment is not appropriate because (i) the issue of "willful and malicious injury" was not essential to the judgment in the Connecticut Action, (ii) federal law does not require federal courts to grant full faith and credit to allegedly unconstitutional state court judgments, (iii) public policy concerns about fairness, quality, and extent of the Connecticut Action outweigh any convenience afforded by the finality of judgment, (iv) collateral estoppel should not be applied when it appears the prior proceeding was skewed with the intent to obtain a non-dischargeable judgment in anticipation of bankruptcy, and (v) the record evidence produced by the Plaintiffs does not independently establish that they are entitled to judgment as a matter of law on a § 523(a)(6) claim.[29]

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Legal Standard

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment, "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings. FED. R. BANKR. P. 7056. A movant is entitled to summary judgment by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A material fact is one that might affect the outcome of the suit under governing law." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018).

Plaintiffs, as the movants here, bear the burden of proof at trial. So they must show the lack of a genuine issue of disputed fact that entitles them to judgment as a matter of law. If successful, the burden shifts to the nonmovant, Jones, to identify specific record evidence and articulate precisely how the evidence

---

[27] Brief in Supp. of Mot. for Summ. J. at 2–3, ECF No. 60.

[28] Brief in Supp. of Mot. for Summ. J. at 3, ECF No. 60.

[29] Def.'s Resp. to Mot. for Summ. J. at 10–12, ECF No. 61.

purports to defeat summary judgment. *See Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 869 (S.D. Tex. 2019) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). In determining whether summary judgment is appropriate, all inferences are drawn in Jones's favor. *See Harville v. City of Houston, Mississippi,* 945 F.3d 870, 874 (5th Cir. 2019).

<u>Analysis</u>

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

## I.      Section 523(a)(6) and Collateral Estoppel

A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed . . . ." § 101(5).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity. . . ." The Bankruptcy Code does not define "willful" or "malicious." In *Kawaauhau v. Geiger*, the U.S. Supreme Court held that a "willful and malicious injury" means a "deliberate or intentional injury." 523 U.S. 57, 61 (1998). This means that there must be intent to cause the injury, not just the act which leads to the injury. *Id.* at 61–62. In the Fifth Circuit, intent to cause injury exists "where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Shcolnik*, 670 F.3d 624, 629 (5th Cir. 2012) (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)). The objective standard requires a court to analyze from a reasonable person's perspective "whether the defendant's actions were substantially certain to cause harm, [and] are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Chowdary v. Ozcelebi (In re Ozcelebi),* 640 B.R. 884, 905 (Bankr. S.D. Tex. 2022) (citing *Berry v. Vollbracht (In re Vollbracht),* 276 Fed. App'x. 360, 361–62 (5th Cir. 2007)). Substantial certainty does not mean absolute certainty, but it must be something more than a high probability. *See Mahadevan v. Bikkina (In re Mahadevan)*, 617 F.

7 / 18

Supp. 3d 654, 660 (S.D. Tex. 2022) (citing *In re D'Amico*, 509 B.R. 550, 561 (S.D. Tex. 2014)).[30]

Because of this intent requirement, debts arising from reckless or negligently inflicted injuries are not excepted under § 523(a)(6). *Geiger*, 523 U.S. at 64. For example, debts related to a debtor's act of intentionally driving a car into a crowded bar and killing a creditor's relatives were found to be based on willful and malicious injuries. *See Mahadevan*, 617 F. Supp. 3d at 660 (citing *Red v. Baum* (*In re Red*), 96 F. App'x 229, 230 (5th Cir. 2004)). But debts related to a debtor's act of illegally selling a rifle to an individual, who years later shot people, were not based on a willful and malicious injury. *See Leyva et al. v. Braziel (In re Braziel)*, 653 B.R. 537, 558 (Bankr. N.D. Tex. 2023). The debtor intended to sell the rifle to the third party. *Id.* at 557. And while the sale itself was an intentional illegal act, it was not an act intended to harm the victims under either an objective or subjective standard. *Id.*

Plaintiffs can invoke collateral estoppel to establish that a debt is nondischargeable. *See Grogan v. Garner,* 498 U.S. 279, 284 n.11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Collateral estoppel prevents parties from relitigating issues of fact that were already "determined by a valid and final judgment" in a prior lawsuit in any future lawsuit involving the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Federal courts must give full faith and credit to state-court judgments. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."); *Shimon v. Sewerage & Water Bd. Of New Orleans,* 565 F.3d 195, 199 (5th Cir. 2009) (quoting *Parsons Steel*).

