**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE:  ALEXANDER E. JONES | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor | § | Chapter 7 |

_____

**MOTION FOR RECONSIDERATION AND REHEARING OF THIS COURT'S**
**ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY**
**OF THE ESTATE OF ALEXANDER E. JONES AND**
**NOT SUBJECT TO THE AUTOMATIC STAY**
**[Dkt. No. 1251]**
**AND RENEWED REQUEST FOR THE PENDING RELIEF OF A PRIVATE**
**SALE OF THE FSS ASSETS FOR CASH**
**[Dkt. No. 1131, 1248[1]]**

**This motion seeks an order that may adversely affect you.  If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  You must file and serve your response within 21 days of the date this was served on you.  Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you.  If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:**

This Motion is filed by Alexander E. Jones ("Jones") for himself and his wholly owned company, Free Speech Systems, LLC ("FSS").  Collectively they are referred to as "Jones", and the bankruptcy estate of Jones is called the "Jones Chapter 7 Estate".  Jones asks this Court to reconsider and rehear this Court's Order entered on October 1, 2025 [Dkt. No. 1251] (the "Order") wherein the Court determined that:

---

[1]      *See*, p. 51, p. 25 of Dkt. No. 1248.

"…for all the reasons stated on the record at the October 1, 2025, hearing: The Automatic Stay imposed under Section 362(a) of the Bankruptcy Code in the Jones Bankruptcy Case does not apply to FSS or any of FSS's assets because these assets are not property of the Jones Bankruptcy Estate under Section 541 of the Bankruptcy Code."

and further seeks the relief Jones has been seeking by Motion filed May 28, 2025 (Dkt. No. 1131) as requested again on September 30, 2024 (Dkt No. 1248) and would show the court as follows:

**I.**
**PRELIMINARY STATEMENT**
**AND RELEVANT BACKGROUND FACTS**

**A.     Summary of Motion**

1.      Jones respectfully moves for reconsideration under Federal Rule of Civil Procedure 54(b) of this Court's October 1, 2025 Order confirming that the FSS assets are not subject to the automatic stay.

2.      This Motion arises out of two bankruptcy cases; one filed by Jones and the other filed by "consent" of Jones of the 100% owned affiliate LLC FSS.  This Bankruptcy Court entered an Oder (the "Order") **Exhibit 1** (Dkt. No. 1251).  Accordingly, this Motion is timely filed.

3.      Jones was originally in a Chapter 11 case, filed after his affiliate FSS filing of its Subchapter V case but the case was converted to a liquidating Chapter 7 case after Jones was unable to confirm a Chapter 11 Plan of Reorganization.   FSS is no longer in any bankruptcy case, after its failed attempt to confirm a plan of reorganization as a Subchapter V Debtor and its case was dismissed.  Both bankruptcies arose out of the litigation over broadcasts by Jones and FSS involving the Sandy Hook school murders by Adam Lanza.

4.      Importantly, on May 28, 2025 (Dkt. No. 1131) Jones sought to have this Bankruptcy Court reconsider its decision that no auction would be conducted and upon hearing on June 5, 2025, this Court announced that it may consider a private sale of the FSS Assets but

announced it would take all matters under consideration for at least 60 days [Dkt. No. 1193, p. 65-66: 9-3]. Jones's Motion requesting the Court allow the private sale of the FSS assets in this bankruptcy case (just as this Court originally intended) is still pending and was at the time the Court entered its order on October 1, 2025. Jones re-urges his request for further hearing and a ruling from the Court on this requested relief.

5.      On October 1, 2025, this Court held a hearing on *The Sandy Hook Families' Emergency Joint Motion for Entry of an Order Confirming that FSS Assets are not Subject to the Automatic Stay* (the "Emergency Motion") [Dkt. No. 1241].  The Emergency Motion asked this Court to *confirm* that on February 5, 2025, the Court found that the Supplemental Order was "null and void," and that FSS's assets were not property of the Chapter 7 Estate.  This Court found that it did not do so on February 5, 2025.

6.      The Emergency Motion also sought an order stating that Jones's continued efforts to rely on the automatic stay to prohibit the Sandy Hook Families from proceeding with collection efforts in Texas state court must be curtailed since the automatic stay went away after being voided on February 5, 2025.

7.      At the hearing, the Court held that February 5, 2025, had nothing to do with the lack of the automatic stay because the automatic stay *indeed had never applied to the FSS Assets* because entering the Supplemental Order, the Bankruptcy Court did not transfer any title to the FSS Assets to the Estate of Jones.  Instead, the Court explained that the Supplemental Order only "deemed" FSS's Assets were vested in the Estate of Jones, which the Court distinguished from the property actually being "property of the (Chapter 7) estate" of Jones.[2]  According to the Court, "I

---

[2]      It says 'Effective as of the date of this pursuant to 349(b), all property of the estate shall be deemed to have vested in the estate as property of the estate.' So, it's deemed as property of the estate, but that doesn't mean it's property of the estate." [**Exhibit 2,** October 1, 2025, Transcript, p. 7:10-15].

cannot convert something into property of the estate, so the automatic stay can never go into effect with respect to that." [*See*, October 1, 2025, Transcript (**Exhibit 2**), 8 - 9:24, 1 – 3].

### B.    The Court as a Textualist[3]

8.    The court emphasized that, as a textualist, the Order was clear:

"It says 'Effective as of the date of this ***pursuant to 349(b),*** all property of the estate shall be deemed to have vested in the estate as property of the estate.' So, it's deemed as property of the estate, but that doesn't mean it's property of the estate." *See*, Supplemental Order (Emphasis Added).

[*See,* **Exhibit 2,** October 1, 2025, Transcript, p. 7:10-15] (*See*, Supplemental Order FSS Dkt. No. 1021).  Nonetheless, the Court did not reference on October 1, 2025, or in the Order of that date, that § 349(b)(3), as recited in the *text* of the Supplemental Order, provides that ***"[u]nless the court, for cause, orders otherwise***, a dismissal of a case . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case . . . ."  (11 U.S.C. § 349(b)(3) [Emphasis Added]). [*See*, Tr. Nguyen and Court pg. 24 to 28 line 4].

9.    In addition to September 24, 2024, the Court expressly discussed "the cause" on several other occasions – protecting the FSS Assets from dissipation, avoiding a race to the courthouse, and to protect the assets.   And § 341(b)(3), just as discussed on September 24, 2024, with the U.S. Trustee,

"… applies to all property of the estate, ***not just property that was in existence as of the date the … petition was filed.*** Fulfilling the 'basic purpose' of § 349(b)(3), 'to undo the bankruptcy case, as far as practicable,' as described in *Jevic*, 137 S. Ct. at 984,[4] requires return of *all* property of the estate — regardless of whether such property became property of the estate on the day the petition was filed under § 541(a)(1), ***or whether such property became property of the estate post-petition***…," (Emphasis Added)

---

3       See, **Exhibit 2,** Tr. 10-1-25 pg. 43, 7-9.
4       *In re Haddad*, 572 B.R. 661, 663 (Bankr. E.D. Mich. 2017).  11 U.S.C.S. § 349(b)(3) applies to all property of the estate, not just property that was in existence as of the date a Chapter 13 petition was filed.

*See, e.g. In re Haddad*, 572 B.R. 661, 675 (Bankr. E.D. Mich. 2017).[5]

10.     Although contrary to the understanding of all parties,[6] the Court's rationale for determining that the automatic stay did not apply to the assets of FSS was, first that when FSS was dismissed from bankruptcy in June 2024 [FSS Dkt. No. 956], pursuant to section 541 of the Bankruptcy Code, the Court did not have the authority to convert non-debtor assets into assets of the Estate of Jones. **Exhibit 2**, 9: 21 – 23.   Jones argues that § 349(b)(3) permits just such a result.

### C.     The June 2024 Dismissal Order

11.     It is the conversion of the Jones case and dismissal of the FSS case that gives rise to the issues sought to be reconsidered.  The Jones case was converted on June 14, 2024 [Dkt. No. 708] (the "Conversion Date") to Chapter 7 with Chris Murray appointed as its Trustee.  FSS (the Jones 100% owned LLC holding the production assets necessary to air The Alex Jones Show) was not converted to Chapter 7 but dismissed by Order of the Bankruptcy Court [FSS Dkt. No. 956], but subject to the Dismissal Order (that included a transfer of sorts of all signatory authority and bank accounts of FSS funds to the Jones Chapter 7 Estate).  Importantly, those funds have been used and in large part exhausted by the Jones Chapter 7 Estate but replaced with new post-dismissal operations of the Jones Chapter 7 Estate.  *See, infra* **Exhibit 3** attached hereto (the "Initial Cash Order" or the "FSS Dismissal Order").

12.     At that time, the Sandy Hook Families were not in agreement as to the fate of FSS.  The Connecticut Plaintiffs opposed dismissal and filed an Emergency Motion for an Order Converting the Chapter 11 Case to a Chapter 7 Case.  [FSS Dkt. No. 921]. The Texas Plaintiffs

---

[5]     See, also *In re Walter*, 199 B.R. 390, 392 (Bankr. C.D. Ill. 1996) ["Judge Ginsburg concluded that, while § 349(b)(3) deals only with property that was property of the estate pre-petition, the same logic should apply to post-petition property of the estate…."]

