No. 25-

In the

# Supreme Court of the United States

**EXHIBIT**

**6**

Alexander E. Jones; 22-33553

exhibitsticker.com

———— •◆• ————

ALEXANDER E. JONES;
FREE SPEECH SYSTEMS, LLC,

*Petitioners,*

*v.*

ERICA LAFFERTY, *et al.*,

*Respondents.*

———————————

**On Petition for a Writ of Certiorari to the
Supreme Court of Connecticut**

## PETITION FOR A WRIT OF CERTIORARI

Ben C. Broocks
  *Counsel of Record*
Broocks Law Firm, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

Alan B. Daughtry
Alan Daughtry Law Firm
3355 West Alabama, Suite 444
Houston, TX 77098

Shelby A. Jordan
Jordan & Ortiz, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

382896



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTIONS PRESENTED

This case presents multiple constitutional questions of first impression involving the use of a punitive administrative Death Penalty Sanction for small discovery errors to impose liability, bypass burdens of proof, and award punitive damages against a media defendant reporting on a matter of public concern in a suit brought by public figures. The trial court's entry of a liability-decreeing administrative Death Penalty Sanction eliminated the Plaintiffs' requirement to prove falsity, fault, or actual malice, and resulted in an award of over $1.4 billion in damages without meaningful appellate review. The questions presented are

1. In actions brought by public figures against media defendants reporting on matters of undeniable public concern, may a state court through an administrative Death Penalty Sanction: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove fault, falsity, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; and/or (c) permit the award of punitive damages premised solely on such sanctions. And if so, whether the standards for so doing require a showing of a serious threat to the administration of justice and that no lesser sanctions would suffice.

2. Whether this Court is constitutionally required to independently review the trial record to ensure that constitutional facts were proven—and whether such review is even possible where the record was curtailed by a liability-decreeing administrative Death Penalty Sanction.

*ii*

3.  Can a liability-decreeing administrative Death Penalty Sanction judicially decree the validity of a plaintiff's complaint making the following actionable solely because they were alleged and judicially deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context.

*iii*

## PARTIES TO THE PROCEEDINGS

Petitioners Alexander E. Jones and Free Speech Systems, LLC were Defendants in the trial court and Appellants before the Court of Appeal.

Respondents, Erica Lafferty, William Aldenberg, William Sherlach, Donna Soto, Jillian Soto-Martino, Carlee Soto-Parisi, Carlos Soto, Ian Hockley, Nicole Hockley, Matt Barden, Jacqueline Barden, David Wheeler, Francine Wheeler, Robbie Parker, and Jennifer Hensel were Plaintiffs in the trial court and Appellees before the Court of Appeal.

*iv*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Petitioner, Free Speech Systems, LLC ("FSS") states that it has no parent corporation and that no publicly held company owns 10% or more of Applicant's stock.  FSS is owned by Alex Jones.  Jones has filed for bankruptcy protection in the Southern District of Texas.  Although a Trustee has been appointed over his and FSS's assets, Jones is the manager of FSS.

*v*

## RELATED PROCEEDINGS

Bankruptcy Court for the United States District Court for the Southern District of Texas, Houston Division, which are pending:

- Cause No. 22-33553, *In re: Alexander E. Jones*
- Adversary No. 23-03037, *Wheeler, et al. v. Jones, et al.*
- Adversary No. 24-03228, *Jones v. Chris Murray, et al.*
- Adversary No. 22-03034, *Wheeler, et al. v. FSS*
- Adversary No. 23-03036, *Wheeler, et al. v. FSS*

Connecticut State Court Proceedings:

- Superior Court, Complex Litigation Docket at Waterbury, Connecticut, Docket No. UWY-CV-18-604636-S/6046437-S/6046438-S, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, judgment entered on verdict on December 22, 2022;
- Appellate Court of Connecticut, AC 46131/46132/46133, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, opinion issued December 10, 2024; and
- Supreme Court for the State of Connecticut, PSC-240253, Erica Lafferty, et al. v. Alex E. Jones, et al., petition for certification denied on April 8, 2025.

*vi*

Texas State Court Proceedings:

- Travis County District Court, Cause No. D-1-GN-18-001605, *Marcel Fontaine v. Alex E. Jones, et al.*, matter pending;
- Travis County District Court, Cause No. D-1-GN-18-001835, *Neil Heslin v. Alex E. Jones, et. al.*, final judgment entered on January 12, 2023;
- Travis County District Court, Cause No. D-1-GN-18-001842, *Leonard Pozner, et al. v. Alex E. Jones, et al.*, matter pending; and
- Third Court of Appeals at Austin, Texas, Cause No. 03-23-00209-CV, *Alex E. Jones, et al. v. Neil Heslin, et al.*, matter argued to the on May 28, 2025.
- Third Court of Appeals at Austin, Texas, Cause No. 03-25-00617-CV, Free Speech Systems, LLC v. David Wheeler, et al., matter pending.

*vii*

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . .i

PARTIES TO THE PROCEEDINGS. . . . . . . . . . . . . .iii

CORPORATE DISCLOSURE STATEMENT . . . . . . iv

RELATED PROCEEDINGS . . . . . . . . . . . . . . . . . . . . .v

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . .xi

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . .xiii

PETITION FOR A WRIT OF CERTIORARI. . . . . . . .1

OPINIONS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . .7

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED . . . . . . . . . . . . . . . . . . . .8

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .8

  A.  The Sandy Hook Tragedy And Its Very
      Public Aftermath Were Matters Of
      Public Concern. . . . . . . . . . . . . . . . . . . . . . . . . . .8

  B.  The Plaintiffs Were Public Figures . . . . . . . . . . .8

*viii*

*Table of Contents*

*Page*

C.  Alex Jones Is A Media Defendant Entitled To All First Amendment Freedom Of The Press Protections .........................11

D.  Alex Jones Goes On Megyn Kelly Show In June 2017 Which Prompts Suit ..............11

E.  The Complaint ...........................12

F.  The Administrative "Death Penalty" Default Sanction Was Unjust And Disproportionate .........................12

G.  Trial Court Strikes Jones's Notice Of Constitutional Defenses ...................15

H.  Trial Court Conducts A "Damages-Only" Trial Where Jury Was Told Liability Had Been Established.........................15

I.  Appeals Process .........................16

REASONS FOR GRANTING THE PETITION.....17

A.  While *Sullivan* Is Still The Law And This Case Is Its Identical Twin, The Administrative Default Judgment Discarded It..............17