The laws of the state in which the judgments were entered determine whether collateral estoppel applies. *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1201 (5th Cir. 1996). A Connecticut state court entered the judgment, so the Connecticut rules of issue preclusion apply here. Under Connecticut law, collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011). Plaintiffs must establish that: "[1] [t]he issue must have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." *Wiacek Farms,*

---

[30] The plain meaning of willful and malicious tracks the objective and subjective tests under *Shcolnik* and *Miller*. Willful means "done deliberately: intentional." *Willful*, Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/willful) (last visited Oct. 17, 2023). And malicious means "having or shown a desire to cause harm to someone" Malicious, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/malicious) (last visited Oct. 17, 2023).

*LLC v. City of Shelton*, 30 A.3d 27, 32 (Conn. 2011) (quoting *Busconi v. Dighello*, 668 A.2d 716, 723 (Conn. App. Ct. 1995)).

An issue is actually litigated if it was "properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *See Solon v. Slater*, 287 A.3d 574, 586 (Conn. 2023). Fully and fairly litigated means that the party to be estopped "had an adequate opportunity to litigate the matter in the earlier proceeding." *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2  (Conn. Super. Ct. Jan. 19, 1996); *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993). To be necessary to the judgment, the determination of the issue must have been central to the judgment rendered (i.e., the judgment could not have been rendered without the determination). *See Wiacek Farms*, 30 A.3d at 32. In other words, "an issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1116 n.17 (Conn. 2002) (internal citations omitted). It is not enough that a fact could have been determined by the prior court but was not. *World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S, 2008 WL 4307568, at *6 (Conn. Super. Ct. Aug. 29, 2008) (citing *State v. Aparo*, 614 A.2d 401, 412 (Conn. 1992)).

Connecticut courts also note that there must be an identity of issues between the state court action and the issues to be decided here before collateral estoppel applies. *See, e.g.*, *Peterson v. iCare Mgmt., LLC*, 250 A.3d 720, 729 (Conn. 2021). This requires a court to assess the facts underlying a plaintiff's claim in the first proceeding. *See Solon*, 287 A.3d at 587. A court should determine "what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." *Id.* (quoting *Aetna Casualty & Sur. Co. v. Jones*, 596 A.2d 414, 421 (Conn. 1991)). Plaintiffs bear the burden of showing collateral estoppel applies here.

A bankruptcy court does not necessarily need a full state court record to apply collateral estoppel. *See Fielder v. King (In re King)*, 103 F.3d 17, 19 n.1 (5th Cir. 1997). But a state court record devoid of factual findings to support a dischargeability determination is not entitled to summary judgment. *See Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) (denying application of collateral estoppel where state court record lacked findings of fact).

## II.    Summary Judgment is Granted on Compensatory Damages

### A.    The issues were "fully and fairly litigated" and "actually decided"

Under Connecticut law, the allegations in a petition are deemed admitted, and the defendant's liability is established if a default judgment is entered against a defendant based on discovery abuse. *Smith v. Snyder*, 839 A.2d 589, 598 (Conn. 2004). "[A] default judgment is a decision on the merits and has the same preclusive

effect as any other judgment decided on its merits, so long as the party who is precluded had an 'adequate opportunity to litigate the matter in the earlier proceeding.'" *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. June 29, 2018) (quoting *State v. Ellis*, 497 A.2d 974, 989 n.22 (Conn. 1985)).