[6]     In the Emergency Motion, Plaintiffs' sole basis for their position that the automatic stay did not apply is that the Court "voided" the Supplemental Order during the February 5, 2025, hearing.

supported dismissal. [FSS Dkt. No. 945] (Texas had the Turnover Order and Garnishment in the wings).

13.     On the Conversion Date the FSS Dismissal Order included a provision that the signatory authority and all FSS bank accounts were transferred to the Jones Chapter 7 estate.  *See*, **Exhibit 3** attached hereto.  There was no *"deemed vested"* language regarding the bank accounts in the FSS Dismissal Order, distinct from the language of the second order to follow on September 24, 2025, involving FSS non-cash assets as described below (the "Supplemental Order" **Exhibit 4** attached hereto).

14.     In arguing in support of conversion and recognizing that the underlying case had recently converted to Chapter 7 proceeding, the Connecticut Plaintiffs argued to this Court that the primary concern they had in opposition to dismissal of FSS from bankruptcy was the equity of distribution of FSS Assets between the Sandy Hook Families.  In communicating their concerns to this Court during a June 14, 2024, hearing, the Connecticut Plaintiffs argued that ensuring that a Chapter 7 trustee had complete control of FSS's assets would provide the requisite security:

```
 9              MR. KIMPLER:  It could help if there is a Chapter
10    7 trustee that has complete control over the distribution of
11    FSS assets and it's all getting distributed through the
12    Jones case, yes, but it's not a complete solution.
13              THE COURT:  No.  I agree.
14              MR. KIMPLER:  There's not a stay that would be
15    protecting FSS.  Nothing would stop one of the families from
16    going in and collecting a judgment against FSS.  You'd be at
17    the same point where you'd be saying does the stay in the
18    Jones Chapter 7 case prevent a collection effort against
19    FSS.
```

[*See*, June 14, 2024, Transcript (Dkt. No. 721), 66: 9 – 19].  Protecting FSS's assets from a race to collection among creditors was crucial to an equitable distribution and the Connecticut Plaintiffs were behind in the courthouse race.

     **D.**    **Texas Plaintiffs Immediately Obtain Turnover Order After FSS's Dismissal Order**

15.    Of course, the most significant bankruptcy policy recognized by the Supreme Court is "fair and equitable distributions" among creditors of the asset value of the debtor's available property.  The Connecticut Plaintiffs were concerned that the Texas Plaintiffs would win the race.  Their fear was well founded.  On the same day of the FSS Dismissal Order, the Texas Plaintiffs attacked the cash transferred to the Jones Chapter 7 Case through a post-Dismissal Turnover Order issued by the State District Court).  In response to the Emergency Motion brought by the Trustee (the recipient of the FSS cash) the Bankruptcy Court *immediately protected the cash from the State Turnover Order* (which confirmed to Jones and likely all, that those assets were property of the

Jones Chapter 7 Estate and would be entitled to protection).[7]   On June 27, 2024, a hearing was held on the Texas Plaintiffs' Turnover Order they obtained, at which the Court questioned the Texas Plaintiffs' lawyer, Avi Moshenberg (Moshenberg), about his State Court Turnover and Garnishment Order.  Moshenberg admitted to the Court  his actual knowledge of the FSS Dismissal Order and its transfer of the FSS bank accounts and cash to the Jones Chapter 7 Estate.   The Court then issued a bench ruling:

> [Dkt. No. 758, Tr. Pg. 19]
> 15   …                     So what I'm going to do is enter an
> 16   amended order that makes it really clear that I'm aware that
> 17   there was an order entered by the state court.
> 18     *In my view*,  *it conflicts with my order,* and so *you're*
> 19   *not to turn over any amounts of bank accounts and you'll stay*
> 20   *any directive to -- you're under no compulsion to turn anything*
> 21   *over or abandon*, because, quite frankly, it's more abandonment,
> 22   I think, in terms of what you may decide to do or not do. But
> 23   we'll take those issues out.

June 27, 2024, Tr. 19:15-23 [Dkt. No. 758]. (Emphasis added).   The Court dealt with the bank accounts in this bench order by *prohibiting the Trustee* from turning over any "amounts" of bank accounts. Shortly after this hearing the Trustee removed the State Court Turnover and Garnishment to the Bankruptcy Court. [24-01034; Dkt. No. 1].   The removal acknowledged that Jones's 100% membership interest in FSS constitutes non-exempt property under applicable non-bankruptcy law and is property of the Estate in the Jones Bankruptcy Case pursuant to 11 U.S.C. §541.   On June 27, 2024, the Court discussed the "cause" under § 349(b)(3) of protecting the assets from just such inequitable results.    The removal also acknowledged that the State Court Turnover and

---

[7]          Important here, as discussed below, the Texas Plaintiffs appealed the transfers of cash and the transfer of assets, claiming that the Bankruptcy Court had no authority to transfer title to the FSS assets to the Jones Chapter 7 Estate or authorize the § 363 sale of those assets.  Later the Texas Plaintiffs dismissed this appeal and these orders became final, non-appealable orders *and law of the case*.

Garnishment action has a clear and direct impact on the interests and property of the Debtor's estate under 11 U.S.C. § 541, also a clear statement of "cause" under § 349(b)(3).

### E.    The Pre-petition Relationship of Jones and the FSS Assets and Operations

16.    Significant to the pre-petition relationship of Jones and the FSS operations and physical assets, was that

- Only Jones generated income for FSS; that is FSS did not have any other income generator other than Jones promotions; and

- Only the Jones' generated income purchased the FSS assets; and

- Jones' income was derived from Jones utilizing the FSS assets to produce income from promotion of health supplements that were purchased by FSS from income generated by Jones.

- FSS had no other investors or owners, no lenders nor secured debt,[8] no bonds holders, and only monthly trade credit that was generally paid when due.

This symbiotic relationship, although clothed in the LLC-entity cloak, made distinguishing of these two functions impractical, if not impossible.  It was this "relationship" that made Jones and FSS "jointly and severally liable" for the Connecticut Judgment and the Texas Judgment. This relationship was also noted by the Court:

---

[8]    The one exception was Jones father's business PQPR that was owned 79% by Jones, but that FSS owed approximately $50 million for the purchase of supplements sold by FSS over a multiple-year credit facility between FSS (Jones) and his father.  This was a family business of sorts, but not in the traditional sense of family-owned enterprises.  It was more akin to the Country Western Star riding around in his tour bus with no other band members, only a roadie crew.

> 7        When I converted this -- when I dismissed FSS, I
> 8    did a couple of things.  I explicitly told Mr. Murray that
> 9    he was in charge of the bank account and that he had control
> 10   of the equity of FSS.  He's in charge.  And that's -- and I
> 11   said it on the record, and I remember Ms. Catmull was
> 12   sitting in the same -- right around there.  And I said --
> 13   because I didn't want dual seven trustees being around.  All
> 14   this can be done with one trustee.  He's in charge of the
> 15   equity of FSS and he can do what he wants with it.

September 24, 2024, Tr. 12:7-15 [Dkt. No. 861].

> 23        The creditors of FSS are one and the same of the
> 24   creditors of Mr. Jones.  They are the same.  So this is not
> 25   being done for the benefit of FSS creditors.  This is being
> 1    done for the benefit of the Jones creditors who sued FSS and
> 2    Jones.  And now the Trustee holds the equity for them.
> 3    Everything is going to them through this estate.  But
> 4    there's cash there, and you're just using a particular
> 5    portion of the cash that's available through FSS to then
> 6    liquidate the FSS stuff.  But ultimately it will be
> 7    distributed through the Jones Chapter 7 case for the benefit
> 8    of the same creditors who have been appearing.  They're in
> 9    one and the same.  And the families here and PQPR, they're

September 24, 2024, Tr. 12:23-13:9 [Dkt. No. 861].   These clear findings, all undisputed, certainly

constitute § 349(b)(3) "cause" to treat the FSS Assets as property of the Jones Chapter 7 Estate.

17.    This special relationship continued throughout the trials in Texas and Connecticut,

and through the two Chapter 11 bankruptcies.  And, when the FSS Dismissal Order was entered

using the text "deemed vested" in the Jones Chapter 7 Estate, it simply continued the same

relationship, to use the FSS cash and replenish that cash with newly generated income from Jones

continued promotions (as the Supplemental Order allowing operations appeared to contemplate).

Importantly here, if the cash ordered to be transferred to the Jones Chapter 7 Estate were not "property of that estate" (under § 541) then the use of that cash was not authorized by any order and wholly unprotected.

**F.      September 24, 2024, Hearing**

18.      On September 24, 2024, this Court entered its Supplemental Order [FSS Dkt. No. 1021] that "deemed vested" pursuant to § 349(b)(3) "all" he FFS Assets in the Jones Chapter 7 Estate.  If such assets were not transferred and owned by the Jones Chapter 7 Estate, then those assets could not be sold free and clear of liens, claims, and encumbrances under the bankruptcy code, which was the Bankruptcy Court's announced purpose in protecting and transferring those assets to the Chapter 7 Estate.

19.      In seeking this authority from this Court to winddown FSS through an orderly auction and sales process the Trustee argued that:

> "Upon that dismissal order getting entered, the Trustee analyzed the dismissal order, understood that from the dismissal order, the Court was retaining jurisdiction over certain matters and was also specifically delineating certain things that the Trustee was to do, including taking control over all of the estate."