B.  This Court Has Issued No Jurisprudential Teaching On State Court Administrative Default Judgments .......................19

*ix*

*Table of Contents*

*Page*

C.  Independent Review Is Mandated Here As
    In All First Amendment Cases. . . . . . . . . . . . . .21

D.  The Complaint Itself Demonstrates There
    Is No Defamation  . . . . . . . . . . . . . . . . . . . . . . . .22

E.  Liability Default Judgments Against
    Media Defendants Are Constitutionally
    Impermissible . . . . . . . . . . . . . . . . . . . . . . . . . . .31

    1.  Falsity—Death Penalty Default
        Unconstitutionally Allowed Liability
        Without The Plaintiffs Having Proved
        Falsity Of Specific Statements By
        Clear And Convincing Evidence. . . . . . . . .31

    2.  Fault—The Death Penalty Sanction
        Unconstitutionally Allowed Liability
        Without The Plaintiffs Having Proved
        Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

    3.  The Death Penalty Sanction
        Unconstitutionally Allowed IIED
        Claims To Be Submitted On The Wrong
        Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . .33

    4.  Death Penalty Sanction
        Unconstitutionally Decreed Liability
        For Jones For Acts Of Third Parties . . . . .34

*x*

## Table of Contents

*Page*

5. Death Penalty Sanction Unconstitutionally Allowed Profit Motive To Factor In When It Is Irrelevant In Media Libel . . . . . . . . . . . . . .35

F. Punitive Damages Cannot Be Based On A Death Penalty Sanction . . . . . . . . . . . . . . .36

G. If A Death Penalty Sanction Is Permitted, The Punishment Must Fit The Crime . . . . . . . .36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*xi*

## TABLE OF APPENDICES

*Page*

APPENDIX A — ORDER OF THE SUPREME COURT FOR THE STATE OF CONNECTICUT, DECIDED APRIL 8, 2025.....1a

APPENDIX B — OPINION OF THE APPELLATE COURT OF CONNECTICUT, FILED DECEMBER 10, 2024.................3a

APPENDIX C — OPINION OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, CONNECTICUT, FILED NOVEMBER 10, 2022 .......................75a

APPENDIX D — ORDER OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, DATED DECEMBER 24, 2021...105a

APPENDIX E — OPINION OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, CONNECTICUT, FILED NOVEMBER 15, 2021 .....................107a

APPENDIX F — TRIAL COURT ORDER OF THE SUPERIOR COURT OF THE JUDICIAL DISTRICT OF WATERBURY AT WATERBURY, CONNECTICUT, DATED AUGUST 5, 2021...........................121a

APPENDIX G — RELEVANT CONSTITUTIONAL PROVISIONS INVOLVED..................126a

*xii*

*Table of Appendices*

*Page*

APPENDIX H—PETITION FOR CERTIFICATION OF THE SUPREME COURT, STATE OF CONNECTICUT, FILED JANUARY 21, 2025 . . .128a

APPENDIX I—TRANSCRIPT—JURY CHARGE, FILED OCTOBER 6, 2022 . . . . . . . . . . . . . . . . . . . .147a

APPENDIX J — VERDICT, DATED OCTOBER 12, 2022 . . . . . . . . . . . . . . . . . . . . . . . . .172a

APPENDIX K — NOTICE OF DEFENSES OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, FILED NOVEMBER 24, 2021 . . . . . . . . . . . . . . . .189a

*xiii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Berisha v. Lawson,*
    141 S. Ct. 2424 (2021). . . . . . . . . . . . . . . . . . . . . . . . . . .32

*Bose Corp. v. Consumers Union,*
    466 U.S. 485 (1984). . . . . . . . . . . . . . . . . . . . . . . .3, 21, 22

*Bridges v. California,*
    314 U.S. 252 (1941) . . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*Counterman v. Colorado,*
    600 U.S. 66, 143 S. Ct. 2106 (2023). . . . . . . . . . . . . .6, 35

*De Blasio v. Aetna Life & Cas. Co.,*
    186 Conn. 398, 441 A.2d 838 (1982) . . . . . . . . . . . . . .15

*Gertz v. Robert Welch,*
    418 U.S. 323 (1974) . . . . . . . . . . . . . . . . . . . . . . . . .11, 32

*Harte-Hanks Commc'ns v. Connaughton,*
    491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . . . . . . .4, 14, 35

*Herbert v. Lando,*
    441 U.S. 153 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988). . . . . . . . . . . . . . . . . . . . . . . . . .33, 35

*xiv*

*Cited Authorities*

*Page*

*In re Yasiel R.,*
   317 Conn. 773, 120 A.3d 1188 (2015) . . . . . . . . . . . . . 16

*Lafferty v. Jones,*
   229 Conn. App. 487 (2024). . . . . . . . . . . . . . . 12, 22, 33

*Mckesson v. Doe,*
   144 S. Ct. 913 (2024). . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Milkovich v. Lorain Journal Co.,*
   497 U.S. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . 17, 32

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982). . . . . . . . . . . . . . . . . . . . . . . . .34, 35

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964). . . . . . . . . . . . . . . . .5-7, 17-19, 33, 35

*Phila. Newspapers v. Hepps,*
   475 U.S. 767 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 17, 32

*Rosenbloom v. Metromedia,*
   403 U.S. 29 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Snyder v. Phelps,*
   562 U.S. 443 (2011). . . . . . . . . . . . . . . . . . . 16, 17, 21-33

*Soto v. Bushmaster Firearms Int'l, LLC,*
   331 Conn. 53, 202 A.3d 262 (2019) . . . . . . . . . . . . . . .10

*xv*

*Cited Authorities*

*Page*

*St. Amant v. Thompson,*
   390 U.S. 727 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

*State v. Golding,*
   213 Conn. 233, 567 A.2d 823 (1989) . . . . . . . . . . . . . .16

*Time, Inc. v. Firestone,*
   424 U.S. 448 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . .22

**Statute**

28 U.S.C. §1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

1

## PETITION FOR A WRIT OF CERTIORARI

In this case controversial conservative media defendants Alex Jones and his company Free Speech Systems, LLC (collectively, "Jones") were sued in rural Connecticut over Jones's coverage of the 2012 Connecticut-based Sandy Hook Elementary School murders, which were the subject of reporting and debate worldwide. Jones received no trial on liability as his liability was "judicially decreed" as a result of a liability-decreeing administrative Death Penalty Sanction. Based on liability imposed by judicial fiat, the ensuing damages-only trial produced a $1,436,650,000 judgment—believed to be the largest in American libel history. It is an amount that can never be paid, and which based on the trial court's findings may not be dischargeable in bankruptcy. The result is a financial death penalty by fiat imposed on a media defendant whose broadcasts reach millions.