As noted above, the fully and fairly litigated prong is satisfied under Connecticut law where there is opportunity to litigate the matter, whether or not the defendant benefits from it. *Custom Pools*, 1996 WL 66264, at *2. Jones had the opportunity to participate in the state court litigation for three years before the default judgment was entered. He then participated in the damages trial and presented evidence on that issue. He also submitted argument before the state court ruled on common-law and CUTPA punitive damages. Thus, finding that the state court default judgment order and the resulting damages awards have the effect of fully and fairly adjudicating the issues decided in connection with the defamation, intentional infliction of emotional distress, and CUTPA claims is consistent the reasoning and holdings in Connecticut cases.

Jones argues that the precise issue of "willful and malicious injury" was not litigated in the Connecticut Action and that he did not have a chance to present certain defenses at trial. Neither argument changes the outcome here. Remember that Connecticut law focuses on the facts underlying the claims to determine identity of issues, and here those facts show identical issues. *See Solon*, 287 A.3d at 587. Federal courts focus on whether a state court made specific findings about an injury to a plaintiff that meets the test for willful and maliciousness under § 523(a)(6), and not the specific label of "willful and malicious." *See, e.g.*, *Mahadevan*, 617 F. Supp. 3d at 660 (analyzing collateral estoppel principles on defamation and intentional infliction of emotional distress claims); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014) (same); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 421 (Bankr. S.D. Tex. 2012) (same).

The Plaintiffs' complaints contain multiple well pleaded allegations about Jones's intent to cause the Plaintiffs harm or substantial certainty that Jones's actions would cause harm, all of which are deemed admitted as a result of the default judgment. They, along with the jury award, also constitute fully and fairly adjudicated issues (and actually decided ones) for purposes of collateral estoppel.

- "Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse."[31]

---

[31] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 7, 3 at ¶ 7, ECF Nos. 57-4, 57-6.

Case 22-33553 Document 1464 Filed in TXSB on 09/30/25 Page 170 of 196

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence."[32]

- "Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax — and he never has."[33]

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."[34]

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people."[35]

- "On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."[36]

- "Jones and Infowars purposefully sought to direct their message and spur 'investigation' of the Sandy Hook families."[37]

- "Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners . . ."[38]

---

[32] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 8, 3 at ¶ 8, ECF Nos. 57-4, 57-6.

[33] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 9, 3 at ¶ 9, ECF Nos. 57-4, 57-6.

[34] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 11, 3 at ¶ 11, ECF Nos. 57-4, 57-6.

[35] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 13, 3 at ¶ 13, ECF Nos. 57-4, 57-6.

[36] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 14, 3 at ¶ 14, ECF Nos. 57-4, 57-6.

[37] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 83, 3 at ¶ 89, ECF Nos. 57-4, 57-6.

[38] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 97, 3 at ¶ 103, ECF Nos. 57-4, 57-6.

- "The defendants' outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."[39]

- "The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs. . ."[40]

- "The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[41]

- "The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages."[42]

Jones tries to argue that these issues were not fully and fairly litigated because there was never a trial on liability. But the argument lacks merit because of the legal effect of the default judgment. Jones also claims he was deprived of certain constitutional rights by the state court. This Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise complaints about not being permitted the right to argue certain defenses at the damages trial or his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards. A right to appeal the state court's decision aside, the fully and fairly litigated and actually decided prongs are satisfied. *See, e.g.*, *Sims*, 479 B.R. at 421 (citing *Prager v. El Paso Nat. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969)); *In re Dahlin*, No. 16-36169, 2018 WL 2670501, at *4 (Bankr. S.D. Tex. May 16, 2018) (finding that, under full faith and credit, defendant could not argue against nondischargeability because death penalty sanctions were improperly ordered). The Court rejects Jones's argument that it does not have to give full faith and credit to the state court default judgment order or the resulting damages awards.

---

[39] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 377, 3 at ⁋ 457, ECF Nos. 57-4, 57-6.

[40] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 337, 3 at ⁋ 417, ECF Nos. 57-4, 57-6.

[41] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 365, 3 at ⁋ 445, ECF Nos. 57-4, 57-6.

[42] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 14, 3 at ⁋ 433, ECF Nos. 57-4, 57-6.