[*See*, September 24, 2024, Transcript [Dkt. No. 861, p. 7:18 – 23].  The Court explained that "[t]he creditors of FSS are one and the same of the creditors of Mr. Jones… you're just using a particular portion of the cash that's available through FSS to then liquidate the FSS stuff."  [Dkt. No. 861, p. 12: 23–13:6].  Accordingly, the Court was attempting to facilitate a mechanism whereby the Trustee would be able to distribute the equity that the Trustee held in FSS and additionally liquidate FSS's assets in an orderly, fair and equitable sales process, and not a race to the Courthouse.  The Bankruptcy Court determined that pursuant to § 349(b)(3), this should be done "through the Jones Chapter 7 case for the benefit of the same creditors who have been appearing."  [Dkt. No. 861, p. 13: 6–8].

20.     In the following exchange between the Trustee's counsel, Joshua Wolfshohl, and the Court, the Court corrected Wolfshohl's statement to make it absolutely clear that the FSS assets are property of the Estate of Jones:

```
14    asking for -- and I do think that there's reason under 363
15    to get this order even though maybe the actual assets we're
16    selling are not property of the Alex Jones estate, part of
17    why we have felt the need to do this is because of --
18          THE COURT:  It is property of the Alex Jones
19    estate, because Alex Jones owned the equity interest in FSS
20    541, all legal or equitable interests.  All.  And all has
21    got to mean all.
22          MR. WOLFSHOHL:  Okay.  And I prefer that
23    interpretation.
24          THE COURT:  No, no, it's not my interpretation.
25    It's Congress.  Congress used the word all.  All legal and
1     equitable interests of the debtor become property of the
2     estate.  All means all.  And we can't shortchange what all
3     means.  And -- and upon conversion unless otherwise ordered.
```

[Dkt. No. 861, p. 16:14-17:3] [*reciting the language of § 349(b)(3)*].  The Court further stressed that this was not subject to more than one interpretation. [Dkt. No. 861, p. 17:10-11] ("And all has got to mean all. And we don't get to kind of pick and choose what all means.").  It was during the same hearing that the U.S. Trustee argued their objection to the Court's proposed Supplemental Order.  The US Trustee voiced concerns that the ownership of 100% of the equity *alone* would not make the FSS assets property of the Jones Estate but stated those concerns would be resolved if the Court clarified the order "to include all of the FSS hard assets *as property of the estate*."

```
12              MR. NGUYEN:  Your Honor, if you clarify the order
13    to include all of FSS hard assets as property of the estate,
14    the U.S. Trustee won't have any objection.  I think you are
15    able -- you have discretion under 349 to order otherwise.
16    As long as that order is clear, we're fine with that.
```

[Dkt. No. 861, p. 26:12-16]. Therefore, in order to address any possible concerns, the Court agreed it would enter an order (which would become known colloquially as the "Supplemental Order"), as part of what the Court referred to as "belt and suspenders", providing clarity that the FSS assets *were property of the Jones Estate* and therefore could be sold by the Trustee through the Jones Estate:

```
11    it sounds like everybody needs it anyway -- I'm more than
12    happy to clarify in my order that all the assets -- if it
13    didn't include it in the assets, that's why he has the cash,
14    right?  That's why he's got the cash and that's why he's got
15    the equity interest.  He's got everything.  That was always
16    the intent as to what was going on.  But if that makes this
```

[Dkt. No. 861, p. 24:11-16].

```
22    want -- I'm going to give you all the assets of FSS.  I'm
23    going to clarify that that's what you always had, the assets
24    of FSS.  And I just want to make sure that other people look
```

[Dkt. No. 861, p. 26:22-24].   The concern expressed by the U.S. Trustee was one of the contributing factors that led the Court to enter its Supplemental Order "pursuant to § 349(b)(3). As it was apparent that this Court was communicating to the parties that the intent it had in dismissing FSS from bankruptcy was to protect those assets by vesting all of FSS's assets into the

Estate of Jones, which were to be protected, controlled, administered, and sold by the Trustee free and clear of all liens.

21.     As a result of the issues discussed during the September 24, 2024, hearing (as set out above), the Court entered the "Supplemental Order" dated September 24, 2024, ordering that "pursuant to § 349(b)(3)", _all assets_ of FSS shall be "deemed vested" in the Alex Jones Chapter 7 estate.  *See*, **Exhibit 4**.  Additionally, the Supplemental Order authorized the Trustee to operate FSS and the FSS Assets that had previously simply continued operating by  the Trustee from and after the Jones Estate Conversion Date.  As noted by the Court, this Supplemental Order included "all" assets of FSS [*See*, Dkt. No. 861, Tr 9-24-25, p. 24].

22.     However, even before the entry of the Supplemental Order, the Court had determined that the actual assets that were being transferred to Estate of Jones included assets of FSS.  [Dkt. No. 861, p. 16: 18–21]:

> "It is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS. [Section] 541, all legal or equitable interests of the Debtor become property of the estate.  All means all."); [Dkt. No. 861, p. 17: 1–17] … "I'm concerned because – but no one disputes that Alex Jones owned a hundred percent of the equity interest in FSS. And all has got to mean all.  And if you own the equity interest in FSS, **then it is property of his estate.  It would be property of his estate if he just filed Chapter 7**." (Emphasis added.)

23.     Based first on the FSS Dismissal Order (without "deemed vested" language, and next on the Supplemental Order reciting § 349(b)(3), the Trustee and Jones simply continued the operations utilizing those assets "*as if*" the Trustee, (the successor owner of the Jones 100% ownership in the *equity in FSS*) was the 100% owner of *the FSS Assets* pursuant to the Supplemental Order and note the lessee, or receiver, or temporary holder, of those FSS Assets, or in possession by any other status, except §§ 541 and 349(b)(3).  Thereafter _all parties_ to the Jones

Chapter 7 case except the Texas Plaintiffs in their appeal, treated the assets as owned by the Jones Estate as property of the estate and subject to the automatic stay.  .

24.     The Court made it abundantly clear in the September 24, 2024, hearing that resulted in the Supplemental Order that the assets that "deemed vested" in the Jones Chapter 7 Estate were ***actually*** vested in that Estate.  The transcript contains numerous references where the Court made clear it always intended to actually transfer "all" FSS assets to the bankruptcy trustee, who was stepping in and selling FSS's assets when the Trustee previously only held the membership interest in FSS.

**G.     Other References to the FSS Assets Being Transferred**

25.     In a hearing that took place on December 10, 2024 [Dkt. No. 992] before this Court, where the Trustee sought permission from this Court for an order permitting a sale of the FSS Assets free and clear of all liens, claims and encumbrances pursuant to § 363, the Trustee testified:

Q:   What's the relation of [FSS] to Alex Jones Estate?

A:    So, there's two. The estate owns 100 percent of the membership interest in FSS, but it owns the assets of the FSS Chapter 11 estate.

Q:    And what do you base that on, that statement?

A: So, FSS filed for bankruptcy on its own. Its assets went into a Chapter 11 estate. Upon dismissal of that case, or as of the dismissal of that case, those assets were vested in the Chapter 7 individual estate of which I'm the trustee.

The Bankruptcy Court hearing this testimony did not correct the Trustee, nor suggest that the Jones Chapter 7 Estate could not utilize § 363 to sell the FSS Assets free and clear of liens, clams, and encumbrances.  [*See*, Dkt. No. 992, December 10, 2024, Tr., 7:18-8:3].  Although the bankruptcy Court did not approve the sale, it was denied on entirely different grounds than lack of jurisdiction to sell pursuant to § 363 as the Sale Motion sought.

26.     On November 18, 2024, in asking this Court to enter an order in furtherance of the sale of the FSS Assets, the Trustee argued that pursuant to the terms of the Supplemental Order, property rights that are owned by FSS are vested in the Estate of Jones and therefore subject to the control of the Trustee. [Dkt. No. 915], ¶55, n. 4 ("The Trustee is not prosecuting appeals of those judgments on behalf of FSS, and such appellate rights are property of FSS, which are vested in the bankruptcy estate of the Debtor as property of his estate to be administered by the Trustee pursuant to the Supplemental Dismissal Order.").   Thus, it is clear that the Trustee had the understanding that the FSS assets had become property of the Jones Chapter 7 Estate as a result of the Supplemental Order.  It is highly unlikely the Trustee would have spent almost two millions of dollars of the Estate of Jones in his pursuit to sell the FSS assets if the FSS assets were not protected by § 363 sale provisions and § 362 the automatic stay but could be seized by one of FSS's creditors at any time.   And, if those assets were not property of the Estate, a § 363 Sale could not utilize the bankruptcy code to accomplish such sale.

## H.     Texas Plaintiffs' Appeal of Supplemental Order

27.     Important to consideration of this Supplemental Order is the appeal by the Texas Plaintiffs of the Supplemental Order (which that had obtained, *just after to the FSS Dismissal Order,* a Turnover and Garnishment of the FSS assets).   The appeal sought to overturn the Supplemental Order.   In contrast, the Connecticut Plaintiffs supported the entry of the Supplemental Order.[9] The Connecticut Plaintiffs even intervened in the appeal.   The Texas

---

[9]     The Texas Plaintiffs, as noted above, did not support the Dismissal Order (in part) or the Supplemental Order and appealed the Orders to the District Court.  The Connecticut Plaintiffs supported those Order, as noted in their Motion to Intervene in the  District Court appeal:

> 11. Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS. (Dkt. No. 957) The Connecticut Families filed a statement in support

Plaintiffs did not attempt to get a stay of the Supplemental Order that formalized what had been occurring since the entry of the FSS Dismissal Order.