The fifteen Plaintiffs were relatives—mothers, fathers, spouses, and siblings—of six of the twenty victims, along with one unrelated FBI agent. They filed suit after Jones was interviewed in 2017 by NBC's Megyn Kelly, their Complaint claiming in general that from 2012 to 2017 (a) Jones denied there were any murders at Sandy Hook; (b) the Plaintiffs were participants in deceiving the public; and (c) Jones's listeners had in some instances harassed the Plaintiffs for which Plaintiffs claimed Jones was liable. The causes of action sounded primarily in defamation and intentional infliction of emotional distress (IIED), even though virtually none of the Plaintiffs were named in any of Jones's broadcasts, and every IIED claim rested on the allegedly defamatory broadcasts.

2

The administrative Death Penalty Sanction declared Jones liable for everything alleged in Plaintiffs' Complaint, which attached none of the purportedly defamatory broadcasts, instead including only snippets and phrases lifted out of context from a handful of Jones's shows.

As a conservative media figure, Jones's opinions—and those expressed by some of his guests—focused largely on exposing what he believed were efforts by the mainstream media and the Obama Administration to convert the tragedy into a mass theatrical production in service of anti-gun legislation. He also highlighted inconsistencies and oddities in the official narrative, which in turn had fueled public concerns that the public was being given false or incomplete information, and which ultimately gave rise to broader conspiracy theories about the event. Jones urged his listeners to investigate for themselves rather than rely on the politically motivated mainstream media. In his coverage, after pointing to specifics, Jones expressed opinions of media excesses with terms such as "hoax" and "staged," generally directed at the media circus, while often in the same broadcasts acknowledging that murders had in fact occurred. Yet Plaintiffs' Complaint on which Jones was decreed liable by default, repeatedly referenced only selected portions of broadcasts, omitting clarifying language.

One example is illustrative. Plaintiffs' Complaint alleged that in a January 27, 2013 broadcast, Jones stated:

> "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction. . . ."

3

Plaintiffs seized on the single word "staged" to claim that Jones was accusing the Plaintiffs—who were not named—of falsifying the murders. But the Complaint deliberately omitted what Jones said in the same broadcast:

> "I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy."

Viewed in full context, Jones expressly affirmed that deaths occurred, while using the phrases "staged" or "hoax" to characterize media and governmental scripting. It is therefore contextually impossible to construe his remarks as denying deaths, as the Complaint did by selective editing. Precisely to guard against such distortions, this Court has required independent judicial review of the entire record in First Amendment cases. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958 (1984) ("*Bose*"). No such review has occurred here at any level by any court.

Here the trial judge explicitly stated on the record that the Death Penalty Sanction was entered for three reasons, all trivial at best. **Strike One** against Jones was that his lawyers filed a motion to obtain a commission for an out-of-state deposition of Hillary Clinton, thought to be behind the suit because of her friendship with plaintiff Erica Lafferty and Jones' prior public support of Trump in the 2016 election. The trial court found Jones's motion for a deposition commission violated a protective order because it recited that the motion's genesis was an unnamed Plaintiff's refusal to testify in a deposition how her legal fees were being paid and how all 15 Plaintiffs had come together to be represented by the same law firm.

4

The second reason was because Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data that the Plaintiffs alleged would show the number of vitamin supplement sales Jones made during broadcasts mentioning Sandy Hook—**Strike Two**. Jones's lawyers also could not retrieve in a form and format to the liking of the Plaintiffs, accounting "subaccounts" from FSS's accounting journal entries to determine supplement sales—**Strike Three**. By these, the Plaintiffs hoped to demonstrate Jones's profit motive even though this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989). Even though these infractions (a) were trivial and unrelated to the merits of the case and (b) the information sought could have been obtained by other means, the trial court used these as the basis to discard the First Amendment, decreeing Jones liable for everything alleged.

Having been stripped of his Constitutional rights, in the ensuing "damages-only" trial, the six-person jury sitting 28 miles from the murder site awarded the fifteen plaintiffs a total of $965,000,000 in compensatory damages, to which the trial court added $471,650,000 in CUTPA and punitive damages amounting to an award of approximately $95,776,667 per plaintiff.

This record-breaking award was possible only because the Death Penalty Sanction that judicially decreed—without any proof whatsoever, much less clear and convincing evidence—that: (i) Jones made every statement Plaintiffs alleged, though their Complaint contained only excerpts; (ii) every such statement was false; and (iii)

5

Jones subjectively knew they were false. The same fiat further declared Jones liable for all acts and statements of unrelated third parties, deemed to be his "listeners," for whom he was held responsible. No proof was required that Jones had any connection to those individuals or their actions or that they were even his listeners.

This case presents the Court with an opportunity to clarify that in actions brought by public figures against media defendants reporting on matters of undeniable public concern, a state court may not, through procedural sanctions: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove falsity, fault, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; or (c) permit the award of punitive damages premised solely on such sanctions. If there are circumstances in which such a Death Penalty Sanction may override the First Amendment, this Court should articulate the constitutional guardrails necessary to prevent abuse.

In *New York Times v. Sullivan*, 376 U.S. 254 (1964) ("*Sullivan*") this Court stated:

> "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker."

6

*Sullivan*, 376 U.S. at 271. That constitutional command was discarded here by judicial fiat. With this case left undisturbed, all broadcasters are now at risk because of a new and easy means of bypassing *Sullivan* and its progeny through a Death Penalty Sanction that sidesteps core First Amendment protections. And the threat is to all media broadcasters including *legacy newspapers and broadcasters* (New York Times, Wall Street Journal, ABC, NBC, CNN), *digital-native outlets* (Politico, Axios, Vox), *nonprofit investigative groups* (ProPublica, The Intercept), *independent podcasters* (Joe Rogan, Pod Save America, Ben Shapiro), *social media platforms* (TikTok, Twitter/X, Reddit), *algorithmic aggregators* (Google News, Apple News, Morning Brew), and *state-sponsored players* (BBC, Al Jazeera, RT, Xinhua). Reporting from all of these sources will result in self-censoring fear of suits especially in small locales, where any of these news sources may be targeted for locally unpopular speech.

The result will chill the reporting of news. *Counterman v. Colorado*, 600 U.S. 66, 75-76, 143 S. Ct. 2106, 2114-15 (2023) ("*Counterman*") (J. Kagan) ("Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed . . . ").