This Court also agrees with the reasoning in cases like *Herbstein v. Bretman*, 266 B.R. 676, 685 (N.D. Ill. 2001), which held:

> [W]here [a litigant] participated extensively then failed to comply with an express court order issued multiple times at a risk of incurring default, [then] we agree with the Bankruptcy Court . . . that [the litigant] should not now be able to sidestep the collateral estoppel doctrine and litigate an issue in this forum that was forestalled in [another court] due solely to [the litigant's] decisions. [The litigant] is not entitled to a second bite at the apple. The issue underlying the … default judgment were "actually litigated" for purposes of the collateral estoppel doctrine.

### B.    The issues were necessary to the judgment, including the jury award of damages

The findings about Jones's willful and malicious injury to the Plaintiffs' were also necessary to the judgment and the jury award of damages.

A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hopkins v. O'Connor,* 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004).

As noted earlier, the jury was instructed, among other things, that "the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large."[43] The jury was also instructed that the Jones defendants proximately harmed the Plaintiffs by spreading lies about them to their audience and the public by urging people to investigate the Plaintiffs about the alleged "Sandy Hook hoax."[44]

To establish intentional infliction of emotional distress under Connecticut law, a plaintiff must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the

---

[43] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 14, ECF No. 57-21.

[44] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 15, ECF No. 57-21.

emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 757 A.2d 1059, 1062 (Conn. 2000) (internal quotation marks omitted) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986)).

The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress:

> These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe.

Thus, there are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. These are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The jury considered damages in a multi-day trial and awarded damages based on these findings.

Nothing in the jury instruction for defamation or intentional infliction of emotional distress contemplates that a lesser standard of intent should apply to Jones's knowledge of the injury. Therefore, the damages for defamation and intentional infliction of emotional distress were necessarily awarded based on the finding that Jones intended to harm the Plaintiffs. On compensatory damages, the jury charge contains specific findings premised on the default judgment—not a broad general charge lacking in detail. This Court focuses on what the jury charge actually says, and not what it *could* say or *could* imply.

This case is like the bankruptcy court decision in *In re Scarbrough*. In *Scarbrough*, state court findings about a debtor's actions supported a finding that the debtor acted with a subjective motive to cause harm, so the debt was nondischargeable under § 523(a)(6). *Scarbrough*, 516 B.R. at 912. The state court findings included, for example, that the debtor damaged another's reputation and failed to turn over evidence for the express purpose of causing that party harm so the debtor could win his case. *Id.* at 905. The defamation jury instruction was that the debtor made statements he "knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." *Id.* at 912. That instruction mirrors the defamation instruction in this case.

14 / 18

The Fifth Circuit Court of Appeals later affirmed the bankruptcy court's holding. *Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 456 (5th Cir. 2016). The Fifth Circuit held that the jury's finding of damages for defamation independently supported the judgment, was binding, and precluded relitigating that issue in another case. *Id.* Therefore, in Jones's case, the language of the jury instruction confirms that the damages awarded flow from the allegation of intent to harm the Plaintiffs—not allegations of recklessness. *See Caton v. Trudeau (In re Caton)*, 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998) (finding that the factual allegations on which liability was based in a state court proceeding showed that the defendant acted with intent to cause injury). Summary judgment on the nondischargeability of the jury awards for compensatory damages is granted.[45]

## III. Summary Judgment is Granted on CUTPA Punitive Damages

For the reasons explained above, the issue of willful and malicious injury was also fully and fairly (and finally) litigated in relation to the CUTPA punitive damages award. Jones had the opportunity to participate in the state court litigation, and he did so. He also submitted argument about CUTPA punitive damages.

The findings on willful and maliciousness were also necessary to the judgment. These findings were actually litigated and determined. There is no question that the issues to be estopped are identical. The state court issued a 45-page opinion on the CUTPA and common law punitive damages.[46] The court determined that the material allegations in the Plaintiffs' complaints, "which have been established by virtue of the defaults" entitled them to an award of CUTPA punitive damages. On CUTPA punitive damages, the court stated it assessed factors such as (i) the degree of the defendants' relative blameworthiness— whether it was reckless, intentional, or malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages were small, providing a low incentive to bring the action; and (v) whether the award will deter the defendant and others from similar conduct.[47]

The court considered the degree of blameworthiness the most important consideration and found that Jones's actions were intentional and malicious, and

---

[45] The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal.