### I.      Conduct and Operations Over the Following Year After the Supplemental Order

#### i.      The Trustee's Attempt to Sell to The Onion Pursuant to § 363 of the Bankruptcy Code

28.      Over the following year, acting on the authority of the Initial Cash Order and the Supplemental Order, the Trustee first attempted to hold, and advertised a § 363 auction sale.  Under the premise that one cannot sell what is not owned, and a non-debtor cannot utilize the bankruptcy code for sale of its own property, Jones was comfortable that a bankruptcy sale would net the best price for all of FSS Assets.  However, the Trustee's process in conducting was not ordinary, and could be described as extraordinary in its terms favoring what was ultimately a "Joint Bid" by the Connecticut Plaintiffs and The Onion,[10] that resulted in the Trustee announcing that The Onion was a successful bidder.  The Joint Bid was part cash and the majority a contribution of Connecticut Plaintiffs' non-final judgment's future dividends.  After a lengthy hearing, the Court rejected the sale process and refused to approve The Onion as the successful bidder in light of a cash bidder that had greatly exceeded The Onion's cash bid.  The Court ordered a second bidding process to be considered by the Trustee.

#### ii.      The Court Orders a Second Bidding Process

29.      Next, in contemplation of the Trustee's second bidding process ordered by the Bankruptcy Court, the cash bidder in the original failed auction made an unsolicited cash bid of

---

of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors. (Dkt. No. 959.)

[10]      The Onion is an internet blog supported through Bloomberg and "Every Town", a gun control non-profit foundation.   The Connecticut Plaintiffs, individually, partnered with The Onion to make a joint bid of cash and judgment dividend credits with the express intention of acquiring the FSS assets for destruction or to be used as parody after gaining access to FSS's supporter and credit card purchase records.

$8 million in December 2024. [Dkt. No. 1089] The Trustee did not initiate a new auction, but instead participated in negotiations with the Connecticut and Texas Plaintiffs, reaching a "Rule 9019 Settlement Motion (although it is unclear what the controversy was between the Trustee and the two Plaintiffs that needed settling) providing, among many other terms, that

   (i) the Connecticut Plaintiffs judgment and proof of claim (that had been objected to and was on appeal in Connecticut) would be ordered as an "Allowed Claim" in the Jones Chapter 7 case without trial of the pending objection, and allowed as to FSS even "as if" FSS was still in a bankruptcy case, though FSS was no longer in bankruptcy; and

   (ii) as to the Jones Chapter 7 case, the "settlement" provided that the Texas Plaintiffs, only two of the five having gone to trial resulting in two judgments each a $24 million judgments and proof of claim that was then, and continues now, on appeal in Texas. The Settlement provided that all five Plaintiffs would receive as "Allowed Claims" in the Jones Chapter 7 Estate of approximately $480 million, allegedly to "equalize" the dividend distributions between the two Plaintiff groups at 75% Connecticut Plaintiffs and 25% Texas Plaintiffs. The 9019 Settlement Motion was firmly denied.

   **iii.** **The February 5, 2025, Hearing On the Trustee's Settlement for the Plaintiffs**

  30. At the hearing held on February 5, 2025, the Bankruptcy Court, expressing great frustration about the settlement, denied the 9019 Settlement Motion and announced the Court's intention to "void" the Supplemental Order, but also then noted that because of the appeal by the Texas Plaintiffs, the Bankruptcy Court had lost jurisdiction to void the order and could not do so. *See*, February 5, 2025, Tr., p. 8:15-20 [Dkt. No. 1072]. This is the law – thus even had the Court not stated on the record that it could not void the Supplemental Order, the law provides that it

could not.[11]   Thus, with the Court's acknowledgment of appellate law (that a trial court loses plenary power and jurisdiction over an order on appeal from that court) Jones and FSS continued to believe that the FFS Assets were protected by the bankruptcy code.

### iv.   The March 19th Order Denying FUAC's Request for a New Auction

31.   On March 19, 2025, the Bankruptcy Court entered an Order on the Motion of the unsuccessful cash bidder, FUAC, LLC ("FUAC") seeking an order for a new auction based on its' new December 2024 $*8 million cash bid* [Dkt. No. 1121] that had not been responded to by the Jones Chapter 7 Estate Trustee Murray. The confusing order provided the following language regarding the February 5, 2025:

> This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

32.   However, the second paragraph denied the FUAC Motion but not because the February 5, 2025 had voided the Supplemental Order and would have made the FUAC Motion moot (moot because the Trustee no longer owned or had rights in the FSS assets if the Supplemental Order was no longer effective) but because FUAC was found to have no standing to bring the Motion to compel a new auction as an unsuccessful bidder of the first auction.

### v.   The June 5, 2025, Hearing on Jones Motion To Reconsider the Court Determination of No New Auction

---

[11]   Jones incorporates herein its summary set out in the Response to the Emergency Motion to Find the Automatic Stay did not apply to the FSS Assets including the Plaintiffs seeking sanctions against the Plaintiffs' counsel for pleading in the State Court that the Bankruptcy Court recognized the appellate law, recognized that it did not have jurisdiction to void the Supplemental Order, and did not void the Supplemental Order.  The State Court after considering the record, decided that the Bankruptcy Court did void the Supplemental Order on February 5, 2025, notwithstanding the furnished transcript of June 5, 2025, where the Bankruptcy Court repeated that it did not void the Supplemental Order.  Jones and FSS will furnish to the State District Court the October 1, 2025, transcript wherein the Bankruptcy Court repeated that it did not void the Supplemental Order.

33.     The confusing result of the March 19 Order denying the FUAC Motion for a new auction resulted in Jones filing his Motion to Reconsider the March Order and Jones' Motion to order a second auction. [Dkt. No. 1131] and on the Motion of Jones to reconsider Judge Lopez's February 5, 2025, decision not to order a new auction on June 5, 2024.

34.     As to voiding the Supplemental Order, at the October 1 hearing the Bankruptcy Court noted that the Court had not voided or set aside the Supplemental Order, recalling both his February 5 remarks on the record about the loss of jurisdiction because of the pending Texas Plaintiffs appeal, and later on June 5 recalling making a lengthier analysis of the Bankruptcy Court's inability to have voided the Supplemental Order while on appeal.  Importantly, no party to the October 1 hearing argued that the Supplemental Order that "deemed vested" (the FSS Assets) in the Jones Chapter 7 Estate a property of that Estate actually did not transfer any title or protected rights (protected by, for example, the automatic stay that protects all bankruptcy estate property from seizure or any self-help collection activities).  The only arguments made were that the automatic stay existed but went away as a result of the February 5, 2025, voiding by J. Lopez of the Supplemental Order.

35.     In fact, the Turnover Order Judge Gamble signed (the form of which was submitted by jointly by both the Connecticut and Texas Plaintiffs Motion and Proposed Order) reads that the assets of FSS were transferred to the bankruptcy estate by means of two orders:

> **The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i)   as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

And during the June 5, 2025 hearing, the Court made clear that the Supplemental Order had not been set aside:

> 8        THE COURT:  I don't think I modify the order --
>
> 9        MR. JORDAN:  You didn't.
>
> 10        THE COURT:  -- back in February.
>
> 11        MR. JORDAN:  No.
>
> 12        THE COURT:  The question is, do I do it now?  It's
>
> 13   the question you're telling me.

Dkt. No. 1193, June 5, 2025 Tr., p. 47, lines 8-13. The Court repeated the fact that it did not have authority to nullify the Supplemental Order several times, including:

> 5        The matter was currently pending.  That order was
>
> 6   currently pending on appeal at the time, so I couldn't revoke
>
> 7   one way or the other, right?  Once bankruptcy, once an appeal
>
> 8   is filed, the Court loses jurisdiction over that.  What I

…

```
23    that I sold and so I haven't revoked anything.  I didn't have
24    authority to do it anyway, but to me, putting up another
```

Dkt. No. 1193, June 5, 2025, p. 40, l: 5-8, 23-24.

> **vi.    The Plaintiffs' Motion Seeking the Court to Re-affirm That the
> Supplemental Order Had Been Voided On February 5, 2025, and as a
> Result the "Automatic Stay" Protecting Property of the Jones Chapter 7
> Estate Did Not Apply To the FSS Assets. [Dkt. No. 1241]**

36.     On September 26, 2025, the Plaintiffs filed an Emergency Motion that was set and

heard on October 1, 2025, giving Jones less than 3 days to prepare for this claimed

"Emergency")[Dkt. No. 1241].

37.     The Plaintiff's Emergency Motion argued that the automatic stay went away when

the Supplemental Order was voided **on February 5, 2025** (which itself illustrates that all parties

believed the FSS Assets were property of the Jones Chapter 7 Estate).

38.     Although the Connecticut Plaintiffs arguments have changed over time, they

ultimately contended that the June 2024 Dismissal Order gave the Chapter 7 Trustee *dual powers*

including "signing authority over FSS' bank accounts *and the power to dispose of its assets for the*

*benefit of creditors*, though those assets remained the property of FSS."  [Pls Resp. to Motion to

Stay, p. 23].  They even claimed FSS' filings agreed, *albeit* misquoting Jones.  *Id*. n. 5.  The

Connecticut Plaintiffs further claimed in their Emergency Motion that the September 2024

Supplemental Order did so as well but then claimed the bankruptcy judge nullified that order in

February 2025.  No party took the position announced by Judge Lopez at the October 1st hearing.