It will also flood state and federal courts with demands for default judgments. Faced with the precedent of this very case, courts will be left without guidance on whether

7

constitutional pronouncements of this Court can be discarded by a Death Penalty Sanction—and, if so, how offensive must the alleged discovery abuse be to justify replacing trial by jury with trial by sanction.

*Sullivan* remains controlling law. Should this Court decide to revisit *Sullivan*—and Jones does not contend it should—this case would present the occasion. What the Court should not do, however, is nothing, thereby allowing First Amendment jurisprudence to descend into uncharted waters of greater uncertainty.

## OPINIONS BELOW

The decision of the Supreme Court for the State of Connecticut (App. A, 1a-2a) is reported at 333 A.3d 105. The Opinion of the Appellate Court of Connecticut (App. B, 3a-74a) is reported at 229 Conn. App. 487. The opinion of the Superior Court (App. C, 75a-104a) is reported at 2022 Conn. Super. LEXIS 2813.

The orders and opinions of the Superior Court (App. D, 105a-106a) (App. E, 107a-120a) (App. F, 121a-125a) have not been published.

## JURISDICTION

The Supreme Court of Connecticut denied certification for their review of this case on April 8, 2025. This Court granted Petitioners' Application to Extend Time to File Petition (25A7) until September 5, 2025. The jurisdiction of this Court is based on 28 U.S.C. §1257.

8

## CONSTITUTIONAL AND STATUTORY
## PROVISIONS INVOLVED

The First Amendment, the Fifth Amendment and the Fourteenth Amendment. App. G, 126a-127a.

## STATEMENT OF THE CASE

### A. The Sandy Hook Tragedy And Its Very Public Aftermath Were Matters Of Public Concern

The tragic Sandy Hook murders took place in December of 2012 in Newtown, Connecticut, a small town with a population of under 30,000 and captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since. The Sandy Hook tragedy triggered widespread public debate over gun control and generated extensive public commentary concerning inconsistencies in media coverage. This, in turn, led to a broad array of public opinions, including claims that certain aspects may have been a "hoax" which to Jones meant media propaganda. These were undeniably matters of public concern.

### B. The Plaintiffs Were Public Figures

Plaintiff William Aldenberg was/is a law enforcement official with the FBI who was on site at Sandy Hook leading the investigation there. Complaint, ¶28. As a federal law enforcement official, Aldenberg was unquestionably a public figure. *St. Amant v. Thompson*, 390 U.S. 727

9

(1968) (deputy sheriff). The Sandy Hook tragedy quickly morphed any of the Plaintiffs who were not before, into significant public figures as driving forces for gun control.

At the 2016 Democratic National Convention Plaintiff Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton and was shown in close support of Secretary Clinton given her positions on gun control.



Some of the Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their very public gun control advocacy. There President Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Plaintiffs called for Congress to act on gun violence prevention. Based on public records and media coverage, David and Francine Wheeler were even asked to substitute for President Obama in his weekly, nationally televised address to publicly advocate these issues.

10



Nicole Hockley and Ian Hockley were active in the media and Mark Barden and Jacqueline Barden frequently gave interviews and public statements. William Sherlach joined in public advocacy for changes in gun laws and mental health reform. Mark and Jackie Barden, Nicole Hockley, and William Sherlach co-founded Sandy Hook Promise, which holds itself out on its publicly accessible web site. https://www.sandyhookpromise.org/who-we-are/about-us.

Their status as public figures increased when they sued Remington Arms, the manufacturer of the weapon used by the murderer in a highly publicized suit. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 64, 202 A.3d 262, 271 (2019). That case and its settlement for $73,000,000 was publicized world-wide, referring to the Plaintiffs as the "Sandy Hook Families."

All Plaintiffs were public and vocal advocates for gun reform, school safety, mental health awareness (and it's connection to violence) and participated in marches and public forums. There is thus no question that the Plaintiffs were "public figures," which has Constitutional

11

significance [*Gertz v. Robert Welch*, 418 U.S. 323, 336-37 (1974)] which the Death Penalty Sanction ignored.

## C. Alex Jones Is A Media Defendant Entitled To All First Amendment Freedom Of The Press Protections

Jones is a media defendant and the Plaintiffs readily admitted this. Complaint, ¶¶7, 30-35 & 40. Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary. Though some controversies have followed him, Jones has maintained his dedication to free speech, individual rights, and against gun control, positioning himself as a steadfast proponent of questioning mainstream narratives. Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio. As such he was entitled to, but denied, all the Constitutional protections afforded media defendants.

## D. Alex Jones Goes On Megyn Kelly Show In June 2017 Which Prompts Suit

In June 2017, NBC talk show host and political commentator Megyn Kelly hosted Alex Jones on a live broadcast on NBC. The interview covered many subjects and lasted approximately 17.5 minutes in its entirety. Approximately 4.5 minutes of that airtime involved (a) Kelly talking about Sandy Hook, which included her own comments and commentary, (b) Kelly asking question

12

of and making allegations against Jones; and (c) Kelly interviewing Neil Heslin, a parent of one of the murdered children who sued Jones in Texas.

### E. The Complaint

In May 2018—five years after the tragedy—Plaintiffs sued Jones and others [CR 64], asserting claims for (i) invasion of privacy, (ii) defamation and defamation per se, (iii) intentional infliction of emotional distress, and (iv) Connecticut Unfair Trade Practices Act ("CUTPA") violations. Initially, Jones filed a motion to dismiss pursuant to the Connecticut anti-Slapp statute. As a sanction, the trial court dismissed that motion which was upheld by the Connecticut Supreme Court. *Lafferty v. Jones*, 336 Conn. 332 (2020).

### F. The Administrative "Death Penalty" Default Sanction Was Unjust And Disproportionate

Shortly after the case was returned to the trial court, on November 14, 2021, that court entered a Death Penalty Sanction. A transcript of its ruling recites the three reasons for entry. As to the first ground, Jones's lawyers filed a motion for leave to depose Hillary Clinton [App. E, 108a]. A protective order had been entered in the case that provided that information covered in depositions could be (a) designated as "confidential" but also (b) used for the preparation and trial of the case. Trial Dkt. No. 185.10, p. 4, ¶9. As the deposition of one of the plaintiffs began, it became apparent that plaintiffs' counsel would resist any testimony about how all 15 plaintiffs happened to find themselves in the same law office six years after the Sandy Hook shootings. It was the collective belief on Jones's side,

13

that the prosecution of Jones was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign against Hillary Clinton in 2016. To that end, counsel for Jones sought a commission to take the deposition of Clinton in New York, explaining why Clinton's deposition was being sought using the following two sentences:

> "On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid."