[46] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 39, ECF No. 58-2.

[47] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 29–30, ECF No. 58-2 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 418 (2003)).

awarded punitive damages based on these findings.[48] The state court did not base any of the CUTPA punitive damages on recklessness:

> The record clearly supports the plaintiffs' argument that *the defendants' conduct was intentional and malicious, and certain to cause harm* by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." . . . This depravity, and cruel, persistent course of conduct by the defendants establishes *the highest degree of reprehensibility and blameworthiness.* . . Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.[49]

These are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. They are not, as Jones argues, superfluous findings about intent related to the Plaintiffs' harm. It is irrelevant that the state court could have awarded damages on reckless acts. What is important is what the court actually did. Here there are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The state court also considered the additional factors listed above, but the focus remained on willful and intentional acts, and not on a lesser standard like recklessness.

In sum, the state court made specific findings that went directly to the amount of punitive damages. They were necessary to the judgment. So summary judgment is granted on the debt for CUTPA punitive damages.

## IV.     Summary Judgment is Denied on Common-law Punitive Damages

In Connecticut, common-law punitive damages are limited to the expense of litigation (attorneys' fees and costs) less taxable costs. *See, e.g.*, *Bifolck v. Philip Morris, Inc.*, 152 A.3d 1183, 1213 (Conn. 2016). The jury charge instructed that common-law punitive damages could be awarded if the defendants' actions were willful, wanton, or malicious.[50] A willful and malicious harm is based on an intent without just cause or excuse.[51] And "the intentional injury aspect may be satisfied if

---

[48] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43, ECF No. 58-2.

[49] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 44–45, ECF No. 58-2.

[50] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[51] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

the resultant harm was the direct and natural consequence of the intended act."[52] But wanton misconduct is defined as "reckless misconduct."[53]

There are bankruptcy cases holding that punitive damages should be found nondischargeable based on findings of willful and malicious injury when the compensatory damages and punitive damages flow from the same conduct. *See, e.g.*, *Macris v. Saxton (In re Saxton)*, No. 10-44412, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). In *Gober*, the Fifth Circuit held that "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober*, 100 F.3d at 1208.

It is logical to presume that the findings of willful and malicious injuries based on defamation and intentional infliction of emotional distress were necessary to the award of common-law punitive damages. But unlike the instructions for defamation and intentional infliction of emotional distress, the jury had a right to award common-law punitive damages based on reckless actions *or* actual intent to cause harm. This proves fatal on summary judgment.

Under Fifth Circuit law, recklessness does not meet the standard for willful and malicious injury under § 523(a)(6). *Miller*, 156 F.3d at 603. And there must be intent to cause the injury, not just an act which leads to the injury. *Kawaauhau*, 523 U.S. at 61–62. The record is not expressly clear on whether the damages were solely based on willfulness and maliciousness. Thus, summary judgment is denied on the debt for common-law punitive damages.

## V. Summary Judgment does not Violate Policy or Jones's Constitutional Rights

Finally, Jones argues that the Court should not grant summary judgment because the state court judgment was entered in anticipation of this bankruptcy proceeding. But there is no evidence of manipulation that even remotely warrants serious consideration of this argument based on the record before the Court. This ancillary argument, and related arguments by Jones about his disagreements with the state court default judgment order and damages awards do not change the

---

[52] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[53] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

outcome.[54] Again, he can make such argument to the appropriate state appellate court.

## Conclusion

For the reasons stated above:

1. Summary judgment is granted on the $965 million debt for compensatory damages awarded in the Connecticut Action for defamation and intentional infliction of emotional distress.

2. Summary judgment is granted on the $150 million debt for CUTPA punitive damages.

3. Summary judgment is denied on the $321.65 million in attorneys' fees and $1,489,555.94 in costs awarded as common law punitive damages.