The Bankruptcy Court then made a startling pronouncement.  Jones and FSS *think* Judge Lopez

said the Supplemental Order *had not transferred ownership* of any of FSS's assets - Judge Lopez

saying the Supplemental Order never *vested* FSS Assets in the Jones Bankruptcy Estate, the assets

were merely "*deemed vested*".   Judge Lopez seemed insistent that there is a significant difference between the two phrases – vested and deemed vested.

39.      According to Judge Lopez, the Supplemental Order that "deemed vested" all FSS assets in the Jones Chapter 7 Estate, did not actually transfer any "Property of the Estate" but only "deemed" the property vested in the Chapter 7 Estate.  When asked if what the Court was saying was that the automatic stay never protected the FSS assets and that at any time any creditor could have seized those assets from the Trustee - Judge Lopez did not respond.  However, when Judge Lopez dealt earlier with the Texas Plaintiffs turnover order, recall that J. Lopez entered an order that the Jones Chapter 7 Trustee not turnover pursuant to the State Court Turnover and Garnishment Order any of the assets of cash or assets held by FSS.

40.      In fact, sale of the FSS assets by the Trustee was never prohibited by the Bankruptcy Court, and up to June 5, 2025, the Bankruptcy Court commented that it continued to be an option the court said would be considered:

```
 6          The question is do we do another sale?  That's the
 7    real question.  Or another proposed sale with another proposed
 8    hearing and determining what the assets are there and then who
 9    will conduct the sale and who would do the auction and whether
10    you do some cash or and what the analysis would be to get me
11    comfortable that those assets are actually owned by FSS.  And
```

Dkt. No. 1193, June 5, 2025, Tr. 49:6-11.

**J.**      **First Ever Claim Made to This Bankruptcy Court That the FSS Assets Were Not Protected by the Automatic Stay**

41.      The first occasion for any dispute raised in this Bankruptcy Court that the FSS assets were not property of the Jones Chapter 7 Estate was on September 25, 2025, five months

after February 5, 2025, when the Texas and Connecticut Plaintiffs claimed in their Emergency Motion to Confirm (that the Automatic Stay terminated on February 5, 2025) that this Bankruptcy Court "voided" the Supplemental Order on February 5, 2025.  Although in that hearing the Court did say it was voiding that order, until an "on the record conversation" with Jones counsel, the Bankruptcy Court recognized he did not have the jurisdiction to void an order that was pending on appeal at the District Court:

```
15   back to doing -- no, I should back up and mention that the
16   supplemental order was appealed by the Texas families.  I
17   think that matter is still pending.
18          MR. JORDAN:  It is, Judge.
19          THE COURT:  I lose jurisdiction over that
20   immediately.
```

[*See*, Dkt. No. 1072, Tr. February 5, 2025, Tr., 8:15-20].  This same position was echoed by this Court in the June 5, 2025, hearing, and repeated in the October 1, 2025, hearing (although in October the Court

## II.
## JURISDICTION FOR CONSIDERATION
## OF THIS MOTION AND THE REQUEST FOR RELIEF

42.     Additionally, under Federal Rule of Civil Procedure 54(b) and Bankruptcy Rule 7054, this Court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Puga v. About Tyme Transp., Inc.*, 2017 WL 6049244, at *1 (S.D. Tex. Feb. 21, 2017).  Jones Motion is directed to a non-final and therefore interlocutory order to be reconsidered.

43.     The Court has complete discretion "to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or

clarification of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). The Court's discretion is "not cabined by the heightened standards for reconsideration governing final orders." *Id.* at 337 (internal quotations and citations omitted).

44.     Where a party timely files a motion seeking reconsideration such as a motion to alter or amend the judgment under Fed.R.Civ.P. 59, a motion for new trial under Rule 59, or a motion for relief under Fed.R.Civ.P. 60(b), the 14-day bankruptcy deadline for filing a notice of appeal will be tolled so that it runs from the entry of the order disposing of the last of these motions, as provided in Federal Rule of Appellate Procedure 4(a)(4). Here, Jones seeks a new trial, or to alter or amend the October 1, 2025, Order. Jones also seeks reconsideration pursuant to Fed.R.Civ.P. 60(b)(6) incorporated in the Rules of Bankruptcy Procedure.

45.     Here basis for reconsideration of this interlocutory order is the injustice to the parties and bankruptcy system itself from:

(i). the interpretation of the Bankruptcy Court order that reaches an unjust result;

(ii). the failure to grant a hearing on the pending relief of a sale of the FSS Assets by a cash auction, secret bidding, awarded to the highest cash bidder; and

(iii).  the abuse of process and wrongful conduct of the Connecticut and Texas Plaintiffs set out in Jones Motion to Reconsider the auction process, and this Motion.

46.     A motion to reconsider (including non-final or final orders) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "*the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process.*" *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added); Fed.R.Civ.P. 60(b)(6).  Such is the case here.

47.     This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has

exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v.*

*Higgins*, 743 F.2d 984 (3ʳᵈ Cir. 1984).

### III.
### STANDING OF JONES TO
### SEEK THIS RELIEF

48.     Jones as the Chapter 7 Debtor has constitutional and bankruptcy code standing to

bring this request for relief,**[12]** and for the purpose of both the appeals of the Plaintiff Creditors'

Claims and the Courts prior order to conduct a public auction. Jones's standing also arises out of

his position as the sole managing member of FSS.   [*See*, note 12, *Truck Ins. Exch. v. Kaiser*

*Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024)].

---

[12]     Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest
. . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in
interest include:
>  "*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an
>  equity security holder, or any indenture trustee."
>  • *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that*
>  *are potentially concerned with or affected by a proceeding.*"];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066
>  (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining
>  the scope of a party in interest right to participate].
>  • *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A*., 530 U. S. 1, 7 (2000);
>  • *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the
court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):
>  [I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to
>  be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any
>  remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a
>  pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the
>  debtor's continuing liability after bankruptcy could be affected.
• *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering
the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets
of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the
outcome of the claim objection]; *See, also,  In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a
pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be
returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an
excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder
of a nondischargeable claim.  The debtor certainly wants to maximize the distribution to the holder of a
nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the
claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13
(Resnick & Sommers ed. 15th ed. rev. 2009).

**IV.**
**ARGUMENTS AND AUTHORITIES**
**One Chapter 7 Debtor LLC can Transfer Its Assets to the**
**Affiliated Chapter 7 Debtor-Sole Owner of the LLC Since**
**It is the Sole Manager/Member Permitted Authority**

**A.      The Court's Recognition of Additional *Postpetition* Property**

49.      Section 541 of the Bankruptcy Code defines property of the estate of a debtor (*e.g.* Alex Jones) to be broadly construed as "all legal and equitable rights and interest" of a debtor on the Petition Date.  Section 349 authorizes the Bankruptcy Court to "otherwise" the broad scope to accomplish the purposes of § 541.  Very generally speaking, property that is acquired *after a bankruptcy petition date* is not included in "property of the estate" by § 541, with the statutory and common law exceptions, first, "for cause" pursuant to § 349(b)(3).  Additional statutory and bankruptcy law exceptions to this rule and a substantial body of law regarding "deemed" property of the estate, begins with the test set out in *Segal v. Rochelle* 82 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966) and continuing through the passage of the Bankruptcy Code and § 541's test expanding the *Segal* test to "all legal and equitable interests" in property, to the current status of law in the Fifth Circuit that holds "all legal and equitable interests" is broader then "if sufficiently rooted in the pre-bankruptcy past" test.

50.      First, *In re Vasquez*, 581 B.R. 59, 66-67 (Bankr. D. Vt. 2018) observed that 'the temporal line of demarcation (of property of the estate as of the Petition Date) is not impervious and a legal claim that accrues postpetition can be deemed property of the estate' if it is 'sufficiently rooted in the pre-bankruptcy past.'" Quoting *Chartschlaa*, 538 F.3d at 122 (*quoting Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966)) [decided under the Bankruptcy Act];  *see , also Sikirica v. Harber (In re Harber)*, 553 B.R. 522, 528 (Bankr. W.D. Pa. 2016) [decided under the Bankruptcy Code].  Vasquez (also decided under the Bankruptcy Code analyzes

the status of the law on recognizing "postpetition" property interests as property of the estate under

*Segal*:

> In *Segal*, the Supreme Court considered the scope of "property of the estate" under the Bankruptcy Act. The Court found even though the debtors, a partnership and its individual partners, could not collect a tax refund until after they filed their bankruptcy cases, the tax refund "existed at the time [the] bankruptcy petitions were filed." Segal, 382 U.S. at 380. Although the debtor's refund was received postpetition, the Court ruled the debtor's right to that asset was nevertheless "*sufficiently rooted in the pre-bankruptcy past* and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property'" of the estate as of the date of petition.  *Id* at 71.
> …
> Segal's analysis of the meaning of "property" under the now superseded Bankruptcy Act retains "continued vitality" in the Second Circuit and in 'most other Circuits.'[13] *Id*. In re Vasquez*, at 71-72.
> …

## B.    The Fifth Circuit Agrees With the Applicability of the *Segal* Test But Considers § 541 More Broad Than the *Segal* Test

51.    The Fifth Circuit in *Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 n. 52 (5th Cir. 2014), cites *Segal v. Rochelle* as good law:

> *Note 52.   In re Trinity Gas Corp. (Reorganized)*, 242 B.R. 344, 350 (Bankr. N.D. Tex. 1999) ("[T]he obvious purpose of § 541(a)(7) is to include property and rights which are acquired in the estate's normal course of business in property of the estate."); *In re Doemling*, 116 B.R. 48, 50 (Bankr. W.D. Pa. 1990) ("Relatively few courts have been called upon to determine whether a property interest which was acquired postpetition in a Chapter 11 case qualifies as property of the estate pursuant to § 541(a)(7).  The following principle can, however, be extracted from certain of those cases: a property interest acquired postpetition during the pendency of a Chapter 11 case qualifies as property of the estate, *for purposes of § 541(a)(7),* only if said property interest is traceable to (or arises out of) some prepetition property interest which already is included in the bankruptcy estate."); *see also Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966) (holding that *whether property is included in an estate depends on whether it "is sufficiently rooted in the pre-bankruptcy past* and so little entangled with the

---

[13]    *In re Ross*, 548 B.R. 632, 638 (Bankr. E.D.N.Y. 2016); *see, e.g., TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 n. 52 (5th Cir. 2014); Underhill v. Huntington Nat'l Bank (In re Underhill), 579 F. App'x 480, 481 (6th Cir. 2014); Cook v. Baca, 512 F. App'x 810, 820 (10th Cir. 2013); Martinez v. Lincoln Gen. Ins. Co., 417 F. App'x 711, 712 (9th Cir. 2011); Fix v. First State Bank of Roscoe, 559 F.3d 803, 809 (8th Cir. 2009); Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008); In re Alvarez, 224 F.3d 1273, 1278-79 (11th Cir. 2000); Beaman v. Shearin (In re Shearin), 224 F.3d 346, 351 (4th Cir. 2000).

bankrupts' ability to make an unencumbered fresh start"). *In re TMT Procurement Corp.* at 525 n.52 (5th Cir. 2014)

So, being the sole owner and sole manager of an LLC when the sole owner files bankruptcy may be viewed in the Fifth Circuit both under §541 broader test "all legal and equitable interests" or under the "sufficiently rooted in the pre-bankruptcy past" – and in both examples the assets of such single member LLC and the Jones/FSS symbiotic relationship can be deemed property of the estate in the individual's bankruptcy.  It cannot be argued that the sole owner, sole manager, with discretionary powers over all assets of the co-debtor LLC, including the right to liquidate those assets, and where the LLC is wholly dependent on the activities of the sole owner for all of its income, is not directly and materially "rooted in the pre-bankruptcy past and capable of § 349(b)(3) "for cause" inclusion in the Jones Chapter 7 Estate.

52.    Eight years before *TMT* the Fifth Circuit explained in *Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 498-99 (5th Cir. 2006) that the Code created a broader scope of "property of the estate" than contained in the old and replaced  Bankruptcy Act:

> "Section 541 now governs what is considered property of the estate, and unlike former § 70(a)(5) of the Bankruptcy Act, § 541 expressly defines property . . . [and] under current law, a debtor's interest in property may be contingent—*or enjoyment of the interest may be postponed*—until after bankruptcy, *but the debtor must have had a prepetition legal interest nonetheless*.[14]
>
>       …
>
> The Bankruptcy Code was *intended to create a more uniform and comprehensive scope to "property of the estate"* which is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. Under Section 70(a) of the earlier Act, the inclusion of an asset within the estate varied in accordance with (1) an individual examination of the legal nature of the asset (2) in light of the purposes of the Bankruptcy Act. This two-part test reflected the dual and often conflicting policies woven into the Act.[15]  These policies were to secure for the

---

[14]    Note *Burgess* also notes that "although Congress has specifically approved of *Segal's* result, [its] 'sufficiently rooted' test did not survive enactment of the Bankruptcy Code" (because the Code is broader).  *In re Bolton*, at 53 n.8

[15]    Thus, although Congress has specifically approved of *Segal's* result, [note **6**].  However, the Fifth Circuit holds that the *Segal's* "sufficiently rooted" test under the old Bankruptcy Act did not survive the enactment of the

benefit of creditors everything of value the bankrupt might possess in alienable or leviable form, but to permit a bankrupt to accumulate new wealth after the date of his petition and to allow him an unencumbered [*499] fresh start. Relying upon these competing considerations, the Supreme Court developed a rule that where property "is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start . . . it should be regarded as 'property' [of the estate]."

> *The enactment of the Bankruptcy Code undertook to obviate this analytical conundrum. Under Section 541 of the Code, all property in which the debtor has a "legal or equitable interest" at the time of bankruptcy comes into the estate.*

706 F.2d 574, 578 (5th Cir. 1983) (internal citations and footnotes omitted) (emphasis added), *overruled on other grounds by Patterson v. Shumate*, 504 U.S. 753, 112 S. Ct. 2242, 119 L. Ed. 2d 519 (1992). Section 541 now governs what is considered property of the bankruptcy estate, and unlike former 70a(5) of the Bankruptcy Act, 541 expressly defines property: "All legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541. *Thus, under current law, a debtor's interest in property may be contingent or enjoyment of the interest may be postponed until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless*. *Id. Burgess* at 498-499.

In this case, the Debtor Alex Jones has at least a significant equitable interest in the sole member, manager managed as the sole owner of FSS and FSS assets and financial survival are wholly dependent and inextricably intertwined with the Jones Chapter 7 Estate as to be considered a single entity. As this Bankruptcy Court noted, the two were almost indistinguishable. FSS, without the promotion of Jones, would have no income and only debt.

53. In numerous cases throughout the Circuits, upon filing a bankruptcy by an individual that is the sole owner of an LLC he manages, the *law merges the ownership interest with the manager interest* such that the Trustee in bankruptcy is not only the owner of the LLC,

---

Bankruptcy Code. As this court previously explained in *Goff v. Taylor*.The majority opinion cites only dictum in a case from this court that the Supreme Court overruled. *In re Goff*, 706 F.2d 574, 578 (5th Cir. 1983), overruled by *Patterson v. Shumate*, 504 U.S. 753, 112 S. Ct. 2242, 119 L. Ed. 2d 519 (1992). *In re Goff* concluded that the Bankruptcy Code ***broadened any pre-existing test for property of the debtor's estate***. ("The Bankruptcy Code was intended to create a more uniform and comprehensive scope to 'property of the estate' which is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. . . . The sweeping scope of [the § 541(a)(1)] automatic inclusion was intended to remedy most of the old Act's perceived deficiencies."). *Burgess at* 512 n.18.

but the sole manager.**[16]**  The FSS sole member/manager is Alex Jones who as " *the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.*  *See*, Exhibit 5, § 802 of the FSS Company Agreement.

54.     Also, consider here where the LLC was in its own bankruptcy case and its assets were subject to the claims of many of the same creditor (the two largest of which were jointly and severally liable with its 100% sole owner).  The language above, coupled with the fact the LLC itself was in bankruptcy, and its assets were liable for the joint and several debts and its own debts – which was the status of the "transferor" accomplished by this Court when it ordered the Jones Chapter 7 Estate was "deemed vest(ed)" with FSS Assets.

55.     This result comes also from a different source.  One of the consequences of allowing the bankruptcy trustee to exercise management powers over the LLC is that the trustee will be able to dissolve the LLC and distribute its assets to the bankruptcy estate and make the assets available to pay creditors.  When that happens, however, there is zero asset protection for the bankrupt member and the race to judgment or the Courthouse ensues.  This Bankruptcy Court expressly wanted to avoid this and avoid the administration of two Chapter 7 Trustees for an owner and entity that was for all practical purposes, combined.  But to do so in a fashion that gave the FSS assets no protection is counterintuitive to the purpose and goal announced several times by the Bankruptcy Court.

56.     Finally, Alex Jones had far more than a legal interest in FSS as the sole owner and as the sole manager with the "authority to take any action (he) deemed necessary, convenient or advisable in connection with the management of the Company."  *See,* Company Agreement

---

[16]        *A-Z Electronics, LLC*, 350 B.R. 886 (Bkrtcy. D. Idaho 2006);  *In re: Ashley Albright*, 291 B.R. 538 (Bkr. D Colo. 2003);  *In re Modanlo*, 2006 WL 4486537 (D. Md. 2006).

[**Exhibit** 5. At the time of the "deemed vesting" of FSS Assets into the Jones Chapter 7 Estate the manager was the Trustee for the Jones Chapter 7 Estate that managed the FSS Assets upon termination of the FSS bankruptcy. Burgess notes the following distinction:

> Second, *Segal* is distinguishable *because the debtor did have a prepetition legal interest in that case.* At the time of bankruptcy, 172 of the Internal Revenue Code gave the debtor a *claim* for a tax refund if certain conditions were met. *It was the combination of the law and the conditions made legally relevant by the law that conferred on the debtor a prepetition legal interest*: the claim for a refund. In that way, the *Segal* debtors' claim for a refund is similar to the prepetition accrual of a cause of action that results in a postpetition judgment in the debtor's favor. In such cases, the debtor's cause of action is a prepetition legal interest 541(a)(1) property *that brings the postpetition judgment into the estate* as proceeds under 541(a)(6). *See, e.g.*, *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) [holding that causes of action for age and sex discrimination that arose prepetition (but brought only post-petition )were  property of the bankruptcy estate]. *Burgess* at 498-99 . Id., Burgess at 499.[17]

*See, also In re PS On Tap, Ltd. Liab. Co.*, 669 B.R. 56, 66 (Bankr. C.D. Cal. 2025).