[Trial Dkt. No. 385].

Although the two offending sentences did not disclose testimony but only a refusal to answer, the trial judge denied the request for commission [Trial Dkt. No. 385.10] and used this as the first of the three grounds for the Death Penalty Sanction.

The second ground was that Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data showing sales ("Analytics Data"), i.e., the same issues presented earlier that resulted in the denial of Jones's anti-SLAPP motion. 336 Conn. at 378, n.35. Given that the "failure" regarding analytics was one of the reasons the trial court there had initially denied Jones's statutory rights to an anti-Slapp motion, the Connecticut Supreme Court had a reason for addressing it earlier and did so demonstrating its sole relevance was to Plaintiffs' CUTPA claim—which would later be dismissed on appeal— explaining Plaintiffs' claimed need involved showing

14

Jones's profit motive relevant to Plaintiffs' CUTPA claim. After the Connecticut Supreme Court returned the case to the trial court, the Plaintiffs again explained that the "critical importance" of this was tied to their now-dismissed CUTPA claim. Dkt. 450, pp. 14-15.

The third ground was because Jones's lawyers could not retrieve accounting "subaccounts" from Jones's accounting journal entries also sought for sales information to determine profits [App. E, 110a] ("Sub-ledger Data"), the trial court concluded Jones had failed to provide "full and fair compliance" with a request for the data, thus "willfully withholding information" that was of "critical importance" to the plaintiffs in pursuing their CUTPA claims. In the Death Penalty Sanction order itself, the trial judge cited this. App. E, 119a. Thus, both the Analytics and Subledger grounds were tied directly to the now-reversed CUTPA claim, as Plaintiffs admitted stating: "These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims." Dkt. 450, pp. 14-15.

Notably, none of the three stated bases for the Death Penalty Sanction has anything to do with defamation or intentional infliction, and that is particularly true as to the Analytics and Subledgers, as this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989).

The effect of this Death Penalty Sanction was for the trial court to judicially decree that everything Plaintiffs' Complaint alleged was true without the need for proof.

15

### G.   Trial Court Strikes Jones's Notice Of Constitutional Defenses

After entry of the Death Penalty Sanction, Jones filed a Notice of Defenses specifically stating the Constitutional defenses referenced herein, which would have allowed Jones to offer evidence contradicting any allegation of the Complaint and challenged the right of the Plaintiffs to maintain the action. App. K 189a. *De Blasio v. Aetna Life & Cas. Co.*, 186 Conn. 398, 401, 441 A.2d 838, 839 (1982). The trial court, however, struck this because of the Death Penalty Sanction.

### H.   Trial Court Conducts A "Damages-Only" Trial Where Jury Was Told Liability Had Been Established

As a direct result of the Death Penalty Sanction, in the ensuing "damages-only" trial, the trial court made it abundantly clear that "fault" was not at issue. The charge simply lifted quotes from the Plaintiffs' complaint on which the Death Penalty Sanction had been granted and repeatedly instructed the jury that that they were to assume as "facts" that alleged statements were actually statements made by Jones, they were defamatory, they were false, and they were made with legal malice. App. I, 148a, 157a. The trial court even instructed the damages-only jury that the court itself had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 163a.

Also because of the Death Penalty Sanction, the "damages-only" jury was repeatedly instructed by the

16

trial court that damages were presumed—their task was only to figure out how much those presumed damages were. App. I, 161a. See also App. I, 159a, 160a, & 165a.

This Court, however, has repeatedly emphasized that it is an absolute constitutional requirement that each alleged defamatory statement be precisely identified in context, focusing particularly on "what was said, where it was said, and how it was said" and that it is "necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, at 453-54 (2011) ("*Snyder*"). This it did not occur given the Death Penalty Sanction.

## I.   Appeals Process

Jones appealed to the Connecticut Court of Appeals which upheld the Death Penalty Sanction, refused to consider the Constitutional issues Jones raised and refused to consider the inappropriate denial of Jones's Notice of Defenses (holding them to have been inadequately briefed and not having been raised, respectively). However, it did determine CUTPA was not a valid claim but did not address what the effect of that finding was on the Death Penalty Sanction that were tied to the CUTPA claims it found invalid.

Jones requested review by the Connecticut Supreme Court [App. H, 128a] which was bound to accept the case for review given it's long-standing policies to review cases involving the denial constitutional rights even if not previously raised. *State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989) and *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Yet breaking its own requirements,

17

however, the Connecticut Supreme Court denied review. App. A, 1a.

### REASONS FOR GRANTING THE PETITION

**A.  While *Sullivan* Is Still The Law And This Case Is Its Identical Twin, The Administrative Default Judgment Discarded It**

In *Sullivan*, this Court stated applicable Constitutional rules that cannot be set aside for any reason in a Freedom of the Press case and certiorari should be granted here because these teachings were ignored. This Court has stated:

> "The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." 376 U.S. at 271.

Labelled preempting "federal rules" that "place limits on the application of the state law. . . ." [*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 15-17 (1990) ("*Milkovich*")] this Court has proclaimed these as unalterable "constitutional rules." *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986) ("*Hepps*"). These Constitutional rules apply to both defamation and IIED claims asserted against media defendants. *Snyder v. Phelps*, 562 U.S. 443 (2011).

The administrative default ignored these constitutional rules. While *Sullivan* is not without its critics, until overruled, it remains the law and state courts are not at

18

liberty to ignore this Court's instructions. That *Sullivan* is controlling here is certain as this case is virtually identical factually to *Sullivan* making the jurisprudence of that case and its progeny fully applicable here. Therefore, a state court administrative default judgment against a media defendant violates the teachings of *Sullivan* and cannot stand.

As stated, this case is a virtual mirror image of *Sullivan*. Here, suit was filed in a small Connecticut community twenty-eight miles from the site of the murders and presided over by a judge elected by that community—just as *Sullivan* was filed in a small Alabama community and presided over by a locally elected judge. In *Sullivan*, the political motivation was racism; here, it was prejudice against a conservative media figure who stood firmly against gun control. Among other errors, in *Sullivan* the trial court instructed the jury that "falsity and malice were presumed," prompting this Court to announce its effective preemption of state law that has been consistently repeated.