4. All other objections raised by Jones not specifically addressed above are denied.

Signed:  October 19, 2023

_____

Christopher Lopez
United States Bankruptcy Judge

---

[54] Jones also makes several arguments best described as grounds for appeal which this Court declines to address (for example, Jones argues that the CUTPA award was improper based on the allegations in the complaints). Def.'s Resp. to Mot. for Summ. J. at 43, ECF No. 61. These arguments are rejected.

18 / 18

# EXHIBIT D

# Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073

Docket Number: AC46131
Issue Date: 5/13/2025
Sent By: Supreme/Appellate

---

## Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073

AC46131    ERICA LAFFERTY ET AL. v. ALEX EMRIC JONES ET AL.

Notice Issued: 5/13/2025 9:08:23 AM

**Notice Content:**

**Motion Filed: 4/28/2025**
**Motion Filed By: Alex E Jones**
              **Free Speech Systems, Llc**

**Order Date: 05/13/2025**

**Order: Denied**

By the Court
Notice sent to Counsel of Record

# EXHIBIT E

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, <br> Plaintiffs | § <br> § <br> § | IN THE DISTRICT COURT |
| vs. | § <br> § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and <br> FREE SPEECH SYSTEMS, LLC, <br> Defendants | § <br> § <br> § <br> § | 261st JUDICIAL DISTRICT |

### DECLARATION OF AVI MOSHENBERG

1. "My name is Avi Moshenberg.  I am over the age of twenty-one years and am fully competent to make this Declaration.  I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2. "I am an attorney in the law firm of Lawson & Moshenberg PLLC and licensed to practice law in the State of Texas.  I am one of the attorneys of record for Neil Heslin and Scarlett Lewis (collectively, the Texas Families or the Judgment Creditors).  I am authorized to make this Declaration on behalf of the Judgment Creditors.

3. "Judgment Creditors own judgments against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors).  The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 804, Corpus Christi, Texas 78401; Alexander Emric Jones c/o Ben C. Broocks, Broocks Law Firm PLLC, 248 Addie Roy Road, Suite B301, Austin, Texas 78746.  The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760.  The post office address of the

- 2 -

Judgment Creditors is the Texas Families c/o Avi Moshenberg, 2301 Commerce Street, Houston, Texas 77002.

4. "Judgment Debtors owe $50,043,923.80 under the Judgments rendered before the 261st District Court of Travis County, Docket No. D-1-GN-18-001835 (the Texas Judgments). The Texas Judgments are comprised of two documents: the jury verdict and final judgment. Authenticated copies that are sealed and signed are being filed contemporaneously with this Declaration.

**Oath**

My date of birth is March 16, 1986 and my business address is 2301 Commerce Street, Suite 200, Houston, Texas, 77002, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on July 1, 2025.

_____
Avi Moshenberg

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § § | 261st JUDICIAL DISTRICT |

**ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC**

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) and that the judgment rendered in Cause No. D-1-GN-18-001835 before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment) (collectively, the Judgments, held by, collectively, the Judgment Creditors) are valid, final, and payable. Judgment Debtor Alexander E. Jones and Judgment Debtor Free Speech Systems, LLC (together, the Judgment Debtors and each a Judgment Debtor) owe, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment and $50,043,923.80 under the Texas Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review.  The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case).  On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy.  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable.   On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgments remain unsatisfied; that Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC own property that is not

exempt from attachment, execution, or seizure for the satisfaction of the Judgments; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtors' nonexempt property to satisfy the Judgments.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)   as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee), and

(ii)   as to Judgment Debtor Alex Jones:

a.   all non-exempt assets, including assets he may acquire in the future, that are not property of the Chapter 7 Estate;

b.   any assets of his Chapter 7 Estate that the Trustee expressly abandons; and

c.   any payments Judgment Debtor Alex Jones is contractually entitled to that are not property of the Chapter 7 Estate, including any payable after June 14, 2024, the date the Bankruptcy Court converted the Jones Bankruptcy Case to chapter 7 (the Conversion Date).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.

**The Court also FINDS that** the Judgments are final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgments. The Turnover Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1. **Receiver's Information**.

> Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)
>
> Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759
>
> Telephone Number: (512) 892-0803
>
> Email Address: gmilligan@harneypartners.com

2. **Custodia Legis**.  The entry of this Order creates a receivership estate wherein all of Judgment Debtors' respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order.  The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3. **Turnover**. The Judgment Debtors shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtors or their counsel.  All third parties in possession of any Turnover Property that is subject to any Judgment Debtors' control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtors shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank

statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtors (regardless of date).

4.      **Continuing Effect of Order**.  Judgment Debtors and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgments and this Order are paid in full.

5.      **Receiver's Powers**.  Receiver has the authority to take possession of all of Judgment Debtors' Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgments.  Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtors; (2) all financial accounts

(bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtors that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtors; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtors, except paychecks for current wages; (4) hire a real estate broker to sell any real property and mineral interest belonging to the Judgment Debtors; (5) hire any person or company to move and store the property of the Judgment Debtors; (6) insure any property belonging to the Judgment Debtors; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtors; (8) obtain local, state and federal tax records of the Judgment Debtors; (9) obtain from any landlord, building owner or building manager where the Judgment Debtors or the Judgment Debtors' business is a tenant copies of such Judgment Debtors' lease, lease application, credit application, payment history and copies of such Judgment Debtors' checks for rent or other payments; (10) hire any person or company

necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtors may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtors in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain  all records pertaining to the Judgment Debtors from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtors from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtors and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtors (including mortgage companies) copies of such Judgment Debtors' credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the Judgment Debtors, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order.  The Receiver shall not reduce or eliminate by agreement with the Judgment Debtors or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgments without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtors, an all their directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees

---

(other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7.      **Duties of Law Enforcement**.  Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8.      **Sales of Real Property Require Notice**.  Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtors and any lien holder on such real property.

9.      **Receiver's Bond**.  No bond is required of Receiver.

10.      **Receiver's Oath**.  Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.      **Receiver's Fee**. Without further application, notice, or order of the Court, the Receiver shall pay himself as receiver's fees an amount equal to 20% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees.  The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors

from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtors, and as costs, such fees and expenses are in addition to amounts owed under Judgments.  Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after paying in full the Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction and in an amount and proportion pursuant to agreement between the Texas Families and the Connecticut Families.  No receiver's fees exceeding 20% of all proceeds coming into Receiver's possession shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.     **Receiver's Expenses**.  Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment Creditors, including by email with counsel, or (ii) upon application to the Court with notice to the Judgment Creditors.  The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request.  The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtors, and Receiver may collect those expenses from Judgment Debtors in addition to the amount collected to satisfy the Judgment.

13.     **Employ Professionals**. Without further application or order of the Court, the Receiver may retain and reasonably compensate, in Receiver's sole discretion,

collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate without Court approval (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14. **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtors and their books, records, and their past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtors' counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the

collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.     **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtors, Judgment Debtors' property, Turnover Property, or the Judgments. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.     **Attorney's Fees**.  Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtors. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.     **Exempt Property**.  Nothing in this Order shall be construed to apply to exempt property, if any, of any Judgment Debtor, or any property of the Chapter 7 Estate

(expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtors that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by a Judgment Debtor.

18.     **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

19.     **Rule 679a Ordering Provisions Against Individual Judgment Debtor**.  **Personal Property Rights of Individual Judgment Debtor Alex Jones:** Receiver must comply with Texas Rule of Civil Procedure 679b.  **Receiver to Hold Property**: Receiver must not disburse funds to Judgment Creditors or sell property within 14 days after serving Judgment Debtor Alex Jones with the Notice of Protected Property Rights, the Instructions for Protected Property Claim Form, and the Protected Property Claim Form approved by the Supreme Court of Texas, or within 17 days if service was by mail.  If the Judgment Debtor Alex Jones asserts an exemption, Receiver may only disburse funds to Judgment Creditors or sell property otherwise belonging to Judgment Debtor Alex Jones with Judgment Debtor Alex Jones's written consent or a court order.

ISSUED AND SIGNED on _____.


                                                   _____
                                                   JUDGE PRESIDING