> ("To decide whether to treat post-petition claims as estate property, the Supreme Court has instructed us to determine whether such claims are 'sufficiently rooted in the pre-bankruptcy past'") (quoting *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966)). *Id. In re PS On Tap*, at 66. … But here, it does not. Faithful application of the Supreme Court's holding in *Segal v. Rochelle* under the circumstances presented here, requires the Court to look beyond the closing date of the tax period, and instead examine the basis for the ERCs, even though they may have been inchoate obligations as of the Petition Date. *Id.* at 69.[18]

These cases illustrate the significance of this Bankruptcy Court's Dismissal Order. Protecting the

---

[17]    Burgess noted the distinction that although the crop was grown pre-petition and had it been existing insurance or claims for the loss that had accrued, the claim in Burgess was not of that nature:

> Here, by contrast, Burgess suffered the crop loss before filing for bankruptcy, but he did not have a prepetition claim to, or interest in, the disaster-relief payment *because the legislation authorizing the payment had not yet been enacted*. If Burgess had no right or interest that constituted property within the meaning of 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under 541(a)(6). Two other courts have recently reached the same conclusion in the context of federal disaster-relief payments to farmers. *Burgess* at 499.

[18]    *Also citing*:

> *United States v. Carey (In re Wade Cook Fin. Corp.),* 375 B.R. 597, 580 (B.A.P. 9th Cir. 2007) ["Though *Segal* was decided under the prior Bankruptcy Act, it remains good law under the Bankruptcy Code applicable to the instant case. *United States v. Sims (In re Feiler),* 218 F.3d 948, 955 (9th Cir. 2000); *Chappel v. Proctor (In re Chappel),* 189 B.R. 489, 493 (9th Cir. BAP 1995). *Id.* 596-597].

value of the FFS Assets could only be done by Alex Jones, which is precisely what was accomplished by this Court Dismissal Order and Supplemental Order.   This Court's insistence that the Trustee's version of a § 363 sale arranged by the demands of the Plaintiffs did not fulfill the demands of the Code or the Court because it attempted to sell for non-cash and at a far too low price.   And, because of the nature of the auction process produced by the Plaintiffs (not the Trustee), there was no true competitive bidding – the Plaintiffs effectively controlled the bidding and did not want to compete with cash bidding.

**V.**
**THE IMPORTANCE OF A LEGITIMATE § 363 SALE IN THIS CASE**
**TO PREVENT A POLITICAL ULTERIOR MOTIVE FROM**
**ABUSING THE  LEGITIMATE BANKRUPTCY PROCESS**

**A.**     **The Texas and Connecticut Plaintiffs' Bad Faith and Bad Acts Caused Loss of This Court's Confidence in An Auction Sale By the Trustee and A Seven (7) Month Delay In Resolving the Sale of the FSS Assets**

57.     The Connecticut Plaintiffs are not interested in achieving a sale of the FSS assets at the highest value, but only a sale that results in the destruction of the Alex Jones "brand" of InfoWars (*e.g.*, The Onion attempted purchase).   The Connecticut and Texas Plaintiffs (and the Onion) have announced to the trial Courts, to the media, and to this Bankruptcy Court through their conduct and their frequent statements, that their true motive is not to obtain the highest value, so that their just debt may be repaid, but to destroy the value of the Debtor and his assets and obtain a non-dischargeable debt that will prevent Alex Jones from exercising his freedom of the press and free speech rights.

58.     This Court is the gatekeeper on issues of ulterior motives and bad faith.  *Cont'l Ins. Co. v. La. Oil Ref. Corp.,* 89 F.2d 333, 337 (5th Cir. 1937).[19]   A creditor may not cast his vote for

---

[19]     "The judge in acting on a plan must investigate the good faith and purity of the acceptance, and the time of acquiring the claims so voting. Paragraphs (e), (f) (6), of section 77B, 11 U.S.C.A. § 207(e), (f) (6); Texas Hotel Securities Corporation v. Waco Development Co. (C.C.A.) 87 F.(2d) 395, 396."

an ulterior purpose and expect to have it counted.  Ulterior motives have been held to include 'pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business.'"  *In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008). [20]

59.   The destruction of the InfoWars brand and Alex Jones ability to exercise his freedom of the press and free speech is an abusive ulterior motive:

> Ulterior motives which can constitute bad faith include "pure malice, 'strikes', blackmail, and ***the [destruction of an entity]*** in order to advance the interests of a competing business."

*In re Landing Assocs., Ltd.,* 157 B.R. 791, 802 (Bankr. W.D. Tex. 1993) citing *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988). [21]   The Law in the Fifth Circuit is the same as In re Landing Assoc:

> *See Town of Belleair, Fla. v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942). In *Groves*, a plan of reorganization was denied confirmation on the grounds that "special inducements" had been used to secure the acceptance of the plan by a group of creditors who were also bondholders of the debtor corporation. *See Groves*, 132 F.2d 542-43. The court found that the creditor-bondholders had been principally motivated by the existence of the "special benefits" which benefitted their bondholder interests rather than their interests as creditors, and that such ulterior motives breached the requirement of good faith. *Id.* at 543. [22]

---

[20]     citing *Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.),* 859 F.2d 17, 19 (4th Cir. 1988), *citing In re Pine Hill Collieries Co.,* 46 F.Supp. 669, 671 (E.D. Pa. 1942), and *In re MacLeod Co., Inc.,* 63 B.R. 654 (Bankr. S.D. Ohio 1986).

[21]     Also citing *In re MacLeod Co., Inc.*, 63 Bankr. at 655 *and In re Featherworks Corp.*, 36 Bankr. at 463 (both citing *P-R Holding Corp.* with approval). In *P-R Holding Corp.*, the court stated that "when the [questioned activity] is in aid of an interest other than an interest *as a creditor*, [it] may amount to bad faith. . . ."

[22]     *In re Mangia Pizza Invs., LP,* 480 B.R. 669, 681 (Bankr. W.D. Tex. 2012): *citing In re Landing Assocs., Ltd.,* 157 B.R. 791, 807 (Bankr. . W.D. Tex. 1993) ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked.").   *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 682 (Bankr. W.D. Tex. 2012) cited I*n re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990), noted that the creditor in that case had purchased its claims only after the debtor's disclosure statement was approved, and then "almost exactly in the amount required to block the plan of reorganization." *Id.* at 289-90. In addition, in determining that the creditor's true motive was to "take over and control the debtor," the court noted that the two classes in which the creditor had purchased claims had "directly opposite interests with respect to the . . . litigation." *Id.*

*In re Dernick*, 624 B.R. 799, 808 (Bankr. S.D. Tex. 2020) instructs that "… a court must assess "the true interest being benefitted by the questioned activity" to determine whether the creditor is seeking to benefit itself in some way other than as a creditor acting on its claim.  Here, the determination is simple.  The "creditors" Plaintiffs are seeking a political "gun control" victory which Plaintiffs define as the destruction of the Alex Jones "brand" of InfoWars.  This is a the "ulterior motive" that is not permitted in the process of bankruptcy, whether reorganization or liquidation (at both stages, the Plaintiffs acted in bad faith on their ulterior motive).

60.     This conduct is not an allowed motive of a creditor, it is the motive of a political view bent on destruction of an opposed political view (*i.e.*, the conservative voice of Alex Jones by his political opponents, the far-left progressive movement seeking gun control, financed by such organization as Bloomberg and its supported foundations Every Town and The Onion) (the "Political Motive").  This Political Motive is not recognized in bankruptcy and cannot be rewarded by a federal court where the goal is wholly inconsistent with the rights of a legitimate creditor and the constitutional rights of the debtor.

61.     Because this Bankruptcy Court refused to permit the Connecticut and Texas Plaintiffs control of the bankruptcy auction and Trustee, the Plaintiffs *now oppose any auction* of the FSS assets.  The Plaintiffs have not sought a fair and equitable distribution of bankruptcy proceeds, but to control the bankruptcy assets to accomplish an abuse of the bankruptcy process. Most critically, that abuse involves the prevention of a debtor of the right to future exercise constitutional rights – freedom of the press and free speech.

62.     It is the sale proceeds that must then be applied to those Judgments as credits of the sale process, and depending on the outcome of the appeals, may even allow payment in full of one or both of these judgments.  Allowing the operation and protection of these assets has and will

continue to be for the benefit of the creditors and the Jones Estate until the sale concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than through a fair, non-collusive process.[23]

63.     Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment rights).[24]   In fact, abuse of process conduct it is contrary to the bankruptcy fresh start, even where a claim is found non-dischargeable.  If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts.  This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[25]

---

[23]     Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[24]     *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

>     The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428] includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.').  *Id.* at 428.

[25]     "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term.

Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[26]

64.     This obvious abuse of process must be eliminated from controlling this bankruptcy. Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction – uncontrolled by any outside source other than this Bankruptcy Court enforcing its own orders to sell.