Hence the unquestioned teaching of *Sullivan* and its progeny is that particularly in cases where public plaintiffs sue a media defendant for its coverage and opinions on matters of public concern, among the key requirements, the plaintiffs must prove the falsity of claimed defamations, that the media defendant acted with actual malice, and that showing of malice must be made by clear and convincing evidence. Malice by clear and convincing evidence must also be shown for punitive damages. None of that was required here. For this reason, Certiorari should be granted to clearly confirm that state courts may not issue administrative default judgments against media defendants.

19

### B. This Court Has Issued No Jurisprudential Teaching On State Court Administrative Default Judgments

This Court's jurisprudence has not specifically addressed the intersection between *Sullivan's* constitutional rules and a state court's entry of an administrative liability-decreeing default judgment. Certiorari should be granted to reaffirm the Constitutional rules that this Court has pronounced, or to announce that these Constitutional rules allow an exception for a state court default, stating the specific grounds.

The authority believed to be most relevant from this Court is *Bridges v. California*, 314 U.S. 252 (1941) ("*Bridges*") and it does not support finding such a carve out. In *Bridges*, the petitioners were found in contempt for publishing reports of court proceedings; the court claimed to have the power to punish by contempt publications "if they tend to interfere with the fair and orderly administration of justice in a pending case." *Bridges*, 314 at 259. There Justice Black stated "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Id*. at 260. Jones here has been deprived of both.

The then-prevailing view was contempt was justified when a court was faced with a clear and present danger of the obstruction to the "orderly and fair administration of justice." *Id*. at 263. This Court did not fully embrace that view to uphold contempt, noting it did "no more than recognize a minimum compulsion of the Bill of Rights" which contained the "sweeping constitutional mandate against any law 'abridging the freedom of speech or of

20

the press' . . . necessarily [requiring] measuring a power of all American courts, both state and federal, including this one." *Id.* at 260. Analyzing the allegedly contemptuous conduct there, the Court found nothing that "sidetracked the course of justice."

The *Bridges* test is inapplicable, however, as it involved contempt of court, whereas here the Death Penalty Sanction was merely based on alleged discovery abuse. But even if it were the test, the three trivial bases given for denying Jones his twin rights of "free speech and fair trial" cannot conceivably be argued to significantly obstruct the administration of justice. Hence, this Court must make clear that a Death Penalty Sanction of a state trial court for alleged discovery abuse, cannot veto or disregard the constitutional safeguards put in place by this Court.

Furthermore, allowing a trial court to grant a Death Penalty Sanction against a media defendant—thereby accepting as proved and accurate everything a defamation plaintiff has alleged—opens the door to abuse. As demonstrated *infra*, once such a default judgment declares a media defendant liable for every allegation in the complaint, the following become actionable solely because they were pleaded and deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context. Surely this cannot be this Court's intention.

21

Jones respectfully states that if this Court determines that a trial court can impose a Death Penalty Sanction, then two concomitant things must occur. First, this Court must announce guidelines to guide state and federal courts as they circumnavigate the above-stated constitutional safeguards.

Second, this Court must issue guidance so that simply because a Death Penalty Sanction judicially decrees the validity of a plaintiff's complaint: (i) opinions otherwise not actionable do not become actionable; (ii) nondefamatory statements do not become defamatory; (iii) context of alleged defamatory statements does not become irrelevant; (iv) invalid causes of action do not become valid; and (v) actions of unrelated third parties do not become the responsibility of the media defendant.

## C. Independent Review Is Mandated Here As In All First Amendment Cases

This Court requires that appellate courts independently review the factual record in cases implicating the First Amendment to ensure constitutional conformity. *Bose*, 466 U.S. at 499. This review assesses whether the requisite constitutional facts have been proved by "clear and convincing evidence." *Rosenbloom v. Metromedia*, 403 U.S. 29, 55 (1971). It also requires the independent judicial review of the speech's context, content, form, and setting. *Snyder*, 562 U.S. at 453-54. No such review has been conducted by any court and it is incumbent on this Court to do so here and now.

Such review is not limited to whether a trial court recited constitutional principles, which did not occur, but

22

requires a conscious determination of the existence or nonexistence of critical facts. *Time, Inc. v. Firestone*, 424 U.S. 448, 463 (1976). That determination must examine the "content, form, and context" of each challenged statement, as revealed by the entire record. *Snyder*, 562 U.S. at 453.

Here, the record is barren of factual determinations on constitutional issues because of the Death Penalty Sanction. [App. K]. Because no fact finder made the determinations the Constitution requires, and because no record exists from which this Court can conduct the de novo review mandated by *Bose* and its progeny, the judgment must be reversed.

The Connecticut Court of Appeals exacerbated the problem by refusing to conduct the required constitutional analysis, dismissing briefing on the issue as "bereft of any substantive legal analysis" and thus deemed abandoned. *Lafferty*, 229 Conn. App. at 510 n.26. Yet this Court holds that appellate courts have a duty to conduct de novo review when constitutional rights are implicated. *Bose*, 466 U.S. at 506 n.24. Independent review is thus not an optional task but a constitutional mandate.

### D.  The Complaint Itself Demonstrates There Is No Defamation

As a result of the Death Penalty Sanction, the only "what, where and how" of alleged defamatory statements was in the Complaint. See CR 64. Even in the face of a default, a complaint must still articulate valid claims. And even a cursory review of the Complaint shows the allegations made do not pass Constitutional muster. Moreover, phrases such as "hoax" and "fake as a three-

23

dollar-bill," cited out of context in the Complaint, are plainly hyperbolic opinions about events, lacking any specific "what, where, or how" to explain or support them. They are opinions about events, specific news accounts or news conferences, made in a broader social context. Moreover, it is not even clear what the references to "hoax" in the Complaint pertain to; a press conference? a specific news coverage segment?

The media landscape is rife with groups challenging various events, including Holocaust denial, moon landing skepticism, 9/11 conspiracy theories, and even flat Earth claims. However, such statements critique or dismiss the events themselves, not the character, conduct, or reputation of those associated with them. Referring to an event as a "hoax" targets the nature of the event, not any specific individual. An unnamed Plaintiff cannot have been "defamed" by statements directed at generalized events.

Further fatal, none of the Plaintiffs (with one exception) were identified, named, singled out, or directly referenced in any way. No statement complained of alleged misconduct, dishonesty, or moral failing on the part of any Plaintiff.

Additionally, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the defamatory "statement" and more importantly, why it was defamatory.

In other places, statements are made that convey no possible defamatory meaning. As one example of

24

numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.



See e.g., Complaint. See e.g., CR 64-102. Was this defamatory? Was it true? The jury was told it was maliciously defamatory without explanation.

In another example, the Complaint at ¶111-17 [CR 76] complains of a 1.27.2013 video as follows (focusing particularly on ¶112):

112. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've

25

been coached, people who have been given cue cards, people who are behaving like actors."

But what the Complaint intentionally omits is what Jones said immediately before this where he said: "**I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy.**" Trial Ex. 1 (video). It was only after Jones stated the deaths were real that he stated things were being "staged."

Hence, plainly stating he believes the tragic murders occurred in the same video he used the term "staged" demonstrates it is contextually impossible to claim the use of the word "staged" (or Jones's equivalent term, "hoax") meant there were no deaths. Rather, those terms criticized media and government scripting, not the reality of the tragedy. No reasonable viewer could interpret Jones's comments as a denial of the murders when viewed in context. Rather the clear focus was on media manipulation and the political exploitation of the tragedy.

In another example, the Complaint turned to Plaintiff Robbie Parker, the only one of two Plaintiffs named and states the following:

> 113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks

26

like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying.

[CR 76]. In the video at issue, Robby Parker does in fact approach the microphone laughing, then visibly changes his demeanor to become serious.

 

This moment, widely circulated and debated online, was interpreted by some commentators, including Jones's guests, as evidence of staging or inauthenticity. The commentary focused on this video clip itself—not on private facts about Parker—illustrating how the challenged speech concerned the public narrative around the event. The Complaint then pleads:

116. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious. . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

27

117. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns. . . . Something though, really, is starting to get suspicious here. . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

[CR 76]. What Jones was referring to was Robbie Parker's "staged" performance in a press conference when he referenced Parker actually laughing at the news conference and clutching in his hands what clearly appeared to be "cue cards." It was not suggesting his child had not died.

Moreover, Jones's comments are not defamatory statements of fact, but expressions of constitutionally protected opinion. Yet for these, Robbie Parker was awarded $120,000,000 in compensatory damage consisting of $60M in "Defamation Damages" and another $60M in Emotional Distress Damages [App. J, 173a] to which the trial court appended $50,000,000 in punitive damages for a total award of $170,000,000.

Plaintiff William Aldenberg, an FBI agent who was listed as a "first responder," testified at the "damages-only" trial and made no accusations that Alex Jones ever spoke about him, aired information about him, or directed harassment toward him. When asked, "Did Mr. Jones direct his audience to Mr. Halbig's website (Halbig being a show-guest)?" Aldenberg responded, "To be honest, certain, I just don't recall that. I don't." (Pg. 54: 22–25).

28

In fact, Aldenberg testified he only learned of Jones through his conversations with an FBI counselor. (Pg. 46: 16-17, 20). As to how it affected him, he said:

> "You can say whatever you want about me. I don't care; just say whatever you want. I'm a big boy, I can take it. But they want to make profits; they want to make millions and millions of dollars." (Pg. 50: 13-17, 23-26).

And for this testimony which the trial court instructed the jury was false, defamatory and made with malice, the jury awarded him $45M in "Defamation Damages" and another $45M in Emotional Distress Damages [App. J, 185a] to which the trial court appended another $40,000,000 in punitive damages for a total award of $130,000,000. And Mr. Jones was powerless to refute the any of the allegations given the Death Penalty Sanctions rendered against him.

In another example of the travesty that occurred in not requiring the full context of broadcasts and publications to be scrutinized, Complaint ¶¶ 171- 179 reference a call-in exchange Jones is alleged to have had on December 28, 2014. Of particular relevance are Complaints paragraphs 176 and 177 (emphasis added):

> 176. Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. **I knew they jumped on it, used the crisis, hyped it**

29

**up**. But then I did deep research-and my gosh, it just pretty much didn't happen."

177. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

Notably, in ¶ 176 Jones is quoted as saying " I knew they jumped on it, used the crisis, hyped it up" which obviously means that there was a crisis and it had been made into a media and governmental circus. But ignoring that, ¶ 177 is the summary accusation that "plaintiffs fabricated the deaths of their loved ones." It is not possible for Jones to have spoken of people "using the crisis" if there was no crises—i.e. deaths. And if this in itself is not abundantly clear, Jones broadcast that occurred the day before (i.e., December 27, 2014) removed any doubt that Jones did not say children had not been killed, but the crisis was being propagandized: "I said, they may have killed real kids, but they're practicing how to propagandize and how to control the press and how to put out a product that is a fraud."

In yet another example, Complaint ¶¶ 326-335 detail the June 18, 2017 "profile" of Jones done by Megyn Kelly. The Complaint references Kelly's interview with Neil Heslin, a father of one of the slain children who elected to file suit on virtually identical allegations in Texas. The Complaint quotes Heslin as saying "I lost my son. I buried my son. I held my son with a bullet hole through his head." Complaint ¶326. The Complaint then goes on to reference a June 26, 2017 broadcast by reporter Owen Shroyer, stating in a most deceptive manner, that Shroyer

30

> "claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes." Complaint ¶ 327.

What the Complaint does not state and was never presented because of the Death Penalty Sanction, was (a) the entirety of what Helsin said; (b) what Shroyer actually said and why; and (c) what Jones himself said about this. As to Heslin, after his statement above, he said in the Megyn Kelly interview which was designed to attack Jones for sloppy reporting: "I dropped him off at 9:04 . . . at school with his book bag [and] hours later, I was picking him up in a body bag." The problem with Heslin's statements was that Shroyer was simply stating what the coroner said, which was, that did not happen. While the Complaint references video footage Shroyer played, it does not quote the coroner, who actually said: "We did not bring the bodies and families into contact. We took pictures of them, of their facial features. It's easier on the families when you do that." Clearly the coroner's statement that he did not bring the families and bodies into contact, contradicts Heslin's statements. Then Heslin's own petition in Texas continues to quote the coroner as saying "All bodies were removed from the school before dawn Saturday and transported to the medical examiner's base in Farmington—about 40 miles away. The children's autopsies were performed first so that their bodies could be made available to funeral directors 'for obvious reasons.'"

31

Clearly, given the coroner's own statements Shroyer's comments were accurate. At worst, the broadcasts suggested Heslin may have exaggerated for dramatic effect—especially to support a narrative attacking Jones. And amplifying that is what Jones himself said about this on July 20, 2017 when Jones first referenced what the coroner had said and then stated: "**I'm sure later maybe the parents saw their children.** The point is that the media lies so much, you can't blame the public asking questions. . . ." (emphasis added). The entire context shows on its face there is no defamation.

## E. Liability Default Judgments Against Media Defendants Are Constitutionally Impermissible

Plaintiffs concede that Jones is a media defendant. [CR 64-69]. As such, he was entitled to but denied the full protections afforded media defendants under the U.S. Constitution because of the Default Judgment Sanction. But depriving Jones of these protections is not constitutional.

### 1. Falsity—Death Penalty Default Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Falsity Of Specific Statements By Clear And Convincing Evidence

This Court's long-standing mandate is that "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation. . . . We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth–must similarly fall here to a constitutional requirement that

32

the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Hepps*, 475 U.S. at 775-76. This was not done. The trial court determined these issues by judicial fiat on grounds that had nothing to do with the merits. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove the falsity of specific statements of a media defendant. Factual falsity cannot be judicially decreed.

> **2.** **Fault—The Death Penalty Sanction Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Fault**

Another ignored black-letter Constitutional requirement is that liability of a media defendant cannot be entered without a finding of fault and that fault cannot be negligence. *Gertz*, 418 U.S. at 347; *see also Milkovich*, 497 U.S. at 15-16. Rather, fault must be proven to rise to the level of intentional or recklessness, which the Plaintiffs had the burden to prove by clear and convincing evidence as to each and every alleged libelous statement Jones was accused of making. *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021). Here there was no finding of fault, except by Death Penalty Sanction. In the ensuing "damages-only" trial, the trial court repeatedly instructed the jury that fault was not at issue. See App. I, 148a; see also [App. I, 157a, 158a, 163a). In fact, as a result of the Death Penalty Sanction, the trial court even instructed the jury that it had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 164a.

33

And topping off the improprieties in the subsequent "damages-only" trial, Jones's testimony was deeply restricted—an issue the Court of Appeals refused to consider. *Lafferty*, 229 Conn. App. at 491. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove a media defendant's malice by clear and convincing evidence as was done here. Subjective malice cannot be simply judicially decreed.

### 3. The Death Penalty Sanction Unconstitutionally Allowed IIED Claims To Be Submitted On The Wrong Standard.

Another constitutional error predicated on the Death Penalty Sanction involves the emotional distress damages which total $561,000,400. App. H, 133a. In *Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57 (1988), this Court clearly stated that the "actual malice by clear and convincing evidence" standards articulated in *New York Times Co. v. Sullivan* applies to claims of intentional infliction of emotional distress. This has been repeatedly reaffirmed. *Snyder*, 562 U.S. at 451. Yet the trial court's jury charge, because of the Death Penalty Sanction, used a negligence standard: "The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct." App. I, 157a. The standard of "knew or should have known" is the legal standard of negligence.

34

### 4. Death Penalty Sanction Unconstitutionally Decreed Liability For Jones For Acts Of Third Parties

The jury charge, informed the jury that "[D]efendants proximately caused harm to the plaintiffs by . . . urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly [behind] the Sandy Hook hoax." App. I, 160a. The actual charge itself goes on to state that this "result[ed] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard the evidence in this case." App. I, 160a. Further, the Complaint is replete with acts of third parties in allegedly stalking some of the Plaintiffs, with no evidentiary tie to Jones. CR 65, ¶ 14; CR 65, ¶15 ("They have confronted strange individuals videotaping them and their children."); CR 65, ¶16; CR 69, ¶55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.) With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

This is blatantly unconstitutional. Justice Sotomayor in her recent concurrence in *Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) summarized the law forbidding liability for "incitement" of third parties to act (*citing NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982), cited in *McKesson*, the Supreme Court went so far as to acknowledge that even advocacy of the use of force or violence is protected by the First Amendment when acts of violence are alleged to have been encouraged and

35

committed. *See also, Counterman*, 600 U.S. at 76, ("That rule helps prevent a law from deterring 'mere advocacy' of illegal acts—a kind of speech falling within the First Amendment's core."). Here, telling viewers to "investigate" for themselves, even if true, is purely protected by the Constitution which was ignored. The case of *NAACP v. Claiborne Hardware Co.*, dealt with civil rights activist Medgar Evers, whose urgings to his listeners to employ violence was not actionable even though vastly more inflammatory than Jones's encouragement of his listeners to simply investigate for themselves, this Court stating, "An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." Here, by virtue of the Death Penalty Sanction, Jones was decreed liable for everything any Plaintiff complained happened to them by strangers—a preposterous proposition by itself and certainly unconstitutional in its effect.

### 5. Death Penalty Sanction Unconstitutionally Allowed Profit Motive To Factor In When It Is Irrelevant In Media Libel

A media defendant's profit motive is constitutionally irrelevant in a media libel case. *Harte-Hanks*, 491 U.S. at 667.

> "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

36

Notwithstanding this, two of the three grounds for the "death penalty" sanctions were tied to Jones's alleged profit motive. Also, in the "damages-only" trial, particularly in the Plaintiffs' closing argument, Jones's "profit motive" was repeatedly emphasized. And this argument was allowed because the Complaint on which the Death Penalty Sanction had been granted, pleaded Jones's profit motive. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to argue the "profit motive" of a media defendant, as was done here.

### F. Punitive Damages Cannot Be Based On A Death Penalty Sanction

Even if Plaintiffs were not public figures, an award of punitive damages required plaintiffs themselves to prove malice and do so by clear and convincing evidence. *Herbert v. Lando*, 441 U.S. 153 (1979); *Gertz*, 418 U.S. at 349. Here the administrative Death Penalty Sanction removed this burden and punitive damages in the hundreds of millions were awarded without this showing. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to receive punitive damages.

### G. If A Death Penalty Sanction Is Permitted, The Punishment Must Fit The Crime

The Death Penalty Sanction was based on three trivial matters, none of which related to the integrity of the trial court. Furthermore, Jones appeared in the case, substantially complied with discovery, engaged in motion practice, attended endless "status" conferences, sat for dozens of depositions and provided tens of thousands of pages of documents to the Plaintiffs. Imposing a financial

37

life-ending Death Penalty Sanction was a denial of constitutional Due Process.

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Dated: September 5, 2025

Respectfully submitted,

BEN C. BROOCKS
  *Counsel of Record*
BROOCKS LAW FIRM, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

SHELBY A. JORDAN
JORDAN & ORTIZ, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

ALAN B. DAUGHTRY
ALAN DAUGHTRY LAW FIRM
3355 West Alabama, Suite 444
Houston, TX 77098