**B.     The Connecticut and Texas Plaintiffs Abuse of Process Goes Far Beyond the Efforts to Destroy Jones and FSS Assets in This Bankruptcy by Jones and FSS**

65.     As noted above, Jones and FSS have filed on September 5, 2025, their writ of *certiorari* with the Supreme Court of the United States.  *See*, **Exhibit "6"** attached hereto.  It has been placed on the agenda for the Justices' private conference on October 10, 2025.  The text of the Writ discloses many of the abuses of the Connecticut Plaintiffs in the Connecticut jury trial, including their opening and closing statements that Jones should be punished so severely that he can never be part of the public discourse in the future.  This is exactly the plan that motivated this Bankruptcy Court's frustration with the two auctions and an absurd settlement pushed by the Plaintiffs and adopted by the Trustee.   The efforts of these Plaintiffs are pre-dated by the federal

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[26]     *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020). Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

government's efforts to stop Alex Jones from continuing his broadcasts, long before Sandy Hook. The following facts have meticulously been explored and only discovered within the past months.

66.     The Conduct of the Plaintiffs Admit Their Intention To Destroy the InfoWars Brand and the Ability of the Debtor and FSS to Conduct Their Constitutionally Protected Free Press and Speech.   This is made clear by the simple fact that five (5) years after 2012 and the Sandy Hook murders the first client to seek to file a suit was the FBI Agent and first responder William Aldenberg.  The seven (of the more than 24 murder victims) families were willing to participate in the suit Aldenberg wanted filed, as an FBI Agent.  His story as to why he waited almost five years defies credulity. Preliminarily, from December 2012 to early 2018 when FBI agent Aldenberg's suit was filed against Alex Jones and his broadcast company Free Speech Systems, LLC ("FSS") not a single demand was made to Jones or FSS about his purported claims of fake murders by Aldenberg or any of the Plaintiffs (except one), including no demand for a retraction or even public threats of claims and suits.   This silence was mirrored by the absence of media attention to the topic (since no claims were made by parents) and was not "news".  With what was to come, the silence was deafening.

67.     In fact, the Veritas secret video of CIA and FBI Contractor who was secretly taped bragging about his efforts on behalf of the FBI to find ways to financially destroy Jones ("Chop his [financial] legs off").[27]  Gavin O'Blennis ("O'Blennis") claims to have been an active contractor with the CIA who also worked with Homeland Security and the FBI.  He claimed that he had confidential financial information given to him on Alex Jones because the FBI was looking to charge Jones with criminal conduct but could not find any basis.

68.     O'Blennis also establishes that the FBI was directly involved in Aldenberg's efforts

---

27     https://www.youtube.com/watch?v=M5nRqWzBX-o

to get a suit filed against Alex Jones and FSS.  O'Blennis bragged in the undercover video/audios made on March 23rd and March 28th, 2024, that "they" (likely referencing Aldenberg and the FBI) were able to "educate" the Sandy Hook families that the families had a civil lawsuit case against Jones and FSS.  Of course, and notwithstanding that 15 of the children-victims' families refused to participate,[28] that is exactly what Aldenberg, the FBI, DOJ, and selected law firms were able to confuse through literally over 1,000 news articles referencing the "Sandy Hook families" Plaintiffs, *as if all of the 20 families agreed to participate*.  Also undisclosed was the fact that a majority of these Plaintiff-Parents were involved in foundations dedicated to gun control and *financed in part by DOJ grants*.

69.     On information and belief Aldenberg worked closely with Chris Mattei when he served as a DOJ attorney while both officed in Connecticut.[29]  Aldenberg's testimony and his dramatically "sad story" at trial was that it took almost five years of enduring multiple threats of personal harm and harassment, during which the FBI "refused all help" him in his efforts to sue Alex Jones.  According to Aldenberg, Aldenberg claims he finally found Chris Mattei after a 4-year search for help, who he claims immediately agreed to take his case.  Hardly a credible statement about what Aldenberg was doing during this time to accomplish the "hit" on Jones and FSS, but Aldenberg's statements were made under oath.  Remarkably during this time, Aldenberg never directly talked with Jones or anyone on Jones' behalf or ever made a public complaint about

---

[28]     The Plaintiffs are the parents of five children killed at Sandy Hook — Jacqueline and Mark Barden, Nicole and Ian Hockley, Francine and David Wheeler, Jennifer Hensel and Jeremy Richman, and Robert Parker — as well as relatives Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto, the mother and three siblings (respectively) of first-grade teacher Victoria Leigh Soto; Erica Lafferty-Garbatini, the daughter of Sandy Hook Elementary School Principal Dawn Hochsprung; and Bill Sherlach, the husband of Mary Sherlach., and finally William "Bill" Aldenberg, the FBI agent and first responder to the scene.

[29]     According to Chris Mattei's personal profile on his firm's Web site, "That trial culminated in a $1.4 billion jury verdict, ***the largest defamation verdict in American history*** …."  And his Instagram account "Former corruption prosecutor, worked with Aldenberg's investigation of a 2012 FBI corruption probe in Connecticut's 5th District, where future Senator Chris Murphy was a former representative.

Jones. [*See*, trial testimony Aldenberg, pg. 6-7, *infra*. summary of Aldenberg's trial testimony].

   **C.    It Is Only This Court That Can Protect The Bankruptcy System from Abuses And Ulterior Motives Designed To Deprive a Debtor of His Right To Earn A Living By Exercising His Constitutional Rights**

   70.    The Plaintiffs' are frequently heard claiming that they will destroy the InfoWars Brand and keep Alex Jones out of the public discourse.  Those examples have been quoted to this Court on multiple occasions and continue through recent weeks.  Avi Moshenberg is a current example of the continued announcements of the ulterior motives of these Plaintiffs, not to collect a just debt but to destroy an individual with whom they politically disagree:

> "Now that there's a receiver in place, Alex Jones is no longer going to control the Infowars brand. ***It's time to shut it down***," said Avi Moshenberg, one of several attorneys for the families.

Previously Moshenberg has been vocal about ending Alex Jones career as a broadcaster:

> Moshenberg said "his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening. Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."[30]

As previously cited to this Court, the Connecticut Plaintiffs have made the same public statements reflecting their ulterior non-creditor motive to destroy the InfoWars brand and Alex Jones access to the public discourse.   As the Jones/FSS Motion for Cert. pending at the U.S. Supreme Court

---

[30]    https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/.  *See, also* The Onion: Here's Why I Decided To Buy 'InfoWars' - The Onion.pdf:

   "What's next for InfoWars remains a live issue. The excess funds initially allocated for the purchase will be reinvested into our philanthropic efforts that include business school scholarships for promising cult leaders, a charity that donates elections to at-risk third world dictators, and a new pro bono program pairing orphans with stable factory jobs at no cost to the factories.
        As for the vitamins and supplements, we are halting their sale immediately. Utilitarian logic dictates that if we can extend even one CEO's life by 10 minutes, diluting these miracle elixirs for public consumption is an unethical waste. Instead, we plan to collect the entire stock of the InfoWars warehouses into a large vat and boil the contents down into a single candy bar–sized omnivitamin that one executive (I will not name names) may eat in order to increase his power and perhaps become immortal.

illustrates, there was no trial on defenses of freedom of the press or free speech, all being eliminated by a default judgment and a subsequent "hearsay" trial.

71.     The Plaintiffs' demand to set aside the Supplemental Order and allow an unsupervised State Court sale intended to result in the destruction of the "brand" and the debtor's constitutional rights.  That ulterior motive goes to the heart of what this Bankruptcy Court must protect.  It is of note that the Trustee refuses to conduct a sale or auction with an $8 million bid from a capable and responsible bidder, *in hand*.  The Trustee simply refuses to act for fear of the reprisal by the Connecticut and Texas Plaintiffs.   Those Plaintiffs seek a sale that guarantees the destruction of the FSS assets that will net the Plaintiffs far less than $8 million, and that is their intention.  No one will buy assets for value if their goal is to destroy the assets.   That is what is happening in this Court.

## VI.
## CONCLUSION

72.     The continued efforts of Jones and FSS have been to provide a method that gives creditors of their respective estates the highest possible dividend from any inevitable sale of the FSS Assets to creditors exercising their rights as creditors to collect on a just debt.  Jones has illustrated and argued that the refusal of the Connecticut and Texas Plaintiffs to participate in this Bankruptcy Court's process is motivated by bad faith and a political motive that seeks the destruction of the value of the FSS Assets to accomplish the denial of Jones to exercise is fundamental right to freedom of the press and speech.  There is no explanation otherwise – the Plaintiffs have announced repeatedly, and joint bid with a political organization The Onion, on the basis of the purchase and destruction of the value of Jones Assets.

73.     This Court is the gatekeeper of the policies of the Bankruptcy Code, including the paramount policy of fair and equitable distributions among creditors.   The conduct of these

Plaintiffs illustrates exactly the opposite of that policy.   The goal is to take Alex Jones out of the public discourse and off the air by destruction of his ability to earn an income by accessing his 30 million daily listeners, a goal they often brag about.

74.      Were the goal payment of a just debt, no sane creditor would destroy the engine that generates the repayment power in order to collect their debt.  All that Jones and FSS have sought in this case is a fair, honest, public auction of the FSS Assets that may be preserved so that Jones is able to make reasonable efforts at repayment, with a desire to ultimate reach an overall resolution of the debt.

**WHEREFORE, PREMISES CONSIDERED,** the Court should deny Plaintiffs their request for an order finding that the FSS assets are not property of the Chapter 7 Estate, and for such other relief which Movants shall be justly entitled.

Dated: October 8, 2025                           Respectfully Submitted,

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577

Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@brookslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on October 8, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan